# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| HO-CHUNK NATION, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 25-cv-698 |
| | ) | |
| v. | ) | |
| | ) | |
| KALSHI INC., KALSHIEX LLC, | ) | |
| ROBINHOOD MARKETS, INC., | ) | |
| ROBINHOOD DERIVATIVES LLC, | ) | |
| and DOES 1-20, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND MONEY DAMAGES

## INTRODUCTION

1.     This is an action brought by the Ho-Chunk Nation (the "Nation"), a federally recognized Indian Tribe, seeking a preliminary and permanent injunction against the defendants to prevent them from engaging in illegal sports gambling on the Nation's Indian lands in direct violation of the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.* ("IGRA"), the Nation's Tribal-State Gaming Compact ("Compact") with the State of Wisconsin ("State") entered into pursuant to the IGRA, the Nation's Gaming Ordinance ("Ordinance") approved by the Chairman of the National Indian Gaming Commission pursuant to the IGRA, and the Tribal Gaming Commissions' regulations adopted pursuant to the Nation's federally approved Ordinance and Compact.

1

2.    By way of background, for the majority of this Country's history, gambling on sports has been illegal under federal law and the laws of most states for both moral reasons and to ensure that sporting events were fair and free from gambling-related corruption. In 1992, Congress enacted the Professional and Amateur Sports Protection Act, 28 U.S. Code § 3701 *et seq*., which purported to bar the States (other than Nevada and New Jersey) from authorizing sports betting. In 2018, however, the Supreme Court struck down that Act, recognizing that "Americans have never been of one mind about gambling[,]" and holding that Congress could not lawfully impose such a barrier on state lawmakers. *Murphy v. NCAA*, 584 U.S. 453, 458 (2018). Since then, most states have legalized sports gambling through licensing and registration regimes that generate much needed tax dollars for states and, typically, require bettors to be 21 years old to place sports bets. Indian tribes, too, have begun to offer sports gambling on their reservations in those states where, consistent with the IGRA, the state permits such gambling under state law.

3.    In 2025, the gaming industry shifted significantly. Currently, 18-year-old high school students across the United States—including some that are located on Indian reservations—are on their phones placing bets on the outcome of virtually every sporting event occurring across the globe, without any regulation of that betting by states or Indian tribes and the protective measures related to corruption and problem gambling imbedded in such regulatory schemes, in contravention of federal, state, and tribal law. And they are placing those illegal bets using defendants Kalshi Inc. and KalshiEX LLC, ("Kalshi"), and Robinhood Markets, Inc. and Robinhood Derivatives LLC ("Robinhood").

4.    Kalshi, no surprise, does not call its sports betting offerings sports gambling. Rather, Kalshi will tell the Court that it is a Designated Contract Market,

regulated exclusively by the Commodities Futures Trading Commission ("CFTC"), and is merely operating a "prediction market" that permits the buying and selling of "commodities contracts," or swaps on sporting events. While masquerading as novel commodities and futures products, these event contracts are, substantively, nothing more than illegal, unregulated wagers on the outcomes of sporting events:



5.      Contrary to Kalshi's assertions, Kalshi is engaging in sport gambling as defined by the IGRA and the Nation's Compact and Ordinance. Therefore, the Nation seeks an order from the Court enjoining Kalshi from conducting its illegal sports gambling operation.

6.      In addition, the Nation seeks a permanent injunction enjoining Kalshi's illegal gambling on its Indian Lands because such gaming is currently unregulated, violates the State's Constitution and criminal law, and directly interferes with the ability of the Nation to govern itself under its own laws on its Indian Lands—lands owned by the United States of America in trust for the Nation.

## JURISDICTION

7.      This Court's jurisdiction over the Tribe's claims is based upon the following:

a)      28 U.S.C. § 1331, in that this action arises under the Constitution

and laws of the United States, specifically, the IGRA, the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO"), the Lanham Act, 15 U.S.C. § 1051 *et seq.*, and the federal common law;

b)    28 U.S.C. § 1362, in that the district courts have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior ("Secretary"), wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States;

c)    25 U.S.C. § 2710(d)(7)(A)(ii), in that this is an action initiated by a federally recognized Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted in violation of a Tribal-State compact that is in effect;

d)    18 U.S.C. § 1964(c), in that this is an action initiated by the Tribe for injuries to its business caused by defendants' violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") through a pattern of racketeering activity.

e)    15 U.S.C. § 1125(a)(1)(B), in that this action seeks to redress false and misleading statements of fact made in commercial advertising or promotion that misrepresent the nature, characteristics, or qualities of defendant Kalshi's activities.

## VENUE

8.    Venue is proper in this Court, pursuant to 28 U.S.C. § 1391, in that:

a)    The defendants conduct business within this District; and

b)    A substantial part of the events or omissions giving rise to the Tribe's claims occurred in this District.

## PARTIES

4

9.     The Ho-Chunk Nation, formerly known as the Wisconsin Winnebago, is a federally recognized Indian tribe. The Nation is the beneficial owner of and exercises jurisdiction over land held in trust for it by the United States of America, which is located throughout a 14-county area of the State of Wisconsin.  The Nation engages in a variety of class III gaming activities at three gaming facilities located on the Nation's trust land, pursuant to a Tribal-State gaming compact with the State of Wisconsin.

10.    Defendant Kalshi Inc. is a Delaware corporation headquartered at 594 Broadway, Rm 407, New York City, New York 10012. On information and belief, it is the parent company of all other Kalshi entities.

11.    Defendant KalshiEX LLC is a Delaware corporation headquartered at 594 Broadway Rm 407, New York City, New York 10012. On information and belief, it is a wholly owned subsidiary of Kalshi Inc. that operates as a commodities exchange.

12.    Defendant Robinhood Markets, Inc. is a Delaware corporation headquartered at 85 Willow Road, Menlo Park, California 94025. On information and belief, it is the parent company of all other Robinhood entities (collectively, "Robinhood"). Robinhood is an investment platform that permits trading on stocks, ETFs, and other commodities. As relevant here, Robinhood has partnered with Kalshi to open—on the Robinhood investment platform—a prediction market hub, allowing persons located both on and off the Nation's Indian Lands to place illegal, unregulated wagers in the form of event contracts.

13.    Defendant Robinhood Derivatives LLC is a Delaware corporation headquartered at 85 Willow Road, Menlo Park, California 94025. On information and belief, it is the wholly owned subsidiary of Robinhood Markets, Inc. It is a futures commission merchant and provides options on futures trading. As relevant

here, it is the division of Robinhood that has partnered with Kalshi to offer a prediction market hub, allowing persons located both on and off the Nation's Indian Lands to place illegal, unregulated wagers in the form of event contracts.

14.     The above-named defendants are collectively referred to as "Defendants." The true names and capacities of the Defendants sued herein as DOE DEFENDANTS 1 through 20, inclusive, are currently unknown to Plaintiff, who therefore sue such Defendants by fictitious names. Each of the Defendants designated herein as a DOE is legally responsible for the unlawful acts alleged herein. Plaintiff will seek leave of Court to amend the complaint to reflect the true names and capacities of the DOE Defendants when such identities become known.

## GAMING ON INDIAN LANDS PURSUANT TO THE INDIAN GAMING REGULATORY ACT

15.     Courts have long recognized that Congress has "exclusive authority" over Indian affairs. *Michigan v. Bay Mills Indian Community*, 572 U.S. 782, 788-90 (2014). This exclusive authority is rooted in the Indian Commerce Clause (art. I, § 8, cl. 3) and the Supremacy Clause (art. VI, cl. 2) of the Constitution, which gives Congress "the exclusive and absolute power to regulate commerce with the Indian tribes, — a power as broad and as free from restrictions as that to regulate commerce with foreign nations." *United States v. Forty-Three Gallons of Whiskey,* 93 U.S. 188, 194 (1876); *Worcester v. Georgia* 31 U.S. 515, 551-57, 558–60 (1832); *Seminole Tribe v. Fla.,* 517 U.S. 44, 62 (1996).

16.     The Indian Commerce Clause authorizes Congress "[t]o regulate Commerce . . . with the Indian Tribes." Art. I, §8, cl. 3. The United States Supreme Court has interpreted the Indian Commerce Clause to reach not only trade, but certain "Indian affairs," as well. *Cotton Petroleum Corp. v. New Mexico*, 490 U. S. 163, 192 (1989).

QB\168080.00083\98102991.1

17.     The Supreme Court does not treat the Indian Commerce Clause as interchangeable with the Interstate Commerce Clause. *Id.* Unlike the Interstate Commerce Clause, where States retain "some authority" over trade, the Supreme Court has ruled that "virtually all authority over Indian commerce and Indian tribes" lies with the Federal Government. *Seminole Tribe of Fla.*, 517 U. S. at 62.

18.     From this exclusive authority the Supreme Court has held that there arises and exists a trust relationship between the United States and the Indian tribes that informs and restrains the Congressional exercise of legislative power. *United States v. Mitchell*, 463 U. S. 206, 225-226 (1983). Pursuant to this trust relationship, the Federal Government has "'charged itself with moral obligations of the highest responsibility and trust'" toward Indian tribes. *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 176 (2011), *quoting Seminole Nation v. United States*, 316 U.S. 286, 296-297 (1942).

19.     Based upon the trust responsibility owed to tribes by the United States, courts presume that when Congress legislates on Indian affairs, its intent towards the tribes is benevolent and federal statutes that arguably would abrogate or abridge tribal rights to self-government are narrowly construed in favor of the tribes retaining them. *Montana v. Blackfeet Tribe*, 471 U.S. 759, 766 (1985).

20.     For this reason, the Supreme Court has adhered to "the general rules that statutes passed for the benefit of the dependent Indian tribes . . . are to be liberally construed, doubtful expressions being resolved in favor of the Indians." *Id.*

21.     Applying these canons of statutory construction, the Supreme Court in *California v. Cabazon Band of Indians*, 480 U.S. 202 (1987) ("*Cabazon*"), held that California had no authority to enforce its gambling laws against Indian tribes on their Indian lands. *Id.*, 480 U.S. at 221-222.

22.     In response to the *Cabazon* decision, Congress enacted the Indian

Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721, to create a framework for Indian tribes, states, and the federal government to exclusively and comprehensively regulate tribal gaming on "Indian lands."

23.    The purpose of IGRA, set forth in 25 U.S.C. § 2702, is:

a)    to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments;

b)    to provide a statutory basis for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players; and

c)    to declare that the establishment of independent Federal regulatory authority for gaming on Indian lands, the establishment of Federal standards for gaming on Indian lands, and the establishment of a National Indian Gaming Commission are necessary to meet congressional concerns regarding gaming and to protect such gaming as a means of generating tribal revenue.

24.    Under IGRA, if the gaming activity is not specifically prohibited by Federal law and is conducted within a state which does not, as a matter of criminal law and public policy, prohibit such gaming activity: (1) Indian tribes and the National Indian Gaming Commission ("NIGC") have the **exclusive** right to regulate class II gaming on Indian lands; and (2) the Indian tribes and the states, pursuant to a compact, have the **exclusive** right to regulate class III gaming on Indian lands. 25 U.S.C. § 2701(5) (emphasis added).

25.    IGRA defines "Indian lands" as "all lands within the limits of any

Indian reservation"; and "any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual Indian or held by any Indian tribe or individual subject to a restriction by the United States against alienation and over which an Indian tribe exercises governmental power." 25 U.S.C. §§ 2703(4)(A)-(B).

26.    IGRA established a statutory framework for the regulation of Indian gaming, which "expressly pre-empts the field of governance of gaming activities on Indian lands." *Pueblo of Santa Ana v. Kelly*, 932 F. Supp. 1284, 1289 (D.N.M. 1996) (quoting S. REP. No. 100-446 at 6); *Gaming Corporation v. Dorsey & Whitney*, 88 F. 3d 536 (8th Cir. 1996).

27.    IGRA divides Indian gaming into three classes, with different regulatory requirements for each class. Class I gaming consists of traditional tribal games for prizes of minimal value connected with tribal ceremonies or celebrations. 25 U.S.C. § 2703(6). Class I gaming is within the exclusive regulatory jurisdiction of the tribes. Class II gaming consists of bingo, "whether or not electronic, computer, or other technological aids are used in connection therewith," including "pull tabs, lotto, punch boards, tip jars, instant bingo, and other games similar to bingo." 25 U.S.C. § 2703(7)(A)(i). Also included in class II gaming are non-banked card games either explicitly authorized by state law or not prohibited by state law and played in conformity with state regulations regarding hours of play and limits on wagers and pot sizes. 25 U.S.C. § 2703(7)(A)(i)-(ii) and (7)(B). Class III gaming is defined as "all forms of gaming that are not class I gaming or class II gaming," 25 U.S.C. § 2703(8), which includes sports gambling.

28.    Class III gaming can be the most lucrative form of gaming. It includes the games played in a typical casino in Las Vegas, such as slot machines, craps, roulette, and house banked and percentage card games, like blackjack (21).

29.     The federal regulations adopted by the NIGC, which implement IGRA, specifically state that class III gaming includes "[a]ny sports betting and pari-mutuel wagering including but not limited to wagering on horse racing, dog racing or jai alai." 25 C.F.R. § 502.4 (c).

30.     While federal regulations define class III gaming as including all house banked games, 25 C.F.R. § 502.4 (a), the regulations separately state that sports betting constitutes class III gaming without reference to whether the wagering is house banked. 25 C.F.R. § 502.4 (c).

31.     Thus, sports betting constitutes a class III gaming activity regardless of whether the wager is made against the house or against other bettors.

32.     Under IGRA, in order for class III gaming to be conducted on Indian lands: (1) the tribe must have adopted a tribal ordinance that authorizes the playing of the class III games and the ordinance must have been approved by the Chairman of the NIGC (the federal regulatory agency created under IGRA); (2) the state in which the class III gaming will be conducted must "permit" such gaming for any purpose by any person, organization, or entity; and (3) the class III gaming must be conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the state, pursuant to IGRA. 25 U.S.C. § 2710(d)(1).

33.     In order to go into effect, a tribal-state class III gaming compact must be approved by the Secretary, 25 U.S.C. § 2710(d)(8)(A), or deemed approved by operation of law, 25 U.S.C. § 2710(d)(8)(C), and notice of approval must be published in the Federal Register, 25 U.S.C. § 2710(d)(3)(B).

34.     Gaming conducted by any person or entity on Indian lands that is not authorized by a tribal-state class III gaming compact violates IGRA and federal and state criminal law. *See* 25 U.S.C. §1166 (applying "all State laws pertaining to the licensing, regulation, or prohibition of gambling, including but not limited to

10

criminal sanctions" to Indian country). *See also Coeur D'Alene Tribe v. State*, 842 F. Supp. 1268, 1282 (D. Idaho 1994) ("Accordingly, the court finds that in the absence of a tribal gaming ordinance and a compact, neither the Tribe nor any non-tribal entity … may conduct Class III gaming on the reservation.").

35.    Any class II or class III gaming conducted by a third-party management company on Indian lands on behalf of a tribe with a compact must meet the strict requirements of IGRA, 25 U.S.C. § 2710(d)(9) and 25 U.S.C. § 2711, in order to conduct that gaming. Further, any contract authorizing a third-party management company to conduct gaming on Indian lands on behalf of a tribe must be approved by the Chairman of the NIGC. *Id*. *See also* 25 C.F.R. § 533.

36.    IGRA provides tribes an enforcement mechanism to prevent gaming from being conducted on Indian lands that is not authorized by a tribal-state compact. "The United States district courts shall have jurisdiction over . . . any cause of action initiated by a State or Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact entered into under [IGRA] that is in effect . . . ." 25 U.S.C. § 2710(d)(7)(A)(ii).

## THE HO-CHUNK NATION'S COMPREHENSIVE REGULATION OF GAMING

### A.    The Nation's Regulation of Gaming Under Its Compact.

37.    The Nation is authorized to conduct class III gaming, including sports wagering, on its Indian Lands pursuant to a class-III gaming compact. The Nation entered into its Compact with the State in 1992, and it has been subsequently extended four times.

38.    The Compact affords the Nation primary responsibility for the regulation of its gaming facilities and activities to ensure the fairness of the playing of the class III games, to shield the games from criminal activity, to ensure that the

Nation is the primary beneficiary of the gaming activities, and to promote tribal economic development and self-sufficiency. To achieve these objectives, the Compact promotes ethical practices in conjunction with class III gaming through the licensing and control of persons and entities employed in, or providing goods and services to, the tribal gaming operations, protects against the presence or participation of persons whose criminal backgrounds, reputations, character, or associations make them unsuitable for participation in gaming, thereby maintaining a high level of integrity in tribal governmental gaming, and protects the patrons and employees of their gaming facilities.

39.    The Compact thus regulates class III gaming on the Nation's Indian Lands to ensure compliance with IGRA, its tribal Gaming Ordinance, and the NIGC and Tribal Gaming Commissions' minimum internal control standards. Through that regulated class III gaming, the Compact enables the Nation to develop self-sufficiency, promote tribal economic development, and create jobs and generate revenues to support the Nation's government and its governmental services and programs. Relevant to the Nation, tribal governmental gaming is the primary source of revenue funding the Nation's government and its governmental services and programs.

40.    Under its Compact, the Nation is authorized to operate slot machines, lottery games, banked and percentage card games, and sports gambling at its casinos.

41.    By making its sports wagering contracts available on the Nation's Indian Lands and offering for play to the general public the class III game of sports wagering, Kalshi violates the Nation's Compact, Ordinance, and Gaming Commission regulations, and directly interferes with and impairs the Nation's sovereign right to regulate gaming on its Indian Lands.

**B.    The Nation's Regulation of Gaming Under its Gaming Ordinance.**

42.     Pursuant to the IGRA and the Nation's own inherent sovereign authority, the Nation has enacted a Gaming Ordinance that has been approved by the Chair of the NIGC, comprehensively regulating gaming activities on the Nation's Indian Lands.

43.     The Ordinance establishes a Tribal Gaming Commission ("TGC") with the authority to adopt and enforce regulations that establish comprehensive minimum internal control standards for the playing of all games conducted on the Nation's Indian Lands, including but not limited to the rules for the playing of the games and approval and testing of the equipment used in the playing of the games.

44.     In addition, the Ordinance requires every person, organization, and entity involved in gaming activities on the Indian Lands to go through a detailed criminal history and background check and obtain gaming licenses issued by the TGC verifying that the licensee is not involved in or associated with any criminal activity.

45.     Finally, the Ordinance and the Nation's TGC regulations specify what games can be played on the Nation's Indian Lands and prohibits the playing of any class III game that is not expressly authorized by the Nation's Compact or Ordinance.

## KALSHI'S ILLEGAL SPORTS GAMBLING ON THE NATION'S INDIAN LANDS

46.     Kalshi is engaging in illegal sports gambling on the Nation's Indian Lands disguised as event contracts that allow people to speculate on the outcome of a sporting event. Event contracts usually pose a binary, yes-or-no question as to whether the underlying event will happen. Events contracts are governed by the Commodities Exchange Act, 7 U.S.C. 1, et. seq. ("CEA").

47.     Under the CEA, event contracts are a subset of futures contracts, which

are derivatives contracts for the sale and purchase of a specified asset or basket of assets, including event contracts, at a specified price on a specified future date.

48.    A derivative is a financial instrument or contract whose price is directly dependent upon (i.e., derived from) the value of one or more underlying assets—for example, commodities (like corn and wheat), securities, or debt instruments. Derivatives take many forms, including futures, options, and swaps. Derivatives allow the purchaser to take on exposure to an underlying asset without actually requiring a direct investment in the asset.

49.    Simply put, futures contracts are agreements to buy or sell a specific commodity or asset at a predetermined price at a predetermined date. U.S. law defines "commodity" broadly to include physical goods (agricultural products, metals, energy, etc.) as well as broad categories of intangibles (services, rights, and interests in which futures contracts are traded). 7 U.S.C. § 1a(9).

50.    In 2000, Congress passed the Commodity Futures Modernization Act ("CFMA"), which amended the CEA and introduced new legal categories of commodities: *excluded commodities* and *exempt commodities*. An "excluded commodity" was defined to include various financial indices and, importantly, occurrences or contingencies beyond the control of the contracting parties that are associated with financial or economic consequences. 7 U.S.C. §§ 1a(19)–(20).

51.    In effect, 7 U.S.C. § 1a(19) brought certain event-based phenomena, such as weather events or other contingencies, into the fold of regulated derivatives, classifying them as commodities on which futures or swaps could be based.

52.    In 2010, Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010. Dodd-Frank § 745(b) expanded the CEA to add Section 5c(c)(5)(C), sometimes called the "special rule for event contracts." *See* Brian Quintenz, *Any Given Sunday*, Statement of Commissioner Brian D. Quintenz

14

on ErisX RSBIX NFL Contracts and Certain Event Contracts (March 25, 2021) ("Quintenz Statement").[1]

53.     This provision expressly empowered the CFTC, an independent federal agency created by Congress in 1974 under the "The Commodity Futures Trading Commission Act", 7 U.S.C. § 4, to regulate financial derivative markets in accordance with the CEA, 7 U.S.C. § 1 *et seq*.; 17 C.F.R. § 1 *et seq.*, and authorized the CFTC to prohibit certain types of derivatives contracts if it finds them "contrary to the public interest," specifically naming certain specific categories. *See* 7 U.S.C. § 7a-2(c)(5)(C).

54.     Pursuant to this authority, in 2011, the CFTC promulgated Regulation 17 C.F.R. § 40.11, titled *"Review of event contracts based upon certain excluded commodities*," which formalized the review process for event contracts. Regulation 40.11 mirrored the substance of the statutory language and set out the procedure for the Commission to block an event contract. Subsection (a)(1) of Regulation 40.11 establishes a clear prohibition: "*A registered entity shall not list for trading or accept for clearing*" any contract "based upon an excluded commodity, as defined in [the CEA], that involves, relates to, or references terrorism, assassination, war, **gaming**, or an activity that is unlawful under any State or Federal law." *Id.* (emphasis added). Any event contract that falls into one of those sensitive categories is thus *per se* barred from being listed by a registered entity.

55.     Consistent with the findings and purpose of the CEA, the CFTC promulgated regulations that allow registered entities to self-certify event contracts through 17 C.F.R. § 40.2 and where self-certified products or contracts present compliance issues, the self-certifying registered entity must provide a "concise explanation and analysis that is complete" concerning "the underlying commodity,

---

and the [contract's] compliance with applicable provisions of the [CEA], including core principles, and the [CFTC] regulations thereunder." 17 C.F.R. § 40.2(a)(3)(v).

56.     17 C.F.R. § 40.11(c) established a 90-day review process: if an exchange, like Kalshi, self-certifies a new event contract that may violate Regulation 40.11(a), the Commission can stay the listing for up to 90 days while it evaluates the contract and then issue an order approving or disapproving it. *Id*.

57.     Thus, by 2011, the regulatory structure was in place to address the rise of event contracts, which previously fell into a gray area between regulated futures and mere wagers.

58.     Until recently, the CFTC's consistent stance has been to prohibit contracts that it views as "gaming" or betting-type events, while permitting other event-based contracts.

59.     At bottom, the purchase or sale of a "true" futures contract on an exchange is motivated by two economic purposes — (1) the opportunity to make a profit or (2) to minimize the risk of loss from a change in the market price or the happening of an event.

60.     Thus, "true" futures contracts, and the purposes for which they are traded, "serve[] legitimate hedging and price discovery functions, thereby facilitating production of the underlying commodity." *Bd. of Trade v. SEC*, 677 F.2d 1137, 1151 (7th Cir. 1982). "Indeed, one basic justification for a futures market is that futures trading in a central location performs a 'price discovery' function for the underlying commodity, thereby furnishing producers and users a reference point for their pricing on the cash market." *Id*. at 1173 n.15.

61.     This is, ultimately, what differentiates "true" commodities futures contracts from gambling on a sporting event. While gambling *via* an event contract on next year's rainfall measures allows a wheat farmer to hedge against the risk of a

low production year in the event of a lack of rain, betting on whether the Bears will win the Super Bowl serves absolutely no hedging or other economic purpose. Indeed, every football fan in Wisconsin understands that such a "contract" lacks economic purpose; rather, such a "contract" is simply a gambling scheme that involves prize, chance, and consideration. Nor does such a "contract" perform any price discovery function on an underlying commodity. It is simply gambling on sports. And it is offered, unabashedly, by Kalshi, to the public, as such, even within states and Indian reservations that strictly prohibit sports betting.

62.     In resorting to this legal fiction, Kalshi seeks to blur the distinction between careful minimization and allocation of market risk and what, in reality, amounts to unregulated sports gambling, to such an extent that the preexisting regulatory regime that distinguishes futures from off-exchange betting cannot restrict their business.

63.     Such a result runs directly contrary to Congress's intent in enacting the 2010 amendments to the CEA to specifically give the CFTC the authority to prohibit sports wagering contracts, which — categorically — do not fulfill the economic purposes for which "true" futures contracts are permitted, but regulated:

> Mrs. FEINSTEIN. I am glad the Senator is restoring this authority to the CFTC. I hope it was the Senator's intent, as the author of this provision, to define "public interest" broadly so that the CFTC may consider the extent to which a proposed derivative contract would be used predominantly by speculators or participants not having a commercial or hedging interest. Will CFTC have the power to determine that a contract is a gaming contract if the predominant use of the contract is speculative as opposed to a hedging or economic use?
>
> Mrs. LINCOLN. That is our intent. The Commission needs the power to, and should, prevent derivatives contracts that are contrary to the public interest because they exist predominantly to enable gambling through supposed "event contracts." It would be quite easy to construct an "event

contract" around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament. **These types of contracts would not serve any real commercial purpose. Rather, they would be used solely for gambling.**

156 Cong. Rec. S5906-07, (daily ed. July 15, 2010)(emphasis added).

64. Kalshi's operations quite clearly "construct an 'event contract' around sporting events such as the Super Bowl" and, therefore, serve no real commercial purpose. Rather, they are used solely for gambling, in direct violation of the CEA and its implementing regulations and as shown above the IGRA, and the Nation's Compact, Ordinance, and TGC's regulations.

65. Because Kalshi's contracts are not futures contracts but instead simply gambling on sports, as defined by the Nation's Compact, Ordinance, and state law, which only permits Tribes within the State to conduct sports betting, Kalshi's offering of the contracts to the general public for play on the Nation's Indian Lands violates the IGRA.

66. By making its sports wagering contracts available on the Nation's Indian Lands, and offering for play to the general public the game of sports betting, Kalshi not only violates each of the Nation's Compact, Ordinance, and TGC regulations, but it also directly interferes with and impairs the Nation's sovereign right to regulate gaming on its Indian Lands.

67. Furthermore, by illegally offering its sports wagering contracts to persons located both on and off of the Indian Lands in Wisconsin, Kalshi draws business away from the Nation's casinos by allowing patrons to participate in class III gaming from their homes. Loss of revenue has a direct impact on tribal governmental functions and has a tangible effect on the services and programs the tribal governments provide to their members and all persons who live, work, and visit the Nation's Indian Lands.

68. On information and belief, Kalshi has offered and continues to offer its

sports event contracts to consumers on the Nation's Indian Lands with the knowledge that its sports event contracts undercut tribal class III gaming markets, in violation of IGRA, over which the federal, state, and tribal governments exercise **exclusive** regulatory jurisdiction.

<div align="center">

### KALSHI'S EVASION OF CFTC REGULATION

</div>

69.     In 2020, as stated above, the CFTC authorized Kalshi to list event contracts for public trading as a DCM. *KalshiEX LLC*, 2024 WL 4164694, at \*4.

70.     On June 12, 2023, Kalshi filed a self-certification to trade congressional control contracts, which allowed buyers to predict which political party will control the U.S. House of Representatives or Senate on a specific, future date, and took the form of a binary "yes/no" event contract that posed the question: "Will <chamber of Congress> be controlled by <party> for <term>?" *KalshiEX LLC*, 2024 WL 4164694, at \*4.

71.     On June 23, 2023, the CFTC sent a letter to Kalshi representing that it had exercised its authority to initiate a 90-day review of Kalshi's self-certified submission because it determined that the contracts "may involve, relate to, or reference an activity enumerated" in the CEA and applicable regulations. *KalshiEX LLC*, 2024 WL 4164694, at \*4; Notification of 90-day Review (June 23, 2023)[2]; Release Number 8728-23, *CFTC Announces Review of Kalshi Congressional Control Contracts and Public Comment Period* (June 23, 2023).[3]

72.     On September 22, 2023, at the conclusion of the 90-day review period, the CFTC issued an order prohibiting Kalshi from listing its congressional control contracts for trading pursuant to 17 C.F.R. § 40.11, consistent with 7 U.S.C. § 7a-2(c)(5)(C). *KalshiEX LLC*, 2024 WL 4164694, at \*5. In its order the CFTC determined that Kalshi's congressional control contracts involve two activities

---

[2] https://www.cftc.gov/sites/default/files/filings/ptc/23/06/ptc0623230001.pdf.
[3] https://www.cftc.gov/PressRoom/PressReleases/8728-23.

<div align="center">19</div>

enumerated in the special rule: gaming and unlawful activity. *KalshiEX LLC*, 2024 WL 4164694, at *5. As a result, the CFTC found that Kalshi's congressional control contracts were contrary to the public interest. *KalshiEX LLC*, 2024 WL 4164694, at *6; CFTC Order (September 22, 2023)[4]; Release Number 8780-23, *CFTC Disapproves KalshiEX LLC's Congressional Control Contracts* (September 22, 2023).[5]

73.    On November 1, 2023, Kalshi initiated litigation against the CFTC, challenging the CFTC determination, *inter alia*, that Kalshi's congressional control contracts were contrary to the public interest because the contracts involve gaming.

74.    In the *KalshiEX LLC* litigation, Kalshi argued its election contracts do not involve gaming because an event contract involves gaming "if it is contingent on a game or game-related event" such as "the Kentucky Derby, Super Bowl, or Masters golf tournament."

75.    In the *KalshiEX LLC* litigation, the Court acknowledged the potential application of the IGRA in supplying a definition of "gaming" as codified in, but not defined by, the CEA and implementing regulations. *KalshiEX LLC*, 2024 WL 4164694, at *9 ("And while the CFTC's order also considered and pulled definitions from a federal statute, it did not look to the only one that the Court is aware actually uses the term 'gaming'—the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2701.").

76.    June 10, 2024, the CFTC proposed rule-amendments to 17 C.F.R. Part 40, to "specify types of event contracts that fall within the scope of CEA section 5c(c)(5)(C) and are contrary to the public interest." Event Contracts, 89 Fed. Reg. 48968-01, *48969. The proposed rule-amendments repeatedly acknowledge the CFTC's limited resources. "From a resource allocation perspective, this [rule-

---

[4] https://www.cftc.gov/sites/default/files/filings/documents/2023/orgkexkalshiordersig230922.pdf.
[5] https://www.cftc.gov/PressRoom/PressReleases/8780-23.

amendment] will be of significant benefit to the Commission and its staff, since, in the Commission's experience, a single § 40.11(c) review is resource-intensive and consumes hundreds of hours of staff time." *Id*. The rule-amendments were never finalized.

77.     In September 2024, the U.S. District Court for the District of D.C. sided with Kalshi, ruling that political event contracts do not involve illegal gaming. Throughout the litigation process, Kalshi repeatedly argued to the court that, "*Congress did not want sports betting to be conducted on derivatives markets*" and "*Congress sought to prevent exchanges from facilitating casino-style or sports gambling.*" Kalshi told the court that, "[c]ontracts that 'serve[] no commercial purpose at all' may therefore not deserve to be traded on a regulated exchange . . . . And, at least in general, contracts relating to games—again, activities conducted for diversion or amusement—are unlikely to serve any 'commercial or hedging interest.'"

78.     On January 7, 2025, CFTC Chairman, Rostin Behnam, announced that he would step down from the position of Chairman on January 20, 2025, and that Benham's last day at the Commission would be February 7, 2025. Public Statements & Remarks, *Chairman Rostin Behnam Announces Departure from CFTC* (January 7, 2025).[6]

79.     Having won the right to list political event contracts by explaining how those contracts were different than sports betting, Kalshi reversed course.

80.     On January 22, 2025, just over a week after the incoming President's son, Donald Trump, Jr. announced that he was joining Kalshi as a strategic adviser,[7] Kalshi filed a self-certification to trade sports event contracts, which allowed buyers to predict the winner of a sport event title related to American sports leagues, and

---

[6] https://www.cftc.gov/PressRoom/SpeechesTestimony/behnamstatement010725.
[7] https://thehill.com/business/5082357-trump-jr-joins-kalshi-prediction-market/.

QB\168080.00083\98102991.1

took the form of a binary "yes/no" event contract that posed the question: "Will <team> win <title>?"

81.    When self-certifying, Kalshi did not mention the prohibited contracts enumerated in 7 U.S.C. § 7a-2(c)(5)(C) or that, as a registered entity, Kalshi is prohibited from listing contracts that involve gaming pursuant to 17 C.F.R. § 40.11. The self-certification merely states that it is CEA compliant.[8]

82.    On February 5, 2025, the CTFC announced its intent to hold a public roundtable related to sports-related event contracts. The purpose of the roundtable was to "establish a holistic regulatory framework that will both foster thriving prediction markets and protect retail customers from binary options fraud such as deceptive and abusive marketing and sales practices."[9] The roundtable was to include topics such as: "CFTC-registered entities' legal arguments in court that event contracts based on games or sports contests or sporting events constitute 'gaming' and are therefore prohibited under the Commodity Exchange Act," as well as "other issues including but not limited to Constitutional questions such as the Commerce Clause, States' rights and State regulatory schemes, Federalism, Federal preemption doctrines, and Tribal sovereignty as well as other federal laws applicable to sports betting." Release Number 9046-25, CFTC Announces Prediction Markets Roundtable (February 5, 2025).[10] The roundtable was then subsequently cancelled without explanation. Dustin Gouker, *News: CFTC Cancels Prediction Markets Roundtable*, Event Horizon (April 24, 2025).[11]

83.    On February 7, 2025,[12] Kalshi filed a self-certification to trade sports event contracts, which allowed buyers to predict the winner of a sport event title related to American sports leagues, and took the form of a binary, "yes/no" event

---

[8] https://www.cftc.gov/sites/default/files/filings/ptc/25/01/ptc01222514045.pdf.
[9] https://www.cftc.gov/PressRoom/PressReleases/9046-25
[10] https://www.cftc.gov/PressRoom/PressReleases/9046-25.
[11] https://nexteventhorizon.substack.com/p/news-cftc-cancels-prediction-markets.
[12] This is the same day former Chairman Behnam exited the CFTC.

contract that posed the question: "Will <team> win <event>?" The self-certification does not mention the prohibited contracts enumerated in 7 U.S.C. § 7a-2(c)(5)(C) or that, as a registered entity, Kalshi is prohibited from listing contracts that involve gaming pursuant to 17 C.F.R. § 40.11. The self-certification merely states that it is CEA compliant. Kalshi Notification Regarding the Initial Listing (February 7, 2025).[13]

84.    On February 11, 2025, President Donald Trump nominated Brian Quintenz, a Kalshi Board Member, to replace Rostin Behnam as the Chairman of the CFTC. Quintenz, in a statement concerning the CFTC's review of ErisX futures contracts involving NFL football games on March 25, 2021, asserted that the CEA "special rule," 7 U.S.C. § 7a-2(c)(5)(C), is unconstitutional, that the CFTC regulation, 17 C.F.R. § 40.11 is invalid, that the prohibited contracts enumerated in 7 U.S.C. § 7a-2(c)(5)(C) and 17 C.F.R. § 40.11 are not, in fact, prohibited and that "the Commission is not a moral arbiter. It is not expert [sic] in determining what the [sic] is in the public's interest, and it is certainly not equipped to tell the public what its interest *should* be." Quintenz Statement, *supra*, ¶ 52.

85.    Quintenz also stated: "Interestingly, the statute also does not require the CFTC to make any determinations on these contracts at all. It is completely up to the Commission to decide whether and when to review an enumerated event contract or set of contracts for a public interest determination. If the Commission made no public interest determinations pursuant to this statutory section, it would nonetheless be following the law." Quintenz Statement, *supra*, ¶ 52.

86.    On March 7, 2025, the Major League Baseball ("MLB") wrote a letter to the CFTC expressing concerns about sports event contracts. The MLB stated: "As the resemblance between sports event contracts and traditional sports betting markets

---

[13] https://www.cftc.gov/sites/default/files/filings/ptc/25/02/ptc02072514957.pdf.

QB\168080.00083\98102991.1

continues to grow, so too does the need to replicate the integrity and consumer protections that exist at the state level. Currently, those protections are lacking."[14]

87.     On March 17, 2025, Robinhood announced that it partnered with Kalshi to offer March Madness sports event contracts. Kalshi's CEO, Tarek Mansour stated: "[we] couldn't ask for a better partner in Robinhood to bring our vision to every American." Tom Nightingale, *Robinhood launches Kalshi-powered sports markets, starting with March Madness*, SBC Americas (March 17, 2025).[15]

88.     On May 16, 2025, interim Chairman of the CFTC, Caroline Pham signaled her intent to leave the CFTC once Quintenz is confirmed to the appointment of the CFTC Chairman, leaving only Quintenz and commissioner Kristin Johnson on the Commission. Jesse Hamilton, *CFTC's Pham Said to Plot Exit, Agency May Be Left Without a Party Majority*, Coin Desk (May 16, 2025).[16]

89.     On May 21, 2025, Quintenz submitted an ethics statement to the CFTC, confirming that Quintenz was employed by Kalshi and held stock and unvested stock options in Kalshi. Brian Quintenz, Ethics Statement to CFTC at 2 (May 21, 2025).[17]

90.     On May 28, 2025, CFTC Commissioner Kristin Johnson signaled her intent to leave the CFTC "later this year," leaving Quintenz as the sole commissioner.  Julia Shapero, *CFTC leaders exit as Trump pick prepares to take helm*, The Hill (May 28, 2025).[18]

91.     On information and belief, Kalshi has been prolific in offering sports event contracts with the knowledge that the legality of their sports event contracts is highly questionable and widely criticized as an impermissible form of sports gaming

---

[14] https://www.cftc.gov/media/11941/MLB030725/download (last visited June 24, 2025).
[15] https://sbcamericas.com/2025/03/17/robinhood-kalshi-sports-event-contracts/.
[16] https://www.coindesk.com/policy/2025/05/14/cftc-s-pham-said-to-plot-exit-agency-may-be-left-without-a-party-majority.
[17] https://extapps2.oge.gov/201/Presiden.nsf/PAS+Index/009D247776338CD385258C95002C929F/$FILE/Quintenz%2C%20Brian%20D.%20%20finalEA.pdf.
[18] https://thehill.com/newsletters/technology/5322818-cftc-leaders-exit-as-trump-pick-prepares-to-take-helm/.

or gambling, at a time when power in the CFTC is being consolidated in one commissioner, Quintenz, a Kalshi board member, with the knowledge that the CFTC is understaffed and lacks the resources to adequately review and regulate Kalshi's self-certified contracts to ensure compliance with the CEA.

92.     As a direct result of these events, Kalshi has been able to avoid regulation of its sport gambling activities by the CFTC.

## KALSHI'S FALSE AND MISLEADING ADVERTISING

93.     Kalshi actively promotes its products, including its sports betting and event "contracts," across major social media platforms such as TikTok, Instagram, X.com, and YouTube.

94.     On its Instagram account (@kalshi_official), Kalshi, as shown in **Exhibit A**, has published advertisements asserting itself as "The First Nationwide Legal Sports Betting Platform" and that its customers can engage in "Sports Betting Legal in all 50 States on Kalshi." (*See* **Exhibit A**).

95.     Kalshi's Instagram account includes a post, dated January 23, 2025, stating in the caption post: "Legal sports markets, accessible to Americans in all 50 states." The post remains accessible on Kalshi's Instagram. (*See* **Exhibit B**).

96.     On February 3, 2025, Robinhood announced in a press release it would be offering "Super Bowl Betting via Kalshi." (*See* https://www.bloomberg.com/news/articles/2025-02-03/robinhood-launches-super-bowl-event-contracts-for-retail-traders, last accessed on July 24, 2025). Kalshi posted the same announcement to its Instagram on February 3, 2025.

97.     On June 11, 2025, Kalshi posted an advertisement to its Instagram account containing depictions of people exclaiming "I'm all in on OKC" and "Indiana got that dog in them." The advertisement further contains a depiction of a shirtless man exclaiming "Kalshi lets you legally trade on anything, anywhere in the

U.S." The same advertisement has been posted to other Kalshi social media accounts including TikTok.

98.    On July 19, 2025, Kalshi sponsored a TikTok video wherein a man explains to viewers, in responses to a question about the legality of Kalshi's platform, that Kalshi is "totally [legal] . . . in all 50 states, even California." (*See* **Exhibit C**).

99.    Kalshi's App Store listing has promoted that "You can bet on that" and that the smartphone app and/or Kalshi's platform is "Legal in all 50 states":





Kalshi has otherwise promoted or advertised that its platform, website(s), software, and/or application(s) allow for "betting." (*See* **Exhibit D**).

100.   As part of its widespread promotional strategy, Kalshi has described its platform as a place for placing "live bets" in various promotional materials including billboard signs, out-of-home advertising on bus stops, on trucks, and the sides of buildings, in various locations including New York City, Los Angeles, Miami, and Dallas.

101.   Social media users have raised questions and/or concerns regarding the legality of Kalshi's platform, website(s), software, and/or application(s). Examples include questions by consumers such as (i) "Serious question – how is this legal?" and (ii) "I just wanted to confirm before using Kalshi. Washington state has strict 'gambling' laws in place and I know Kalshi is a trading app for contracts. Is there a guarantee I will not get into any legal trouble for using there [sic] app in the state?."[19]  (*See* **Exhibit E**).

102.   Other social media users have expressed concerns over the legality and morality of the Kalshi's platform and offerings, stating: "Kalshi is dangerous. Sports betting should not be okay for under 21 let alone in all 50 states." (*See* **Exhibit E**).

103.   Similarly, on one of Kalshi's promotional or sponsored TikTok videos, various TikTok users commented: "This shouldn't be legal"; "Betting culture is crazzyyy"; "Didn't Enron do the exact same thing?"; "Enron is back baby!"; "Betting on the weather is insane"; "Predatory marketing"; "Calling it a trading app is crazy"; "I 'traded' it all on black and now im by the wendy's dumpster if anybody wants service for a $5"; "Addiction type beat"; "1-800-GAMBLER"; "'Trading'"; "'Trade' ima buy $15 that it's sunny tomorrow. Yea that's a trade alright"; "As a meteorologist would this be insider trading?"; "Holy addiction"; "'I traded that I'd

---

[19] https://www.reddit.com/r/Kalshi/comments/1m0c3da/legality_behind_kalshi/ (last accessed on July 24, 2025).

be…' dawg that's called betting. You gambled."; "This is literal distopia. Please don't do this." (*See* **Exhibit F**).

104.    Kalshi's promotional materials frequently utilize the term "odds" in its advertisements. Kalshi even sells merchandise, including hats that say "What are the odds."

105.    Kalshi's deceptive promotional materials also pre-date its push into the sports gambling market. For instance, in close proximity to its advertisements of sports event contracts on various social media platforms, Kalshi marketed its platform as a betting app during the 2024 U.S. Presidential election. In one video posted on October 17, 2024, an interviewer is seen pulling a number of voters aside who are going to the polls to vote and asking, "How much money would you bet on Trump winning the election?"

106.    On October 15, 2024, Kalshi posted a TikTok video on its official account, where its CEO and Co-founder, Tarek Mansour, explains in response to the question: "Hey my man, what do you do for a living", that "I'm the founder of Kalshi […] its an app and website where you can bet on anything." In the video, the man then asks, "anything?" and Tarek Mansour replies, "Anything. [...] We are the first platform that legalized betting on the U.S. election. Now, Americans can actually bet on whose going to win, Trump versus Kamala. You can bet on the weather tomorrow. You can bet on inflation. You can bet on whether Eric Adams is gonna get fired. Or when he's gonna get fired."

107.    Additionally, on October 17, 2024, Kalshi posted a TikTok video on its official account, where its CEO and Co-founder, Tarek Mansour, explains that "I wanted to see our Billboard. So, these are live trades, live bets, of people actually betting on the exchange as we speak… If you bet on Kalshi right now, you're gonna get streamed on this billboard."

108.   Likewise, a TikTok post on Kalshi's page from October 19, 2024, states: "For the first time in 100 years, you can legally bet on U.S. elections." The post interviews different individuals, including one person who says, "If I could mortgage my house to bet on Trump, I would."

109.   Similarly, sponsored social media posts promote Kalshi as "legalized sports trading in all 50 U.S. states," "Legal in all 50 states," or "Sports Betting legal in all 50 States? It's Happened!". (*See* **Exhibit G**).

110.   The above examples are just a few of the many misleading and false statements by Kalshi that its platform, websites(s), software, and/or application(s) permit users to legally place sports bets and/or wages in all 50 States.

### GENERAL ALLEGATIONS AS TO THE GAMING ENTERPRISE

111.   Having reversed course on its ability to offer "trades" on the outcomes of sports events, right after making the incoming president's son a Kalshi "Strategic Advisor" at the start of a new presidency, Kalshi quickly partnered with at least one other entity to establish a nationwide online sports betting racket, bypassing the safeguards put in place by applicable state regulations. As described in more detail below, this group of entities (the "Gaming Racket"), worked together to offer online class III gaming, as defined by the IGRA, across the country, regardless of the fact that doing so violated federal and state laws.

112.   The Gaming Racket consisted of Kalshi and Robinhood, and various individual officers, directors, agents, and/or employees of these entities who knowingly participated in the Gaming Racket's affairs.

113.   The Gaming Racket knew that the CFTC prohibited offering sports as derivative contracts because it was "contrary to the public interest" as the contracts involved, "gaming." 7 U.S.C. § 7a-2(c)(5)(C)(i)(v); 17 C.F.R. § 40.11.

114.   In fact, just months before the Gaming Racket began offering online

class III gaming across the country, Kalshi repeatedly acknowledged that it could not legally offer sports betting contracts because, "Congress did not want sports betting to be conducted on derivatives markets." *KalshiEX LLC v. Commodity Futures Trading Comm'n*, No. 23-3257 (JMC), 2024 18 WL 4164694 (D.D.C. Sept. 12, 2024), Appellee's Brief, at 41.

115.   Similarly, Robinhood Derivatives, LLC, trying to get the CFTC to take a narrow approach to defining gaming, recommended that the CFTC "focus on prohibiting single sporting events or contests." 156 Cong. Rec. S5906-07, (daily ed. July 15, 2010). Further emphasizing its point, it stated, "[t]o the extent this discussion on the floor of the Senate represents Congressional intent, it focused on a comparison of gambling related to the results of *single* sporting events." *Id.*

116.   Immediately following a court ruling for Kalshi and against the CFTC, allowing Kalshi to list its election contracts, Robinhood announced its intention to allow trading on the outcome of the U.S. Presidential election. Right after this announcement, Robinhood saw a spike in its shares of 4%, despite the event contracts being rolled out to a limited number of U.S. citizen users.

117.   In early 2025, the Gaming Racket began offering sports betting products. While its initial effort to offer a product for the 2025 Super Bowl were rebuffed by the CFTC, the Gaming Racket shortly after offered sports betting products strategically timed with the March Madness NCAA men's and women's basketball tournaments. During the 2025 March Madness tournaments, Kalshi reported a substantial trading volume of over $320 million, specifically on tournament-related markets. These trades took place in all 50 states and were widely available on Robinhood.

118.   The Gaming Racket used a different arrangement than Robinhood typically uses with its third-party partnerships. Rather than Robinhood facilitating

trades and earning revenue through payment for order flow, the Gaming Racket used a direct revenue-sharing model, giving Robinhood a commission payment on each contract traded.

119.   In addition, the Gaming Racket members co-brand with each other, rather than Robinhood coordinating with a market maker to connect users to the Gaming Racket's event contracts.

120.   The Gaming Racket does not rely on individual-to-individual matching traditionally used for swaps trades. Instead, it uses Susquehanna International Group, LLP ("Susquehanna") to provide liquidity by consistently taking the opposite side of trades, thereby ensuring there are always buyers and sellers available. The result is that it appears that the Gaming Racket has a " banked house," facilitating the continuous and smooth execution of these event contracts, which function as wagers.

121.   The Gaming Racket offers sports event contracts, which Kalshi began self-certifying on January 22, 2025—in violation of both the CEA and its enforcing regulations. By enacting the CEA, Congress gave the CFTC the discretion to prohibit certain "gaming" events contracts that are against public interest. The CFTC exercised that discretion in passing Regulation 40.11. In doing so, the CFTC prohibited registered entities from listing event contracts that involve, relate to, or reference, among other things, gaming.

122.   The Gaming Racket, through its member, Kalshi, ignored this complete prohibition and instead sought to self-certify these sports betting products under Regulation 40.2. In its self-certification Kalshi provided initial examples including questions such as "Will <team> win <title>?" for major sports championships, including the Super Bowl. Doing so, of course, was futile as the CTFC had prohibited registered entities from listing such products if they even referenced gaming.

31

123.    Wisconsin prohibits sports betting outside of applicable compacts that the State has entered into with Indian tribes located in the State. Wisconsin prohibited the legislature from allowing lotteries, in its constitution and, despite the fact that the state has passed a number of amendments clarifying what is allowed, unless one of those specific amendments apply, schemes involving prize, chance, and consideration are illegal in Wisconsin. None of the limiting amendments allow for sports betting in Wisconsin.

124.    State regulators in several states, including Nevada, New Jersey, and Maryland, have issued cease-and-desist letters to both Kalshi and Robinhood, accusing them of unlawfully offering sports wagering in the state and demanding the voiding of placed wagers. Letter from Mary Jo Flaherty, Interim Director, New Jersey Division of Gaming Enforcement, to Tarek Mansour, CEO, Kalshi (March 27, 2025).[20] In immediate response, Robinhood promptly ceased allowing New Jersey customers to open new positions on March Madness event contracts and implemented geofencing to restrict access in other states raising similar concerns. While Kalshi has noted that it also collects geolocation data, Kalshi has initiated lawsuits against state regulators to assert federal preemption or challenge the legality of state actions.

125.    Even though it cannot deny that it is prohibited from listing products that even reference gaming, Kalshi continues to maintain that it is regulated by federal law under the CFTC; therefore, state gambling laws are preempted concerning their sports event contracts. Despite the wave of state enforcement attempts, Kalshi reported over 5.2 million trades totaling $1.6 billion for their sports event contracts from January through mid-2025.

### FIRST CAUSE OF ACTION

---

[20]https://www.nj.gov/oag/ge/docs/EmergencyOrders/Kalshi2025.pdf

**(Violation of the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701–2721)**

126.   The Ho-Chunk Nation realleges each of the allegations set forth in the proceeding paragraphs of this complaint and by this reference incorporates each allegation as if set forth herein in full.

127.   Gambling in Indian country is criminally prohibited by federal statute, except gaming conducted by a federally recognized Indian tribe in accordance with the IGRA. 18 U.S.C. §1166.

128.   IGRA established a statutory framework for the regulation of Indian gaming that expressly pre-empts the field of governance of gaming activities on Indian lands. *Gaming Corp. of Am. v. Dorsey & Whitney*, 88 F.3d 536, 543–44 (8th Cir. 1996).

129.   Under IGRA, in order for class III gaming to be conducted on Indian lands: (1) the tribe must have adopted a tribal ordinance that authorizes the playing of the class III games and the ordinance must have been approved by the Chair of the NIGC, a federal regulatory agency created under IGRA; (2) the state in which the class III gaming will be conducted must "permit" such gaming for any purpose by any person, organization, or entity; and (3) the class III gaming must be conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the state, pursuant to IGRA. 25 U.S.C. § 2710(d)(1).

130.   In order to go into effect, a tribal-state class III gaming compact must be approved by the Secretary, 25 U.S.C. § 2710(d)(8)(A), or deemed approved by operation of law, 25 U.S.C. § 2710(d)(8)(C), and notice of approval must be published in the Federal Register. 25 U.S.C. § 2710(d)(3)(B).

131.   Federal regulations that implement IGRA define "gaming activity" or "gaming activities" as "the conduct of class III gaming involving the three required elements of chance, consideration, and prize or reward." 25 C.F.R. § 293.2(d).

QB\168080.00083\98102991.1

132.    Federal regulations that implement IGRA state that class III gaming includes "[a]ny sports betting and parimutuel wagering including but not limited to wagering on horse racing, dog racing or jai alai." 25 C.F.R. § 502.4(c).

133.    Kalshi and Robinhood are not federally-recognized Indian tribes conducting class III gaming activity pursuant to a Tribal-State Compact, 25 U.S.C. §§ 2710(d)(1)–(2), or Secretarial Procedures. 25 U.S.C. § 2710(d)(7)(B)(vii).

134.    Through self-regulation, Kalshi has offered sports event contracts that are explicitly prohibited under 17 C.F.R. § 40.11(a)(1), and Kalshi has admitted that the subject matter of those contracts constitutes gaming.

135.    Kalshi's self-certifications of its sports event contracts, pursuant to 17 C.F.R. § 40.2, are defective because the submissions fail to adequately address CEA compliance issues and establish that the prohibited contracts are nevertheless CEA compliant and are, therefore, not contrary to the public interest.

136.    Kalshi has an adequate, available remedy for explicit CFTC approval under 17 C.F.R. § 40.3, but has chosen not to avail itself of CFTC approval.

137.    Kalshi's contracts fall outside the permissible scope of the CEA and, therefore, constitute unlawful gambling in Indian lands under 18 U.S.C. § 1166, because the Kalshi app may currently be accessed for the purpose of staking something of value (consideration), on a sports event involving the elements of consideration and chance, for the purposes of receiving a reward based on the outcome of the event, consistent with the definition of class III gaming activity in 25 C.F.R. § 293.2(d), from locations in Indian country, as defined by IGRA, 25 U.S.C. §§ 2703(4)(A)-(B).

138.    As a result, any person over the age of eighteen with a cell phone, tablet, or computer can access the Kalshi app and engage in unlawful gambling on Indian lands.

139.    Kalshi has not implemented any mechanism, such as geo-location and geo-fencing, that would prevent any person or entity from engaging in sports betting using the Kalshi app on the Nation's Indian lands.

140.    IGRA establishes a right of action by an "Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact [or Secretarial Procedures] entered into . . . that is in effect," over which the "United States district courts shall have jurisdiction . . . ." 25 U.S.C. § 2710(d)(7)(A)(ii).

141.    An actual case or controversy exists between the Nation and Kalshi, in that the Nation asserts that Kalshi is conducting class III gaming on the Nation's Indian Lands and such conduct violates the Nation's Compact and federal and state law, while Kalshi contends that its activities do not constitute gaming and, therefore, do not violate IGRA.

WHEREFORE, the Ho-Chunk Nation prays as hereinafter set forth below.

## SECOND CAUSE OF ACTION

### (Violation of the Nation's Gaming Ordinance)

142.    The Ho-Chunk Nation realleges each of the allegations set forth in the proceeding paragraphs of this complaint and by this reference incorporates each allegation as if set forth herein in full.

143.    The Nation is a sovereign governmental entity that exercises inherent powers of self-government with the jurisdiction and authority to enact its own laws and enforce those laws against both Indians and non-Indians engaging in activities on its Indian Lands. *United States v. Wheeler*, 435 U.S. 313, 323 (1978); *Water Wheel v. LaRance*, 642 F. 3d 802 (9th Cir. 2011).

144.    In enacting the IGRA, Congress expressly granted Indian tribes the right to regulate gaming activities on their respective Indian lands through the enactment

of tribal gaming ordinances that would become effective upon the approval of those ordinances by the Chair of the NIGC. 25 U.S.C. § 2710(b) and § 2710(d).

145.    Pursuant to the IGRA and its inherent sovereign authority, the Nation has enacted a Gaming Ordinance comprehensively regulating all gaming activities on its Indian Lands. The enactment of the Ordinance was not only an exercise of the Nation's own inherent sovereign authority but also an exercise of Congressionally delegated authority granted to the Nation by Congress with the enactment of the IGRA. *United States v. Mazurie*, 419 U.S. 544 (1975).

146.    As such, the Nation's Ordinance preempts the field of conduct that the Nation defines as gaming in its Ordinance, including any other federal or state law that conflicts with the express provisions of the Ordinance authorized by the IGRA and which also conflicts with the provisions of the CEA. *Fisher v. District Court*, 424 U.S. 383 (1976).

147.    Under the Ordinance, Kalshi's sports gambling activities meet the definition of gaming that is strictly regulated by the Nation through the Ordinance. Pursuant to its inherent sovereign and congressionally delegated authority granted to the Nation by IGRA, the Nation has jurisdiction to enforce the provisions of its Ordinance against Kalshi, including prohibiting Kalshi from engaging in sports betting on its Indian Lands by offering future event gaming contracts.

WHEREFORE, the Ho-Chunk Nation prays as hereinafter set forth below.

## THIRD CAUSE OF ACTION
### (Civil RICO - 18 U.S.C. § 1962(c))

148.    The Ho-Chunk Nation realleges each of the allegations set forth in the proceeding paragraphs of this complaint and by this reference incorporates each allegation as if set forth herein in full.

149.    Each member of the Gaming Racket is a "person" as that term is

defined in 18 U.S.C. § 1964(3).

150. The Gaming Racket is in association as an "enterprise" as that term is defined in 18 U.S.C. § 1961(4). The Gaming Racket associated for the common purpose of profiting off the running of an illegal sports betting operation by offering sports betting in violation of IGRA as described above as well as in violation of the CEA and its enforcing regulations.

151. The Gaming Racket had an ongoing organization with an ascertainable structure and functioned as a continuing unit with separate roles and responsibilities.

152. The Gaming Racket was formed and functions with a common purpose: to design, market, distribute, and widely disseminate event contracts based on sports outcomes ("gaming contracts"), all the while consciously disregarding or actively circumventing prior regulatory concerns and even their own prior stated positions that such contracts constituted prohibited "gaming." Kalshi and Robinhood decided to jointly enter and aggressively expand the market for gaming contracts with a mutual awareness of the ongoing regulatory scrutiny surrounding such products, resulting in shared liability and operational interdependence for this specific venture.

153. Through this Gaming Racket, Defendants Kalshi and Robinhood, along with their respective officers, directors, agents, and employees who knowingly participated in its affairs, directly and indirectly conducted and engaged in the enterprise's activities through a pattern of racketeering activity, as defined in 18 U.S.C. § 1961(1). Specifically, the Gaming Racket has: (1) engaged in wire fraud as prohibited by 18 U.S.C. § 1343; (2) transmitted wagering information as prohibited by 18 U.S.C. § 1084, and (3) operated an illegal gambling business as prohibited by 18 U.S.C. § 1955.

154. The Gaming Racket created a scheme to offer sports betting through the guise of events contracts, seeking to cloak their activity through the self-certification

process of the CFTC, even though registered entities are prohibited from offering event contracts that even contain a reference to gaming. The Gaming Racket charges for sports betting through use of electronic payments, using wires in furtherance of their scheme.

155.    The Gaming Racket engages in the business of betting or wagering on sports events and knowingly uses wire communicates in interstate and Indian commerce to transmit bets, wagers, or information assisting in placing bets or wagers.

156.    In Wisconsin, sports betting is exclusively legal when conducted by federally recognized Indian tribes under tribal-state gaming compacts, which are authorized by Wis. Stat. § 14.035. This limited authorization represents a general prohibition to gambling as established by the Wisconsin Constitution Article IV, § 24.

157.    To the extent that 18 U.S.C. §1084(b) would apply to the Gaming Racket's transmission of information for use in news reporting of sporting events or contests, or for the transmission of information assisting in the placing of bets or wagers on a sporting event or contest in Wisconsin, the Gaming Racket still actively transmits bets or wagers not excepted under Section 1084(b).

158.    Kalshi and Robinhood, by and through the Gaming Racket described herein, have knowingly conducted, financed, managed, supervised, directed, or owned all or part of an illegal gambling business, as defined by 18 U.S.C. § 1955, and which violates Wis. Stat. § 945.03, prohibiting commercial gambling.

159.    Wisconsin Statute § 945.03(1m) states that whoever intentionally does any of the following is engaged in commercial gambling:

    a.    Participates in the earnings of or for gain operates or

permits the operation of a gambling place[21]; or

b.   For gain, receives, records or forwards a bet or offer to bet or, with intent to receive, record or forward a bet or offer to bet, possesses facilities to do so; or

c.   For gain, becomes a custodian of anything of value bet or offered to be bet; or

d.   Conducts a lottery[22] where both the consideration and the prize are money, or with intent to conduct such a lottery, possesses facilities to do so; or

e.   Sets up for use for the purpose of gambling or collects the proceeds of any gambling machine[23]; or

f.   For gain, maintains in this state any record, paraphernalia, tickets, certificates, bills, slip, token, paper, writing or other device used, or to be used, or adapted, devised or designed for use in gambling; or

g.   For gain, uses a wire communication facility for the transmission or receipt of information assisting in the placing of a bet or offer to bet on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of a bet or offer to bet.

160.   Wisconsin strictly construes its general ban on gambling, repeatedly

---

[21] A "Gambling Place" is any building or tent, any vehicle (whether self-propelled or not) or any room within any of them, one of whose principal uses is any of the following: making and settling bets; receiving, holding, recording or forwarding bets or offers to bet; conducting lotteries; or playing gambling machines. Wis. Stat. § 945.01(4)(a).

[22] A "lottery" is an enterprise wherein for a consideration the participants are given an opportunity to win a prize, the award of which is determined by chance, even though accompanied by some skill. Wis. Stat. § 945.01(5)(a).

[23] A "gambling machine" is a contrivance which for a consideration affords the player an opportunity to obtain something of value, the award is determined by chance, even though accompanied by some skill and whether or not the prize is automatically paid by the machine. Wis. Stat. § 945.01(3)(a).

finding that schemes that involve prize, chance, and consideration that do not fall into any of the specific exceptions to this prohibition are illegal.

161.    With respect to § 945.03(1m)(a), Kalshi and Robinhood participate in the earnings of the Gaming Racket through a direct revenue-sharing model whereby Robinhood earns a $0.01 commission per contract traded.

162.    With respect to § 945.03(1m)(b), the Gaming Racket, through Robinhood's platform, directly receives, records, and forwards users' "Yes" or "No" positions, which function as bets or offers to bet on the outcomes of sporting events. This includes the operational mechanisms within the platform that accept, process, and track these wagers.

163.    With respect to § 945.03(1m)(e), Robinhood's platform and mobile application serves as a machine that is used for gain, by the Gaming Racket, to facilitate the placing and resolution of these gambling contests on sporting events.

164.    With respect to § 945.03(1m)(f), the purchase of "Yes" or "No" positions on these gaming contracts constitutes the sale of "chances" or "tickets" in a gambling contest, as the participants pay a fixed price for the opportunity to win a larger, fixed payout based on the uncertain outcome of a sporting event. It is a scheme involving all of the elements of gaming: prize, chance, and consideration.

165.    With respect to § 945.03(1m)(g), the Gaming Racket transmits real-time pricing, probability, and outcome information related to the gaming contracts through its online platforms, which is information that assists in the placing bets or wagers within the gambling business.

166.    The Gaming Racket involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business. These persons include, but are not limited to, Kalshi and Robinhood, their respective executives, officers, and employees responsible for the development, self-certification,

marketing, platform integration, and financial operations of the "prediction markets hub" and the gaming contracts.

167.   The illegal gambling business has been and remains in substantially continuous operation for a period in excess of 30 days, and/or has a gross revenue of $2,000 in any single day. The substantial volume of trades generating direct, shared revenue for the Gaming Racket through transaction fees on an ongoing basis since at least February 2025 demonstrates both a substantially continuous operation and daily gross revenues far exceeding the statutory threshold.

168.   As a federally recognized Indian Tribe holding the exclusive right to operate sportsbook on the Nation's Indian lands within Wisconsin, the Nation has suffered direct and substantial injury to its business by reason of the Gaming Racket's violations of 18 U.S.C. § 1962(c). The Gaming Racket's systematic engagement in a pattern of racketeering activity, encompassing wire fraud (18 U.S.C. § 1343), the transmission of wagering information (18 U.S.C. § 1084), and the operation of an illegal gambling business (18 U.S.C. § 1955) encroaches upon and usurps the Nation's exclusive market. By conducting these unlawful activities, Kalshi and Robinhood have unlawfully diverted revenue that, by law and compact, belongs exclusively to the Nation. This direct competition from the Gaming Racket, enabled and sustained by these prohibited racketeering acts, has caused the Nation to suffer concrete and quantifiable injury in the form of significant lost profits and diminished market share to its established business.

169.   Accordingly, Kalshi and Robinhood, as members of the Gaming Racket, are jointly and severally liable to the Ho-Chunk Nation for its actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

WHEREFORE, the Ho-Chunk Nation prays as hereinafter set forth below.

## FOURTH CAUSE OF ACTION

**(Infringement of the Nation's Sovereignty and Interference with Tribal Self-Governance)**

170.    The Ho-Chunk Nation realleges each of the allegations set forth in the proceeding paragraphs of this complaint and by this reference incorporates each allegation as if set forth herein in full.

171.    Kalshi's sports gambling activities are being conducted in direct violation of the Nation's duly enacted Ordinance, which strictly regulates sports gambling and mandates that the Nation have the sole proprietary interest in, and responsibility for, the conduct of any gaming activity conducted on the Nation's Indian lands.

172.    By engaging in illegal sports gambling in violation of the Nation's Ordinance, Kalshi is interfering with and will continue to interfere with the Nation's ability to govern itself, its members, and all persons who work, live, and visit the Nation by preventing it from determining to what extent and under what conditions, if any, persons, organizations, and entities can engage in class III gaming on its Indian Lands.

173.    An actual controversy exists between the Nation and Kalshi, in that the Nation contends that it has the authority to enforce its Ordinance against Kalshi and prohibit it from engaging in sports gambling on its Indian Lands, while Kalshi asserts that the Nation has no such authority.

174.    Kalshi's past and future actions of violating the Nation's Ordinance by engaging in sports gambling on its Indian Lands impermissibly interferes with the ability of the Nation to govern itself on its Indian Lands under its own laws. *Williams v. Lee*, 358 U.S. 217 (1959).

175.    The Nation has been irreparably injured by Kalshi's unlawful sports gambling on its Indian Lands and unless Kalshi is provisionally and permanently

QB\168080.00083\98102991.1

restrained and enjoined from engaging in such illegal gambling the Nation will be prevented from governing itself on its Indian Lands under its own Tribal laws, causing severe and irreparable injury for which the Nation has no plain, speedy, or adequate remedy at law.

WHEREFORE, the Ho-Chunk Nation prays as hereinafter set forth below.

## FIFTH CAUSE OF ACTION
### (False Advertising – Lanham Act, 15 U.S.C. § 1125(a)(1)(B))

176.    The Ho-Chunk Nation realleges each of the allegations set forth in the proceeding paragraphs of this complaint and by this reference incorporates each allegation as if set forth herein in full.

177.    Kalshi has made false and misleading statements of fact about its platform, website(s), software, application(s), and/or its activities in general.  Those statements mispresent the nature, characteristics, and/or legality of Kalshi's platform, websites, software, and/or applications and are expressly false, impliedly false, or both. Kalshi has misrepresented that its platform, websites, software, and/or applications are fully legal and accessible nationwide (in all 50 states) despite the defectiveness of Kalshi's websites, software, and/or applications—including under 17 C.F.R. § 40.2. Kalshi's false and/or misleading statements include, but are not limited to, statements that Kalshi is "The First Nationwide Legal Sports Betting Platform" and that Kalshi offers "Sports Betting Legal in all 50 States." *See supra* ¶ 94.

178.    Kalshi has knowingly induced or caused third parties—including Robinhood and marketing agencies—to engage in acts of false advertising or promotion by repeating Kalshi's false or misleading claims.

179.    Each of Kalshi's false or misleading statements were intentionally made

in the context of a commercial advertisement or promotion, including Instagram advertisements, posts, and Reels, TikTok video product promotions, TV commercials, paid or sponsored product placements on social media platforms, YouTube videos or advertisements, X.com (formerly Twitter) posts or advertisements, and on Kalshi's own websites. These mediums are distributed across the Internet and designed to promote nationwide the purchasing or using of Kalshi's platform, website(s), software, and/or applications to place sports betting or sports event "contracts."

180.   Kalshi knew or should have known its statements and/or advertising activities were false, misleading, and deceptive. Indeed, numerous online users have expressed concern or skepticism regarding the legality of the activities or "contracts" allowed on Kalshi's platform, website(s), software, and/or application(s). *See supra* ¶¶ 101-103. Kalshi has continued to keep its false or misleading advertisements on its social media platforms, including advertisements that refer to Kalshi offering sports betting.

181.   Kalshi's false and misleading statements have deceived, and/or have the tendency to deceive, a substantial segment of their intended audience (including tribal members) about matters material to their decision making, and are likely to continue to materially deceive others in the future. Kalshi deliberately disseminated these false claims in various channels relied on by consumers, including tribal members.

182.   Kalshi's deception is also material, as it is likely to cause consumers, including tribal members, to use Kalshi's platform, website(s), software, and/or application(s) to place sports bets or purchase sports event "contracts," believing such use to be universally compliant and that Kalshi offers a legally compliant sports betting platform.

183.   Kalshi's platform, website(s), software, and/or application(s) are offered in interstate and Indian commerce and in within every state nationwide. Similarly, Kalshi's false or misleading claims were and are made in commercial advertising and promotion within interstate and Indian commerce.

184.   As a direct and proximate result of Kalshi's false or misleading statements, the Nation has been, and is likely to continue to be, injured. The Nation has suffered, and will continue to suffer, lost sales and lost profits from its protected businesses, as well as continuing damage to the Nation's business, goodwill, and reputation.

185.   The Nation's immediate and irreparable injuries have no adequate remedy at law, and the Nation is entitled to injunctive relief and up to three times its actual damages and/or an award of Kalshi's profits, as well as costs and the Nation's reasonable attorney fees under 15 U.S.C. §§ 1116-17.

WHEREFORE, the Ho-Chunk Nation prays as hereinafter set forth below.

## PRAYER FOR RELIEF

Pursuant to its claims and causes of action alleged herein, the Ho-Chunk Nation prays as follows:

1.     That the Court declare Kalshi's sports event contracts to be outside the permissible scope of the CEA as self-certified contracts that involve, relate to, or reference gaming in contravention of the prohibition in 17 C.F.R. § 40.11(a)(1) and, therefore, Kalshi's contracts constitute illegal class III gaming activity in violation of 18 U.S.C. § 1166 and the IGRA;

2.     That the Court declare that Kalshi and Robinhood's conduct is unlawful class III gaming activity in violation of 18 U.S.C. § 1166 and, therefore, subject to injunctive relief under IGRA, 25 U.S.C. § 2710(d)(7)(A)(ii);

3.     That the Court declare that Kalshi, as a self-certifying registered entity,

45

self-regulating the products offered on its DCM, is impermissibly regulating an area of Indian commerce, within the field of class III gaming activity in Indian country, outside the permissible scope of the CEA, where IGRA occupies the field of regulation and grants Tribes the exclusive right to regulate class III gaming activity on Indian lands;

4.    That the Court declare that Kalshi's gambling activities on the Nation's Indian Lands violates the Nation's Ordinance and constitutes an impermissible interference with the ability of the Nation to govern itself on its Indian Lands under its own laws;

5.    That the Court preliminarily and permanently enjoin Kalshi and Robinhood from offering sports events contracts on or near the Nation's Indian Lands;

6.    That the Court declare that Kalshi's and Robinhood's joint conduct demonstrate systematic engagement in a pattern of racketeering activity in violation of RICO, 18 U.S.C. § 1962(c);

7.    That the Nation be awarded treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1962(c) and the Nation's own attorney fee ordinance;

8.    That the Court order injunctive relief as permitted by 15 U.S.C. § 1116(a), and award damages, including disgorgement of ill-gotten gains, lost profits, costs, and attorneys' fees, as permitted by 15 U.S.C. § 1117(a); and

9.    That the Court grants such other and further relief as may be deemed appropriate.

QB\168080.00083\98102991.1

Dated: August 20, 2025.

QUARLES & BRADY LLP


*/s/ Emily M. Feinstein*
EMILY M. FEINSTEIN
BRYCE A. LOKEN
33 East Main Street, Suite 900
Madison, WI 53703
(608) 251-5000 phone
(608) 251-9166 facsimile
Emily.Feinstein@quarles.com

THE LAW OFFICES OF RAPPORT
AND MARSTON
Lester J. Marston
Cooper M. DeMarse
405 West Perkins Street
Ukiah, CA 95482
(707) 462-6846 phone
(707) 462-4235 facsimile
ljmarston@rmlawoffice.net

THE HO-CHUNK NATION
Michael P. Murphy, Legislative Counsel for
Ho-Chunk Nation
P.O. Box 667
Black River Falls, WI 54615
(715) 284-9343 phone
Michael.Murphy@ho-chunk.com

*Attorneys for The Ho-Chunk Nation*

47

QB\168080.00083\98102991.1