# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WISCONSIN

|  |  |
|---|---|
| HO-CHUNK NATION,<br><br>       *Plaintiff*,<br><br>   v.<br><br>KALSHI INC., KALSHIEX LLC,<br>ROBINHOOD MARKETS, INC.,<br>ROBINHOOD DERIVATIVES LLC, AND<br>DOES 1-20,<br><br>       *Defendants*. | Case No. 3:25-cv-00698 |

# BRIEF IN SUPPORT OF KALSHI DEFENDANTS'
# MOTION TO DISMISS PLAINTIFF'S COMPLAINT

## TABLE OF CONTENTS

I.  PRELIMINARY STATEMENT ................................................................ 1

II.  BACKGROUND ............................................................................. 4

    A.  LEGAL BACKGROUND ........................................................... 4

        1.  Congress Passes the Commodity Exchange Act to Bring Federal Regulation to the Derivatives Market. ........................................ 4

        2.  Congress Passes the Indian Gaming Regulatory Act to Regulate Federal, State, and Tribal Relations Relating to Gaming "on Indian Lands." .............................................................................. 5

        3.  Congress Passes the Unlawful Internet Gambling Enforcement Act to Address State and Tribal Regulation of Gaming in the Internet Era. ......... 6

        4.  Congress Further Amends the Commodity Exchange Act Through Dodd-Frank and Addresses Regulation of Event Contracts. ..................... 7

    B.  FACTUAL BACKGROUND ........................................................ 9

III.  ARGUMENT ............................................................................... 10

    A.  LEGAL STANDARD ............................................................... 10

    B.  PLAINTIFF FAILS TO STATE A CLAIM UNDER IGRA (COUNT I) ......... 11

        1.  Plaintiff Lacks a Statutory Right of Action for Violations of IGRA. ....... 11

        2.  UIGEA Governs the Conduct Alleged in the Complaint and Insulates It from Liability in Deference to the CFTC's Exclusive Jurisdiction Over Transactions on DCMs. .................................................. 16

        3.  The Complaint's Allegations of Non-Compliance with the CEA Are Irrelevant and Incorrect. .......................................................... 18

    C.  PLAINTIFF FAILS TO STATE A CLAIM FOR VIOLATION OF TRIBAL GAMING ORDINANCES (COUNT II). ......................................... 21

        1.  Plaintiff Lacks Authority to Exercise Tribal Jurisdiction Over Kalshi, a Nonmember. ...................................................................... 21

        2.  The CEA Preempts the Ordinance. ............................................... 24

    D.  PLAINTIFF LACKS STANDING TO SUE FOR INFRINGEMENT OF TRIBAL SOVEREIGNTY (COUNT IV). ......................................... 26

    E.  PLAINTIFF FAILS TO STATE A LANHAM ACT CLAIM (COUNT V). .... 28

        1.  Plaintiff Lacks Standing Under the Lanham Act. ................................ 28

        2.    Plaintiff Fails to Allege Falsity. ................................................................. 30

        3.    Plaintiff Does Not Adequately Allege a Likelihood of Deception or
             Injury. .............................................................................................. 32

    F.    PLAINTIFF FAILS TO STATE A CIVIL RICO CLAIM (COUNT III). ........ 32

        1.    Plaintiff Has Not Alleged that Defendants Are Conducting the Affairs
             of an Association-in-Fact Enterprise. ......................................................... 34

        2.    Plaintiff Does Not Plausibly Allege Any Predicate Acts of
             Racketeering. ..................................................................................... 36

        3.    Plaintiff Fails to Allege a Cognizable RICO Injury.................................. 39

    G.    PLAINTIFF FAILS TO PLEAD ANY CLAIM AGAINST KALSHI INC..... 41

IV.    CONCLUSION ........................................................................................... 41

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*,
  977 F.2d 1147 (7th Cir. 1992) ...................................................................................4

*Anza v. Ideal Steel Supply Corp.*,
  547 U.S. 451 (2006) ................................................................................................40

*Bd. of Forensic Document Exam'rs v. Am. Bar Ass'n*,
  922 F.3d 827 (7th Cir. 2019) .................................................................................30

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................10

*Bible v. United Student Aid Funds, Inc.*,
  799 F.3d 633 (7th Cir. 2015) .................................................................................34

*Blue Lake Rancheria v. Kalshi Inc.*,
  2025 WL 3141202 (N.D. Cal. Nov. 10, 2025) ............................................. *passim*

*Bob Jones Univ. v. United States*,
  461 U.S. 574 (1983) ................................................................................................38

*Cabazon Band of Mission Indians v. Wilson*,
  124 F.3d 1050 (9th Cir. 1997) ...............................................................................14

*California v. Cabazon Band of Mission Indians*,
  480 U.S. 202 (1987) ..................................................................................................5

*California v. Iipay Nation of Santa Ysabel*,
  898 F.3d 960 (9th Cir. 2018) ...........................................................................2, 17

*Carr v. Trs. of Purdue Univ.*,
  2024 WL 3819424 (S.D. Ind. Aug. 14, 2024) ......................................................27

*Cayuga Nation v. N.Y. State Gaming Comm'n*,
  2025 WL 2161290 (N.D.N.Y. July 30, 2025) .................................................12, 13

*Chaset v. Fleer/Skybox Int'l, LP*,
  300 F.3d 1083 (9th Cir. 2002) ...............................................................................41

*Child's Health Def. v. Meta Platforms, Inc.*,
  112 F.4th 742 (9th Cir. 2024) ................................................................................40

*Clapper v. Amnesty Int'l*,
    568 U.S. 398 (2013) ...........................................................................................27

*Cleveland Bakers & Teamsters Health & Welfare Fund v. AMAG Pharms., Inc.*,
    2025 WL 1024103 (D. Mass. Mar. 12, 2025) .........................................................35

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*,
    173 F.3d 725 (9th Cir. 1999) ...............................................................................30

*Conn. Nat'l Bank v. Germain*,
    503 U.S. 249 (1992)............................................................................................18

*Crichton v. Golden Rule Ins. Co.*,
    576 F.3d 392 (7th Cir. 2009) .........................................................................34, 36

*Dairyland Greyhound Park, Inc. v. Doyle*,
    719 N.W.2d 408 (Wis. 2006)...............................................................................13

*Davids v. Coyhis*,
    869 F. Supp. 1401 (E.D. Wis. 1994)....................................................................12

*EEOC v. Waffle House, Inc.*,
    534 U.S. 279 (2002)............................................................................................13

*Firestone Fin. Corp. v. Meyer*,
    796 F.3d 822 (7th Cir. 2015) ...............................................................................10

*First Nationwide Bank v. Gelt Funding Corp.*,
    27 F.3d 763 (2d Cir. 1994)..................................................................................40

*Fisher v. District Court*,
    424 U.S. 382 (1976)............................................................................................24

*Fiskars Finland Oy Ab v. Woodland Tools Inc.*,
    2024 WL 3936444 (W.D. Wis. Aug. 26, 2024)................................................30, 32

*Fitzgerald v. Chrysler Corp.*,
    116 F.3d 225 (7th Cir. 1997) ...............................................................................33

*Florida v. Seminole Tribe of Fla.*,
    181 F.3d 1237 (11th Cir. 1999) ...........................................................................12

*Fox v. Iowa Health Sys.*,
    399 F. Supp. 3d 780 (W.D. Wis. 2019) ................................................................11

*FPC v. Tuscarora Indian Nation*,
    362 U.S. 99 (1960)..............................................................................................25

*Gensler v. Strabala*,
    764 F.3d 735 (7th Cir. 2014) ..................................................28

*Goodloe v. Nat'l Wholesale Co.*,
    2004 WL 1631728 (N.D. Ill. July 19, 2004)...........................29

*Harrison v. Jefferson Par. Sch. Bd.*,
    78 F.4th 765 (5th Cir. 2023) ..............................................26, 27

*Hart v. Amazon.com, Inc.*,
    191 F. Supp. 3d 809 (N.D. Ill. 2016) ....................................28

*Hemi Grp., LLC v. City of New York*,
    559 U.S. 1 (2010)..................................................................40

*Holmes v. Sec. Inv. Prot. Corp.*,
    503 U.S. 258 (1992)..........................................................39, 40

*HomeLight, Inc. v. Shkipin*,
    721 F. Supp. 3d 1019 (N.D. Cal. 2024) ................................28

*Hornell Brewing Co. v. Rosebud Sioux Tribal Ct.*,
    133 F.3d 1087 (8th Cir. 1998) ...........................................15, 22

*Hot Wax, Inc. v. Turtle Wax, Inc.*,
    191 F.3d 813 (7th Cir. 1999) .............................................30, 32

*Jackson v. PayDay Fin., LLC*,
    764 F.3d 765 (7th Cir. 2014) .......................................... *passim*

*James Cape & Sons Co. v. PCC Constr. Co.*,
    453 F.3d 396 (7th Cir. 2006) .............................................33, 41

*Jay E. Hayden Found. v. Fist Neighbor Bank, N.A.*,
    610 F.3d 382 (7th Cir. 2010) ................................................36

*KalshiEX LLC v. CFTC*,
    2024 WL 4164694 (D.D.C. Sept. 12, 2024) ........................10, 20

*KalshiEX LLC v. CFTC*,
    2024 WL 4802698 (D.C. Cir. Nov. 15, 2024) .........................20

*KalshiEX LLC v. CFTC*,
    No. 24-5205 (D.C. Cir. May 5, 2025)...................................10

*KalshiEX LLC v. Flaherty*,
    2025 WL 1218313 (D.N.J. Apr. 28, 2025) ...........................19, 39

*In re Kmart Corp.*,
    434 F.3d 536 (7th Cir. 2006) ................................................................35

*Knox v. Am. Fam. Ins. Co.*,
    2025 WL 1137222 (W.D. Wis. Apr. 10, 2025) ........................................13

*Krueger Int'l, Inc. v. Royal Indemnification Co.*,
    481 F.3d 993 (7th Cir. 2007) ................................................................13

*Lackey v. Stinnie*,
    604 U.S. 192 (2025) ............................................................................15

*Lexington Ins. Co. v. Smith*,
    117 F.4th 1106 (9th Cir. 2024) ............................................................22

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) .......................................................................28, 29

*Medical Marijuana, Inc. v. Horn*,
    604 U.S. 593 (2025) ............................................................................40

*Menominee Tribal Enters. v. Solis*,
    601 F.3d 669 (7th Cir. 2010) ...........................................................25, 26

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
    456 U.S. 353 (1982) .........................................................................4, 35

*Michigan v. Bay Mills Indian Cmty.*,
    572 U.S. 782 (2014) ....................................................................*passim*

*Midwest Grinding Co. v. Spitz*,
    976 F.2d 1016 (7th Cir. 1992) ..............................................................37

*MillerKing, LLC v. DoNotPay, Inc.*,
    702 F. Supp. 3d 762 (S.D. Ill. 2023) .....................................................29

*Mkt. Track, LLC v. Efficient Collaborative Retail Mktg. LLC*,
    2015 WL 3637740 (N.D. Ill. June 11, 2015) ..........................................29

*Montana v. United States*,
    450 U.S. 544 (1981) .......................................................21, 22, 23, 26

*NLRB v. Little River Band of Ottawa Indians*,
    788 F.3d 537 (6th Cir. 2015) ................................................................25

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015).............................................................................30

*Plains Com. Bank v. Long Fam. Land & Cattle Co.*,
   554 U.S. 316 (2008) ................................................................21, 23, 24

*Pueblo of Pojoaque v. New Mexico*,
   863 F.3d 1226 (10th Cir. 2017) ...........................................................14

*QVC Inc. v. Your Vitamins, Inc.*,
   439 F. App'x 165 (3d Cir. 2011) ....................................................31, 32

*Ratfield v. U.S. Drug Testing Lab'ys, Inc.*,
   140 F.4th 849 (7th Cir. 2025) ..............................................................39

*RBG Plastics, LLC v. Sparkles Gift & Party Shop, Inc.*,
   2025 WL 2764505 (N.D. Ill. Sept. 29, 2025) ...............................11, 28

*Reves v. Ernst & Young*,
   507 U.S. 170 (1993) .............................................................................34

*Roppo v. Travelers Com. Ins. Co.*,
   869 F.3d 568 (7th Cir. 2017) ...............................................................33

*Saginaw Cnty. v. STAT Emergency Med. Servs., Inc.*,
   946 F.3d 951 (6th Cir. 2020) .........................................................26, 27

*San Manuel Indian Bingo & Casino v. NLRB*,
   475 F.3d 1306 (D.C. Cir. 2007) ...........................................................25

*Sandoz Pharms. Corp. v. Richardson-Vicks, Inc.*,
   902 F.2d 222 (3d Cir. 1990) ................................................................30

*Santa Clara Pueblo v. Martinez*,
   436 U.S. 49 (1978) ...............................................................................25

*Sedima S.P.R.L. v. Imrex Co.*,
   473 U.S. 479 (1985) .............................................................................33

*Slaney v. Int'l Amateur Athletic Fed'n*,
   244 F.3d 580 (7th Cir. 2001) .........................................................11, 37

*Sokaogon Chippewa Cmty. v. Babbitt*,
   214 F.3d 941 (7th Cir. 2000) ...............................................................25

*Spicer v. Chi. Bd. of Options Exch., Inc.*,
   977 F.2d 255 (7th Cir. 1992) ...............................................................36

*Stachon v. United Consumers Club, Inc.*,
   229 F.3d 673 (7th Cir. 2000) ...............................................................34

*Steven v. Roscoe Turner Aeronautical Corp.*,
  324 F.2d 157 (7th Cir. 1963) ................................................................41

*Stifel, Nicolaus & Co. v. Lac Courte Oreilles Band of Lake Superior Chippewa
  Indians of Wis.*,
  2014 WL 2801236 (W.D. Wis. June 19, 2014) (Conley, J.) ...........................23, 24

*Stifel, Nicolaus & Co. v. Lac du Flambeau Band of Lake Superior Chippewa
  Indians*,
  807 F.3d 184 (7th Cir. 2015) .............................................................23, 27

*Stockbridge-Munsee Cmty. v. Wisconsin*,
  922 F.3d 818 (7th Cir. 2019) ..............................................................11, 12

*Strate v. A-1 Contractors*,
  520 U.S. 438 (1997).........................................................................21, 23

*Szalanski v. Arnold*,
  2025 WL 1726222 (W.D. Wis. June 20, 2025) ..............................................1

*Taxpayers of Mich. Against Casinos v. Michigan*,
  685 N.W.2d 221 (Mich. 2004)..............................................................13

*ThermoLife Int'l, LLC v. Gaspari Nutrition Inc.*,
  648 F. App'x 609 (9th Cir. 2016) .......................................................30, 31

*Uni*Quality, Inc. v. Infotronx, Inc.*,
  974 F.2d 918 (7th Cir. 1992) .................................................................37

*United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v.
  Walgreen Co.*,
  719 F.3d 849 (7th Cir. 2013) .................................................................34

*United States v. Britton*,
  289 F.3d 976 (7th Cir. 2002) .................................................................37

*United States v. Long*,
  324 F.3d 475 (7th Cir. 2003) .................................................................24

*United States v. Turner*,
  551 F.3d 657 (7th Cir. 2008) .................................................................37

*United States v. Wheeler*,
  435 U.S. 313 (1978)...........................................................................21

*Vampire Fam. Brands, LLC v. MPL Brands, Inc.*,
  2021 WL 4134841 (C.D. Cal. Aug. 6, 2021)...........................................29

*Vicom, Inc. v. Harbridge Merch. Servs., Inc.*,
    20 F.3d 771 (7th Cir. 1994) ..............................................................33

*Viehweg v. Ins. Programs Mgmt. Grp., LLC*,
    2024 WL 4165078 (7th Cir. Sept. 12, 2024) ............................40, 41

*Water Wheel Camp Recreational Area Inc. v. LaRance*,
    942 F.3d 802 (9th Cir.) ......................................................................22

*Williams v. Curran*,
    714 F.3d 432 (7th Cir. 2013) ..............................................................1

*Wisconsin v. Ho-Chunk Nation*,
    478 F. Supp. 2d 1093 (W.D. Wis. 2007) ..........................................13

*Wisconsin v. Ho-Chunk Nation*,
    512 F.3d 921 (7th Cir. 2008) ............................................................12

**Statutes**

7 U.S.C. § 1a ...............................................................................7, 8, 34

7 U.S.C. § 2 .................................................................................. *passim*

7 U.S.C. § 6c ........................................................................................4

7 U.S.C. § 7 ......................................................................................8, 9

7 U.S.C. § 7a-2 ............................................................................ *passim*

7 U.S.C. § 8 ..........................................................................................8

7 U.S.C. § 12c ......................................................................................8

7 U.S.C. § 13 ........................................................................................8

7 U.S.C. § 13a-1 ..................................................................................3

18 U.S.C. § 1084 ....................................................................36, 38, 39

18 U.S.C. § 1166 ................................................................................14

18 U.S.C. § 1343 ................................................................................36

18 U.S.C. § 1955 ................................................................................36

18 U.S.C. § 1962 ................................................................................33

25 U.S.C. § 2701 ..................................................................................5

25 U.S.C. § 2702 ..............................................................................................5

25 U.S.C. § 2703 ..............................................................................................5

25 U.S.C. § 2706 ............................................................................................15

25 U.S.C. § 2710 ....................................................................................... passim

31 U.S.C. 5361 ................................................................................................6

31 U.S.C. 5362 ..........................................................................7, 16, 17, 38

31 U.S.C. 5363 ....................................................................................7, 16

31 U.S.C. 5365 ......................................................................................17, 38

Pub. L. No. 111-203, 124 Stat. 1376, 1666 (2010) .........................................8

Wis. Stat. § 945.01(1)(a)(1) ...........................................................................39

Wis. Stat. § 945.03(1m) .................................................................................39

**Other Authorities**

17 C.F.R. § 38 .............................................................................................8, 9

17 C.F.R. § 40 ..........................................................................................passim

CFTC Release No. 9091-25, *CFTC Staff Issues FCM FAQs* (June 30, 2025) ...........................34

*Description of and Terms of Kalshi's 2025 Market Maker Program* ..........................................36

Fed. R. Civ. P. 12(b) ..................................................................................27, 41

Fed. R. Evid. 201(b) .......................................................................................1

H.R. Conf. Rep. No. 93-1383 (1974) ..........................................................4, 5

*Hearings Before the H. Comm. on Agric.*, 93d Cong. 121 (1973) ...................................4

*Hearings Before the S. Comm. on Agric. & Forestry*, 93d Cong. 848 (1974) ...........................4

S. Rep. No. 91-617 (1969) ..............................................................................33

S. Rep. No. 93-1131 (1974) ...............................................................................4

Sanford J. Grossman & Merton H. Miller, *Liquidity and Market Structure*, 43 J.
    Fin. 617 (1988) .......................................................................................36

## I.    PRELIMINARY STATEMENT

Years ago, Congress achieved a delicate balance of federal, state, and tribal interests in regulating gaming activity "on Indian lands."  It struck that balance through the Indian Gaming Regulatory Act ("IGRA")—a statute that applies on Indian territory "and nowhere else."  *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 795 (2014).  Now, as KalshiEX LLC and other prediction markets have begun offering sports event contracts nationwide on federally regulated exchanges known as designated contract markets ("DCMs"), Indian tribes like Plaintiff Ho-Chunk Nation have perceived a threat to their "exclusive market" of on-reservation gaming.  ¶ 168.[1]  On July 22, 2025, three Indian tribes sued KalshiEX LLC and Kalshi Inc. (together, "Kalshi") in the Northern District of California.  Complaint, *Blue Lake Rancheria v. Kalshi Inc.*, 3:25-cv-06162-JSC (N.D. Cal. July 22, 2025) (ECF No. 1).  One month later, Plaintiff, represented by the same counsel, commenced this action.

Plaintiff's Complaint is substantially similar to the earlier complaint, asserting the same causes of action and borrowing much of its overheated rhetoric.  At the heart of both complaints is the same flawed theory: that IGRA provides the tribes with a foothold to regulate trading on a derivatives exchange operating from many miles away.  If successful, Plaintiff's claim would wreak havoc in a national derivatives market overseen by one federal regulator (the Commodity Futures Trading Commission ("CFTC")) pursuant to a preemptive federal statute (the Commodity Exchange Act ("CEA")) under a regulatory scheme painstakingly established by Congress.

---

[1] Unless otherwise specified, "¶ __" refers to paragraphs in the Complaint.  "Ex. __" refers to exhibits to the Declaration of Olivia S. Choe, dated November 21, 2025, filed herewith.  The Court can take judicial notice of these exhibits because they are either incorporated by reference in the Complaint or are the proper subject of judicial notice under Federal Rule of Evidence 201(b).  *See Szalanski v. Arnold*, 2025 WL 1726222, at *2 n.2 (W.D. Wis. June 20, 2025) (quoting *Williams v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013)).

But as the Northern District of California held in mid-November, IGRA does not provide the foothold Plaintiff seeks. *Blue Lake Rancheria v. Kalshi Inc.*, 2025 WL 3141202, at *8 (N.D. Cal. Nov. 10, 2025) (denying California tribes' motion for a preliminary injunction on IGRA and Lanham Act claims because they had not shown a likelihood of success on the merits). Under 25 U.S.C. § 2710(d)(7)(A)(ii)—the provision under which Plaintiff claims authorization to sue— tribes do not have a cause of action except to pursue violations of state-tribal compacts, which the Complaint does not and cannot allege. The IGRA claim at the heart of the Complaint should be dismissed on this basis alone.

Even if the statute created an applicable right of action, the Complaint fails to state a claim. IGRA focuses on gaming activity "located" or "conducted" on reservations and does not address internet activity at all, "which is unsurprising 'given Congress passed IGRA in 1988—a few years before the internet became publicly available.'" *Blue Lake Rancheria*, 2025 WL 3141202, at *6 (citing *California v. Iipay Nation of Santa Ysabel*, 898 F.3d 960, 964 n.6 (9th Cir. 2018)). In 2006, Congress passed the Unlawful Internet Gambling Enforcement Act ("UIGEA") to deal with the question presented here—whether state or tribal law should apply to "bets or wagers" that are "initiated" in a place where they are unlawful. UIGEA says that state and tribal laws generally apply in such situations, but creates a specific exception for transactions—like those at issue here—conducted on a CFTC-regulated exchange. *Id.* at *6 ("Kalshi's contracts fall within the UIGEA's exemption for transactions regulated under the Commodity Exchange Act."). For this reason, too, Plaintiff's IGRA claim should be dismissed.

Plaintiff attempts to sidestep UIGEA's carveout by arguing that the CEA does not apply here because Kalshi has supposedly failed to comply with it, arguing that Kalshi's submissions to the CFTC regarding its event contracts (self-certifications) were somehow "defective" and that the contracts are "explicitly prohibited" under the CEA. ¶¶ 134-35. Neither assertion is true, and even

if they were true, these accusations at most raise issues for the CFTC. They do not empower Plaintiff to ask the Court to enjoin Kalshi's conduct under IGRA.

Plaintiff's reliance on tribal ordinances, sovereignty, and self-governance fares no better. The Complaint does not allege facts showing that Plaintiff has authority, as a matter of tribal sovereignty or under IGRA, to enforce any ordinances against Kalshi, a nonmember. And in any event, the CEA preempts Plaintiff's ordinances when it comes to Kalshi's event contracts. Plaintiff's invocations of sovereignty and self-governance do not rescue these infirmities, as the Complaint fails to allege any injury to sovereignty that would establish Article III standing.

Plaintiff's remaining claims under the Lanham Act and federal civil RICO statute ask the Court to accept that Kalshi is a fraudulent enterprise that has been deceiving the public and engaging in a criminal conspiracy with Robinhood—all under the supervision of a federal regulator with robust civil enforcement authority over both and the ability to refer criminal matters to the U.S. Department of Justice. *See* 7 U.S.C. § 13a-1. These allegations do not even approach plausibility, much less the exacting standards of Rule 9(b). With regard to the Lanham Act claim, the Complaint does not allege a commercial injury necessary to establish standing; false statements of fact (as opposed to opinion); or a likelihood of consumer deception. *Blue Lake Rancheria*, 2025 WL 3141202, at *1-3 (finding tribes had not shown a likelihood of succeeding on a substantially similar Lanham Act claim). With regard to RICO, the Complaint alleges nothing more than ordinary business dealings intended to make Kalshi's event contracts broadly available to the market, and the criminal statutes that allegedly give rise to the necessary "predicate acts" are inapplicable as a matter of law.

Plaintiff may be frustrated that it cannot regulate a derivatives market that it speculates could divert patrons from its casinos. But its displeasure with the balance that Congress struck in

enacting IGRA, UIGEA, and the CEA does not give rise to a claim.  The Complaint should be dismissed with prejudice.

## II.    BACKGROUND

### A.    Legal Background

#### 1.    Congress Passes the Commodity Exchange Act to Bring Federal Regulation to the Derivatives Market.

Congress enacted the CEA in 1936 to bring a measure of federal regulation to the derivatives markets.  *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 362 (1982).  Congress initially stopped short of a comprehensive federal scheme, preserving parallel state authority over "transactions" subject to the CEA.  7 U.S.C. § 6c.  A patchwork of regulations resulted, leading to calls for a regulatory framework that was "uniform throughout the United States" and not "subject to the vagaries of" different obligations in "different jurisdictions." *Hearings Before the H. Comm. on Agric.*, 93d Cong. 121 (1973).

In 1974, Congress heeded these calls by amending the CEA to bring "all futures trading under federal regulation."  *Hearings Before the S. Comm. on Agric. & Forestry*, 93d Cong. 848 (1974).  In furtherance of that effort, Congress took two essential steps.  First, it created the CFTC to oversee trading on federally designated "contract market[s]."  7 U.S.C. § 2(a)(1)(A).  Second, it vested the CFTC with "exclusive jurisdiction" over trading on those federal exchanges.  *Id.*; *see Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1157 (7th Cir. 1992) ("State laws specifically directed towards the futures markets naturally operate in an area preempted by the CEA.").  Although House drafters introduced a state-law savings clause, the Senate added language clarifying that the clause applied "except as hereinabove provided" by the statute's grant of exclusive jurisdiction to the CFTC.  S. Rep. No. 93-1131, at 31 (1974).  The Senate also "struck" the existing provision that preserved state laws applicable to derivatives "transactions."  H.R. Conf.

Rep. No. 93-1383, at 35 (1974).  The conference report explained that the amendments were designed to "preempt the field insofar as futures regulation is concerned."  *Id.*

### 2. Congress Passes the Indian Gaming Regulatory Act to Regulate Federal, State, and Tribal Relations Relating to Gaming "on Indian Lands."

In 1988, Congress passed IGRA in response to the Supreme Court's decision in *California v. Cabazon Band of Mission Indians*, which held that states could not regulate gaming on Indian lands.  *Bay Mills*, 572 U.S. at 794 (citing *Cabazon Band*, 480 U.S. 202, 221-22 (1987)).  Congress recognized that tribes were engaged in "gaming activities on Indian lands as a means of generating tribal governmental revenue," but then-existing federal law did not provide "clear standards" governing such gaming.  25 U.S.C. § 2701(1), (3).  Congress therefore sought to "provide a statutory basis for the operation of gaming by Indian tribes."  *Id.* § 2702(1).  It did so through a unique blend of federal, state, and tribal oversight.  It also created the National Indian Gaming Commission ("NIGC") to lead the effort on the federal level.

The statute affords tribes exclusive jurisdiction over class I gaming "on Indian lands," *id.* § 2710(a)(1), defined to mean "social games solely for prizes of minimal value," *id.* § 2703(6). With respect to class II and class III gaming, however, the statute provides for concurrent jurisdiction of federal, state, and tribal authorities.  Relevant here, it authorizes "[c]lass III gaming activities on Indian lands . . . only if such activities are," among other things, "located in a State that permits such gaming" and "conducted in conformance with a Tribal-State compact."  *Id.* § 2710(d)(1)(B)-(C).  It requires that "any Indian tribe" wishing to engage in class III gaming activity "on Indian lands" (or to authorize someone else to do so) adopt a tribal ordinance and enter into a "Tribal-State compact" with the state in which the class III gaming activities would be "located," to be approved by either the Chairman of the NIGC or Secretary of the Interior.  *Id.*

§ 2710(d)(1)-(3).  If a compact with the state cannot be achieved, the Secretary of the Interior is to promulgate "procedures" guiding the regulation of gaming activity.  *Id.* § 2710(d)(7)(B)(vii).

Finally, IGRA provides that the United States district courts have jurisdiction over lawsuits by (1) a state or tribe to enjoin a class III gaming activity that is "located on Indian lands" ***and*** "conducted in violation of any Tribal-State compact . . . that is in effect"; and (2) the Secretary to enforce procedures established in the absence of a compact.  *Id.* § 2710(d)(7)(A)(ii), (iii).  Thus, through IGRA, Congress established a delicate balance of federal, state, and tribal regulation of gaming activities "conducted" by a tribe or authorized licensee "on Indian lands."  *Id.*  Nowhere does IGRA convey any intent to regulate the derivatives markets that had been brought under the exclusive jurisdiction of the federal government years earlier.

### 3.     Congress Passes the Unlawful Internet Gambling Enforcement Act to Address State and Tribal Regulation of Gaming in the Internet Era.

In 2006, Congress returned to gaming-related legislation, this time to address the advent of the internet and the challenges it posed to enforcement of state and tribal regulation.  The result was UIGEA, which was passed out of a need for "[n]ew mechanisms for enforcing gambling laws on the Internet."  31 U.S.C. § 5361(a)(4).  Notably, Congress was aware it was legislating against the backdrop of IGRA, providing that UIGEA should not be construed as "altering, limiting, or extending any Federal or State law or Tribal-State compact prohibiting, permitting, or regulating gambling within the United States."  *Id*. § 5361(b).  Rather, UIGEA's purpose was to ensure that the diffuse nature of internet technology would not undermine laws or compacts.  *Id*. § 5361(a)(4).

Congress did so by addressing head-on the issue presented here: if a business operates an internet gaming platform in, say, New York (where such conduct is legal), and a person engages in gaming activity over the internet while located in, for example, Utah (where such conduct is illegal), where is the conduct deemed to have occurred for purposes of application of state law—

New York or Utah?  Under UIGEA, the answer is Utah.  UIGEA accomplished this result in the following way.  First, the statute prohibits a person "engaged in the business of betting or wagering" from accepting funds in connection with "unlawful Internet gambling."  31 U.S.C. § 5363.  Second, the statute defines "unlawful Internet gambling" to mean:

> [T]o place, receive, or otherwise knowingly transmit a bet or wager by any means which involves the use, at least in part, of the Internet where such bet or wager is unlawful under any applicable Federal or State law in the State or Tribal lands in which the bet or wager is initiated, received, or otherwise made.

*Id*. § 5362(10)(A).

Thus, if the bettor located in Utah places "a bet or wager by . . . means . . . of the Internet," he has done so "where such bet or wager is unlawful," resulting in a statutory violation.  *Id.*

Crucially, however, Congress carved out derivatives trading activity—such as the event contracts offered by Kalshi—from the reach of UIGEA.  It did so through the statute's definition of "bet or wager," which has a number of exclusions.  As relevant here, the definition excludes "any transaction conducted on or subject to the rules of a registered entity . . . under the Commodity Exchange Act."  *Id.* § 5362(1)(E)(ii); *see also* 7 U.S.C. § 1a(40)(A) (defining "registered entity" to include "a board of trade designated as a contract market" by the CFTC).  Thus, UIGEA's prohibitions on certain bets or wagers placed over the internet does not extend to "transaction[s] conducted on" a DCM such as Kalshi—a "registered entity . . . under the Commodity Exchange Act."  *Id.*  This exclusion ensured that UIGEA could not be used to undermine the uniform federal regulatory scheme established decades earlier.

### 4.  Congress Further Amends the Commodity Exchange Act Through Dodd-Frank and Addresses Regulation of Event Contracts.

Four years after UIGEA's passage, Congress amended the CEA through the Dodd-Frank Act of 2010 ("Dodd-Frank").  Two amendments are relevant here.  First, Congress added "swaps"

to the CFTC's exclusive jurisdiction.  *See* Pub. L. No. 111-203, 124 Stat. 1376, 1666 (2010).

Section 2(a) now provides that the CFTC "shall have exclusive jurisdiction . . . with respect to

accounts, agreements . . . and transactions involving swaps or contracts of sale of a commodity for

future delivery . . . traded or executed on a contract market designated" by the CFTC.  7 U.S.C.

§ 2(a)(1)(A).  And Congress defined "swap" to encompass, among other things, event contracts—

that is, contracts "dependent on the occurrence . . . of an event or contingency associated with a

potential financial, economic, or commercial consequence."  *Id.* § 1a(47)(A)(ii); *see also id.*

§ 1a(19)(iv).

Second, Congress created a "Special Rule" that authorizes the CFTC to review and prohibit

certain event contracts it determines to be "contrary to the public interest."  *Id.* § 7a-2(c)(5)(C)(i).

The CEA provides that the CFTC "may"—but need not—deem event contracts contrary to the

public interest if they "involve" certain categories, including "gaming."  *Id.*; *see also* 17 C.F.R.

§ 40.11.  The decision to prohibit an event contract that falls within one of the enumerated

categories is subject to the CFTC's evaluation of the "public interest."

Today, the CFTC's regulatory framework is extensive, comprehensive, and exclusive.  An

exchange must first apply for and receive the CFTC's designation as a contract market, known as

a "DCM."  7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.100.  Once the CFTC designates an exchange as

a DCM, the CFTC has "exclusive jurisdiction" over swaps and futures contracts traded on the

exchange, including "event" contracts.  7 U.S.C. §§ 1a(47)(A), 2(a)(1)(A).  DCMs are subject to

an extensive federal regulatory framework, including 23 "core principles" identified in the CEA.

*See id.* § 7(d); 17 C.F.R. Pt. 38.  If an exchange violates the CEA or CFTC regulations, the CFTC

has recourse to a comprehensive array of enforcement mechanisms all committed to the agency's

discretion, including penalties, suspension or revocation of the exchange's designation, and

referral to the DOJ for criminal enforcement.  *See, e.g.*, 7 U.S.C. §§ 8(b), 12c, 13.

The CEA also provides that a DCM may list contracts on its exchange without preapproval from the CFTC by self-certifying that the contracts comply with CFTC requirements. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a). CFTC regulations govern what information a DCM must provide to the CFTC in a self-certification. 17 C.F.R. § 40.2. In particular, a DCM must provide a "concise explanation" of how the contract complies with the CEA and its "core principles." *Id.* § 40.2(a)(3)(v); *see also* 7 U.S.C. § 7(d); 17 C.F.R. Pt. 38. One of those core principles requires every DCM to offer market participants "impartial access" to its exchange. 17 C.F.R. § 38.151(b). Self-certified contracts are immediately effective unless and until the CFTC initiates review of any contract. *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.2(c).

## B. FACTUAL BACKGROUND

Kalshi is a New York-based DCM. ¶¶ 10-11, 69. The CFTC designated Kalshi as a contract market in 2020. ¶ 69; Ex. A. Since then, Kalshi has offered a variety of event contracts relating to climate, technology, health, popular culture, economics, politics, and, more recently, sports. ¶¶ 70, 121; Exs. B-E. Kalshi's event contracts are traded exclusively on its DCM. ¶ 69.

Kalshi has entered into commercial relationships with third parties relating to its event contracts. For instance, Kalshi works with Robinhood Derivatives, LLC—an electronic trading platform, registered broker-dealer, and CFTC-registered futures commission merchant ("FCM")—to facilitate trading on Kalshi's DCM by Robinhood customers. ¶¶ 12-13, 116, 118. Kalshi has also contracted with Susquehanna International Group LLP, which provides market-making services to bolster liquidity in the trading of Kalshi's event contracts. ¶ 120.

Kalshi has self-certified the sports event contracts at issue here pursuant to Section 7a-2(c)(1) of the CEA. *See* ¶¶ 55-56, 70, 83. In 2024, the CFTC conducted a review of Kalshi's event contracts relating to political elections pursuant to the Special Rule. ¶¶ 70-71; 7 U.S.C. § 7a-2(c)(5)(C)(i). In conducting that review, the CFTC engaged in a two-step process. It first

determined that Kalshi's political event contracts involved "unlawful conduct" and "gaming" (two enumerated categories under the Special Rule). Ex. F at 10-12. It then determined that the political event contracts were "contrary to the public interest." *Id.* at 13; ¶ 72. The CFTC's order was later set aside as arbitrary and capricious under the Administrative Procedure Act, *KalshiEX LLC v. CFTC*, 2024 WL 4164694, at *6, *13 (D.D.C. Sept. 12, 2024), and the CFTC ultimately abandoned its appeal from that decision, Unopposed Motion for Voluntary Dismissal, *KalshiEX LLC v. CFTC*, No. 24-5205 (D.C. Cir. May 5, 2025) (Dkt. No. 2114321).

On January 22, 2025, Kalshi self-certified, pursuant to Section 7a-2(c)(1) of the CEA, the first of a number of sports event contracts that are now available on its exchange. Those certifications contain extensive information, including in confidential appendices not available to the public, for the CFTC's review. *See, e.g.*, Ex. G at 2 (referencing confidential appendices). The CFTC has not taken issue with the sufficiency of Kalshi's self-certifications. *See* ¶¶ 91-92.

Plaintiff is a federally recognized Indian tribe that operates casinos on its tribal lands. ¶¶ 1, 37, 40. Plaintiff conducts class III gaming, as defined by IGRA, pursuant to its tribal-state compact with the State of Wisconsin. ¶ 9. Plaintiff alleges that its compact allows it to conduct sports betting, ¶¶ 156, 168, but nowhere alleges that it actually conducts sports betting.

### III.    ARGUMENT

### A.    LEGAL STANDARD

To survive a motion to dismiss, a complaint must provide sufficient factual allegations to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Legal conclusions or mere recitals of a cause of action's elements are "not entitled to the assumption of truth." *Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 827 (7th Cir. 2015). Claims that sound in fraud, such as Plaintiff's Lanham Act claim and civil RICO claim (predicated on wire fraud), must also satisfy Federal Rule of Civil Procedure 9(b)'s heightened pleading standard.

*See, e.g.*, *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 597 (7th Cir. 2001) (applying Rule 9(b) to RICO claim); *RBG Plastics, LLC v. Sparkles Gift & Party Shop, Inc.*, 2025 WL 2764505, at *6 (N.D. Ill. Sept. 29, 2025) (applying Rule 9(b) to Lanham Act false advertising claim).

**B.    PLAINTIFF FAILS TO STATE A CLAIM UNDER IGRA (COUNT I).**

The premise of Plaintiff's IGRA claim is that Kalshi is engaging in unlawful class III gaming activity on tribal lands in violation of Section 2710(d)(1) of IGRA.  ¶ 32; *see generally* ¶¶ 126-41.  But the right of action created by IGRA extends *only* to violations of tribal-state compacts, 25 U.S.C. § 2710(d)(7)(A)(ii), which the Complaint does not allege.  And it extends only to conduct occurring "on Indian lands," *id.*, a condition also absent here.  "[W]hen a federal statute creates specific private rights of action, the judiciary cannot add others."  *Stockbridge-Munsee Cmty. v. Wisconsin*, 922 F.3d 818, 824 (7th Cir. 2019).  The Complaint fails to state an IGRA claim for this reason alone.  *See Fox v. Iowa Health Sys.*, 399 F. Supp. 3d 780, 800 (W.D. Wis. 2019) (dismissing plaintiff's claim because Wisconsin law did not create a private right of action).  Even if Plaintiff had a statutory right of action, the Complaint challenges CFTC-regulated derivatives trading that is expressly insulated by UIGEA—the only statute that addresses the lawfulness *vel non* of internet gaming that is unlawful where "bets or wagers" are "initiated."

**1.    Plaintiff Lacks a Statutory Right of Action for Violations of IGRA.**

*a.    Plaintiff Fails to Allege Conduct in Violation of a Tribal-State Compact.*

Plaintiff alleges that Section 2710(d)(7)(A)(ii) authorizes it to sue to enjoin Kalshi from engaging in unlawful class III gaming activity on Plaintiff's tribal lands.  ¶¶ 7(c), 140.  But the provision on which Plaintiff relies does no such thing.  Section 2710(d)(7)(A)(ii) provides:

> The United States district courts shall have jurisdiction over . . . any cause of action initiated by a State or Indian tribe to enjoin a class III gaming activity located on Indian lands **and** conducted in violation of any Tribal-State compact entered into under [Section 2710(d)(3)] that is in effect. (emphasis added).

This provision creates a limited statutory right of action.  *Stockbridge-Munsee*, 922 F.3d at 822 ("The Act creates three express rights of action."); *Florida v. Seminole Tribe of Fla.*, 181 F.3d 1237, 1245-46 & n.13 (11th Cir. 1999) (Section 2710(d)(7)(A)(ii) provides limited right of action); *Cayuga Nation v. N.Y. State Gaming Comm'n*, 2025 WL 2161290, at *3-4 (N.D.N.Y. July 30, 2025) (same).[2]

Courts have applied Section 2710(d)(7)(A)(ii) strictly in accordance with its terms, refusing to recognize claims seeking "to secure enforcement of the IGRA's provisions, other than those actions specifically provided for in the IGRA."  *Davids v. Coyhis*, 869 F. Supp. 1401, 1412 (E.D. Wis. 1994) (granting motion to dismiss IGRA claim).  The provision authorizes suit "not for all 'class III gaming activity located on Indian lands' . . . , but only for such gaming as is 'conducted in violation of any Tribal-State compact . . . that is in effect.'"  *Bay Mills*, 572 U.S. at 795 n.6.  The Seventh Circuit has gone even further, instructing that claims under the provision are cognizable only if they are "limited to alleged compact violations" relating to the "seven matters which a Tribal-State compact negotiated pursuant to the IGRA may address."  *Ho-Chunk Nation*, 512 F.3d at 933-34 (claims must arise from an "alleged violation relat[ing] to a compact provision agreed upon pursuant to the IGRA negotiation process" and "25 U.S.C. § 2710(d)(7)(A)(ii) does not extend to all violations of a Tribal-State compact"); *cf. Seminole Tribe*, 181 F.3d at 1246 n.13 ("the cause of action expressly created by 25 U.S.C. § 2710(d)(7)(A)(ii) is

---

[2] In *Wisconsin v. Ho-Chunk Nation*, 512 F.3d 921, 929 (7th Cir. 2008), in resolving questions relating to the scope of the statutory provision, the Seventh Circuit referred to this provision as granting "federal subject matter jurisdiction."  Years later, in 2014, the Supreme Court clarified that district courts have subject matter jurisdiction to decide "any claim alleging a violation of IGRA," but that the provision "may indicate that a party has no statutory right of action."  *Bay Mills*, 572 U.S. at 787 n.2; *see Stockbridge-Munsee*, 922 F.3d at 821 (recognizing this "way of understanding § 2710(d)(7)(A)(ii)").

plainly not available" where "there is no compact"); *Cayuga Nation*, 2025 WL 2161290, at *2-3 (interpreting Section 2710(d)(7)(A)(ii) to unambiguously require unlawful class III gaming ***and*** a violation of a compact, and rejecting tribal plaintiffs' argument "that the 'and' in this sentence should instead be understood to mean 'or'").

The Complaint does not and cannot allege any violation of Plaintiff's compact with Wisconsin, let alone one falling within the limits set forth by the Seventh Circuit in *Ho-Chunk*. As a threshold matter, state-tribal compacts "create[] a contractual relationship" between the state and tribe. *Dairyland Greyhound Park, Inc. v. Doyle*, 719 N.W.2d 408, 420 (Wis. 2006). "A compact is a contract, subject to the ordinary rules of contract construction." *Wisconsin v. Ho-Chunk Nation*, 478 F. Supp. 2d 1093, 1098 (W.D. Wis. 2007), *aff'd in part, vacated in part*, 512 F.3d 921 (7th Cir. 2008). "It goes without saying that a contract cannot bind a nonparty." *Knox v. Am. Fam. Ins. Co.*, 2025 WL 1137222, at *5 (W.D. Wis. Apr. 10, 2025) (Conley, J.) (quoting *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002)). Non-parties like Kalshi thus "cannot be bound by"—and cannot violate—the terms of a tribal-state compact. *Taxpayers of Mich. Against Casinos v. Michigan*, 685 N.W.2d 221, 230 (Mich. 2004), *aff'd in part*, *rev'd in part on other grounds*, 732 N.W.2d 487 (Mich. 2007).[3]

Section 2710(d)(7)(A)(ii) requires a violation of a provision of a tribal-state compact, which means Congress did not intend to empower tribes or states to sue third parties—rather than each other—under that provision. Kalshi is aware of only a ***single case*** where a tribe attempted to bring suit under IGRA against a non-tribal third party, who was promptly dropped from the suit after settling with the tribe. *See Cayuga Nation*, 2025 WL 2161290, at *1 nn. 1 & 2.

---

[3] Federal law looks to and relies upon state contract law. *See Krueger Int'l, Inc. v. Royal Indemnification Co.*, 481 F.3d 993, 994 (7th Cir. 2007) (applying state law to breach of contract).

Even if Kalshi could somehow breach a contract to which it is not a party, the Complaint—while full of conclusory assertions that Kalshi is violating the compact, ¶¶ 43, 66-68—points to **no** actual provision that Kalshi allegedly violated. This stands to reason, because the agreement governs only the conduct of the parties who entered into it—Plaintiff and Wisconsin. Ex. H at 5.

Plaintiff attempts to elide this inconvenient fact by asserting that the compact does not "authorize" Kalshi to engage in class III gaming activity and that Kalshi therefore is in "violation" of the compact. ¶¶ 41, 45, 64. But "unauthorized" conduct is beyond the scope of the statutory right of action; only violations of a compact trigger it. *Blue Lake Rancheria*, 2025 WL 3141202, at *5 (rejecting argument that Kalshi violated a tribal-state compact by engaging in activity not expressly authorized under the compact); *cf. Bay Mills*, 572 U.S. at 795 n.6 (noting states cannot sue to enjoin tribes from conducting class III gaming with no compact because such gaming, even though unauthorized, would not violate a compact).[4]

### b. *Plaintiff Fails to Allege Conduct Located on Indian Lands.*

Although the Court need not reach the issue, Plaintiff also fails to satisfy the second prerequisite for asserting a cause of action under IGRA—that the claim seeks to enjoin class III gaming activity "located on Indian lands." Kalshi is a Delaware corporation headquartered in New York. ¶¶ 10-11. Other than conclusory allegations that Kalshi makes its contracts "available on the Nation's Indian Lands," ¶ 66, Plaintiff does not explain how running a derivatives exchange

---

[4] This is not to say that **no one** has the power to sue over unlawful class III gaming activity that does not violate the express terms of a compact. As the Supreme Court recognized in *Bay Mills*, "if a tribe opens a casino on Indian lands before negotiating a compact, the surrounding State cannot sue" because there is no violation of a compact; rather, "only the Federal Government can enforce the law." 572 U.S. at 795 n.6 (citing 18 U.S.C. § 1166(d)); *see also Cabazon Band of Mission Indians v. Wilson*, 124 F.3d 1050, 1059-60 (9th Cir. 1997) ("Outside the express provisions of a compact, the enforcement of IGRA's prohibitions on class III gaming remains the exclusive province of the federal government."); *Pueblo of Pojoaque v. New Mexico*, 863 F.3d 1226, 1232 (10th Cir. 2017) ("Only the federal government can impose criminal or other sanctions against allegedly-illegal gaming on tribal lands in the absence of a tribal-state compact.").

from New York amounts to conduct "located on Indian lands." Analysis of that phrase begins, as it must, with the text of the statute, *Lackey v. Stinnie*, 604 U.S. 192, 199 (2025), and the text makes clear that in Section 2710(d)(7)(A)(ii), the "activity located on Indian lands" that concerned Congress was the operation of brick-and-mortar gaming facilities physically located on Indian reservations.

IGRA uses the phrase "on Indian lands" in virtually every section of the statute. *See Bay Mills*, 572 U.S. at 795 ("Everything—literally everything—in IGRA affords tools (for either state or federal officials) to regulate gaming on Indian lands, *and nowhere else*.") (emphasis added). Other indicia of Congress's territorial focus abound: the requirement that tribes issue a separate license "for each place, facility, or location on Indian lands at which class II gaming is conducted," 25 U.S.C. § 2710(b)(1)(B); the authorization of "[c]lass III gaming activities shall be lawful on Indian lands only if such activities are . . . located in a State that permits such gaming," *id.* § 2710(d)(1)(B); and the direction to the NIGC to "inspect and examine all premises located on Indian lands on which . . . gaming is conducted," *id.* § 2706(b)(1)-(2). The term "conduct" also appears throughout the statute, referring to the operation of a gaming facility. *E.g.*, 25 U.S.C. § 2710(b)(1)(B) (requiring a separate license for "each place, facility, or location on Indian lands at which class II gaming is conducted"); *id.* § 2710(b)(2)(A) (referring to "proprietary interest and responsibility for the conduct of any gaming activity"); *id.* § 2710(b)(3) (referring to revenues from gaming "conducted or licensed by any Indian tribe").

All of this underscores that Congress's concern in IGRA was with the operation of gaming businesses physically located on tribal lands. The Complaint nowhere alleges that Kalshi is engaged in anything of the sort. In related contexts, courts have held that touchpoints with an Indian reservation through the internet alone are insufficient to constitute conduct on Indian lands. *See Hornell Brewing Co. v. Rosebud Sioux Tribal Ct.*, 133 F.3d 1087, 1093 (8th Cir. 1998) (online

advertisements viewed by tribal members did not constitute conduct on Indian lands for tribal jurisdiction purposes); *Jackson v. PayDay Fin., LLC*, 764 F.3d 765, 768-69 (7th Cir. 2014) (tribal members' use of the internet to offer loans to nonmembers did not constitute conduct on Indian lands for tribal jurisdiction purposes).

Because Plaintiff does not and cannot satisfy either requirement for asserting a cause of action under Section 2710(d)(7)(A)(ii), Count I should be dismissed.

**2.    UIGEA Governs the Conduct Alleged in the Complaint and Insulates It from Liability in Deference to the CFTC's Exclusive Jurisdiction Over Transactions on DCMs.**

Even if Plaintiff had a statutory right of action, the Complaint nonetheless fails to state a claim under IGRA and should be dismissed for that additional and independent reason.  The question presented is whether a DCM like Kalshi that is operating what Plaintiff says is an internet gaming platform—which can be accessed in a place where Plaintiff alleges that it is unlawful for Kalshi to engage in gaming—can be held liable under IGRA for conducting class III gaming activity on Indian lands.  As the Northern District of California recently concluded when considering this exact question, the answer is no.  *Blue Lake Rancheria*, 2025 WL 3141202, at *6. That is for two reasons.  First, Congress did not contemplate this scenario when it passed IGRA in 1988; the statute is "silent" on the issue.  *Id.* (finding statute's failure to address internet activity "unsurprising" given it was enacted "a few years before the internet became publicly available"). Second, when Congress did turn to the issue of internet gaming, UIGEA expressly ***insulated*** transactions on DCMs, in furtherance of the CFTC's exclusive jurisdiction over such trading.  *See* 7 U.S.C. § 2(a)(1)(A).

Under UIGEA, if a "bet or wager" placed through an internet gaming platform is unlawful where it is "initiated, received, or otherwise made," it is a "restricted transaction" that is unlawful under federal law.  31 U.S.C. § 5362(10); *see also id.* § 5363.  As the Ninth Circuit explained:

> The UIGEA was passed to regulate online gambling. . . . [T]he UIGEA does not prohibit otherwise legal gambling. But the UIGEA does create a system in which a "bet or wager" must be legal both where it is "initiated" and where it is "received." This requirement makes sense in light of how the internet operates. . . . In effect, the UIGEA prevents using the internet to circumvent existing state and federal gambling laws, but it does not create any additional substantive prohibitions.

*Iipay Nation*, 898 F.3d at 964-65. If Congress had stopped there, Plaintiff might have an argument that Kalshi's sports event contracts are "restricted transactions" when initiated or received on Plaintiff's lands, as Kalshi is not covered by the terms of Plaintiff's tribal-state compact and sports betting not covered by a tribal-state compact is illegal in Wisconsin. ¶ 123.

But Congress did not stop there. It went on to exclude from the definition of "bet or wager" "any transaction conducted on . . . a registered entity . . . under the Commodity Exchange Act." *Id.* § 5362(1)(E)(ii). The Complaint acknowledges, as it must, that Kalshi's event contracts fall within that carveout. ¶¶ 46, 69 (alleging that Kalshi is a DCM subject to CFTC oversight under the CEA). Congress created this regulatory construct against the express backdrop of IGRA, yet declined to make any accommodation in UIGEA for "bets or wagers" that could be "initiated" on Indian lands other than for strictly "intratribal" transactions. *See* 31 U.S.C. § 5362(10)(C); *see also id.* § 5365(b)(3) (clarifying civil enforcement powers for restricted transactions on Indian lands); *Blue Lake Rancheria*, 2025 WL 3141202, at *6 (noting that UIGEA "contemplates this delineation" between IGRA and UIGEA). That decision makes sense, given the decades-long Congressional project to establish exclusive federal jurisdiction over the nation's derivatives markets. *See supra* II.A. Against this backdrop, it stands to reason that Congress carved out on-exchange derivatives trading from UIGEA—to avoid any misperception that it wished to reintroduce the unworkable patchwork of regulation that the CEA had eliminated.

The Complaint does not mention UIGEA.  That is unsurprising because the statute is fatal to Plaintiff's IGRA claim.  Plaintiff asks the Court to put on blinders and to assume that only IGRA governs, UIGEA does not exist, and the CEA does not apply because Kalshi has allegedly failed to comply with it (*see infra* III.C).  The Court should decline that invitation.  These three statutes coexist comfortably, and the Court should adopt a reading, easily available here, that harmonizes the statutes, not one that manufactures a "positive repugnancy" among them.  *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992).  As the Northern District of California concluded:

> [T]he UIGEA should be interpreted to apply to cover interstate (or state-to-Indian-lands and vice versa) gaming transactions via the internet, whereas IGRA should be interpreted to cover Class III gaming activities that take place exclusively within Tribal lands. . . . So the UIGEA, not IGRA, governs the challenged internet gambling.

*Blue Lake Rancheria*, 2025 WL 3141202, at *6.

### 3. The Complaint's Allegations of Non-Compliance with the CEA Are Irrelevant and Incorrect.

Faced with the CEA's exclusive regulatory scheme, and UIGEA's express confirmation of that scheme, Plaintiff resorts to alleging that Kalshi has failed to comply with the CEA.  It asks the Court to declare that Kalshi's event contracts are "outside the permissible scope of the CEA" because they are "in contravention of the prohibition in 17 C.F.R. § 40.11(a)(1)" and "*per se* barred."  Compl., Prayer for Relief, ¶ 1; ¶ 54; *see also* ¶¶ 69-92.  The Complaint does not even ***attempt*** to explain why Plaintiff would have standing to bring a challenge to Kalshi's compliance with the CEA or CFTC regulations.  *See Blue Lake Rancheria*, 2025 WL 3141202, at *7 ("[J]urisdiction to decide whether Kalshi's event contracts violate the [CEA] . . . belongs to the [CFTC], which has 'exclusive jurisdiction' over its contract markets.").  Nor does it attempt to explain why any violation of the CEA or CFTC regulations would mean that the CEA does not

apply at all, let alone that IGRA should govern instead. That would make no sense. Failure to comply with the CEA or CFTC regulations is not a reason to turn to IGRA.[5]

In any event, Plaintiff's assertions of non-compliance are wrong. Plaintiff contends that certain event contracts are "*per se* barred" under 17 C.F.R. § 40.11. ¶ 54. Plaintiff misconstrues both the statutory scheme and its implementing regulations. The CEA expressly permits DCMs like Kalshi to self-certify the contracts they wish to list on their exchange. 7 U.S.C. § 7a-2(c)(1). The CEA further provides that the CFTC "shall approve" new contracts as a general matter, but "may determine" whether contracts falling into certain enumerated categories—including the undefined term "gaming"—are "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(B)-(C). In furtherance of the Special Rule, the CFTC promulgated Regulation 40.11, which provides that the CFTC "*may* determine, based on a review of the terms and conditions of a submission under § 40.2," that a contract potentially involving an enumerated activity should be subject to public interest review by the CFTC. 17 C.F.R. § 40.11(c) (emphasis added); ¶ 56. It further provides that "an order approving or disapproving an agreement" subject to such review be issued within 90 days. *Id.* Thus, the text of the rule is clear that, even if a contract falls into a category enumerated in the Special Rule and Regulation 40.11(a), it may still be "approv[ed] or disapprov[ed]" following the CFTC's review—the very opposite of the blanket prohibition Plaintiff asserts. *See* Ex. I, at 44786 ("registered entities ***may always*** certify products pursuant to the procedures in § 40.2," subject to public interest review under § 40.11(c) (emphasis added));

---

[5] For the same reason, Plaintiff's suggestion that Kalshi's sports event contracts are somehow not "'true' futures contracts" is irrelevant. ¶ 63. Whether certain event contracts fall within the ambit of the CEA is a question governed by the statute and CFTC regulations. Plaintiff's subjective views do not somehow transform regulation of trading on a DCM into an IGRA matter. In any event, at least one court has disagreed with precisely this argument. *KalshiEX LLC v. Flaherty*, 2025 WL 1218313, at *6 (D.N.J. Apr. 28, 2025) (rejecting argument that "sporting events are without potential financial, economic, or commercial consequence").

Ex. J, at 48970-71 ("The Commission interprets [the Special Rule] to contemplate that the Commission engage in a ***two-step inquiry***." (emphasis added)).

To bolster its claim that Congress put in place a "complete prohibition" on certain event contracts, ¶ 122, Plaintiff points to certain statements made by counsel in prior litigation between Kalshi and the CFTC over its political event contracts.  ¶¶ 77, 114.  But Kalshi never said that sports event contracts are "per se" prohibited; at most, it acknowledged that it was a closer call whether sports event contracts—as opposed to political event contracts—constituted "gaming" under 17 C.F.R. § 40.11(a).  Kalshi's position in that case—as it is here and consistent with the CEA—was that Congress empowered the CFTC to conduct public interest review of contracts that "may" involve the enumerated categories in Regulation 40.11(a).  Br. of Appellee KalshiEX LLC, *KalshiEX LLC v. CFTC*, 2024 WL 4802698, at *45 (D.C. Cir. Nov. 15, 2024) (observing that it was "sensible for Congress to empower the CFTC to at least review the category of game-based contracts").  Indeed, in that case, the CFTC itself followed precisely that two-step process. *KalshiEX LLC*, 2024 WL 4164694.  *See* Ex. F at 3-4; *see also* Ex. I at 44786 ("registered entities ***may always*** certify products pursuant to the procedures in § 40.2," subject to public interest review under § 40.11(c) (emphasis added)); Ex. J at 48970-71 ("The Commission interprets [the Special Rule] to contemplate that the Commission engage in a ***two-step inquiry***." (emphasis added)).

Plaintiff also suggests that Kalshi's sports event contracts do not fall within the ambit of the CEA because its self-certifications somehow omitted information regarding its compliance with the statute.  ¶¶ 81, 134-35.  But 17 C.F.R. § 40.2 prescribes what information a DCM is required to submit when self-certifying, and there is no well-pleaded allegation that Kalshi failed to comply with any of those requirements.  In support of its theory, Plaintiff cites only the publicly available versions of those certifications, ¶ 81 n.8, and fails to mention the confidential appendices

not available to the public that Kalshi submitted for the CFTC's review.  *See, e.g.*, Ex. G, at 2 (referencing confidential appendices).

## C.    PLAINTIFF FAILS TO STATE A CLAIM FOR VIOLATION OF TRIBAL GAMING ORDINANCES (COUNT II).

Plaintiff alleges that Kalshi has violated its gaming ordinance (the "Ordinance").  ¶¶ 41, 171-72.  But as a matter of law, Plaintiff lacks authority to enforce its Ordinance against Kalshi, a nonmember, and the Ordinance is, in any event, preempted by the CEA (not the other way around).

### 1.    Plaintiff Lacks Authority to Exercise Tribal Jurisdiction Over Kalshi, a Nonmember.

Plaintiff's assertion of "jurisdiction and authority" to enforce its Ordinance against Kalshi, ¶¶ 143-44, 147, collides with Supreme Court precedent establishing that tribal sovereignty is "not so broad as to support the application" of tribal regulations to non-Indians.  *Montana v. United States*, 450 U.S. 544, 563 (1981); *see id.* at 564 (noting "implicit divestiture" of tribal sovereignty in areas "involving the ***relations between an Indian tribe and nonmembers of the tribe***") (emphasis in original) (quoting *United States v. Wheeler*, 435 U.S. 313, 326 (1978)); *Strate v. A-1 Contractors*, 520 U.S. 438, 445 (1997) ("[A]bsent express authorization by federal statute or treaty, tribal jurisdiction over the conduct of nonmembers exists only in limited circumstances.").  Tribes can exercise sovereign authority over nonmembers in just two limited scenarios: (1) where a tribe seeks to regulate "the activities of nonmembers who enter consensual relationships with the tribe or its members," and (2) where a nonmember's conduct "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe."  *Montana*, 450 U.S. at 565-66; *Jackson*, 764 F.3d at 782.  Neither exception applies here.

As to the first, exercise of tribal regulatory authority based on a consensual relationship is proper only when there is "nonmember ***conduct inside the reservation*** that implicates the tribe's sovereign interests."  *Jackson*, 764 F.3d at 782 (emphasis in original) (quoting *Plains Com. Bank*

21

*v. Long Fam. Land & Cattle Co.*, 554 U.S. 316, 332 (2008)).  In *Jackson*, the Seventh Circuit held that tribal jurisdiction over nonmembers—who took out loans offered by a tribe over the internet— was improper because they had "not engaged in any activities inside the reservation that implicate[d] the tribe's sovereign interests."  764 F.3d at 782.  While the nonmembers had entered into a contract with the tribe, "[t]hey did not enter the reservation to apply for the loans, negotiate the loans or execute loan documents."  *Id.*  Rather, the nonmembers applied for the loans "by accessing a website" and "made payments on the loans and paid the financing charges from Illinois."  *Id.*  Such activity did not "implicate the sovereignty of the tribe over its land and its concomitant authority to regulate the activity of nonmembers on that land."  *Id.*; *see also Lexington Ins. Co. v. Smith*, 117 F.4th 1106, 1110-11 (9th Cir. 2024) (denying petition for rehearing *en banc*) (characterizing *Jackson* as involving activity "entirely conducted over the Internet").

Likewise, the conduct at issue here—Kalshi's operation of a nationwide derivatives exchange available to tribal members and nonmembers alike—is "entirely conducted over the Internet."  *See Hornell Brewing*, 133 F.3d at 1093 (tribal jurisdiction over nonmember company was improper where tribal members alleged injury from viewing advertisements online).  Courts have rejected attempts to assert tribal jurisdiction over precisely this kind of activity, where the nonmember has "no connection to the reservation" other than conducting business activity "on the Internet."  *Lexington*, 117 F.4th at 1110-11 (distinguishing such circumstances from situations where exercise of tribal jurisdiction was appropriate).  Absent "conduct inside the reservation," Plaintiff lacks jurisdiction to enforce its regulations against a nonmember like Kalshi.[6]

---

[6] Plaintiff cites to *Water Wheel Camp Recreational Area Inc. v. LaRance* to support its argument that it has "jurisdiction and authority" to enforce its laws against Kalshi.  ¶ 143.  In *Water Wheel*, the Ninth Circuit concluded that the *Montana* analysis applied only when a tribe was attempting to exercise its power over "non-Indians on *non*-Indian land, *not* on tribal land."  942 F.3d 802, 810 (9th Cir. 2011) (emphasis added).  But as the Seventh Circuit has observed in rejecting this

Nor has Plaintiff alleged facts supporting tribal jurisdiction under the second *Montana* exception.  Plaintiff vaguely asserts that Kalshi's conduct "directly interferes with the ability of the Nation to govern itself under its own laws on its Indian Lands," and that Kalshi "draws business away from the Nation's casinos by allowing patrons to participate in class III gaming from their homes," which it surmises has a "direct impact on tribal governmental functions" and a "tangible effect on the services and programs the tribal governments provide to their members and all persons who live, work, and visit the Nation's Indian Lands."  ¶¶ 6, 67.  At its core, Plaintiff's argument is that the "economic effects" of Kalshi's business "affect [the] tribe's ability to provide services to its members"—an argument that the Seventh Circuit has directly rejected.  *Stifel,* 807 F.3d at 209 ("[I]f the second [*Montana*] exception were so broad, it would swallow the general rule.").  "In general, where a case does not affect a tribe's ability to preserve the right of reservation Indians to make their own laws and be ruled by them . . . the second *Montana* exception does not apply."  *Stifel, Nicolaus & Co. v. Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wis.*, 2014 WL 2801236, at *12 (W.D. Wis. June 19, 2014) (Conley, J.) (quoting *Strate*, 520 U.S. at 459) (internal quotations and citations omitted).  Speculating that some people may trade on Kalshi "from their homes" is not the kind of "catastrophic" impact that would "imperil the

---

argument, the Supreme Court's decision in *Plains Commerce* "leaves no doubt that *Montana* applies regardless of whether the actions take place on fee or non-feel land."  *Stifel, Nicolaus & Co. v. Lac du Flambeau Band of Lake Superior Chippewa Indians*, 807 F.3d 184, 207 (7th Cir. 2015), *as amended* (Dec. 14, 2015) (citing *Plains Com.*, 554 U.S. at 328).  "*Plains Commerce Bank* 'circumscribed' the already narrow *Montana* exceptions" so that a tribe's ability to regulate nonmembers "centers on the land."  *Id.*  (quoting *Jackson*, 764 F.3d at 782).  Kalshi's activities clearly do not "center[]" on Plaintiff's tribal land.  *See supra* Section III.C.1.

subsistence of the tribal community" necessary to support Plaintiff's attempt to exert sovereign authority over a nonmember. *See id.* at \*12 (quoting *Plains Com.*, 554 U.S. at 341).[7]

### 2. The CEA Preempts the Ordinance.

Even if Plaintiff had authority over Kalshi, the claim would fail for the additional reason that the Ordinance is preempted by federal law. Plaintiff argues its Ordinance "preempts the field of conduct that the Nation defines as gaming in its Ordinance." ¶ 146. But Plaintiff has it backwards. Tribal gaming ordinances, if adopted pursuant to IGRA and approved by the Commissioner, permit tribes to regulate gaming activity, as defined in the statute, where that gaming activity is "conducted" on tribal lands. But neither IGRA nor any gaming ordinances adopted pursuant to IGRA can preempt the "exclusive jurisdiction" that the CEA gave to the CFTC to regulate event contracts on a federally registered DCM. *See* 7 U.S.C. § 2(a)(1)(A); *supra* II.A.

Citing *Fisher v. District Court*, 424 U.S. 382 (1976), Plaintiff argues that the Ordinance preempts "any other federal or state law that conflicts," including "the provisions of the CEA." ¶ 146. But *Fisher* concerned a conflict "between the jurisdiction of state and tribal courts" over a "litigation involv[ing] ***only Indians***." 424 U.S. at 386 (emphasis added). It provides no support for the notion that Plaintiff's Ordinance could preempt a conflicting ***federal*** law, let alone provide authority over a nonmember. While "Indian tribes retain the powers of a sovereign nation in the limited realm of internal affairs," those powers are "subject to Congress's power completely to divest the tribes of such sovereignty." *United States v. Long*, 324 F.3d 475, 479-80 (7th Cir. 2003);

---

[7] To the extent that Plaintiff argues that it can bring a claim for violation of its Ordinance against Kalshi pursuant to IGRA, ¶ 147, it is wrong. As set forth above, IGRA provides only that tribes can bring a cause of action to enjoin class III gaming activity that is conducted on Indian lands ***and*** in violation of a tribal-state compact. *See supra* III.B.1. It contains no provisions authorizing tribes to bring a cause of action against private parties in federal court for allegedly violating ordinances.

*Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978) ("Congress has plenary authority to limit, modify, or eliminate powers of local self-government which the tribes otherwise possess.").

Thus, "[s]tatutes of general applicability that do not mention Indians"—like the CEA—are nevertheless usually held to apply to them." *Menominee Tribal Enters. v. Solis*, 601 F.3d 669, 670 (7th Cir. 2010) (citing *FPC v. Tuscarora Indian Nation*, 362 U.S. 99, 116 (1960)). Such a statute is "inapplicable to Indians" only if (1) "it would interfere with tribal governance"; (2) "it would clash with rights granted Indians by other statutes or treaties with Indian tribes"; or (3) "there is pervasive evidence that Congress did not intend by silence that the statute would apply to Indians." *Id.* at 671 (internal citations omitted). None of these conditions exists here.

Plaintiff tries for the first exception by contending that Kalshi hurts Plaintiff's ability "to govern itself" by drawing business away from its casinos. ¶¶ 6, 172, 174. But the Complaint does not allege that Plaintiff offers sports betting at its casinos, so there is no business to draw away. In any event, nothing in IGRA "suggests [that tribes have] an affirmative right" to be "free from economic competition." *Sokaogon Chippewa Cmty. v. Babbitt*, 214 F.3d 941, 947 (7th Cir. 2000). That a generally applicable federal statute "may incidentally affect the revenue streams of tribal commercial operations that fund tribal governments" does not mean that it "touches exclusive rights of self-governance in purely intramural matters." *NLRB v. Little River Band of Ottawa Indians*, 788 F.3d 537, 551-53 (6th Cir. 2015) (applying National Labor Relations Act did not undermine "tribal self-governance" and concluding that while "IGRA provides a statutory basis to regulate tribal gaming activities," it did not follow that "no other federal regulations" could apply); *id.* at 548 ("Our sister circuits have . . . conclude[d] that aspects of inherent tribal sovereignty can be implicitly divested by comprehensive federal regulatory schemes that are silent as to Indian tribes.") citing *Menominee Tribal Enters.*, 601 F.3d at 674)); *see also San Manuel Indian Bingo &*

*Casino v. NLRB*, 475 F.3d 1306, 1315 (D.C. Cir. 2007) (tribal casino was not "traditional attribute of self-government" preventing application of law of general applicability).

Nor do the second and third exceptions apply. There is no "clash" between the CEA and IGRA, nor should the Court stretch to create one, where Congress deliberately harmonized those statutes and UIGEA. *See supra* II.A. Nor is there "pervasive evidence that Congress did not intend by silence that the statute would apply to Indians." *Menominee Tribal Enters.*, 601 F.3d at 671 (internal citations omitted). Congress has not been silent—explicitly prohibiting in UIGEA online activity that tribes and states might seek to regulate as gaming *except* as to DCM transactions.

## D. PLAINTIFF LACKS STANDING TO SUE FOR INFRINGEMENT OF TRIBAL SOVEREIGNTY (COUNT IV).

As a fallback, the Complaint separately alleges that Kalshi has interfered with Plaintiff's sovereignty by violating the Ordinance. ¶¶ 170-75. Plaintiff asserts that Kalshi's conduct undermines its ability to regulate gaming on its tribal lands. ¶¶ 6, 41, 66, 172, 174. Plaintiff also claims that Kalshi's sports event contracts have caused Plaintiff to lose revenues, impacting its government operations. ¶ 67.

As explained above, Plaintiff does not have sovereign authority over Kalshi. Under *Montana*, Plaintiff lacks jurisdiction to enforce the Ordinance against nonmembers whose conduct is not "inside the reservation," *Jackson*, 764 F.3d at 782, but instead offered over the internet. As a result, Plaintiff does not and cannot assert a cognizable Article III injury to its sovereignty flowing from Kalshi's alleged violation of the Ordinance. *Harrison v. Jefferson Par. Sch. Bd.*, 78 F.4th 765, 770 (5th Cir. 2023) ("[F]or a sovereign interest to serve as [the basis for] a cognizable injury for federal standing, 'the acts of the defendant . . . [must] invade the [government's] sovereign right, resulting in some tangible interference with its authority to regulate or to enforce its laws.'" (quoting *Saginaw Cnty. v. STAT Emergency Med. Servs., Inc.*, 946 F.3d 951, 957 (6th

Cir. 2020))).  As the Seventh Circuit has noted, "[t]he actions of nonmembers outside of the reservation do not implicate [a] Tribe's sovereignty."  *Stifel*, 807 F.3d at 207.  Count IV must therefore be dismissed on standing grounds under Rule 12(b)(1).

Plaintiff asserts that "[a]n actual controversy exists between the Nation and Kalshi, in that the Nation contends that it has the authority to enforce its Ordinance against Kalshi and prohibit it from engaging in sports gambling on its Indian lands, while Kalshi asserts that the Nation has no such authority."  ¶ 173.  But "contending"—wrongly—that it has authority to enforce its Ordinance does not confer standing on Plaintiff; Plaintiff must ***actually have*** that authority and allege how Kalshi's conduct interferes with it.  Nor can Plaintiff establish injury to its sovereignty merely by alleging that Kalshi is violating the Ordinance.  "[S]omeone violat[ing] a law . . . does not by itself injure the government in an Article III way.  Only 'actual or threatened interference with [its] authority' does."  *Harrison*, 78 F.4th at 771 (quoting *STAT Emergency*, 946 F.3d at 956) (internal quotations omitted).  "Violating the law is different from hindering its enforcement."  *Id.* at 772.  And Plaintiff does not allege any "tangible interference" with its enforcement authority, *id.* at 770, other than characterizing Kalshi's defense against this suit as an assertion that Plaintiff "has no such authority."  ¶ 173.  Plaintiff cannot manufacture Article III standing by asserting that it has enforcement authority over Kalshi when it does not, and then claiming that Kalshi is hindering that authority by pointing out Plaintiff has no such authority.

Plaintiff also alleges that Kalshi's sports event contracts "draw[] business" away from Plaintiff's casinos, resulting in a "[l]oss of revenue" that "has a direct impact on tribal governmental functions."  ¶ 67.  But Plaintiff's theory rests on an "attenuated chain of inferences necessary to find harm," which is not nearly enough.  *Carr v. Trs. of Purdue Univ.*, 2024 WL 3819424, at *7 (S.D. Ind. Aug. 14, 2024) (quoting *Clapper v. Amnesty Int'l*, 568 U.S. 398, 414 n.5 (2013)).  While Plaintiff asserts it holds "the exclusive right to operate sportsbook[s] [sic] on the

Nation's Indian lands," ¶ 168, the Complaint is conspicuously devoid of allegations that Plaintiff offers sports betting at its casinos. Even accepting *arguendo* that Kalshi is engaged in "sports gambling" like a sportsbook (it is not), Kalshi cannot "draw away" business that Plaintiff does not offer to its patrons. Under Plaintiff's logic, any conduct that draws business away from Plaintiff's casinos—the building of a professional sports stadium or concert venue nearby, rezoning of neighboring areas making housing more or less attractive, the relocation of a major employer—would interfere with Plaintiff's right to self-governance. The "attenuated chain of inferences" Plaintiff asks the Court to draw does not establish a claim of harm to its sovereign interest.

## E.    PLAINTIFF FAILS TO STATE A LANHAM ACT CLAIM (COUNT V).

Plaintiff alleges that Kalshi violated the Lanham Act by marketing its sports event contracts as "fully legal and accessible nationwide" and as "betting." ¶ 177. Plaintiff fails to adequately allege Lanham Act standing; its claim thus fails at the threshold. Plaintiff also has not adequately alleged either falsity or consumer deception or injury—certainly not sufficiently for Rule 9(b)'s heightened pleading standards. *Gensler v. Strabala*, 764 F.3d 735, 736 (7th Cir. 2014); *RBG Plastics*, 2025 WL 2764505, at *7.

### 1.    Plaintiff Lacks Standing Under the Lanham Act.

To establish prudential or statutory standing to bring a false advertising claim, Plaintiff must allege (1) "an injury to a commercial interest in reputation or sales," and (2) that their "economic or reputational injury flow[s] directly from the deception wrought by the defendant's advertising." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132-33 (2014).

Plaintiff offers only a conclusory allegation that Kalshi's advertisements have damaged Plaintiff's goodwill and reputation, ¶ 184, without "any other supporting factual content for this statement." *Hart v. Amazon.com, Inc.*, 191 F. Supp. 3d 809, 820 n.4 (N.D. Ill. 2016). None of Kalshi's "statements are alleged to disparage or even refer to [Plaintiff]." *HomeLight, Inc. v.*

*Shkipin*, 721 F. Supp. 3d 1019, 1023 (N.D. Cal. 2024) (no plausible allegation of reputational harm); *cf. Mkt. Track, LLC v. Efficient Collaborative Retail Mktg. LLC*, 2015 WL 3637740, at \*22 (N.D. Ill. June 11, 2015) ("disparaging false statements about a competitor's product . . . harm[] the competitor's goodwill and competitive position").

Plaintiff's allegations of injury to sales are also deficient.  ¶ 184.  The Complaint "has not alleged any facts indicating that [Plaintiff] is a competitor of [Kalshi]."  *Goodloe v. Nat'l Wholesale Co.*, 2004 WL 1631728, at \*12 (N.D. Ill. July 19, 2004).  Nor has it alleged that Plaintiff and Kalshi "sell[] identical products."  *MillerKing, LLC v. DoNotPay, Inc.*, 702 F. Supp. 3d 762, 773-74 (S.D. Ill. 2023) (traditional law firm did not directly compete with "web-based company" that purported to "provide legal services virtually"); *Vampire Fam. Brands, LLC v. MPL Brands, Inc.*, 2021 WL 4134841, at \*7 (C.D. Cal. Aug. 6, 2021) (pre-mixed cocktail distributor did not directly compete with wine and vodka distributor though both sold alcoholic beverages).  Kalshi offers tradeable event contracts on subjects such as economics, politics, weather, and sports, ¶¶ 70, 83, 106, whereas Plaintiff runs brick-and-mortar casinos and does not claim to offer sports betting, ¶ 40.  Given these obvious differences, the Complaint's vague allegations that Kalshi will "draw[] business away," ¶ 67, are simply implausible.

The Complaint also fails to link any harm to Kalshi's advertising, offering only a threadbare assertion that Plaintiff was injured as a "result of Kalshi's false or misleading statements."  ¶ 184.  Elsewhere the Complaint alleges—again without facts—that Defendants "have unlawfully diverted revenue that, by law and compact, belongs exclusively to [Plaintiff]." ¶ 168; *see also* ¶ 67.   None of this establishes the kind of causal link between Kalshi's advertisements and Plaintiff's alleged injury that could rule out "any number of other reasons" why Plaintiff may have lost sales.  *Lexmark*, 572 U.S. at 140 (quotations omitted).  Determining the actual relationship between Kalshi's advertisements (which say nothing about Plaintiff's

casinos) and Plaintiff's allegedly lost sales would require precisely the "speculative proceedings or intricate, uncertain inquiries" that the Supreme Court has cautioned against. *Id.* (cleaned up).

### 2.    Plaintiff Fails to Allege Falsity.

Plaintiff also fails to adequately allege that Kalshi made "a false statement of fact." *Fiskars Finland Oy Ab v. Woodland Tools Inc.*, 2024 WL 3936444, at *7 (W.D. Wis. Aug. 26, 2024) (citing *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir. 1999)). According to Plaintiff, advertisements stating that Kalshi's "platform, websites, software, and/or applications are fully legal and accessible nationwide" are false because Kalshi's operations are supposedly "defective[] . . . under 17 C.F.R. § 40.2." ¶ 177. But as explained above, Kalshi's event contracts are fully compliant with the CFTC's regulations, including 17 C.F.R. §§ 40.2 and 40.11. *See supra* III.B.3. And, in any event, it is inappropriate "for a court in a Lanham Act case to determine preemptively how a federal administrative agency will interpret and enforce its own regulations." *Sandoz Pharms. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 231-32 (3d Cir. 1990); *see also Blue Lake Rancheria*, 2025 WL 3141202, at *7 ("whether Kalshi's event contracts violate the Commodity Exchange Act" is a decision that "belongs to the [CFTC], which has 'exclusive jurisdiction' over its contract markets").

Plaintiff fails to allege falsity for the additional reason that "opinions are non-actionable under the Lanham Act because the statute prohibits only misrepresentations 'of fact.'" *Bd. of Forensic Document Exam'rs v. Am. Bar Ass'n*, 922 F.3d 827, 833 (7th Cir. 2019). A statement that a product is "legal" is an "inactionable opinion," not a statement of fact. *ThermoLife Int'l, LLC v. Gaspari Nutrition Inc.*, 648 F. App'x 609, 614-15 (9th Cir. 2016); *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 184 (2015) (statements of legal compliance are opinions); *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999) ("Statements of opinion are not generally actionable under the Lanham

Act.").  While courts recognize an exception to this rule where the speaker "lacks a good faith belief in the truth of the statement," *Gaspari*, 648 F. App'x at 614-15, that exception does not apply where Kalshi has fully complied with the CEA and CFTC's requirements, *see supra* III.B.3, and "multiple courts have agreed with [Kalshi]."  *Blue Lake Rancheria*, 2025 WL 3141202, at *2 (rejecting substantially similar Lanham Act claim asserted by tribes where plaintiffs had not shown "the opinion is literally false or that Kalshi lacks a good-faith belief in the opinion's truth").

Plaintiff asserts that "Kalshi knew or should have known [its advertising] was false" as "numerous online users have expressed concern or skepticism regarding the legality of" these contracts.  ¶ 180.  But these kinds of anonymous comments—which could have been made by competitors or bots or trolls—are of "limited value."  *QVC Inc. v. Your Vitamins, Inc.*, 439 F. App'x 165, 168-69 (3d Cir. 2011).  "'Trolling'—posting willfully inflammatory, off-topic or simply stupid remarks—plagues blogs and other online forums."  *Id.* at 169 (citation omitted).  It is not plausible to suggest that Kalshi, while operating under the regulatory oversight of the CFTC, believed that its DCM was unlawful based on a smattering of social media comments.

Plaintiff undercuts its other allegations of falsity through contradiction.  Plaintiff claims, for example, that it is "false and misleading" for Kalshi to describe its platform as "nationwide." ¶ 177.  But six paragraphs later, the Complaint alleges that Kalshi's exchange is offered "in within [sic] every state nationwide."  ¶ 183.  Plaintiff also complains that Kalshi's advertisements falsely refer to sports event contracts as "betting."  ¶ 180.  But elsewhere Plaintiff itself asserts—in accusing Kalshi of violating a compact, Secretarial Procedures, and the Ordinances—that Kalshi *is* engaged in betting.  ¶ 41 (alleging Kalshi is "offering for play to the general public the class III game of sports wagering"); ¶ 66 (similar); ¶ 61 (alleging Kalshi is offering "betting on whether the

Bears will win the Super Bowl"). Plaintiff cannot have it both ways, seeking to hold Kalshi liable for offering sports betting ***and*** for deceiving consumers by saying that is what they are doing.[8]

### 3. Plaintiff Does Not Adequately Allege a Likelihood of Deception or Injury.

The Lanham Act claim also fails to adequately allege that Kalshi's advertisements have "deceived or ha[ve] the tendency to deceive a substantial segment of its audience." *Fiskars*, 2024 WL 3936444, at *7 (citing *Hot Wax*, 191 F.3d at 819). It alleges only that Kalshi deceives consumers into believing that purchasing sports event contracts on Kalshi is "universally compliant and that Kalshi offers a legally compliant sports betting platform." ¶ 182. As set out above, Kalshi complies with all applicable law (the CEA and CFTC regulations). And in any event, this allegation of deception does not remotely satisfy Rule 9(b). Again, Plaintiff points only to social media reactions to Kalshi's posts, ¶ 101, but none suggest a consumer was deceived. And Plaintiff alleges no connection between these anonymous comments and the "universe of consumers whose views are relevant"—*i.e.*, those who might plausibly frequent Plaintiff's casinos. *QVC Inc.*, 439 F. App'x at 168-69. Finally, for the same reasons that they cannot establish Lanham Act standing, *see supra* III.E.1, Plaintiff has not sufficiently alleged that they were or are "likely to be injured as a result of [Kalshi's advertisements]." *Fiskars*, 2024 WL 3936444, at *7 (citing *Hot Wax*, 191 F.3d at 819).

### F. PLAINTIFF FAILS TO STATE A CIVIL RICO CLAIM (COUNT III).

Plaintiff accuses Kalshi (a DCM) and Robinhood (an FCM) of engaging in a criminal racketeering enterprise in full view of their federal regulator. The Complaint alleges that Defendants are violating the civil RICO statute by (1) offering sports event contracts, ¶¶ 117, 121;

---

[8] Plaintiff also makes a conclusory allegation that Kalshi "knowingly induced" third parties to "engage in acts of false advertising." ¶ 178. But because Kalshi's advertisements are not false, *see supra* III.E.2, there can be no knowing inducement of false advertising.

and (2) entering into a business relationship that involves "co-brand[ing]," a "revenue-sharing model," and market-makers, like Susquehanna. ¶¶ 118-20. Defendants thus "consciously disregard[]" regulators' "concerns" by offering sports event contracts notwithstanding a "mutual awareness of the ongoing regulatory scrutiny surrounding such products." ¶ 152.

It cannot be a RICO violation for regulated entities to offer a product that certain states or tribes have challenged in court. That is especially true here, where the exclusive federal regulator has not challenged the product in question. RICO was enacted to eliminate "the infiltration of organized crime and racketeering into legitimate organizations operating in interstate commerce." S. Rep. No. 91-617, at 83 (1969); *Fitzgerald v. Chrysler Corp.,* 116 F.3d 225, 227 (7th Cir. 1997) (prototypical RICO case is one in which a person "bent on criminal activity" uses control of a legitimate firm to perpetrate criminal activities). RICO does not apply to routine commercial activity in a routine commercial relationship, and it does not empower Plaintiff to challenge the CFTC's judgment to permit Kalshi and Robinhood to offer sports event contracts.

To make out a claim that Defendants are "conducting the affairs" of an association-in-fact enterprise in violation of 18 U.S.C. § 1962(c), Plaintiff must show: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Roppo v. Travelers Com. Ins. Co.*, 869 F.3d 568, 587-88 (7th Cir. 2017) (quoting *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 778 (7th Cir. 1994)). Plaintiff also must show "that the RICO violation was the proximate cause of its damages." *James Cape & Sons Co. v. PCC Constr. Co.*, 453 F.3d 396, 403 (7th Cir. 2006). Stated differently, "to have standing," Plaintiff must allege that it was injured "by the conduct constituting the violation." *Roppo*, 869 F.3d at 588 (quoting *Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)). Plaintiff fails to adequately allege any of these elements.

1.  **Plaintiff Has Not Alleged that Defendants Are Conducting the Affairs of an Association-in-Fact Enterprise.**

To plead conduct of an association-in-fact enterprise, courts require something that "indicate[s] how the cooperation" between businesses "exceed[s] that inherent in every commercial transaction." *United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 856 (7th Cir. 2013). The Seventh Circuit has distinguished between "a run-of-the-mill commercial relationship where each entity acts in its individual capacity to pursue its individual self-interest, versus a truly joint enterprise where each individual entity acts in concert with the others to pursue a common interest." *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 655-56 (7th Cir. 2015). This "distinction is important" because "[w]ithout it, 'every conspiracy to commit fraud that requires more than one person to commit is a RICO organization and consequently every fraud that requires more than one person to commit is a RICO violation.'" *Id*. at 656 (quoting *Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 676 (7th Cir. 2000)). Thus, courts do not find that commercial parties are "conducting the affairs" of a RICO enterprise absent something beyond routine commercial activity characteristic of each defendant's individual business. *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (routine activity by each defendant insufficient to constitute "conduct[ing] or participat[ing] in the conduct of the '*enterprise's* affairs,'" as opposed to "their *own* affairs") (emphasis in original); *accord Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 398 (7th Cir. 2009).

Plaintiff asserts that Defendants are conducting the affairs of an association-in-fact enterprise "to design, market, distribute, and widely disseminate event contracts based on sports outcomes." ¶ 152. But it is the business of Kalshi to operate an exchange where event contracts are traded, and it is the business of Robinhood to solicit and accept orders to trade. *See* 7 U.S.C. § 1a(6) (defining DCMs), § 1a(28) (defining FCMs); *see also* CFTC Release No. 9091-25, *CFTC*

34

*Staff Issues FCM FAQs* (June 30, 2025), https://www.cftc.gov/PressRoom/PressReleases/9091-25 (FCMs "perform critical functions necessary for the efficient operation of the futures and cleared swaps markets" operated by DCMs by acting as "intermediaries, facilitating transactions between FCM customers on one side and contract markets and clearing organizations on the other") (click "FCM FAQs"); *Merrill Lynch*, 456 U.S. at 360 (describing FCMs as "essential participants" in futures markets).

Plaintiff contends that Kalshi contributes to the alleged enterprise by "self-certifying" sports event contracts, "co-brand[ing]" with Robinhood to offer sports event contracts, paying Robinhood commissions, and using market makers like Susquehanna to provide liquidity for trades. ¶¶ 119-21. But Plaintiff does not (and cannot) allege that such conduct extends beyond routine commercial activity. Congress provided for self-certification of event contracts. *See* 7 U.S.C. § 7a-2(5)(c). And complying with federal regulations is not the conduct of a RICO enterprise. *Cf. Cleveland Bakers & Teamsters Health & Welfare Fund v. AMAG Pharms., Inc.*, 2025 WL 1024103, at *7 (D. Mass. Mar. 12, 2025) (reasoning in the context of a RICO claim that "[i]t would be inconsistent with the FDCA regulatory regime to submit a drug manufacturer to liability under the federal mail- and wire-fraud statutes for (1) doing something that the FDA requires or (2) failing to do something that the FDA prohibits").

As for "co-branding," the Complaint does not allege what it means, let alone how the co-branding extends beyond routine commercial activity. *Cf. In re Kmart Corp.*, 434 F.3d 536, 538 (7th Cir. 2006) (discussing a "co-brand deal" between a big-box retailer and large bank). Similarly, the commission arrangement alleged in the Complaint is typical among derivatives market participants, and hardly anything nefarious. *See, e.g.*, *Merrill Lynch*, 456 U.S. at 359 (explaining DCMs and FCMs "are financed by commissions on the purchase and sale of futures contracts

made over the exchange" and that FCMs have "an interest in maximizing the activity on the exchange").

Finally, while Plaintiff attempts to analogize Susquehanna to the "house" on a sportsbook, that is not its role. Susquehanna is a third-party market maker whose function—providing liquidity on the exchange—is commonplace on DCMs. *See, e.g.*, *Spicer v. Chi. Bd. of Options Exch., Inc.*, 977 F.2d 255, 256 (7th Cir. 1992) (explaining that "[m]arket-makers are individual traders" that "maintain a fair, orderly and liquid market in one or more classes of option contracts"); Sanford J. Grossman & Merton H. Miller, *Liquidity and Market Structure*, 43 J. Fin. 617 (1988) (explaining market makers are a common and necessary feature of well-functioning securities and commodities markets); *Description of and Terms of Kalshi's 2025 Market Maker Program*, https://www.cftc.gov/sites/default/files/filings/orgrules/25/04/rules04212519494.pdf (last visited Nov. 21, 2025) ("The purpose of this Program is to increase liquidity and tighten the spread on the central limit order book and enhance pricing efficiency. More liquidity and tighter spreads on the central limit order book will result in more efficient pricing which benefits all participants in the marketplace."). Plaintiff's failure to allege anything beyond a routine commercial relationship is fatal because "garden-variety" arrangements are "not what RICO penalizes." *Crichton*, 576 F.3d at 400; *see also Jay E. Hayden Found. v. Fist Neighbor Bank, N.A.*, 610 F.3d 382, 389 (7th Cir. 2010) ("[T]he RICO offense is ***using*** an enterprise to engage in a pattern of racketeering activity.") (emphasis in original).

### 2.    Plaintiff Does Not Plausibly Allege Any Predicate Acts of Racketeering.

Plaintiff alleges three predicate acts of racketeering: (1) wire fraud, 18 U.S.C. § 1343; (2) transmitting wagering information, *id.* § 1084; and (3) operating an illegal gambling business, *id.* § 1955. ¶ 153. Civil RICO claims relying on alleged wire fraud are "subject to the heightened pleading standard of Fed. R. Civ. P. 9(b), which requires a plaintiff to plead all averments of fraud

with particularity." *Slaney*, 244 F.3d at 597.  Accordingly, Plaintiff "must, at a minimum" allege its wire fraud predicate acts "with some specificity and state the time, place, and content of the alleged false representations, the method by which the misrepresentations were communicated, and the identities of the parties to those misrepresentations." *Id.*  The Complaint does not do that with respect to wire fraud in particular, nor does it satisfy Plaintiff's pleading obligations with respect to any other predicate acts.

       a.  *Plaintiff Has Not Adequately Alleged Wire Fraud.*

Courts do "not look favorably" on RICO claims predicated on mail and wire fraud, in part because "all modern business transactions entail use of the mails or wires." *Midwest Grinding Co. v. Spitz,* 976 F.2d 1016, 1025 (7th Cir. 1992) (collecting cases).  To plead wire fraud, a plaintiff must allege three elements with specificity: "(1) the defendant participated in a scheme to defraud; (2) the defendant intended to defraud; and (3) a use of an interstate wire in furtherance of the fraudulent scheme." *United States v. Turner*, 551 F.3d 657, 664 (7th Cir. 2008); *see also Uni\*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 924 (7th Cir. 1992) ("Rule 9(b)'s particularity requirement serves an important purpose.  Accusations of fraud can seriously harm a business.  This is especially so in RICO cases . . . .").  "Intent to defraud requires a willful act . . . with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another." *United States v. Britton*, 289 F.3d 976, 981 (7th Cir. 2002).

Plaintiff alleges in conclusory fashion that Defendants are engaged in a scheme to offer sports betting over the wires.  ¶ 154.  But the only fact asserted to support this legal conclusion is Plaintiff's contention that Kalshi's self-certifications violates Regulation 40.11.  ¶¶ 121-22.  For the reasons set forth above, *see supra* III.B.3, that assertion has no merit and—"given multiple courts have agreed" with Kalshi's view that it is operating legally—certainly cannot support an accusation of wire fraud. *Blue Lake Rancheria*, 2025 WL 3141202, at \*2 (plaintiff failed to show

that "Kalshi lacks a good-faith belief" in the legality of its operations).  And to the extent Plaintiff

contends that Kalshi has "reversed course" on whether it can offer sports event contracts, ¶ 111,

that argument fails for the same reason.  *See also supra* III.B.[9]

> b. *Plaintiff Has Not Adequately Alleged Violations of the Wire Act or 18 U.S.C.*
> *§ 1955.*

Plaintiff's second alleged predicate act is violation of the Wire Act.  ¶¶ 155-57.  For at least

three reasons, these allegations also fail.

*First*, Defendants' conduct does not fall within the ambit of the Wire Act.  *See* 18 U.S.C.

§ 1084(a).  Plaintiff alleges in conclusory fashion that Defendants are "engage[d] in the business

of betting or wagering on sports events."  ¶ 155.  The Wire Act does not define "bets or wagers."

And UIGEA—the only federal law that defines the term "bet or wager"—expressly carves out

transactions conducted on DCMs like Kalshi.  31 U.S.C. § 5362(1)(E)(ii); *see also Blue Lake*

*Rancheria*, 2025 WL 3141202, at *6 (concluding that Kalshi's "internet contracts are not bets or

wagers under the UIGEA and therefore do not constitute 'unlawful internet gambling'"); *see supra*

III.B.2.  That definition, which postdated the Wire Act, "is entitled to great weight."  *Bob Jones*

*Univ. v. United States*, 461 U.S. 574, 588 n.10 (1983).[10]  Reading the term "bets or wagers" to

include DCM transactions for purposes of the Wire Act would effectively nullify UIGEA by

subjecting the very transactions UIGEA explicitly excludes from its enforcement provisions to

criminal penalties under the Wire Act—a result Congress surely did not intend.

---

[9] To the extent that Plaintiff relies on the advertising statements it points to in its Lanham Act
claim to support the alleged wire fraud predicate act, those statements are not "false" for the
reasons set forth above and thus cannot support a wire fraud claim.  *See supra* III.E.2.

[10] This is especially so given that UIGEA expressly references the Wire Act.  *See* 31 U.S.C.
§ 5365(c)(2) (referring to 18 U.S.C. § 1084(d)).

*Second*, Kalshi's alleged conduct does not violate the Wire Act because the statute only prohibits activity that is illegal under state law. 18 U.S.C. § 1084(b) (exempting bets or wagers placed "from a state . . . where [such] betting . . . is legal into a state . . . in which such betting is legal"). Plaintiff summarily contends that Kalshi's event contracts are not "excepted [sic] under Section 1084(b)," presumably meaning they are not lawful under Wisconsin law. ¶ 157. But Wisconsin law—like federal law—expressly carves out from the definition of "bet" "[c]ontracts for the purchase or sale at a future date of securities or other commodities." Wis. Stat. § 945.01(1)(a)(1). Plaintiff entirely ignores this provision, which precludes application of Wisconsin's gambling laws to Kalshi's products.

*Third*, state laws prohibiting gambling are—when it comes to event contracts traded on a DCM—preempted by the CEA; Kalshi's conduct is thus not illegal under state law, and the Wire Act does not apply. *See* 7 U.S.C. §§ 7a-2(5)(c)(i)(v), 2(a)(1)(A); *Flaherty*, 2025 WL 1218313, at *5 ("[T]he exclusive-jurisdiction language reflects an intent to occupy the field.").

For the same reasons, Plaintiff's third alleged predicate act—operation of an illegal gambling business in violation of 18 U.S.C. § 1955—also fails. Plaintiff recites at length from Wisconsin Statute § 945.03(1m), but that statute is subject to Wisconsin's definition of "bet," including the carveout for contracts on commodities. And any alleged violation of Section 1955, not otherwise subject to the carveout, is necessarily premised upon an alleged violation of preempted state law.

### 3.    Plaintiff Fails to Allege a Cognizable RICO Injury.

Finally, the Complaint fails to allege that Plaintiff was injured "by reason of" Defendants' alleged RICO violations. *Ratfield v. U.S. Drug Testing Lab'ys, Inc.*, 140 F.4th 849, 852 (7th Cir. 2025). A RICO plaintiff must allege "some direct relation between the injury asserted and the injurious conduct alleged." *Id.* (quoting *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 267-68

(1992)).  As the Supreme Court recently reaffirmed, the "key word is 'direct'; foreseeability does not cut it."  *Medical Marijuana, Inc. v. Horn*, 604 U.S. 593, 612 (2025).  "[A] claim is cognizable under [RICO] only if the defendant's alleged violation proximately caused the plaintiff's injury."  *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 462 (2006).  The injury also "must be concrete, not speculative" and "the damages must be clear and definite."  *Viehweg v. Ins. Programs Mgmt. Grp., LLC*, 2024 WL 4165078, at *1 (7th Cir. Sept. 12, 2024); *see also First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir. 1994) ("[A]s a general rule, a cause of action does not accrue under RICO until the amount of damages becomes clear and definite.").

Plaintiff's theory of injury is too attenuated to support a RICO claim.  Plaintiff alleges it has lost revenue because Defendants offer sports event contracts that "encroach[]" upon Plaintiff's "exclusive" authorization to "operate [a] [sic] sportsbook."  ¶ 168.  But Defendants are not "divert[ing] revenue" from sports gaming that "belongs exclusively to the Nation."  *Id*.  While Plaintiff's compact "***authorize[s]***" it to operate "sports gambling ***at its casinos***," ¶ 40 (emphases added), the Complaint does not allege that the tribe offers sports gaming, let alone online sports gaming.  Plaintiff does not and cannot draw a direct relationship between its alleged injury and Kalshi's sports event contracts.  *See Hemi Grp., LLC v. City of New York,* 559 U.S. 1, 10 (2010) (because plaintiff's theory of causation required the Court to "move well beyond the first step" in the chain of conduct, "that theory cannot meet RICO's direct relationship requirement.").

In addition, Plaintiff's theory of injury "relies on users' independent propensities" between two products—here, games at brick-and-mortar casinos versus sports event contracts traded over a nationwide DCM—the "causal chain" is "too attenuated to establish the direct relationship that RICO requires."  *Child's Health Def. v. Meta Platforms, Inc.*, 112 F.4th 742, 766 (9th Cir. 2024); *Anza*, 547 U.S. at 460 (proximate cause requirement intended to prevent "these types of intricate, uncertain inquiries from overrunning RICO litigation"); *Holmes*, 503 U.S. at 269 (explaining the

direct relationship requirement avoids difficulties of attempting to "ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors").

In the end, Plaintiff does not identify a single individual who elected to trade sports event contracts on Kalshi's exchange instead of patronizing Plaintiff's casino. Its alleged injury is thus neither definite nor concrete. *Viehweg*, 2024 WL 4165078, at *1. Even if Plaintiff expected to, at some undefined point in time, receive more revenue from its casino business by offering sports betting, this speculation is insufficient to support a RICO claim, as would be any further attenuated speculation that Kalshi's sports event contracts would impact any such anticipated revenues. *See James Cape*, 453 F.3d at 403-04 (reasoning that a "court could never be certain whether Cape would have won any of the contracts that were the subject of the conspiracy" and thus affirming dismissal of the RICO claim); *Chaset v. Fleer/Skybox Int'l, LP*, 300 F.3d 1083, 1086, 1087 (9th Cir. 2002) ("expectancy interest" that RICO plaintiff would have received more revenue absent defendants' conduct insufficient).

## G.     PLAINTIFF FAILS TO PLEAD ANY CLAIM AGAINST KALSHI INC.

The Complaint lacks any allegation that Kalshi Inc. is involved in offering event contracts. A parent company, like Kalshi Inc., *see* ¶ 10, cannot be found liable for the conduct of its subsidiary merely because it owns the subsidiary. *See Steven v. Roscoe Turner Aeronautical Corp.*, 324 F.2d 157, 160-61 (7th Cir. 1963). Thus, for this independent reason, the Court should dismiss all claims against Kalshi Inc.

## IV.     CONCLUSION

Kalshi respectfully requests that the Court dismiss the Complaint with prejudice under Federal Rule of Civil Procedure 12(b)(6) as to Counts I, II, III, and V, and under Federal Rule of Civil Procedure 12(b)(1) as to Count IV.

Dated: November 21, 2025

Respectfully submitted,

/s/ Sarah A. Zylstra
Sarah A. Zylstra (State Bar No. 1033159)
szylstra@boardmanclark.com
BOARDMAN & CLARK LLP
1 South Pinckney Street, Suite 410
P.O. Box 927
Madison, WI 53701
Telephone: (608) 257-9521
Facsimile: (608) 283-1709

Olivia S. Choe
ochoe@milbank.com
Joshua B. Sterling
jsterling@milbank.com
MILBANK LLP
1101 New York Avenue, NW
Washington, D.C. 20005
Telephone: (202) 835-7500
Facsimile: (202) 263-7586

Grant R. Mainland
gmainland@milbank.com
MILBANK LLP
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

*Attorneys for Defendants Kalshi Inc.*
*and KalshiEX LLC*