**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| HO-CHUNK NATION, <br><br> Plaintiff, <br><br> v. <br><br> KALSHI INC., KALSHIEX LLC, ROBINHOOD MARKETS, INC., ROBINHOOD DERIVATIVES LLC, and DOES 1-20, <br><br> Defendants. | Case No. 25-cv-698 |

**PLAINTIFF HO-CHUNK NATION'S**
**BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

QB\100006889.2

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................. 2

    1.    The Nation's History in the State of Wisconsin ..................................... 2

    2.    Kalshi Conducts Sports Betting on the Nation's Indian Lands. ........... 5

    3.    Kalshi Misleads, or Attempts to Mislead, Consumers into Believing They Are Placing 50 State Legal Sports Bets, "Contracts," or "Trades." ............................ 6

LEGAL STANDARDS ................................................................................................. 10

    I.    Standard For Interpreting Tribal Statutory Rights .................................. 10

    II.    Standard for Granting a Preliminary Injunction ................................... 13

ARGUMENT ............................................................................................................... 14

I.    THE NATION IS LIKELY TO SUCCEED ON THE MERITS OF ITS IGRA CLAIM... 15

    A.    The Nation has a right to stop third-parties from conducting class III gaming on its Indian lands. ................................................................ 15

    B.    Kalshi conducts class III gaming through its sale of sports event contracts......... 20

        1.    *The United States has long defined sports betting as class III gaming.* ... 21

        2.    *As a Designated Contract Market, Kalshi is prohibited from listing these event contracts as they involve, relate to, or reference gaming.* .............. 22

        3.    *Kalshi is wrong to suggest that its sports betting options are swaps under the Commodity Exchange Act.* ................................................... 26

    C.    Defendants' class III gaming activity occurs on Indian lands. ............................ 29

    D.    Kalshi cannot avoid IGRA enforcement by relying on UIGEA because UIGEA preserves IGRA. ................................................... 30

II.    THE NATION IS LIKELY TO SUCCEED ON THE MERITS OF ITS LANHAM ACT CLAIM.................................................................................................... 32

    A.    In its Advertising, Kalshi Misleading and Deceptively Claims that its Platform is Legal in 50 States and that It Offers Sports Betting. ........................................... 32

    B.    Alternatively, Kalshi's Advertising is Intended to Cause Consumer Confusion and Has Done So. ................................................................... 42

    C.    Kalshi's False Claims are Material to Consumers. .............................................. 46

    D.    Kalshi's Advertising Has Injured the Nation and Continues to Do So................. 47

III.    THE NATION HAS NO ADEQUATE REMEDY AT LAW AND WILL SUFFER IRREPARABLE HARM. ............................................................................... 49

IV.    THE BALANCE OF EQUITIES FAVORS GRANTING A PRELIMINARY
       INJUNCTION. ................................................................................................................ 53

CONCLUSION ..................................................................................................................... 59

QB\100006889.2

**TABLE OF AUTHORITIES**

**Cases**

*Abbott Labs. v. Mead Johnson & Co.*,
   971 F.2d 6 (7th Cir. 1992) ............................................................................................... passim

*Amoco Prod. Co. v. Vill. of Gambell, AK*,
   480 U.S. 531 (1987)............................................................................................................ 14

*Artichoke Joe's Cal. Grand Casino v. Norton*,
   353 F.3d 712 (9th Cir. 2003) ............................................................................................. 13

*Baines v. Walgreen Co.*,
   863 F.3d 656 (7th Cir. 2017) ....................................................................................... 45, 46

*Bell v. Publix Super Markets, Inc.*,
   982 F.3d 468 (7th Cir. 2020) ............................................................................................. 33

*Bland v. Roberts*,
   730 F.3d 368 (4th Cir. 2013) ............................................................................................. 46

*Branch v. Smith,*
   538 U.S. 254 (2003)............................................................................................................ 32

*C & L Enters., Inc. v. Citizen Band Potawatomi Indian Tribe of Oklahoma*,
   532 U.S. 411 (2001)............................................................................................................ 12

*California v. Cabazon Band of Mission Indians*,
   480 U.S. 202 (1987)............................................................................................................ 10

*Castrol, Inc. v. Pennzoil Co.*,
   987 F.2d 939 (3d Cir. 1993) .............................................................................................. 33

*Cayuga Nation v. New York State Gaming Comm'n*,
   775 F. Supp. 3d 651 (N.D.N.Y. 2025).............................................................................. 18

*Chicken Ranch Rancheria of Me-Wuk Indians v. California*,
   42 F.4th 1024 (9th Cir. 2022) ..................................................................................... 10, 11

*Choctaw Nation of Oklahoma v. State of Oklahoma*,
   724 F. Supp. 2d 1182 (W.D. Okla. 2010).......................................................................... 51

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*,
   173 F.3d 725 (9th Cir. 1999) ....................................................................................... 40, 41

*Coca-Cola Co. v. Tropicana Prods., Inc.*,
   690 F.2d 312 (2d Cir. 1982) .............................................................................................. 33

*Comanche Nation v. United States*,
   393 F. Supp. 2d 1196 (W.D. Okla. 2005).......................................................................... 51

*Data Rsch. & Handling, Inc. v. Vongphachanh*,
   278 F. Supp. 3d 1066 (N.D. Ind. 2017) ............................................................................ 40

*Dental Recycling N. Am., Inc. v. Stoma Ventures, LLC*,
   No. 4:23 CV 670 CDP, 2023 WL 6389071 (E.D. Mo. Oct. 2, 2023).................................. 41

iii

*Dexia Credit Loc. v. Rogan*,
　602 F.3d 879 (7th Cir. 2010) ................................................................................ 45

*Dial A Car, Inc. v. Transportation, Inc.*,
　82 F.3d 484 (D.C. Cir. 1996) ............................................................................... 40

*EEOC v. Karuk Tribe Hous. Auth.*,
　260 F.3d 1071 (9th Cir. 2001) ............................................................................. 51

*Eli Lily & Co. v. Arla Foods, Inc.*,
　893 F.3d 375 (7th Cir. 2018) ............................................................. 14, 40, 43, 48

*Epic Sys. Corp. v. Lewis*,
　584 U.S. 497 (2018) ............................................................................................. 20

*Graham v. Med. Mut. of Ohio*,
　130 F.3d 293 (7th Cir. 1997) ......................................................................... 50, 54

*Hot Wax, Inc. v. Turtle Wax, Inc.*,
　191 F.3d 813 (7th Cir. 1999) ......................................................... 14, 33, 47

*Ill. Bell Tel. Co. v. MCI Telecomms. Corp.*,
　No. 96 C 2378, 1996 WL 717466 (N.D. Ill. Dec. 9, 1996) ................................. 51

*Int'l Kennel Club of Chi., Inc. v. Mighty Star, Inc.*,
　846 F.2d 1079 (7th Cir. 1988) ............................................................................. 59

*Johnson & Johnson * Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.*,
　960 F.2d 294 (2d Cir. 1992) ................................................................................ 43

*Johnson & Johnson v. Carter-Wallace, Inc.*,
　631 F.2d 186 (2d Cir. 1980) ................................................................................ 50

*KalshiEX LLC v. CFTC*, No. 24- 5205,
　2024 WL 4802698 (D.C. Cir. Nov. 15, 2024) .................................................... 28

*KalshiEX LLC v. Commodity Futures Trading Comm'n*,
　No. CV 23-3257 (JMC), 2024 WL 4164694 (D.D.C. Sept. 12, 2024),
　*dismissed,* No. 24-5205, 2025 WL 1349979 (D.C. Cir. May 7, 2025) ......................... 24, 25, 29

*KalshiEX LLC v. Flaherty,*
　No. 25-CV-02152-ESK-MJS, 2025 WL1218313 (D. N.J., Apr. 28, 2025) ............................ 37

*KalshiEX LLC v. Martin,*
　793 F. Supp. 3d 667 (D. Md. 2025) .................................................. 6, 26, 37, 56

*KalshiEX, LLC v. Hendrick*,
　No. 2:25-CV-00575-APG-BNW, 2025 WL 3286282 (D. Nev. Nov. 24, 2025) .............. passim

*Kraft, Inc. v. F.T.C.*,
　970 F.2d 311 (7th Cir. 1992) ............................................................................... 47

*Krasno v. Mnookin*,
　148 F.4th 465 (7th Cir. 2025) ............................................................................. 44

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
　572 U.S. 118 (2014) ............................................................................. 39, 41, 48

iv

*LG Elecs. v. Whirlpool Corp.*,
  No. 08 C 242, 2010 WL 2921633 (N.D. Ill. July 22, 2010) ...................................................... 48

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ................................................................................................................. 49

*Mays v. Dart*,
  974 F.3d 810 (7th Cir. 2020) .................................................................................................. 55

*Menominee Tribal Enterprises v. Solis*,
  601 F.3d 669 (7th Cir. 2010) .................................................................................................. 13

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
  456 U.S. 353 (1982) ................................................................................................................. 26

*Merrion v. Jicarilla Apache Tribe*,
  455 U.S. 130 (1982) ................................................................................................................. 13

*Michigan v. Bay Mills Indian Cmty.*,
  572 U.S. 782 (2014) ...................................................................................................... 12, 17, 29

*MillerCoors, LLC v. Anheuser-Busch Companies, LLC*,
  385 F. Supp. 3d 730 (W.D. Wis. 2019) ................................................................................... 48

*Montana v. Blackfeet Tribe*,
  471 U.S. 759 (1985) ................................................................................................................. 12

*Montana v. United States*,
  450 U.S. 544 (1981) ................................................................................................................. 12

*Morningware, Inc. v. Hearthware Home Prods., Inc.*,
  No. 09 C 4348, 2012 WL 3721350 (N.D. Ill. Aug. 27, 2012) .................................................. 48

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
  584 U.S. 453 (2018) ................................................................................................................. 41

*N. Am. Derivatives Exch., Inc. v. Nevada Gaming Control Bd.*,
  No. 2:25-CV-00978-APG-BNW,
  2025 WL 2916151 (D. Nev. Oct. 14, 2025) ........................................................ 23, 24, 26, 27

*Navajo Nation v. Dalley*,
  896 F.3d 1196 (10th Cir. 2018) ............................................................................................... 30

*Nelson on behalf of Nat'l Lab. Rels. Bd. v. Advoc. Health & Hosps. Corp.*,
  273 F. Supp. 3d 919 (N.D. Ill. 2017) .................................................................................. 42, 45

*Norton v. Southern Utah Wilderness All.*,
  542 U.S. 55 (2004) ................................................................................................................... 24

*Paul Davis Restoration, Inc. v. Everett*,
  No. 14-C-1534, 2014 WL 7140038 (E.D. Wis. Dec. 12, 2014) .............................................. 40

*Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*,
  896 F.3d 809 (7th Cir. 2018) .............................................................................................. 13, 50

*Pom Wonderful Ltd. Liab. Co. v. Purely Juice, Inc.*,
  No. CV-07-02633 CAS (JWJx), 2008 U.S. Dist. LEXIS 55426 (C.D. Cal. July 17, 2008) .... 58

*Prairie Band of Potawatomi Indians v. Pierce*,
  253 F.3d 1234 (10th Cir. 2001) ....................................................................... 51

*R.H. Donnelley Corp. v. Ill. Bell Tel. Co.*,
  595 F. Supp. 1202 (N.D. Ill. 1984) ................................................................. 50

*Riddell, Inc. v. Schutt Sports, Inc.*,
  724 F. Supp. 2d 963 (W.D. Wis. 2010) .......................................................... 43

*Roland Mach. Co. v. Dresser Indus., Inc.*,
  749 F.2d 380 (7th Cir. 1984) ..................................................................... 50, 55

*S.E.C. v. Cherif*,
  933 F.2d 403 (7th Cir. 1991) ..................................................................... 42, 45

*Sands, Taylor & Wood v. Quaker Oats Co.*,
  34 F.3d 1340 (7th Cir. 1994),
  *on reh'g in part,* 44 F.3d 579 (7th Cir. 1995) ............................................... 33

*Schering-Plough Healthcare Prods., Inc. v. Schwarz Pharma, Inc.*,
  586 F.3d 500 (7th Cir. 2009) .......................................................................... 33

*Schwarz Pharma, Inc. v. Breckenridge Pharm., Inc.*,
  388 F. Supp. 2d 967 (E.D. Wis. 2005) ........................................................... 33

*Simeon Management Corp. v. FTC*,
  579 F.2d 1137 (9th Cir. 1978) ........................................................................ 47

*Southland Sod Farms v. Stover Seed Co.*,
  108 F.3d 1134 (9th Cir. 1997) ........................................................................ 33

*Starbucks Corp. v. McKinney*,
  602 U.S. 339 (2024) ........................................................................................ 59

*State of California v. Iipay Nation of Santa Ysabel*,
  898 F.3d 960 (9th Cir. 2018) ..................................................................... 30, 31

*Stockbridge-Munsee Cmty. v. Wisconsin*,
  299 F. Supp. 3d 1026 (W.D. Wis. 2017),
  *affirmed* 922 F.3d 818 (7th Cir. 2019) ........................................................... 19

*Sun Microsystems, Inc. v. Microsoft Corp.*,
  87 F. Supp. 2d 992 (N.D. Cal. 2000) .............................................................. 59

*Time Warner Cable, Inc. v. DIRECTV, Inc.*,
  497 F.3d 144 (2d Cir. 2007) ............................................................... 33, 52, 53

*TNT Amusements, Inc. v. Torch Elecs., LLC*,
  No. 4:23-CV-330-JAR, 2025 WL 947506 (E.D. Mo. Mar. 28, 2025),
  *affirmed in relevant part on reconsideration,*
   No. 4:23-CV-330-JAR, 2025 WL 2336858 (E.D. Mo. Aug. 13, 2025) ................ 40, 41, 42, 43

*Tohono O'Odham Nation v. Schwartz*,
  837 F. Supp. 1024 (D. Ariz. 1993) .................................................................. 51

QB\100006889.2

*TrafficSchool.com, Inc. v. Edriver Inc.*,
    653 F.3d 820 (9th Cir. 2011) ................................................................................. 33

*Ty, Inc. v. Jones Grp., Inc.*,
    237 F.3d 891 (7th Cir. 2001) ........................................................................... 50, 55

*U.S. v. Cappetto*,
    502 F.2d 1351 (7th Cir. 1974) ............................................................................. 19

*U-Haul Int'l, Inc. v. Jartran, Inc.*,
    522 F. Supp. 1238 (D. Ariz. 1981),
    *aff'd,* 681 F.2d 1159 (9th Cir. 1982) ............................................................... 33, 54

*United States v. Barela*,
    No. 1:20-CR-01228-KWR, 2021 WL 5447915 (D.N.M. Nov. 22, 2021)............................... 46

*United States v. Lemons*,
    792 F.3d 941 (8th Cir. 2015) ............................................................................... 47

*United States v. Lewisbey*,
    843 F.3d 653 (7th Cir. 2016) ............................................................................... 46

*United States v. Wheeler,*
    435 U.S. 313 (1978)........................................................................................... 10

*Ute Indian Tribe of the Uintah & Ouray Rsrv. v. Utah*,
    790 F.3d 1000 (10th Cir. 2015) ............................................................................ 51

*Valencia v. City of Springfield*,
    883 F.3d 959 (7th Cir. 2018) ............................................................................... 13

*Virginian Ry. Co. v. Sys. Fed'n No. 40*,
    300 U.S. 515 (1937)........................................................................................... 59

*W. Flagler Assocs. v. Haaland*,
    573 F. Supp. 3d 260 (D.D.C. 2021),
    *reversed on other grounds*,  71 F.4th 1059 (Fed. Cir. 2023) ...................................... 49

*Washington v. Confederated Tribes of Colville Indian Reservation,*
    447 U.S. 134 (1980)........................................................................................... 10

*White Mountain Apache Tribe v. Bracker,*
    448 U.S. 136 (1980)........................................................................................... 12

*Winter v. Natural Resources Defense Council, Inc., et al.,*
    555 U.S. 7 (2008)............................................................................................... 59

*Wisconsin Cent. Ltd., v. United States,*
    585 U.S. 274 (2018)........................................................................................... 27

**Statutes**

15 U.S.C. § 1116(a) ..................................................................................... 52, 53

15 U.S.C. § 1125............................................................................................ 14, 33

QB\100006889.2

18 U.S.C. § 1166 ................................................................................................................ 19

18 U.S.C. § 1832 ................................................................................................................ 19

18 U.S.C. § 1836 ................................................................................................................ 19

25 U.S.C. § 2701 ......................................................................................................... 11, 17

25 U.S.C. § 2702 ......................................................................................................... passim

25 U.S.C. § 2710 ......................................................................................................... passim

29 U.S.C. § 151 .................................................................................................................. 59

31 U.S.C. § 5361 ........................................................................................................... 20, 31

31 U.S.C. §§ 5361–5367 .................................................................................................... 30

7 U.S.C. § 1a(47)(A)(ii) ..................................................................................................... 27

7 U.S.C. § 2(a)(1)(A) ................................................................................................... 25, 26

7 U.S.C. § 7a-2 ............................................................................................................. passim

Ariz. Admin. Code § R19-4-117 ....................................................................................... 57

Cal. Penal Code § 337a(1) ................................................................................................. 39

Wis. Stat. § 945.02 ............................................................................................................. 56

Wis. Stat. § 945.03 ............................................................................................................. 39

## Other Authorities

1 Cohen's Handbook of Federal Indian Law § 6.04 (2025) ................................................ 11

S. REP. 100-446, 1988 U.S.C.C.A.N. 3071 ........................................................... 10, 12, 18

## Regulations

17 C.F.R. § 38.150 ............................................................................................................. 58

17 C.F.R. § 38.151(b) ........................................................................................................ 58

17 C.F.R. § 40.11 ......................................................................................................... passim

17 C.F.R. § 40.2 ........................................................................................................... 22, 23

25 C.F.R. § 293.2(d) .......................................................................................................... 21

25 C.F.R. § 502.4 ......................................................................................................... 21, 49

QB\100006889.2

**INTRODUCTION**

The Ho-Chunk Nation (the "Nation") asks this Court to uphold its sovereignty and enforce federal law by prohibiting defendants Kalshi Inc. and KalshiEX LLC ("Kalshi") from engaging in sports betting on its lands and falsely advertising the nature of its business. The Nation, and the Nation alone, is allowed to conduct gambling on its lands. Kalshi is a registered futures and options exchange that advertises to the public that it legally conducts sports betting in all fifty states. Regardless of what Kalshi calls itself, Kalshi cannot infringe on the Nation's sovereignty in contravention of federal law. At present, Kalshi employs false and/or misleading statements to attract consumers to place bets on sporting events on the Nation's land. Kalshi's conduct is not only illegal, it is in direct competition with the Nation's business that is vital to supporting the Nation's government and its people.

Specifically, the Nation asks this Court to enter a preliminary injunction against Kalshi prohibiting it from: 1) conducting sports betting on the Nation's Indian lands in violation of the Nation's Tribal-State compact; and 2) advertising that it, or its platform, offers (a) anything that is legal in all 50 states and (b) "sports betting" or "sports gaming," a statement which, in Kalshi's own words, cannot be true.

Below, the Nation will demonstrate that it satisfies each of the factors necessary to entitle it to preliminary injunctive relief consistent with the statutory relief prescribed by IGRA and the Lanham Act because: 1) the Nation was authorized by Congress, in IGRA, to sue in federal court to enjoin class III gaming on Indian lands in violation of a Gaming Compact and Kalshi is conducting class III gaming on Indian lands in violation of a Gaming Compact; 2) Kalshi misleads consumers when it tells them it offers legal sports betting in all 50 states in violation of the Lanham Act; 3) the Nation has no adequate remedy at law and faces irreparable harm; and 4) because Kalshi is conducting class III gaming on Indian lands in violation of the Gaming Compact the

balance of equities favors granting an injunction.

## BACKGROUND

Below, the Nation summarizes the facts related to its history and the significance of its gaming business to its people, Kalshi's acts of conducting sports betting on the Nation's Indian lands, and Kalshi's choice to advertise what it told courts would not be legal as legal and what it claims are regulated event contract swaps as sports betting.

**1.     The Nation's History in the State of Wisconsin**

The Nation's people have lived in what is now the State of Wisconsin since time immemorial. (Findings of Fact ("FOF"), ¶ 1.) Even before Wisconsin became a state, representatives of the United States attempted to remove them from their lands. (FOF, ¶ 2.) Despite decades of these efforts, the people of the Nation repeatedly returned to their ancestral homelands in Wisconsin. (FOF, ¶ 3.) They were so persistent in their efforts to live in their homelands that, after decades of repeated forced removals, the federal government eventually gave up trying to remove them. (*Id.*) The Nation and its people persisted in Wisconsin despite additional barriers from the federal government, including allotment and forced assimilation. (FOF, ¶ 4.)

The Nation received federal recognition as a tribe in 1963 and has been working since then to reestablish a tribal land base. (FOF, ¶ 6.) In a campaign that has spanned over 50 years, the Nation has taken over 4,400 acres of land into trust, in parcels scattered through 14 Wisconsin counties. (FOF, ¶¶ 5-6.) With its people and land spread around, the Nation faces complications and obstacles to providing essential government services to its people. (FOF, ¶ 7.) To best meet these needs, the Nation has pursued various avenues of economic development. (FOF, ¶ 8.)

One of those avenues is the development and operation of casinos, pursuant to the gaming compact the Nation, then known as the Wisconsin Winnebago Tribe, entered into with Wisconsin

2

in 1992 (the "Gaming Compact"). (FOF, ¶ 9.) The Nation and Wisconsin have amended the Gaming Compact four times, most recently in 2024. (FOF, ¶ 10.) As allowed in the Gaming Compact, the Nation owns and operates casinos. (FOF, ¶¶ 9-11.) The Nation makes annual payments to the State of Wisconsin under the Gaming Compact. (FOF, ¶ 16.) The Nation uses the revenue from its gaming operations to fund governmental operations and provide essential governmental services to its people. (FOF, ¶ 14.)

In the Fourth Amendment to the Gaming Compact, the Nation and the State agreed that, *inter alia*, the definition of the class III gaming the Nation could offer includes Event Wagering which "means accepting wagers on the outcomes of, and occurrences within, sports and non-sports games, competitions, and matches but shall not include pari-mutuel wagering on horse, harness, and dog-racing events." (FOF, ¶ 17.)

In the Gaming Compact, Wisconsin and the Nation not only agreed to allow the Nation to develop and operate casinos, they agreed, as two sovereigns, on the regulation of class III gaming on the Nation's Indian lands. (FOF, ¶ 12.) Wisconsin and the Nation agreed that no other person or entity could conduct gaming on the Nation's Indian lands. (FOF, ¶ 18.) The Nation duly enacted a Tribal Gaming Ordinance pursuant to IGRA, 25 U.S.C. § 2710(d)(1)(A), approved by the Chairman of the National Indian Gaming Commission, 25 U.S.C. § 2710(e), and incorporated the Nation's Gaming Ordinance, by reference, into the Gaming Compact. (FOF, ¶ 19.) The Nation is clear in its Gaming Ordinance in stating, "No person or entity, other than the Ho-Chunk Nation, shall conduct gaming without providing proper notice and obtaining a license, if required, from the Ho-Chunk Nation Commission." (FOF, ¶ 22.) As if that statement was not crystal clear, the Nation also states, in its Gaming Code, "Privately owned gaming operations are prohibited within the jurisdiction of the Nation." (FOF, ¶ 23.)

QB\100006889.2

In the Gaming Compact, Wisconsin and the Nation agreed that the Nation would stringently regulate gaming activities on its lands, which it does through its Gaming Ordinance enforced by its Gaming Commission. (FOF, ¶ 19.) The Gaming Commission is the independent regulatory authority, within the Nation, charged with oversight of the Nation's gaming regulatory matters. (FOF, ¶ 30.) The Gaming Commission ensures compliance with the Gaming Compact and Gaming Ordinance. (*Id.*) It is tasked with making sure the Nation's gaming activities are free from organized crime and other corrupting influences, as well as ensuring that gaming is conducted fairly and honestly by both operators and players. (FOF, ¶ 13.)

Recently the Nation has taken steps to conduct Events Wagering at its casinos, as allowed under the Gaming Compact. (FOF, ¶ 24.) Even though the Nation has a monopoly on conducting class III gaming on its Indian lands, the Nation received less favorable contract terms in establishing Events Wagering than it otherwise would have because third parties, like Kalshi, offer unauthorized Event Wagering on the Nations' Indian lands. (FOF, ¶ 25.) The Nation learned that these actions of Kalshi, and others like it, will take revenue away from the Nation's Event Wagering business. (FOF, ¶ 26.) Once the Nation launches its Events Wagering business, that business will also compete with Kalshi. (FOF, ¶ 26.)

Further, Kalshi's Events Wagering is currently competing with the Nation's brick and mortar casinos. (FOF, ¶ 27.) Kalshi has established a market for consumers interested in legal gaming that does not require consumers to travel to the Nation's casinos to gamble. (FOF, ¶ 28.) Even if consumers prefer the specific class III gaming options offered at the Nation's casinos, consumers who are interested in legal gaming choose the convenience of an online option—such as that offered by Kalshi—over their specific game preference offered on-site at the Nation's casinos. (FOF, ¶ 29.) Therefore, Kalshi's actions have reduced the Nation's revenue by reducing

QB\100006889.2

the number of consumers who travel to the Nation's casinos to gamble and spend on non-gambling services. (FOF, ¶¶ 28, 30.)

**2.      Kalshi Conducts Sports Betting on the Nation's Indian Lands.**

Kalshi operates an internet platform that, among other things, sells sports events contracts. On its internet platform, Kalshi allows consumers to bet "on the outcome of future events." (FOF, ¶ 34.) While the Nation uses the term "Kalshi" to denote both Kalshi, Inc. and KalshiEX, LLC, the two companies operate in tandem and, in fact, Kashi, Inc. operates the internet platform at issue. (FOF, ¶ 34.) Specific to this case, Kalshi allows consumers to trade on the outcome of sports events—not whether a game will be played but what will happen in the game. (FOF, ¶¶ 36-37.) Kalshi also offers consumers the ability to customize their bets, allowing for bets that a specific player will have a specific performance, which team will score first, or that any number of different milestones will be met while the game is being played. Kalshi offers its platform to consumers in all states and claims it is unable to limit the geographic availability of its platform. (FOF, ¶¶ 42.)

Kalshi admits, in prior litigation, that contracts on sporting events were contracts that involved gaming. (FOF, ¶ 42). Kalshi did so in the context of comparing event contracts that did not fall into the public interest concern. (*Id.*) Kalshi explained that contracts on sports events, like the Super Bowl, the Kentucky Derby, and the Masters Golf Tournament, were contracts that involved gaming. (*Id.*)

Kalshi is not licensed by the Gaming Commission to conduct gaming on the Nation's lands. (FOF, ¶ 35.) Kalshi tells consumers that it conducts sports betting nationwide, including in all 50 states, which would include the Nation's Indian lands. (FOF, ¶¶ 45-46.) In response to efforts by various states seeking to stop Kalshi from conducting sports betting in violation of their gambling laws, Kalshi has told courts that it is unable to limit the locations in which consumers can use its

technology to bet on sports. (FOF, ¶ 47.)

Kalshi has self-certified its gaming event contracts in filings with the CFTC. (FOF, ¶¶ 36-41.) While the CFTC has the discretion to review these contracts, it has not reviewed any of Kalshi's gaming event contracts. (FOF, ¶ 43.) Kalshi did not seek pre-approval of its gaming event contracts before self-certifying them. (*Id.*)

The CFTC issued a letter explaining that it has not taken any official action to approve the listing for trading of any gaming event contracts. (*Id.*) In the same letter where the CFTC confirmed it had not taken such action, the CFTC acknowledged that, "at least one federal district court has found that the Commodity Exchange Act ("CEA") does not preempt the application of State gambling, wagering, and gaming laws to sports-related events contracts listed and traded on a CFTC-registered trading venue." (*Id.* (citing *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025)), on appeal to the U.S. Court of Appeals for the Fourth Circuit, Case No. 25-1892).)

3.      **Kalshi Misleads, or Attempts to Mislead, Consumers into Believing They Are Placing 50 State Legal Sports Bets, "Contracts," or "Trades."**

Despite Kalshi's assertion to the CFTC that it is actually selling commodities—swaps that are event contracts—Kalshi tells consumers that it allows sports betting in all 50 states. (FOF, ¶¶ 45-46.) Kalshi advertises that with its platform, sports betting is legal in all 50 states. For example:

6

 

(*Id.*) Kalshi's CEO, Tarek Monsour, has acknowledged that Kalshi is conducting sports betting. In a recent interview he admitted, "I don't have a problem with [calling this] betting, gambling is where I draw the line." (FOF, ¶ 52.) Kalshi holds itself above conducting gambling by claiming that market forces dictate its contracts, rather than a traditional "house." (FOF, ¶ 51.)

Kalshi belies its claim that its contracts are governed by an altruistic market through its own conduct. (FOF, ¶ 53.) In reality, Kalshi creates a false market. (*Id.*) After all, for someone to buy a contract that the Packers will win their next game, someone has to buy the other side—that the Packers will lose. Kalshi talks of this necessity in terms of the need "to provide liquidity." (*Id.*) In reality, Kalshi works with businesses it incentivizes—and in one case Kalshi created—to buy the inverse position, likely the losing side of contracts individual consumers do not buy. (FOF, ¶ 53). Kalshi calls these entities "Market Makers" and props them up by a series of rebates and other

7

incentives. (*Id.*) Kalshi cannot suggest that its sports contracts are supported by the free market when, at the same time, it creates the demand for the inverse of those contracts.

And, while Kalshi will tell this Court that its actions are allowed because it is a DCM under the CEA and that the CFTC has exclusive jurisdiction to regulate it, Kalshi makes no mention of these technical legal theories in its advertising. (*See*, FOF, ¶¶ 45-46, 49.) Kalshi simply tells lay consumers that it conducts sports betting. Kalshi advertisements include:








(FOF, ¶¶ 45-46, 49.)

9

The Nation asks this Court to enjoin Kalshi from conducting class III gaming on its Indian lands in violation of the Gaming Compact and from falsely advertising that its conduct is legal and sports betting.

## LEGAL STANDARDS

To determine whether Plaintiff is entitled to a preliminary injunction, the Court must interpret tribal rights established by federal law. Plaintiff sets forth the legal standard for interpreting said rights and follows by stating the standard for granting a preliminary injunction.

### I.      Standard For Interpreting Tribal Statutory Rights

The Nation is a sovereign government with its lands based in Wisconsin. As a sovereign, the Nation retains powers that "are in general, 'inherent powers of a limited sovereignty which has never been extinguished.'" *United States v. Wheeler,* 435 U.S. 313, 323 (1978). The Nation has these powers because they are "a fundamental attribute of sovereignty." *Washington v. Confederated Tribes of Colville Indian Reservation,* 447 U.S. 134, 152 (1980).

Regardless of whether the right to control gaming on its lands is a fundamental attribute of sovereignty, *see California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 207 (1987), the Nation has a right to control gambling on its Indian lands because Congress delegated that authority to the Nation under IGRA and the Nation has a Gaming Compact with the State of Wisconsin. Congress passed IGRA in response to *Cabazon. See Chicken Ranch Rancheria of Me-Wuk Indians v. California*, 42 F.4th 1024, 1031 (9th Cir. 2022). Congress "attempted to balance the need for sound enforcement of gaming laws and regulations, with the strong Federal interest in preserving the sovereign rights of tribal governments to regulate activities and enforce laws on Indian land." S. REP. 100-446, 5, 1988 U.S.C.C.A.N. 3071, 3075. IGRA "recognizes and affirms the principle that by virtue of their original tribal sovereignty, tribes reserved certain rights . . . and that today, tribal governments retain all rights that were not expressly relinquished." *Id*.

10

As the Ninth Circuit explained, IGRA is "'an example of cooperative federalism' in that it seeks to balance the competing sovereign interests of the federal government, state governments, and Indian tribes, by giving each a role in the regulatory scheme." *Chicken Ranch*, 42 F.4th at 1032 (citations omitted). Congress enacted IGRA to alleviate burdens on federal resources and promote tribal sovereignty, tribal self-government, and tribal self-determination through tribal economic self-sufficiency, namely, through tribal gaming. *See generally* 1 Cohen's Handbook of Federal Indian Law § 6.04[3] (2025) (discussing the history and context of the trust relationship between tribes and the federal government); 25 U.S.C. §§ 2701–2702.

By entering into a State-Tribal Compact, as allowed by IGRA, Wisconsin and the Nation, each a sovereign in its own right, allocated their sovereign powers to regulate class III gaming on the Nation's lands. The Nation and Wisconsin did not break new ground in doing so. As the Supreme Court explained in *Bay Mills*, a Tribal-State compact, "typically prescribes the rules for operating gaming, allocates law enforcement authority between the tribe and State, and provides remedies for breach of the agreement's terms." 572 U.S. at 785 (citing 25 U.S.C. §§ 2710(d)(3)(C)(ii), (v)). Under IGRA, states and tribes are allowed to allocate law enforcement authority for gaming on Indian lands.

In passing IGRA, Congress gave tribes, "**the exclusive right to regulate gaming activity on Indian lands** if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming." 25 U.S.C. § 2701(5) (emphasis added). Congress explained the objectives of this regulation which focused on the integrity of the gaming enterprise, "to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the

11

operator and the players." 25 U.S.C. § 2702(2). Congress also empowered tribes to enjoin class III gaming activity occurring on Indian lands in violation of a Gaming Compact—which, of course, by definition would violate IGRA. 25 U.S.C. §§ 2710(d)(1), 2710(d)(7)(A)(ii).

In doing so, Congress granted tribes the power to enjoin the acts of others on their lands. *See* S. REP. 100-446, 18, 1988 U.S.C.C.A.N. 3071, 3088. Whereas previously the United States Supreme Court ruled that tribes have limited inherent sovereign authority with respect to nonmembers engaged in activities on non-Indian owned fee land located within a reservation, *Montana v. United States*, 450 U.S. 544, 565-66 (1981), Congress gave tribes the authority to stop class III gaming activity occurring on Indian lands in violation of a Tribal-State Compact. In doing so, Congress expressly delegated to Tribes the authority to stop class III gaming by nonmembers conducted in violation of a Tribal-State Compact.

Where Congress gives, Congress can take away but it must do so expressly and unequivocally. *See Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 790 (2014) ("*Bay Mills*") (requiring "unequivocal[]" expression to abrogate sovereign rights (quoting *C & L Enters., Inc. v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 532 U.S. 411, 418 (2001)). "Although Congress has plenary authority over tribes, courts will not lightly assume that Congress in fact intends to undermine Indian self-government." *Bay Mills*, 572 U.S. at 790. According to the Supreme Court, "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Montana v. Blackfeet Tribe,* 471 U.S. 759, 766 (1985). Courts construe ambiguities in federal law "generously" in favor of tribes to comport with "traditional notions of sovereignty and with the federal policy of encouraging tribal independence." *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 143-44 (1980). Federal courts adopt the Tribes' interpretation of Indian statutes not because it is the best interpretation but

12

because it is the Indian Tribe's interpretation. *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 730 (9th Cir. 2003).

Thus, for example, when Congress does not provide clear indication of its intent to abrogate Indian sovereignty rights, courts apply the special canons of construction to the benefit of Indian interests. *Cf. Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 149 (1982). As the Seventh Circuit has held, "a statute of general applicability will be held inapplicable to Indians if it would interfere with tribal governance . . . [o]r if it would clash with rights granted Indians by other statutes. *Menominee Tribal Enterprises v. Solis,* 601 F.3d 669, 671 (7th Cir. 2010). As a result, for example, any other statute of general applicability is inapplicable to tribes if it clashes with the rights granted to tribes in IGRA.

## II.    Standard for Granting a Preliminary Injunction

A plaintiff seeking a preliminary injunction "must establish that it has some likelihood of success on the merits; that it has no adequate remedy at law; [and] that without relief it will suffer irreparable harm." *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 896 F.3d 809, 816 (7th Cir. 2018) (citation omitted). "If that burden is met, the court must weigh the harm that the plaintiff will suffer absent an injunction against the harm to the defendant from an injunction, and consider whether an injunction is in the public interest." *Id.* Courts in this circuit use "a sliding scale approach," whereby "[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor," and vice versa. *Valencia v. City of Springfield*, 883 F.3d 959, 966 (7th Cir. 2018).

To pass the "likelihood of success" threshold, a plaintiff seeking a preliminary injunction "need only demonstrate some likelihood of prevailing on the merits, not that it will definitely prevail." *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 13 (7th Cir. 1992) (citation omitted). To prevail on the merits of a false advertising claim under Section 43(a) of the Lanham Act, 15

13

U.S.C. § 1125(a), a plaintiff must prove:

> (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by loss of goodwill associated with its products.

*Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir. 1999); *see also Eli Lily & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 381–82 (7th Cir. 2018) (same elements stated as three-pronged framework). "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Id*. (quoting *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 542 (1987)).

## ARGUMENT

The Nation moves for a preliminary injunction to enjoin Kalshi from conducting class III gaming on its Indian lands in violation of the Gaming Compact and advertising that (a) its conduct or platform is 50 state legal and (b) that it offers "sports betting" or "sports gaming." Below the Nation will show it is: 1) likely to succeed on its IGRA claim as Congress confirmed that tribes can enjoin class III gaming on Indian lands in violation of Tribal-State Compacts; 2) likely to succeed on its Lanham act claim because Kalshi has already admitted it could not legally offer sports betting; 3) is suffering from irreparable harm and has no adequate remedy as of law as a result of Kalshi's acts; and 4) favored in the balance of equities because Kalshi is trampling on its tribal sovereignty in violation of the law.

14

QB\100006889.2

I.    **THE NATION IS LIKELY TO SUCCEED ON THE MERITS OF ITS IGRA CLAIM.**

The Nation is likely to succeed on the merits of its IGRA claim because Congress, in enacting IGRA, gave tribes the right to seek injunctions when their gaming compacts were violated and Kalshi is violating the Nation's gaming compact. The Nation is likely to succeed on its IGRA claim for four reasons: (1) the Nation has a right, under IGRA, to enjoin illegal gaming on its Indian lands; (2) Kalshi is conducting sports betting, and therefore class III gaming, not the sale of swaps; (3) Kalshi is conducting sports betting on the Nation's Indian lands because bets occur on the Nation's Indian lands; (4) Congress did not limit the Nation's ability to enjoin such gambling on its Indian lands in passing the Unlawful Internet Gambling Enforcement Act. The Nation comes to this Court, as allowed by Congress when it passed IGRA, seeking to enjoin a third party from conducting class III gambling on its Indian lands, as it has shown this gambling is occurring on its lands, this Court should grant the preliminary injunction.

A.    **The Nation has a right to stop third-parties from conducting class III gaming on its Indian lands.**

The Nation asks this Court to enjoin Kalshi's class III gaming activity located on its Indian lands and conducted in violation of its compact with the State of Wisconsin. The Nation has standing to seek this remedy under 25 U.S.C. §2710(d)(7)(A)(ii), in which Congress provided:

> (A) The United States district courts shall have jurisdiction over— . . .
>
> (ii) any cause of action initiated by a State or Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact . . . that is in effect . . . .

In creating this cause of action, Congress limited enforcement to a State or Indian tribe but did not limit the parties against whom a State or Indian tribe could seek such relief. Congress gave a State or Indian tribe the power to bring "*any* cause of action" enjoin class III gaming on Indian lands conducted in violation of a gaming compact.

15

Moreover, lest there be any confusion, in passing IGRA, Congress laid out the only manner in which class III gaming could be lawful on Indian lands. 25 U.S.C. § 2710(d)(1). Congress declared that:

> (1) <u>Class III gaming</u> activities shall be lawful on Indian lands **only if** such activities are—
>
> (A) **authorized** by an ordinance or resolution that—
>
> (i) is adopted by the governing body of the Indian tribe having jurisdiction over such lands . . .
>
> (B) located in a State that permits such gaming for any purpose by any person, organization or entity, and
>
> (C) **conducted in conformance** with a Tribal-State compact entered into by the Indian Tribe and the state . . .

25 U.S.C. § 2710(d)(1) (emphasis added). Kalshi has not, and cannot, allege that it meets any of these requirements.

Here, the Nation is likely to succeed in proving a violation of its Tribal-State compact because the Nation is the only entity authorized to conduct gaming on its lands under the Gaming Compact. Under the Gaming Compact, the Nation has, "the sole proprietary interest in all Class III gaming activities operated under this Compact and shall not authorize, permit, or license the operation of any Class III gaming activity under this Compact by any other person." (FOF, ¶ 18.) In addition, the Nation and Wisconsin incorporated the Nation's Gaming Ordinance, by reference, into the Gaming Compact. (FOF, ¶ 19.) The Nation is clear in its Gaming Ordinance stating, "No person or entity, other than the Ho-Chunk Nation, shall conduct gaming without providing proper notice and obtaining a license, if required, from the Ho-Chunk Nation Commission." (FOF, ¶ 22.) As if that statement was not crystal clear, the Nation also states, in its Gaming Ordinance, "Privately owned gaming operations are prohibited within the jurisdiction of the Nation." (FOF, ¶

16

23.) No one can dispute that a third-party violates the Nation's Tribal-State compact when it conducts class III gaming on the Nation's Indian lands.

Nor is there any real argument that Tribes cannot sue third parties for conducting class III gaming on Indian lands in violation of a Tribal-State compact. As the Supreme Court explained in *Bay Mills*, "[a] compact typically prescribes rules for operating gaming, allocates law enforcement authority between the tribe and State, and provides remedies for breach of the agreement's terms." 572 U.S. at 785; *see also* 25 U.S.C. § 2710(d)(3)(C). Further cementing the allocation of law enforcement authority, Congress required compacts to receive similar treatment to federal regulations in that they must be approved by the Secretary of the Department of Interior and published in the Federal Register. 25 U.S.C. § 2710(d)(3)(B). Suggesting that Congress created the ability for states and tribes to agree to allow tribes to regulate class III gaming on their Indian lands but did not give tribes the power to stop violations of those regulations misunderstands the text and structure of IGRA.

This interpretation is also consistent with Congress's findings and purposes in enacting IGRA. Congress found that, "Indian tribes have the **exclusive right to regulate** gaming activity on Indian lands . . ." 25 U.S.C. §2701(5). Congress identified its purposes, including "to provide a statutory basis for the operation of gaming **by Indian tribes** as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments," 25 U.S.C. §2701(1), to "to provide a statutory basis for the regulation of gaming **by an Indian tribe** . . . to ensure that the Indian tribe is the primary beneficiary of the gaming operation . . ." 25 U.S.C. §2701(2). Moreover, IGRA's legislative history reveals Congress broadly intended to grant "United States district courts jurisdiction over actions by . . . a tribe or state to enjoin illegal gaming on Indian

17

lands." S. REP. 100-446, 18, 1988 U.S.C.C.A.N. 3071, 3088. Thus, Congress did not intend to restrict 25 U.S.C. §2710(d)(7)(A)(ii) to the parties to a gaming compact.

Kalshi has tried to create confusion over tribes' right to enjoin such violations by conflating Tribal-State compacts with ordinary contracts. Even a cursory glance shows this argument fails. In passing IGRA, Congress distinguished between "compact" and "contract." *Compare* 25 U.S.C. § 2710(d)(7)(A)(ii), *with id*. § 2710(d)(3)(C)(v). And, Congress, allowed the parties to the compact to define their own remedies for breach. 25 U.S.C. § 2710(d)(3)(C)(v). At the same time, Congress limited tribes to enjoining violations of the compact if they chose to bring suit in federal court for "any cause of action . . . to enjoin a class III gaming activity located on Indian lands and conducted in **violation of any Tribal-State compact** . . . ." 25 U.S.C. § 2710(d)(7)(A)(ii) (emphasis added).

In doing so, Congress did not create any ambiguity. As a contract between two sovereigns, a compact is binding upon the parties in a manner akin to a private contract. As a regulatory device, however, a compact establishes the *only* conditions under which class III gaming may occur on a particular tribe's Indian lands, which applies to any and all class III gaming, regardless of *who* conducts the gaming. *See Cayuga Nation v. New York State Gaming Comm'n*, 775 F. Supp. 3d 651, 666 (N.D.N.Y. 2025) (finding 25 U.S.C. § 2710(d)(1) "unambiguous," stating: "The text of the statute refers to '[c]lass III gaming activities' 'on Indian lands,' and does not differentiate between who is conducting the gaming. [citation omitted] The definition of class III gaming, . . . defined as 'all forms of gaming that are not class I gaming or class II gaming,' also does not restrict its meaning to only encompass Indian gaming."). Moreover, parties do not violate contracts, they breach them. And, parties do not breach compacts, they violate them. Congress chose to use the word violate in referring to the compact as a regulatory device and used the word breach in referring to a dispute between the parties to the compact.

18

Less than ten years ago, the Seventh Circuit affirmed the ability of a tribe to use IGRA to prevent a competitor—the Nation—from violating a state compact on Indian lands. *Stockbridge-Munsee Cmty. v. Wisconsin*, 299 F. Supp. 3d 1026 (W.D. Wis. 2017), *affirmed Stockbridge-Munsee Cmty. v. Wisconsin*, 922 F.3d 818 (7th Cir. 2019). There, the Stockbridge-Munsee Community ("SMC") sued the Nation, alleging that the Nation was itself violating the Nation's compact with the State by offering more slot machines than authorized by the compact. SMC invoked jurisdiction under 25 U.S.C. § 2710(d)(7)(A)(ii) as against a third party (the Nation), alleging that SMC's suit was "any cause of action," "initiated by [an] Indian tribe," (SMC), "to enjoin a class III gaming activity located on Indian lands," (the Nation's Indian lands), "and conducted in violation of any Tribal-State compact entered into under paragraph (3) . . . ." *Id.*, at 820. The District Court, and later the Seventh Circuit held, among other things, that they had jurisdiction over SMC's suit against a third party for allegedly gaming in violation of the IGRA on Indian lands. *Stockbridge-Munsee Cmty.,* 299 F. Supp. 3d at 1030; *Stockbridge-Munsee Cmty.,* 922 F.3d at 818.

Further, Kalshi would be wrong to suggest that because Congress created a federal criminal enforcement for illegal gambling on Indian lands, *see* 18 U.S.C. § 1166, that there cannot also be a separate, civil cause of action. *U.S. v. Cappetto,* 502 F.2d 1351, 1357 (7th Cir. 1974) (holding that nothing in the Constitution prohibits Congress from providing for civil and criminal enforcement of the law). In fact, Congress has repeatedly created both criminal enforcement and civil enforcement actions. *See, e.g.,* 18 U.S.C. § 1832 (making it a crime to steal a trade secret); 18 U.S.C. § 1836(b) (creating a private civil cause of action for theft of a trade secret).

Congress has not repealed or limited IGRA in the thirty-plus years since it passed. For example, when Congress passed the Unlawful Internet Gambling Enforcement Act in 2006,

19

Congress was explicit that it was not changing the federal, state, or tribal laws regarding gambling. 31 U.S.C. § 5361(b). Kalshi claims that its actions are allowed under the Commodity Exchange Act, but can point to no section of the Commodity Exchange Act that repeals IGRA or applies to class III gaming on Indian lands. In addition to the fact that the Commodity Exchange Act would be inapplicable if it clashes with IGRA, Kalshi also has the burden of overcoming the "strong presumption that repeals by implication are disfavored and that Congress will specifically address preexisting law when it wishes to suspend normal operations in a later statute." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (quotations omitted).

Because it has a Tribal-State Compact and because, as shown below, Kalshi is violating that Compact, the Nation can bring suit in this Court to enjoin Kalshi's conduct. Here, the Nation asks this Court to enforce IGRA and the Nation's tribal sovereignty by prohibiting Kalshi from conducting Event Wagering or any other form of class III gaming on the Nation's Indian lands. If it is not enough that the Nation is a sovereign entity with the power to control what happens on its own lands, Congress explicitly provided this remedy to tribes in passing IGRA.

**B.      Kalshi conducts class III gaming through its sale of sports event contracts.**

Kalshi conducts class III gaming activity under the guise of selling "event contracts," it falsely claims are authorized by the Commodity Exchange Act. But, the United States has long-defined sports betting, like Kalshi offers, as class III gaming. And, with respect to the Nation's Indian lands, Wisconsin prohibits anyone but the Nation from conducting class III gaming. More specifically here, the Nation defines class III gaming in its Gaming Compact to include, among other things, "accepting wagers on the outcomes of, and occurrences within, sports and non-sports games, competitions, and matches but shall not include pari-mutuel wagering on horse, harness, and dog-racing events." (FOF, ¶ 17.)

20

Similarly, Kalshi will not succeed in arguing that it is allowed to conduct class III gaming on the Nation's lands because of the Special Rule to the Commodity Exchange Act. *See* 7 U.S.C. § 7a-2(c)(5)(C). In passing the Special Rule, Congress did not indicate an intent to abrogate the sovereign rights of tribes or repeal IGRA. Nor can Kalshi argue that its sports betting is allowed by the CFTC because the CFTC prohibits Designated Contract Markets, like Kalshi, from listing event contracts that "involve[], relate[] to, or reference[] . . . gaming." 17 C.F.R. § 40.11(a); *see Hendrick*, 2025 WL 3286282, at \*13 n.13. Even if the CFTC had prohibited Kalshi from listing such contracts, Kalshi cannot prove that its sports betting activities are actually swaps as defined by the Commodity Exchange Act. *See Hendrick*, 2025 WL 3286282, at \*6.

### 1. *The United States has long defined sports betting as class III gaming.*

The United States has long defined sports betting as class III gaming. Both the National Indian Gaming Commission and Department of the Interior have promulgated regulations in accordance with IGRA establishing sports betting as a form of class III gaming. 25 C.F.R. § 502.4 provides: "Class III gaming means all forms of gaming that are not class I gaming or class II gaming, including but not limited to . . . sports betting and pari-mutuel wagering . . . ." 25 C.F.R. § 293.2(d) provides: "Gaming activity or gaming activities means the conduct of class III gaming involving the three required elements of chance, consideration, and prize or reward."

Similarly, the Nation and Wisconsin, through the Gaming Compact define sports betting as class III gaming. (FOF, ¶ 17.) In the compact, the Nation and Wisconsin agreed that the Nation could accept, "wagers on the outcomes of, and occurrences within, sports and non-sports games, competitions, and matches." (*Id.*) While the Nation and Wisconsin excluded "pari-mutuel wagering on horse, harness, and dog-racing events," they explicitly allowed betting on both the outcomes of and occurrences within sports and non-sports games.

QB\100006889.2

Here, Kalshi conducts class III gaming because it offers sports betting—allowing consumers to pay Kalshi to bet that a team will win a game or that certain milestones will be reached within a game. And, under the guise of ensuring "liquidity" Kalshi incentivizes entities to buy the sides of event contracts for which there is little or no market. Each time a consumer "buys" one of these event contracts, the consumer is paying consideration, taking a chance, and hoping for a prize or reward. Even ignoring the fact that Kalshi has referred to this conduct as sports betting, Kalshi is conducting sports betting.

### 2. As a Designated Contract Market, Kalshi is prohibited from listing these event contracts as they involve, relate to, or reference gaming.

Kalshi cannot argue that its sports betting is allowed by the CFTC because the CFTC has already prohibited DCMs, like Kalshi, from listing event contracts that "involve[], relate[] to, or reference[] . . . gaming" and the CFTC has not "been requested to take or taken any official action" to approve such conduct. 17 C.F.R. § 40.11(a)(1); CFTC Advisory Letter, CFTCLTR No. 25-36, 2025 WL 2817302, *1 n.4 (September 30, 2025); *see Hendrick*, 2025 WL 3286282, at *8 n.5, *9. Kalshi must admit that these contracts facially involve, relate to, or reference gaming because Kalshi allows consumers to bet on the outcome of sports events as well as place prop bets on player performance, point spread, over/unders, and parlays, all features of modern sports betting. Indeed, Kalshi has admitted that such contracts constitute gaming in prior filings in other courts. Because these contracts involve gaming, Kalshi, as a DCM, is prohibited from listing them.

The CFTC prohibits DCMs from listing these kinds of event contracts. When Congress passed the "Special Rule" and allowed DCMs to self-certify events contracts. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2. Congress also granted the CFTC the discretion to prohibit certain contracts if the CFTC determined those contracts were against the public interest. 7 U.S.C. § 7a-2(c)(5)(C)(i)-(ii); *N. Am. Derivatives Exch., Inc. v. Nevada Gaming Control Bd.*, No. 2:25-CV-

22

00978-APG-BNW, 2025 WL 2916151, at *10 (D. Nev. Oct. 14, 2025) ("*Crypto*"). Shortly thereafter, the CFTC passed 17 C.F.R. § 40.11(a)(1) which prohibits DCMs, like Kalshi, from listing for trading or accepting for clearing:

> An agreement, contract, transaction, or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, that involves, relates to, or references terrorism, assassination, war, gaming, or an activity that is unlawful under any State or Federal law.

17 C.F.R. § 40.11(a)(1). The CFTC did not equivocate in its language here or offer DCMs any discretion to list such contracts, stating, "[a] registered entity **shall not** list for trading or accept for clearing on or through the registered entity any of the following." *Id.* Even if this Court assumes Kalshi was permitted to self-certify these contracts, Kalshi would still be prohibited from listing them.

The CFTC, in Section 40.2, titled, "[l]isting products for trading by certification," established the procedure for self-certification *prior* to listing. "A designated contract market or a swap execution facility must comply with the submission requirements of this section prior to listing a product for trading that has not been approved under § 40.3." 17 C.F.R. § 40.2(a). To comply, a DCM must submit "[a] certification by the designated contract market or the swap execution facility that the product to be listed complies with the Act and Commission regulations thereunder . . . ." 17 C.F.R. § 40.2(a)(3)(iv). However, regardless of whether a DCM self certifies an event contract involving sports events, it would be prohibited from listing that contract.

Kalshi cannot ignore this prohibition by making confusing arguments about the fact that the CFTC has not disapproved the very contracts Kalshi is prohibited from listing. In passing the Special Rule, Congress both allowed DCMs to self-certify and gave the CFTC the discretion to review self-certified contracts. 7 U.S.C. § 7a-2(c)(1); 7 U.S.C. § 7a-2(c)(5)(C)(i); *see generally KalshiEX LLC v. Commodity Futures Trading Comm'n*, No. CV 23-3257 (JMC), 2024 WL

23

4164694, at *2–3 (D.D.C. Sept. 12, 2024), *dismissed,* No. 24-5205, 2025 WL 1349979 (D.C. Cir. May 7, 2025) ("*KalshiEX*") (discussing history of CEA amendments concerning CFTC review and approval authority). Congress did not require the CFTC to individually review contracts that may be against the public interest in making this determination, *see KalshiEX* at *2, and the CFTC chose not to do so in passing 17 C.F.R. § 40.11(a)(1).

Moreover, because the CFTC has the discretion to act on self-certifications but is not required to do so, 7 U.S.C. § 7a-2(c)(1), the Nation could not bring an administrative procedures act claim against the CFTC to compel action. *Norton v. Southern Utah Wilderness All.,* 542 U.S. 55, 63-64 (2004). As the Supreme Court has held, "a claim under [5 U.S.C.] § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take.*" *Id.* (emphasis in original); *see Hendrick*, 2025 WL 3286282, at *4.

Kalshi seems to think that it can ignore the prohibition and list these contracts anyway because the CFTC did not, separately, individually review these contracts to determine if they are against the public interest. Kalshi cannot explain why the CFTC should be required to individually review these contracts to determine if they can be listed when the CFTC has already prohibited them from being listed. *Crypto*, 2025 WL 2916151 at *10 ("The CFTC made that public interest determination on a blanket basis when it promulgated 17 C.F.R. § 40.11(a) . . . ."). Because the CFTC prohibited DCMs from listing contracts that involve, relate to, or reference gaming there is no need for the CFTC to, at the same time, have the resources to review self-certified contracts that it prohibited DCMs from listing. *See* Event Contracts, 89 FR 48968-01, at *48969 ("From a resource allocation perspective . . . in the Commission's experience, a single § 40.11(c) review is resource-intensive and consumes hundreds of hours of staff time.").

24

Indeed, because the CFTC has already prohibited Kalshi from listing such contracts, Kalshi cannot credibly suggest that the CFTC approved its contracts by not exercising its discretion to review them under 17 C.F.R. § 40.11(c); *see Hendrick*, 2025 WL 3286282, at *13 n.13. Because the CFTC prohibited DCM's from listing such contracts, the CFTC would not need to exercise its discretion to review and approve certain events contracts. By not exercising this discretion, the CFTC did not tacitly approve Kalshi's sports event contracts.

Nor can Kalshi claim that its sports betting contracts do not involve, relate to, or reference gaming. To start, Kalshi has already acknowledged that event contracts for sporting events would involve gaming. In particular, to prevent the CFTC from prohibiting Kalshi from selling event contracts based on elections, Kalshi argued, "that contracts on 'sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament' were *precisely* what Congress had in mind as 'gaming' contracts." Plaintiff's Memorandum in Support of Motion for Summary Judgment, at Section I.B.2., *KalshiEX LLC v. Commodity Futures Trading Comm'n,* No. 23-CV-03257-JMC, 2024 WL 4164694 (D.D.C., Jan. 25, 2024). Kalshi has therefore already explained that event contracts on sporting events would involve gaming. And such contracts would be impermissible. Kalshi has no basis for taking a contrary position now. While Kalshi told other courts that contracts like these would involve impermissible gaming, Kalshi does not tell consumers that these contracts are commodities but rather that they are sports bets. (FOF, ¶ 42.)

Finally, Kalshi cannot hope to have this Court ignore this prohibition by suggesting that the CFTC must decide the matter. Although Congress granted the CFTC exclusive jurisdiction in the CEA, 7 U.S.C. § 2(a)(1)(A) ("The Commission shall have exclusive jurisdiction . . . ."), in doing so, it clarified that: "Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State." *Id*. At least one federal court has explained that the

CFTC's "exclusive jurisdiction" is "*as among federal agencies,*" not from the courts. *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 678 (D. Md. 2025) (original emphasis). "As the Supreme Court has explained, the exclusive-jurisdiction provision was intended to 'consolidate federal regulation of commodity futures trading in the Commission' and to 'separate the functions of the [CFTC] from those of the [SEC] and other regulatory agencies.'" *Id*. (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 386–87 (1982)). Thus, "[n]othing in the CEA takes statutory interpretation away from courts." *Crypto*, 2025 WL 2916151 at * 6.

### 3. *Kalshi is wrong to suggest that its sports betting options are swaps under the Commodity Exchange Act.*

Against the long-standing history of states regulating gambling and sports betting, and Congress giving tribes the right to enforce their Tribal-State compacts against violations on Indian lands, Kalshi claims that Congress, without fanfare or announcement, subtly reversed this comprehensive regulatory structure in changes made to the Commodity Exchange Act in the Dodd Frank Act. Even ignoring the special cannons of construction to the benefit of Indian interests and Supreme Court's "strong presumption" that repeals by implication are disfavored, Kalshi is wrong. Kalshi bases this argument on the assumption that its sports event contracts, on which individuals bet on which team will win a game, are swaps. But, Congress did not define swaps so broadly.

In the Commodity Exchange Act, Congress gave the CFTC exclusive jurisdiction over, "accounts, agreements . . ., and transactions involving swaps or contracts of sale of a commodity for future delivery . . ., traded or executed on" a designated contract market. 7 U.S.C. § 2(a)(1)(A). Congress required a listed item to be a "swap[] or contract[] of sale of a commodity for future delivery . . . traded or executed on" a designated contract market in order for the listed item to fall within this exclusive jurisdiction. *Id.* To seek cover under the Commodity Exchange Act, Kalshi has to show that these contracts: 1) are dependent on the occurrence, nonoccurrence, or extent of

an occurrence of an event or contingency; and 2) that the event or contingency is associated with a potential financial, economic, or commercial consequence. 7 U.S.C. § 1a(47)(A)(ii). It cannot.

While Congress did not define occurrence or event, the United States District Court for the District of Nevada did. *See KalshiEX, LLC v. Hendrick*, No. 2:25-CV-00575-APG-BNW, 2025 WL 3286282 (D. Nev. Nov. 24, 2025). Consistent with the Supreme Court's guidance, this Court can likewise look to dictionaries from the time the law was passed to do so define occurrent or event. *See Wisconsin Cent. Ltd., v. United States,* 585 U.S. 274, 277 (2018). The District of Nevada in *Hendrick,* analyzed these terms in this statute and concluded "that the word 'event' in this definition means 'a happening of some significance that took place or will take place, in a certain location, during a particular interval of time, such as a particular sporting event or an organized activity or celebration for the public or a particular group,' and does not mean an outcome." *Hendrick*, 2025 WL 3286282, at *6 (quoting *Crypto*, 2025 WL 2916151, at *8). The *Hendrick* court further determined "that 'contingency' means a contingent event." *Id*. (quoting *Crypto*, 2025 WL 2916151, at *8 n.9). The *Hendrick* court found that "Kalshi's event contracts are based on the outcomes of sporting events or on things that happen during a sporting event. Thus, they are not swaps within the CEA's meaning." *Id*. at *6.

The *Hendrick* court also evaluated whether Kalshi's contracts were "associated with a potential financial, economic, or commercial consequence," noting that "Kalshi argued that this language means 'the event itself has to have potential financial, commercial, or economic consequence. It can't be an event that makes another financially consequential event more or less likely to occur,'" namely, that the "potential financial consequences must be 'extrinsic to the parties to the contract.'" *Id*. The *Hendrick* court rejected this interpretation and held that an "event or contingency is itself inherently joined or connected" with an economic consequence. *Id*. at *6.

27

"This means that the event or contingency itself has some potential financial, economic, or commercial consequence without looking at externalities like potential downstream financial consequences such as parties extrinsic to the event betting on it. And it does not include consumer transactions that have not historically been known to be swaps, such as sports wagers." *Id.*

Here, Kalshi is not offering sports event contracts on whether any particular event will *occur*. Indeed, Wisconsinites betting on sports events through the Kalshi app do not have the option of buying contracts on whether a scheduled Milwaukee Bucks game will occur. They can buy a contract on whether the Bucks will win. This is compounded by the fact that Wisconsinites can purchase contracts that include parlays, prop bets, and other "things that happen during a sporting event" or spanning multiple sporting events, all of which are well outside the CEA's definition of swaps. *Hendrick*, 2025 WL 3286282, at *6.

Significantly, Kalshi has represented, in separate litigation, that "at least in general, contracts relating to games—again, activities conducted for diversion or amusement—are unlikely to serve any 'commercial or hedging interest.'" Appellee's Br. at 45, *KalshiEX LLC v. CFTC*, No. 24- 5205, 2024 WL 4802698, at *45 (D.C. Cir. Nov. 15, 2024). Because this argument presumes that an event contract as to who wins a game, not whether it occurs, is a swap, Kalshi would need to be able to show that the question of who will win serves a commercial or hedging interest. Kalshi has already told another court that Kalshi would be unlikely to succeed on this argument. Plaintiff's Memorandum in Support of Motion for Summary Judgment, at Section I.B.2., *KalshiEX LLC v. Commodity Futures Trading Comm'n,* No. 23-CV-03257-JMC, 2024 WL 4164694 (D.D.C., Jan. 25, 2024); *see also Hendrick*, 2025 WL 3286282, at *7 n.3.

Kalshi is wrong to suggest its sports betting contracts are swaps. When Kalshi sells a sports event contract, it is selling whether a team will win a game and not whether a team will play that

game. Kalshi cannot suggest that these contracts depend on the "occurrence, nonoccurrence, or extent of the occurrence," of a live event. Nor can Kalshi seriously contend, that these contracts serve a commercial or hedging interest because it has already told other courts they do not. For these reasons alone, this Court can conclude that Kalshi's sports event contracts are not swaps.

### C. Defendants' class III gaming activity occurs on Indian lands.

The Nation is also likely to succeed on its IGRA claim because no one disputes that Kalshi allows consumers to place bets on the Nation's Indian lands—which is a violation of the Gaming Compact. Kalshi may have servers in its home state of New York or some other locale, but as long as consumers can bet on the Nation's Indian lands using Kalshi's software, Kalshi is conducting class III gaming on Indian lands. Courts deciding this issue look to where the bet is initiated, not where servers receiving and processing the bets are located.

The Supreme Court specifically addressed the issue of where gaming occurs in *Bay Mills*. 572 U.S. at 795. There, the Bay Mills Indian Community set up a casino outside of their lands and the State of Michigan brought suit claiming the Community was violating IGRA. *Id.* The Supreme Court disagreed, because IGRA governs gaming on Indian lands, and, even though the Community used administrative services from its Indian lands to run this satellite casino, the actual gaming at issue was not on the Community's Indian lands. *Id.* The Supreme Court held that "'class III gaming activity' is what goes on in a casino—each roll of the dice and spin of the wheel." *Id*. at 792.

The Tenth Circuit has also spoken directly on this issue, "Class III gaming activity relates only to activities actually involved in the *playing* of the game, and not activities occurring in proximity to, but not inextricably intertwined with, the betting of chips, the folding of a hand, or suchlike." *Navajo Nation v. Dalley*, 896 F.3d 1196, 1207 (10th Cir. 2018). In the case of remote activity, like here, courts look to where the operative activity, the consumer interaction with gaming like roll of the dice or the spin of the wheel, occurs. Without customers pulling the levers,

29

QB\100006889.2

a building full of slot machines is a warehouse, not a casino.

The Ninth Circuit reached a similar conclusion—that the location of the betting is the location of the gaming. In *State of California v. Iipay Nation of Santa Ysabel*, 898 F.3d 960 (9th Cir. 2018) ("*Iipay*"), the Iipay Nation argued that the locale of the gaming activity it was conducting was where the Iipay Nation received the bet (on its Indian lands), not where the bets were initiated (off the reservation). The Ninth Circuit harmonized IGRA and the Unlawful Internet Gambling Enforcement Act of 2006, 31 U.S.C. §§ 5361–5367 ("UIGEA"), and concluded:

> [A]s the Government argues, the patrons are engaging in "gaming activity" by initiating a bet or a wager in California and off Indian lands. Consistent with the Supreme Court's holding in *Bay Mills*, the act of placing a bet or wager is the "gambling in the poker hall," not "off-site licensing or operation of the games." [citation]. As a result, it seems clear that at least some of the "gaming activity" associated with [Iipay's gaming] does not occur on Indian lands and is thus not subject to Iipay's jurisdiction under IGRA.

*Id*. at 967. *Accord*, *Navajo Nation v. Dalley*, 896 F.3d 1196, 1207 (10th Cir. 2018) ("Class III gaming activity relates only to activities actually involved in the playing of the game. . . .").

This Court should conclude the same here. Kalshi allows consumers to place bets (or buy sports events contracts) on the Nation's Indian lands. As a result, Kalshi must concede that, "it seems clear that at least some of the 'gaming activity' associated" with betting on sports events occurs on Indian lands and is thus subject to the Nation's regulatory jurisdiction under the IGRA. *Id*. Kalshi may be right that another part of its sports betting occurs off of the Nation's Indian lands, but it cannot deny that a key part occurs on the Nation's Indian lands.

**D.    Kalshi cannot avoid IGRA enforcement by relying on UIGEA because UIGEA preserves IGRA.**

Kalshi cannot avoid the Nation's IGRA claims by relying on UIGEA. In passing this act, Congress preserved the full force and effect of IGRA and the Gaming Compact: "No provision of this subchapter shall be construed as altering, limiting, or extending any Federal or State law or

30

**Tribal-State compact** prohibiting, permitting, or regulating gambling within the United States." 31 U.S.C. § 5361(b) (emphasis added).

Rather than conflict with IGRA, Congress allowed UIGEA to operate alongside it. The Ninth Circuit confirmed this point in *Iipay Nation* concluding, "there is no direct conflict between IGRA and the UIGEA and, thus, we give effect to the provisions of both statutes." 898 F.3d at 968. While Kalshi might try to argue that UIGEA controls so that it can rely on the fact that the act exempts CEA transactions, Kalshi would need to ask this Court to ignore the plain language of UIGEA to do so. 31 U.S.C. § 5361(b); *see also Hendrick*, 2025 WL 3286282, at *7 n.3.

Kalshi would prefer UIGEA to apply to its sports betting on the Nation's Indian lands because UIGEA exempts CEA transactions, implying the UIGEA exemption shields Kalshi from the Nation's regulatory authority under IGRA. But, Congress did not choose to repeal IGRA in passing UIGEA and made its choice clear. 31 U.S.C. § 5361(b). While Kalshi has claimed that because UIGEA specifically deals with online gaming, UIGEA must control IGRA, this argument is belied by Congress's choice to leave IGRA in full force and effect when passing UIGEA. Had Congress chosen otherwise, it would not have explicitly stated UIGEA would not limit, alter, or extend, "any Federal or State law or Tribal-State compact prohibiting, permitting, or regulating gambling within the United States." 31 U.S.C. § 5361(b). Even if Congress had not been clear it was making no changes to Federal or State law or a Tribal-State compact, the Supreme Court has long held it will only find an implied repeal where provisions in two statutes are in "irreconcilable conflict," or where the latter Act covers the whole subject of the earlier one and "is clearly intended as a substitute." *Branch v. Smith,* 538 U.S. 254, 273 (2003) (citations omitted). And, as explained in detail above, because IGRA relates to tribal sovereignty, this Court must apply the special canons of construction to uphold Indian sovereignty to the benefit of Indian interests.

31

QB\100006889.2

In passing IGRA, Congress gave Tribes the right to enjoin class III gaming on Indian lands in violation of State-Tribal gaming compacts. Congress has not repealed that right directly or indirectly. Here, Kalshi violates the Nation's Gaming Compact by conducting class III gaming on the Nation's Indian lands. Congress gave the Nation the right to sue in federal court and enjoin this activity. Not only is Kalshi violating the Nation's tribal sovereignty it is violating the Nation's Tribal-State compact. The Nation is likely to succeed on proving this point and is entitled to a preliminary injunction.

## II. THE NATION IS LIKELY TO SUCCEED ON THE MERITS OF ITS LANHAM ACT CLAIM.

The Nation asks this Court to forbid Kalshi from advertising that it, or its platform, (a) offers any activity that is 50 state legal and (b) offers "sports betting" or "sports gaming." To succeed on its request for a preliminary injunction, the Nation need only prove that it has "some likelihood of prevailing on the merits, not that it will definitely prevail." *Abbott Labs*, 971 F.3d at 13. As detailed below, and above, the Nation is likely to succeed on the merits for its false advertising claim under the Lanham Act because (1) Kalshi makes false and deceptive claims about the legality and propriety of its sports betting platform; and (2) Kalshi intends its statements to mislead or cause confusion.

### A. In its Advertising, Kalshi Misleading and Deceptively Claims that its Platform is Legal in 50 States and that Offers Sports Betting.

In the false-advertising provisions of the Lanham Act, Congress protects organizations from having consumers lured away by deceptive ads (or labels, or other promotional materials). *Schering-Plough Healthcare Prods., Inc. v. Schwarz Pharma, Inc.*, 586 F.3d 500, 512 (7th Cir. 2009). In Section 43(a) of the Lanham Act, Congress prohibits not just expressly false statements, but also "claims that may be literally true or ambiguous, but which implicitly convey a false impression, are misleading in context, or [are] likely to deceive consumers" about a matter that is

32

material in the sense that it is "likely to influence [their] purchasing decision." *Hot Wax, Inc.*, 191 F.3d at 819-20 (discussing 15 U.S.C. § 1125(a)). Ultimately "the Lanham Act is at heart a consumer protection statute." *Sands, Taylor & Wood v. Quaker Oats Co.*, 34 F.3d 1340, 1355 (7th Cir. 1994), *on reh'g in part,* 44 F.3d 579 (7th Cir. 1995) (Cudahy, J., concurring in part) ("[T]he underlying purpose of the Lanham Act is consumer protection[.]"); *Bell v. Publix Super Markets, Inc.*, 982 F.3d 468, 480 (7th Cir. 2020) (characterizing the Lanham Act as a "consumer-protection statute[]"); *see also TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 827 (9th Cir. 2011) (citing *U-Haul Int'l, Inc. v. Jartran, Inc.*, 681 F.2d 1159, 1162 (9th Cir. 1982)).

In assessing whether Kalshi is making false claims, this Court must consider those claims in context and not parsed as incomplete phrases or sentences. *See Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997); *Castrol, Inc. v. Pennzoil Co.*, 987 F.2d 939, 946 (3d Cir. 1993); *Schwarz Pharma, Inc. v. Breckenridge Pharm., Inc.*, 388 F. Supp. 2d 967, 976 (E.D. Wis. 2005). "When an advertisement is shown to be literally or facially false, consumer deception is presumed, and 'the court may grant relief without reference to the advertisement's [actual] impact on the buying public.'" *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 153 (2d Cir. 2007) (quoting *Coca-Cola Co. v. Tropicana Prods., Inc.*, 690 F.2d 312, 317 (2d Cir. 1982)). On the other hand, when the statement is literally true or ambiguous, the plaintiff must prove that the statement is misleading in context by demonstrated actual consumer confusion. *Hot Wax,* 191 F.3d at 820.

Here, Kalshi makes a number of false and/or misleading statements about the legality and functionality of its platform, products, and services. In particular, Kalshi has published, in interstate commerce, advertisements that make the following false or misleading statements:

33

1)  "Sports Betting Legal in all 50 States on Kalshi"



2)  That it allows users to bet on sports:



34







(FOF, ¶ 45-46, 48, 49.) These statements are not susceptible to more than one reasonable

interpretation; the only reasonable interpretation is that Kalshi offers "sports betting" and that such sports betting is "legal in all 50 states."

Kalshi has already told the federal courts in the District of Columbia that it could not legally sell sports events contracts under the CEA. Plaintiff's Memorandum in Support of Motion for Summary Judgment, at Section I.B.2., *KalshiEX LLC v. Commodity Futures Trading Comm;n,* Case No. 23-CV-03257-JMC, 2024 WL 4164694 (D.D.C., Jan. 25, 2024); *see also KalshiEX, LLC v. Hendrick*, No. 2:25-CV-00575-APG-BNW, 2025 WL 3286282, at *7 n.3 (D. Nev. Nov. 24, 2025). And, Kalshi cannot point to a change in the law since it told this courts that selling sports events contracts would not be legal. Thus, Kalshi violated the Lanham Act when it advertised that sports betting was legal in all 50 states.

Even if this Court is not willing to judge Kalshi by its own words, Kalshi is wrong to advertise that sports betting is legal in all 50 states. Sports betting is not legal in Wisconsin on the Nation's Indian lands except as allowed in the Gaming Compact—which does not allow third parties, like Kalshi to conduct Gaming. 25 U.S.C. § 2710(d)(1); (FOF, ¶¶ 20-23, 30.). As shown above, Kalshi is not allowed to conduct gambling—including sports betting—on the Nation's lands. Thus, sports betting is not legal in all 50 states.

Moreover, Kalshi is falsely advertising its conduct as sports betting while telling Courts that this conduct is actually part of a legal commodity exchange. Over and over again, Kalshi seeks to avoid state regulation of sports betting by telling courts that it is not conducting sports betting, rather it is conducting a commodity exchange under the Commodity Exchange Act. Kalshi then claims its conduct is above any state claim based on pre-emption. *KalshiEX LLC v. Martin,* 793 F. Supp. 3d 667, 671 (D. Md. 2025) (appeal pending). Kalshi had initially convinced some courts to adopt this argument but, as of late, courts have been rejecting this argument. *Compare KalshiEX*

36

*LLC v. Flaherty,* No. 25-CV-02152-ESK-MJS, 2025 WL1218313 (D. N.J., Apr. 28, 2025) (appeal pending) *with KalshiEX, LLC v. Hendrick,* Case No. 2:25-CV-00575-APG-BNW, 2025WL 3286282 (D. Nev. Nov. 24, 2025) (appeal pending).

Kalshi stokes consumer confusion on these points. Over and over again, Kalshi attempts to dissuade concerns or confusion consumers have expressed regarding the legality or propriety of using Kalshi's platform to place money on sporting events. For example:

 

37



(FOF, ¶ 50.) Consumers' confusion or concerns are understandable given many states, Wisconsin

included, criminally prohibit sports betting activity. *See*, *e.g.*, Wis. Stat. § 945.03; Cal. Penal Code

§ 337a(1).

Kalshi cannot rely on the "legal nature" of its statements as a defense. It is well established

that within the Seventh Circuit a false or misleading statement regarding legality is actionable

under § 40(a)(1)(B). *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 123,

138–40 (2014) (finding that a false advertisement claim based on a letter that stated it was illegal

to use the respondent's products could proceed); *Paul Davis Restoration, Inc. v. Everett*, No. 14-

QB\100006889.2

C-1534, 2014 WL 7140038, at *3–5 (E.D. Wis. Dec. 12, 2014) (finding that a false advertisement that stated the plaintiff was breaking the law was sufficient for a preliminary injunction); *Data Rsch. & Handling, Inc. v. Vongphachanh*, 278 F. Supp. 3d 1066, 1077 (N.D. Ind. 2017) (finding that the defendants' statement that the plaintiff's program and company were illegal was sufficient to state a claim under the Lanham Act). Further, because Kalshi's statements that it offers "legal" sports-betting across the country are "literally false," Kalshi's statements "necessarily deceive consumers, so extrinsic evidence of actual consumer confusion is not required." *Eli Lily & Co.*, 893 F.3d at 382.

Even if the Court turns to an out of circuit doctrine to analyze Kalshi's statements of legality—despite the Seventh Circuit's lengthy history finding such statements actionable—the Court should find that Kalshi's statements cannot be construed as anything other than "statement[s] of objective fact" which are actionable under § 40(a)(1)(B). *TNT Amusements, Inc. v. Torch Elecs., LLC*, No. 4:23-CV-330-JAR, 2025 WL 947506, at *13 (E.D. Mo. Mar. 28, 2025), *affirmed in relevant part on reconsideration,* No. 4:23-CV-330-JAR, 2025 WL 2336858 (E.D. Mo. Aug. 13, 2025). When analyzing statements of legality under § 40(a), some courts apply the rule that "[a]bsent a clear and unambiguous ruling from a court or agency of competent jurisdiction, statements by laypersons that purport to interpret the meaning of a statute or regulation are opinion statements, and not statements of fact." *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999) (relying on *Dial A Car, Inc. v. Transportation, Inc.*, 82 F.3d 484, 488–89 (D.C. Cir. 1996)).

Courts have recognized certain exceptions to the *Coastal* rule. First, a statement by a layperson concerning legality is actionable if "the statutory language was so clear on its face" as to the legality of the conduct at issue. *Dental Recycling N. Am., Inc. v. Stoma Ventures, LLC*, No.

39

4:23 CV 670 CDP, 2023 WL 6389071, at *4 (E.D. Mo. Oct. 2, 2023). Second, if the speaker "lacks a good faith belief in the truth of the statement," the statement is actionable. *Id.* at *5. Third, if the speaker "clearly intended" for the statement to be "reasonably interpreted as a statement of fact," the statement is actionable. *TNT Amusements*, 2025 WL 947506, at *14.

Here the Court need not apply the *Coastal* rule for two reasons. **First**, the Seventh Circuit has yet to adopt the *Coastal* rule and, as set forth above, has a lengthy history of allowing such statements to be actionable. Further, in *Lexmark Intern., Inc. v. Static Components, Inc.*, the Supreme Court made no mention of the *Coastal* rule when it discussed a § 40(a) claim based on statements in a letter discussing the legality of the respondent's products. *See* 572 U.S. at 138. **Second**, Kalshi is not a "layperson[]." *See Coastal Abstract Serv.*, 173 F.3d 725 at 731. Kalshi is a sophisticated business entity making assurances to induce consumers across the country to use its services. For these reasons, the Court should not be constrained by the *Coastal* rule.

Even if the Court applies the *Coastal* rule, Kalshi's statements are actionable because all three exceptions apply to Kalshi's statement.

**First**, the law is "clear" that Kalshi cannot offer legal sports betting in all 50 states. *See Dental Recycling N. Am., Inc.*, 2023 WL 6389071, at *4. The illegality of Kalshi's service on the Nation's Indian lands is established based on both (a) Kalshi's own statements regarding sporting events falling outside CFTC's purview and (b) the above detailed authority and guidance on the issue. Further, Kalshi is wrong to suggest that the 2010 Special Rule moved sports betting from the control of the states to the CFTC creating ambiguity in the law. In 2018, eight years after Congress passed the Special Rule, the Supreme Court held that Congress had not regulated sports betting directly, allowing the states to regulate sports betting as they had other forms of gambling. *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 486 (2018).

*Second*, Kalshi "lack[ed] a good faith belief in the truth of [its] statement." *Id.* at *5. Again, the Court need look no further than Kalshi's own statements in the CFTC context to show that Kalshi itself believes its actions are unlawful.

*Finally*, Kalshi "clearly intend[s]" its statements to be "interpreted as objective fact and not merely opinions." *TNT Amusements*, 2025 WL 947506, at *14. Kalshi's intention is obvious when examining Kalshi's real time interactions with confused consumers. In one instance, Kalshi asserted, in response to confusion on an advertisement promoting that "sports trading is legal in all 50 states on Kalshi," that its legality statement is meant literally and not as an opinion statement:[1]



---

[1] As detailed below, even if the Court concludes these statements are hearsay, the Court may consider hearsay statements on preliminary injunction. *S.E.C. v. Cherif*, 933 F.2d 403, 412 n.8 (7th Cir. 1991); *Nelson on behalf of Nat'l Lab. Rels. Bd. v. Advoc. Health & Hosps. Corp.*, 273 F. Supp. 3d 919, 929 n.5 (N.D. Ill. 2017).

QB\100006889.2

(FOF, ¶ 50.) Kalshi cannot contend that its numerous statements affirming the legality of its service, like the one depicted above, were intended as opinion statements when Kalshi itself publicly reaffirms that its statements should be taken "literally." *See TNT Amusements*, 2025 WL 947506, at *13.

### B.     Alternatively, Defendants' Advertising is Intended to Cause Consumer Confusion and Has Done So.

Not only has Kalshi made a material false statement, the Nation can prove that Kalshi's false statement actually deceives or tends to deceive a substantial number of consumers. If Kalshi made a claim that is not literally false, the Nation is required to prove actual or likely confusion. The Nation can do so by producing extrinsic evidence showing that a significant or substantial portion of consumers who see or hear the advertisement receive, or are likely to receive, the false claim. *See Johnson & Johnson * Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 297-98 (2d Cir. 1992) (hereinafter "*J&J * Merck*"); *Arla Foods*, 893 F.3d at 382.

The Nation can meet this burden in one of two ways. ***Either*** (a) the Nation shows that Kalshi "has intentionally set out to deceive the public [through the implicit false statement], and [that Kalshi's] deliberate conduct in this regard is of an egregious nature," in which case "the burden shifts to [Kalshi] to demonstrate the absence of consumer confusion," *J&J * Merck*, 960 F.2d at 298–99, ***or*** (b) the Nation uses extrinsic evidence to demonstrate the challenged advertisements mislead and confuse a substantial portion of consumers, *J&J * Merck*, 960 F.2d at 298.; *Riddell, Inc. v. Schutt Sports, Inc.*, 724 F. Supp. 2d 963, 971 (W.D. Wis. 2010).

Even if Kalshi's statements are not literally false, which they are, Kalshi is still likely to mislead or confuse consumers with its advertisements. Indeed, social media users have on many occasions expressed concerns or confusion about how Kalshi could offer "50 State legal sports betting." (FOF, ¶¶ 45-46.) As shown below, Kalshi has gone so far as to respond to these comments

42

and reinforce that consumers can participate in "50 State legal sports betting." (FOF, ¶ 45.)



The Court can and should consider all the statements in the screenshots of the "comments"[2]

under Kalshi's social media posts as the comments show that Kalshi's advertisements confuse and

mislead consumers. The Nation contends, as argued below, that the comments are not hearsay.

---

[2] The term "comment" here is intended to refer to written messages users of a social media platform can make in response to or in connection with a post, video, photo, or statement made by the "creator," "author," or "original poster (OP)." *See Krasno v. Mnookin*, 148 F.4th 465, 472 (7th Cir. 2025). Both the creator / OP/ author and the users on a social media platform can provide comments on a post. *Id.* On many platforms, including TikTok which is depicted above, both the author and other users can reply to other comments under a post. *Id.* Further, authors and other users can "like," or apply a similar mode of approval to others' comments. *See* Clare Y. Cho & Ling Zhu, CONG. RSCH. SERV., R46662, SOCIAL MEDIA: CONTENT DISSEMINATION AND MODERATION PRACTICES (2025), https://www.congress.gov/crs-product/R46662; *How do I react to a post or comment on Facebook?*, FACEBOOK HELP CENTER, https://www.facebook.com/help/1624177224568554 (last visited Dec. 7, 2025) ("To react to a . . . . comment . . . Hover over the Like and choose a reaction."); *Like a comment on an Instagram post*, INSTAGRAM HELP CENTER, https://help.instagram.com/107009073121923/?helpref=uf_share (last visited Dec. 7, 2025) ("To like a comment . . . click ♥ Like to the right of the comment.").

QB\100006889.2

Nevertheless, even if the Court finds that the comments are hearsay, the Court can and should consider the comments when weighing whether to grant the preliminary injunction. It is well established that "hearsay [statements] can be considered [by the court] in entering a preliminary injunction." *S.E.C. v. Cherif*, 933 F.2d 403, 412 n.8 (7th Cir. 1991); *Nelson on behalf of Nat'l Lab. Rels. Bd. v. Advoc. Health & Hosps. Corp.*, 273 F. Supp. 3d 919, 929 n.5 (N.D. Ill. 2017) ("It is well established that hearsay testimony is admissible in preliminary injunction hearings."); *see also Dexia Credit Loc. v. Rogan*, 602 F.3d 879, 885 (7th Cir. 2010) ("[W]e have recognized that a district court may grant a preliminary injunction based on less formal procedures and on less extensive evidence than a trial on the merits."). The comments under Kalshi's social media posts are directly relevant to the preliminary injunction as they depict real world consumer responses to Kalshi's misleading advertisements. The Court could not ask for better evidence to weigh whether Kalshi's advertisements are misleading than actual consumers reading and reacting to Kalshi's advertisements in real time. Therefore, the Court can and should consider all the statements in the comments under Kalshi's social media posts.

Kalshi's response to comments under Kalshi's social media posts and the comments that Kalshi "likes"—indicated by a publicly viewable "♥ by author"—are not hearsay as both are "statements" by Kalshi. *See* FRE 801(a). Statements offered against an opposing party and made by the party in an individual or representative capacity are not hearsay. FRE 801(d)(2)(A). Under FRE 801(a), a "statement" is defined as a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion. In *Baines*, the court explained that "*statements* assert propositions that may be true or false. They are distinct from other forms of communication, such as questions or commands." *Baines v. Walgreen Co.*, 863 F.3d 656, 662 (7th Cir. 2017) (emphasis added).

Courts have held that when companies like Kalshi respond to a comment, the company is making its own statement qualifying as non-hearsay admissions under FRE 801(d)(2). *See United States v. Lewisbey*, 843 F.3d 653 (7th Cir. 2016) (holding that posts made by the defendant on Facebook were his own statements and thus qualified as non-hearsay admissions under FRE 801(d)(2)). Similarly, when Kalshi "likes" or "hearts" a comment, Kalshi is making a statement. *See Bland v. Roberts*, 730 F.3d 368, 386 (4th Cir. 2013), *as amended* (Sept. 23, 2013) (finding that "clicking on the 'like' button literally causes to be published the statement that the User 'likes' something, which is itself a substantive statement" in the First Amendment context). Specifically, Kalshi is making a public statement of support for the comments it "likes" or "hearts." Under the *Baines* description, a "like" which places a publicly viewable "♥ by author" on the comment is closer to a "statement[]" than a "question[] or command[]." *See* 863 F.3d at 662.

Further, the fact that Kalshi is "liking" or "hearting" comments from Kalshi's own social media page establishes Kalshi's intent was to make its own statement of support as opposed to some alternative purpose. *See United States v. Barela*, No. 1:20-CR-01228-KWR, 2021 WL 5447915, at *3 (D.N.M. Nov. 22, 2021) (reserving the admissibility ruling on the "liked" pages until more evidence is brought forth because "the 'liked' page itself was not authored by Defendant"). By both replying to comments and "liking" comments made on Kalshi's own social media page, Kalshi is making its own statement.

Likewise, the user comments that Kalshi interacts with are not hearsay because the Nation is not offering them for the truth of the matter asserted. Instead, the Nation offers them to provide context to Kalshi's statements. *See Lewisbey*, 843 F.3d at 658. The Court should find that context surrounding a statement on social media is admissible. *See United States v. Lemons*, 792 F.3d 941, 946–49 (8th Cir. 2015). Without admitting the user comments, Kalshi's statements would be

45

QB\100006889.2

"[un]intelligible" and "[un]recognizable." *See id.* at 947. Therefore, the Court should consider both Kalshi's statements replying to and "liking" the user comments, and the underlying user comments themselves as neither are hearsay.

### C.    Kalshi's False Claims are Material to Consumers.

Kalshi's advertisements are highly material to consumers, in that they are "likely to influence [consumers'] purchasing decision[s]." *See Hot Wax, Inc.*, 191 F.3d at 819. As shown above, Kalshi's advertisements are all the more misleading because they prey upon consumers' confusion and/or misunderstanding of sporting or gaming laws in the United States and lack of common knowledge relating to commodity exchanges. (FOF, ¶ 50).

The fact that the advertisements' message is "misleading in context" and "likely to deceive consumers" makes it actionable under the Lanham Act. *See Hot Wax, Inc.*, 191 F.3d at 820. This is true even when the "context" comes in the form of preexisting beliefs. *See, e.g.*, *Simeon Management Corp. v. FTC*, 579 F.2d 1137, 1146 (9th Cir. 1978) (the fact that a false belief "is attributable to factors other than the advertisement itself does not preclude the advertisement from being deceptive"); *Telebrands Corp., TV Savings, LLC, & Ajit Khubani- Commission Opinon and Order to Cease and Desist,* Trade Reg. Rep. (CCH) ¶ 15800 (Sept. 19, 2005) ("Where, as here, an advertiser exploits preexisting beliefs deliberately by inviting consumers to recall the claims in other ads to help convey a message, it makes little sense to remove the influence of those other ads.").

Kalshi's rapid growth, built upon its false and/or misleading advertising campaign, establishes that Kalshi's false and/or misleading statements are material to consumers. *See Kraft, Inc. v. F.T.C.*, 970 F.2d 311, 324 (7th Cir. 1992) (affirming the F.T.C.'s consideration under a materiality analysis of an "increase in market share" due to false advertising); (FOF, ¶ 54). Although this Court has acknowledged that "FTC precedent is largely inapplicable to Lanham Act

46

cases," *MillerCoors, LLC v. Anheuser-Busch Companies, LLC,* 385 F. Supp. 3d 730, 750 (W.D. Wis. 2019), courts within the Seventh Circuit have used this materiality analysis for Lanham Act claims. *See, e.g., Morningware, Inc. v. Hearthware Home Prods., Inc.*, No. 09 C 4348, 2012 WL 3721350, at *15 (N.D. Ill. Aug. 27, 2012); *LG Elecs. v. Whirlpool Corp.*, No. 08 C 242, 2010 WL 2921633, at *3 (N.D. Ill. July 22, 2010)).

### D.   Kalshi's Advertising Has Injured the Nation and Continues to Do So.

Another element a plaintiff must prove to prevail on a false advertising claim under the Lanham Act is show that it "has been or is likely to be injured as a result of the false statement." *Arla Foods*, 893 F.3d at 382. One such injury is harm to reputation and/or sales. *See Lexmark,* 572 U.S. at 131; *Eli Lilly & Co.*, 893 F.3d at 383. Said injury can result when a defendant's deception or false claims cause consumers to withhold or redirect trade away from the plaintiff. *Lexmark*, 572 U.S. at 133; *Eli Lilly & Co.*, 893 F.3d at 383.

Under the Nation's Fourth Amendment to its Compact with the State of Wisconsin, the Nation can and *will* offer brick-and-mortar Events Wagering, including sportsbook, on its Indian lands. (FOF, ¶¶ 24-26.) In fact, the Nation has already taken significant steps to offer brick-and-mortar sportsbook at its gaming facilities, including working with a licensed vendor to implement the sportsbook. (*Id.*) Kalshi's false and/or misleading statements harm the Nation in three distinct ways: (i) the statements lure consumers away from the Nation's existing, non-sportsbook, gaming offerings; (ii) the statements led to the Nation entering into a contract for its Events Wagering platform on less favorable terms; and (iii) the statements have already led consumers to favor Kalshi's platform over what will be the Nation's Event Wagering platform. (FOF, ¶¶ 25-26, 29.)

***First***, Kalshi's false and/or misleading statements lure consumers away from the Nation's existing Class III gaming offerings. (FOF, ¶ 28). The Nation and defendants compete directly for the same pool of consumer dollars allocated to gaming and to sportsbook specifically. (FOF, ¶ 30-

47

31.) Kalshi's marketing strategy, which explicitly uses the term "sports betting" (a class III gaming activity) and calls its conduct legal, is designed to attract sports gamblers and divert business from the Nation's highly regulated gaming facilities. (*See id.,* ¶ 29); *see* 25 C.F.R. § 502.4. Kalshi's false and/or misleading advertisements have succeeded in reaching a broad consumer base, which necessarily impacts brick-and-mortar sports betting facilities like the Nation's Casinos. *See W. Flagler Assocs. v. Haaland*, 573 F. Supp. 3d 260, 268 (D.D.C. 2021), *reversed on other grounds*, 71 F.4th 1059 (Fed. Cir. 2023) (noting the plaintiff's prediction that online sports wagering would "divert business that would have been spent at [their facilities] and cause it to be spent on online sports gaming" was "reasonable and hardly speculative." (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

**Second**, Kalshi negatively impacted the Nation's leverage in contracting with a vendor to run its Events Wagering platform. (FOF, ¶ 25.) In contracting with a company to launch an Events Wagering platform at its casinos, the Nation was unable to negotiate a lower provider fee because third parties, like Kalshi, are currently capturing the Events Wagering market on the Nation's Indian lands. (FOF, ¶ 25.) Because of Kalshi, the Nation could not offer its vendor the monopoly on its Indian lands provided for in IGRA and the Gaming Compact and, instead. could only offer its vendor the chance to compete in an already established market. (FOF, ¶¶ 18, 26.)

**Third**, and finally, Kalshi will reduce the Nation's revenue from its Events Wagering platform with its false and misleading statements. (FOF, ¶¶ 26, 30.) The Nation will have less people coming to its casinos to conduct events wagering and make ancillary purchases because Kalshi conducts internet sports betting on the Nation's Indian lands.  (*Id.*, ¶ 28.). The Nation will see less revenue, used to fund essential government services, as a result. (*Id.*, ¶ 30, 31.) Thus, Kalshi's advertising will directly impact and undercut the Nation's revenue, harming the Nation's

48

ability to support itself and its members.

## III.   THE NATION HAS NO ADEQUATE REMEDY AT LAW AND WILL SUFFER IRREPARABLE HARM.

In addition to demonstrating a likelihood of success on the merits, a plaintiff seeking a preliminary injunction must show "that it has no adequate remedy at law" and "that without [injunctive] relief it will suffer irreparable harm." *Planned Parenthood of Ind. & Ky., Inc.*, 896 F.3d at 816 (citation omitted). In cases like this one, lack of an adequate remedy and irreparable harm substantially overlap, such that the Nation's injuries are irreparable primarily because the law does not provide a remedy adequate to rectify them. *See Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 383 (7th Cir. 1984) (noting overlap between "no adequate remedy at law" and "irreparable harm" requirements for preliminary injunctions).

To satisfy the burden of demonstrating irreparable harm, a plaintiff "need only present proof providing a ***reasonable basis*** for the belief that the plaintiff is likely to be [irreparably harmed] as a result of the false advertising." *R.H. Donnelley Corp. v. Ill. Bell Tel. Co.*, 595 F. Supp. 1202, 1207 (N.D. Ill. 1984) (citing *Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186 (2d Cir. 1980)) (emphasis added). Harm is irreparable if it "cannot be prevented or fully rectified by the final judgment after tria[l]." *Roland Mach. Co.*, 749 F.2d at 386. In other words, harm is considered irreparable if "compensation in money cannot atone for it." *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 296 (7th Cir. 1997). Classic examples include loss of reputation, goodwill, market share, and customer base—injuries that are difficult to quantify. *See, e.g., Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 902 (7th Cir. 2001) ("[I]t is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill, caused by [Lanham Act] violations.") (quoting *Abbott Labs.*, 971 F.2d at 16); *Ill. Bell Tel. Co. v. MCI Telecomms. Corp.*, No. 96 C 2378, 1996 WL 717466, at *9 (N.D. Ill. Dec. 9, 1996)

QB\100006889.2

("Loss of market share is also irreparable injury, because market share is difficult to recover.").

Courts have long held that impermissible interference with tribal self-government and, necessarily, tribal sovereignty, constitutes irreparable harm. Indian tribes are irreparably harmed by unlawful deprivations of their jurisdictional authority. *Ute Indian Tribe of the Uintah & Ouray Rsrv. v. Utah*, 790 F.3d 1000, 1005 (10th Cir. 2015) (the Tenth Circuit has "repeatedly stated that such an invasion of tribal sovereignty [enforcing state law on Indian land] can constitute irreparable injury"); *Tohono O'Odham Nation v. Schwartz*, 837 F. Supp. 1024, 1034 (D. Ariz. 1993) ("The harm to the Nation's sovereignty cannot be remedied by any other relief other than an injunction precluding the . . . action from proceeding."); *Comanche Nation v. United States*, 393 F. Supp. 2d 1196, 1205–1206, 1210–1211 (W.D. Okla. 2005).

Encroachments on tribal sovereignty constitute an irreparable injury because the harm to tribal self-government is "not easily subject to valuation." *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001); *see also EEOC v. Karuk Tribe Hous. Auth.*, 260 F.3d 1071, 1077 (9th Cir. 2001) ("Assuming that the Tribe is correct in its analysis with respect to jurisdiction, the prejudice of subjecting the Tribe to a subpoena for which the agency does not have jurisdiction results in irreparable injury vis-a-vis the Tribe's sovereignty."); *Choctaw Nation of Oklahoma v. State of Oklahoma*, 724 F. Supp. 2d 1182, 1187 (W.D. Okla. 2010) (holding remedies at law are inadequate to remedy unlawful assertions of state jurisdiction in Indian Country). This reasoning applies equally well to Kalshi's unauthorized Class III gaming on Indian lands in violation of IGRA and the Nation's Gaming Ordinance.

The Nation has no adequate remedy at law and will suffer irreparable harm if Kalshi is allowed to continue trampling on the Nation's sovereignty by conducting class III gaming on the Nation's Indian lands. In passing IGRA, Congress provided that tribes may come to federal court

to enjoin class III gaming occurring on Indian lands in violation of a Tribal-State compact. 25 U.S.C. § 2710(d)(7)(A)(ii). Congress explained that one of the purposes of IGRA was to protect tribal sovereignty by providing "a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C. § 2702(1).

The Nation will only be able to restore its authority to police and regulate class III gaming activity occurring within its lands and prevent further harm to tribal sovereignty through injunctive relief. Therefore, the Court should grant the Nation's request for injunctive relief to prevent the ongoing threat to tribal sovereignty, the impermissible interference with tribal self-government, and the regulation of class III gaming activity on the Nation's Indian lands.

Here, Kalshi is encroaching on the Nation's tribal self-governance, as well as the Gaming Compact. In the Gaming Compact, Wisconsin and the Nation agreed that the Nation would regulate class III gaming on its Indian lands. Congress encouraged these kinds of compacts in passing IGRA. 25 U.S.C. § 2710(d)(3)(C)(i)-(ii). The Nation faces irreparable harm if Kalshi is allowed to conduct class III gaming on its Indian lands in violation of the Gaming Compact.

Additionally, Kalshi is causing specific, concrete irreparable harm that cannot be fully compensated with its false and deceptive advertising, which includes claims of "legal sports betting" and that its gaming contracts are "legal in all 50 states." Under the Lanham Act, the Nation is entitled to a presumption of irreparable harm because it has demonstrated that Kalshi's advertisements are facially false or false by necessary implication above. 15 U.S.C. § 1116(a); *see Time Warner*, 497 F.3d at 153.

The Nation has invested significant resources in establishing strictly regulated class III gaming on their Indian lands, and Kalshi's false advertising interferes with the Nation's authority

51

and ability to regulate class III gaming. (FOF, ¶¶ 11-23, 30.) By misrepresenting their unregulated activities as lawful and likening them to sports betting, Kalshi confuses the public and undermines the Nation's standards for regulating class III gaming. (FOF, ¶ 45-46, 49, 50.) The Nation's gaming authority is contingent on maintaining a clear distinction between legal and illegal operations. Kalshi's advertisements erode this distinction, forcing the Nation to compete with an unregulated entity, which harms their market positions and the integrity of their regulated businesses.

Additionally, Kalshi's false and deceptive advertising, which includes claims of "legal sports betting" and that its gaming contracts are "legal in all 50 states," is causing specific, concrete harm that cannot be fully compensated. Crucially, having demonstrated that Kalshi's advertisements are facially false or false by necessary implication above, the Nation is entitled to a presumption of irreparable harm under the Lanham Act. 15 U.S.C. § 1116(a); *see Time Warner*, 497 F.3d at 153. Moreover, the Nation has invested significant resources in establishing strictly regulated Class III gaming on their Indian lands, and Kalshi's false advertising interferes with the Nation's authority and ability to regulate Class III gaming. (FOF, ¶ 13-23.) By misrepresenting their unregulated activities as lawful and likening them to sports betting, (FOF, ¶¶ 45-46, 49, 50), Kalshi confuses the public and undermines the Nation's standards for regulating Class III gaming in Wisconsin. The Nation's gaming authority is contingent on maintaining a clear distinction between legal and illegal operations. Kalshi's advertisements erode this distinction, forcing the Nation to compete with an unregulated entity, which harms their market positions and the integrity of their regulated businesses.

Moreover, Kalshi's impact on the Nation's economy epitomizes the need for injunctive relief. As established above, Kalshi has rapidly grown through its sweeping and deceptive advertisement campaign.[3] Sweeping and deceptive advertisement campaigns like Kalshi's make it

---

[3] It was reported that in just one weekend in September 2025, "$538 million [was] traded on Kalshi." (FOF, ¶ 49.)

52

inherently difficult to quantify monetary damage. *See U-Haul Int'l, Inc. v. Jartran, Inc.*, 522 F. Supp. 1238, 1255 (D. Ariz. 1981), *aff'd,* 681 F.2d 1159 (9th Cir. 1982) (finding that a rapid increase in market position coupled with deceptive advertising running in multiple communities is relevant to irreparable injury). Kalshi's rapid growth fueled by its sweeping and deceptive advertisements puts the Nation, undoubtedly a competitor of Kalshi, in a uniquely dire position.

This case is not about a private person, a business, or shareholders seeking relief for lost profits and/or damaged reputation. This case is about the very livelihood of the Nation. The Nation funds its government primarily through revenue from gaming. By competing with the Nation, in violation of the Gaming Compact, and offering class III gaming on tribal lands outside the bounds of IGRA, Kalshi is directly impacting tribal governmental functions, all of which depend on gaming revenue to operate. The Nation cannot fund and operate its social services department to protect and support Indian children, offer hot meal programs for tribal elders, host cultural ceremonies, or run programs to preserve its native language without that revenue. It is certainly a "reasonable inference" that Kalshi's surge as a competitor on the back of its numerous deceptive advertisements harms the Nation's economy given the Nation's reliance on gaming to "promot[e] tribal economic development." *Id.*; U.S.C. § 2702(1). This case represents the epitome of harm injunctive relief is designed to address as there is no adequate remedy at law that can repair or "atone" for the destruction of the Nation's economy. *See Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 296 (7th Cir. 1997).

## IV.   THE BALANCE OF EQUITIES FAVORS GRANTING A PRELIMINARY INJUNCTION.

The final consideration for courts reviewing motions for preliminary injunctive relief is the balance of equities. Courts must first "consider any *irreparable* harm that the defendant might suffer from the injunction—harm that would not be either cured by the defendant's ultimately

53

prevailing in the trial on the merits or fully compensated by the injunction bond" that the plaintiff is required to post. *Roland Mach. Co.*, 749 F.2d at 387 (emphasis added). The rule is that, "if the defendant will not be *irreversibly injured* by the injunction because a final judgment in [its] favor would make [it] whole, the injunction will not really harm [it]." *Id.* (emphasis added). Courts balancing the equities must also consider whether the public's interest would be furthered by an injunction. *Abbott Labs.*, 971 F.2d at 11–12.

This balancing process involves a "sliding scale" approach: the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa. *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020) (citing *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001)). The sliding scale approach is not mathematical in nature, rather "it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." *Ty, Inc. v. Jones Group Inc.*, 237 F.3d at 895-896 (citing *Abbott Labs. v. Mead Johnson & Co.,* 971 F.2d 6, 12 (7th Cir. 1992) (internal citations and quotation marks omitted).

Here, the balance of the equities tips sharply in favor of the Nation. With respect to IGRA, if Kalshi is enjoined from offering its contracts on the Nation's Indian lands, Kalshi may very well lose some profits and incur costs. But injury to the Nation's sovereignty and its right to govern itself far outweighs those costs. After all, without an injunction, this Court will be allowing Kalshi to continue to violate IGRA and the Nation's Gaming Ordinance by conducting class III gaming—in competition with the Nation—on the Nation's lands. Given that the Nation is only seeking to prohibit Kalshi from conducting class III gaming on its Indian lands, Kalshi, which advertises itself as available across the country, faces little or no harm from such an injunction. Indeed, courts across the country have sided with states seeking to enforce their gambling regulations against

54

Kalshi. *KalshiEX LLC v. Martin,* 793 F. Supp. 3d 667 (D. Md. 2025); *KalshiEX LLC v. Hendrick,* Case No. 2:25-CV-00575-APG-BNW, 2025 WL 3286282 (D. Nev. Nov. 24, 2025). Kalshi can hardly complain about irreparable harm for having to follow one more law.

Nor can Kalshi claim potential economic or reputational harm from injunctive relief. To start, the Nation has had a monopoly on class III gaming on its lands since 1992. Gambling has long been illegal in Wisconsin. Wis. Stat. § 945.02. Kalshi should not be taken seriously to complain about how they will suffer harm if they are stopped from breaking the law. Crucially, any potential economic or reputational harm to Kalshi arising from injunctive relief granted to the Nation is a consequence of Kalshi's own making. Kalshi is conducting unlawful, unregulated class III gaming, an activity that is subject to stringent regulation to protect the public from the potential consequences of unregulated gambling. Kalshi cannot now assert that enjoining presumptively prohibited contracts from being offered on Indian lands constitutes a significant equitable consideration. On balance, disruptions of tribal sovereignty and core governmental functions of the Tribal governments significantly outweigh any potential harm to Kalshi, particularly since any harm to Kalshi is largely a product of its own conduct and decision-making

In other cases, Kalshi has come forward with a wildly speculative parade of horribles that might possibly befall it if Kalshi had to cease offering class III sports gambling in a state or part of a state. Kalshi has (and will here) argue that geofencing would be hard, and expensive, and would result in financial and reputational damage to Kalshi. None of these claims, even at taken at face value, tip the equities and the public interest in Kalshi's favor.

To start, geofencing in the sports gambling industry is a norm—not an outlier. State-licensed, non-Indian sports gambling companies in the United States routinely geofence state-by-state. In some states, such as Arizona, these companies are required to specifically geofence off all

55

Indian reservations within the state. *See* Ariz. Admin. Code § R19-4-117. Geofencing is thus not only possible, but it is commonplace.

Furthermore, Kalshi itself, in the Kalshi Privacy Policy, states that it "collect[s] [user] location data, including current and historical information concerning a user's geographic location, GPS location, transaction location, and IP addresses that they use in conjunction with [Kalshi's] Services." Kalshi Privacy Policy, p. 2, §1(a).[4] Kalshi further states in its Privacy Policy that it "collect[s] information about [users'] location[s] through GPS, Wi-Fi, [and] wireless network triangulation … to obtain [their] location," and that Kalshi "use[s] the Google Maps API to gather information about [users's] location(s)" through "various technologies to determine [their] location, including IP address, GPS, and other sensors that may, for example, provide Google with information on nearby devices, Wi-Fi access points, and cell towers." *Id*. Thus, regardless of whether or not Kalshi is currently tracking a particular gambler's location, Kalshi cannot cry wolf on this issue. The technologies and policies have already been put into place, by Kalshi.

In the parallel California litigation, Kalshi also argued that, if it were required to halt sports gambling on Indian lands, it would be difficult to identify and unwind any live sports bets where one of the parties entered or crossed tribal lands, even if only briefly. The court need not worry about this concern as the Nation only seeks an injunction prohibiting Kalshi from offering sports gambling contracts on its Indian lands *prospectively*, so as to prevent further harm to individuals that have been deceived by and purchased sports gambling contracts on Kalshi.

Nor can Kalshi succeed by arguing that an injunction would subject it to regulatory risk because, if Kalshi stopped offering its products in specific locales, it would risk violation of the CFTC Core Principles, including its obligation to provide impartial access to its markets and

---

[4] Available at https://kalshi.com/docs/kalshi-privacy-policy.pdf.

QB\100006889.2

services. 17 C.F.R. §§ 38.150, 38.151(b). The risk, Kalshi claims, is that if it complied with a lawful court order geographically limiting access to its sports wagers, the CFTC could respond by seeking to revoke Kalshi's designation. This argument is yet another straw man. On September 30, 2025, the CFTC issued Advisory Letter 25-26 "in connection with a potential lapse in government appropriations to advise FCMs, IBs, DCMs [like Kalshi], DCOs, and RFAs to be prepared for all foreseeable conditions that may result from facilitating the trading and clearing of sports-related event contracts…." CFTC Advisory Letter, CFTCLTR No. 25-36, 2025 WL 2817302, n.4 (September 30, 2025). The CFTC issued the letter "to caution … DCMs … that State regulatory actions and pending and potential litigation, including enforcement actions, should be accounted for with appropriate contingency planning, disclosures, and risk management policies and procedures." *Id*. at 2. Kalshi has no basis to claim that compliance with the requested injunction order could jeopardize its designation with the CFTC—the agency is already anticipating and accounting for such court rulings. Thus, on balance, the equities tip strongly in favor of the Nation.

Concerning Kalshi's advertising practices, Kalshi will not suffer any legitimate hardship from the issuance of a preliminary injunction halting its false and misleading advertisements. "Indeed, there is no harm to a defendant from an injunction which prevents continuing dissemination of false statements." *Pom Wonderful Ltd. Liab. Co. v. Purely Juice, Inc.*, No. CV-07-02633 CAS (JWJx), 2008 U.S. Dist. LEXIS 55426, at *42 (C.D. Cal. July 17, 2008). Requiring a defendant to refrain from using false statements ". . . poses little, if any, harm to [the defendant]." *Id*. (internal citations omitted) (quoting *Sun Microsystems, Inc. v. Microsoft Corp.*, 87 F. Supp. 2d 992, 998 (N.D. Cal. 2000)). Kalshi has knowingly made false statements to consumers through numerous advertising campaigns. The inconvenience arising from a court order directing Kalshi to cease false advertising pales in comparison to the harm incurred by the constitutional infringement of tribal sovereignty and diversion of essential gaming revenue, which the Nation

QB\100006889.2

relies upon to provide essential services. The balance of hardships, therefore, weighs decidedly in favor of granting a preliminary injunction.

An injunction will also serve the public interest, chiefly because members of the public have an obvious interest in "not being deceived about the products they purchas[e]." *Int'l Kennel Club of Chi., Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1092 n.8 (7th Cir. 1988). Indeed, "th[is] public interest in truthful advertising . . . lies at the heart of the Lanham Act." *Abbott Labs*, 971 F.2d at 19 (citation omitted). In deciding what issues affect the "public interest," courts have given considerable weight to the carrying out of executive functions of the government as well as the intent of Congress. *See Winter v. Natural Resources Defense Council, Inc., et al.,* 555 U.S. 7, 24 (2008) ("In this case, the District Court and the Ninth Circuit significantly understated the burden the preliminary injunction would impose on the Navy's ability to conduct realistic training exercises, and the injunction's consequent adverse impact on the public interest in national defense."); *see also Starbucks Corp. v. McKinney*, 602 U.S. 339, 362 (2024) ("When addressing the public interest, courts must defer to Congress's articulation of that interest in the [Act] itself." (citing 29 U.S.C. § 151 ("It is . . . the policy of the United States to . . . encourag[e] . . . collective bargaining and . . . protec[t] the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing . . . .").); *Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937) ("The fact that Congress has indicated its purpose . . . is in itself a declaration of public interest and policy which should be persuasive in inducing courts to give relief.").

Here, the CFTC regulations establish that contracts involving excluded commodities, such as gaming, are presumed to be contrary to the public interest. 17 C.F.R. § 40.11; *see also* 7 U.S.C. § 7a-2(c)(5)(C)(ii). The CFTC regulations also apply this presumption to "activity that is similar to" gaming, broadening the scope of the presumption that gaming activity is contrary to the public interest. 17 C.F.R. § 40.11(a)(2). As a result, the CFTC regulations prohibit a registered entity, such as Kalshi, from offering contracts that involve excluded commodities, such as gaming— specifically because they are categorically not in the public interest. 17 C.F.R. § 40.11(a)(1).

58

QB\100006889.2

Kalshi has nevertheless proceeded to offer its gaming contracts and, in so doing, failed to rebut the presumption that its gaming contracts are contrary to the public interest through the self-certification process.

IGRA comports with the public interest by establishing "a statutory basis for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences . . . and to assure that gaming is conducted fairly and honestly by both the operator and players . . . ." 25 U.S.C. § 2702(2). Kalshi's app-based platform combines one of the most addictive activities, sports betting, with one of the most addictive devices, smart phones, without any preventative measures for compulsive behavior or remedial treatment for addiction. The fact that the CEA and CFTC regulations lack such preventative and remedial measures demonstrates that commodities contracts are not supposed to constitute or mimic gaming activities. By extension, the lack of such preventative and remedial measures demonstrates that Kalshi is operating outside the scope of the CEA in offering sports betting contracts on the Nation's Indian lands.

For these reasons, the balance of the equities and the public interest weigh heavily in favor of the Nation.

## CONCLUSION

The Nation asks this Court to enter a preliminary injunction enjoining Kalshi from conducting class III gaming on its Indian lands and advertising that it provides legal sports betting. In passing IGRA, Congress confirmed that tribes are empowered to enjoin class III gaming that occurs on Indian lands in violation of a Tribal-State compact. The Nation asks this Court to stop Kalshi from trampling its sovereignty by conducting class III gaming on its lands in violation of the Gaming Compact. In addition, the Nation asks this Court to prohibit Kalshi from engaging the aforementioned false advertising.

QB\100006889.2

Dated:  December 17, 2025

*/s/ Emily M. Feinstein*

QUARLES & BRADY LLP
Emily M. Feinstein
Bryce A. Loken
33 East Main Street, Suite 900
Madison, WI 53703
Telephone: 608.251.5000
Facsimile: 608.251.9166
Emily.Feinstein@quarles.com
Bryce.Loken@quarles.com

THE LAW OFFICES OF RAPPORT AND
MARSTON
Lester J. Marston
Cooper M. DeMarse
405 West Perkins Street
Ukiah, CA 95482
Telephone: 707.462.6846
Facsimile: 707.462.4235
ljmarston@rmlawoffice.net

THE HO-CHUNK NATION
Michael P. Murphy, Legislative Counsel for
Ho-Chunk Nation
P.O. Box 667
Black River Falls, WI 54615
Telephone: 715.284.9343
Michael.Murphy@ho-chunk.com

Attorneys for Plaintiff HO-CHUNK
NATION

60

QB\100006889.2