# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WISCONSIN

HO-CHUNK NATION,

        Plaintiff,

        v.

KALSHI INC., KALSHIEX LLC,
ROBINHOOD MARKETS, INC.,
ROBINHOOD DERIVATIVES LLC,
and DOES 1-20,

        Defendants.

Case No.: 25-cv-698

---

## PLAINTIFF HO-CHUNK NATION'S RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS PLAINTIFF'S COMPLAINT

---

# Table of Contents

Introduction ............................................................................................................. 1

Legal Standards ....................................................................................................... 2

   1.   Legal Standard for Motions to Dismiss. ....................................................... 2

   2.   Legal Standard for Interpreting Tribal Statutory Rights. ............................. 2

I.   The Nation Alleges Sufficient Facts to State a Plausible Claim for Relief Under IGRA. ...... 6

   A.   The Nation Is Entitled to Sue Third Parties Who Conduct Class III Gaming on Its Indian Lands in Violation of its Gaming Compact. ...................................... 6

   B.   Kalshi Cannot Succeed on a Motion to Dismiss by Disputing the Nation's Factual Allegations that it Conducts Class III Gaming on the Nation's Indian Lands. ......................... 10

   C.   UIGEA Does Not Apply to IGRA Because it Does Not Alter, Limit, or Extend Any Federal or State Law or Tribal-State Compact. ........................................ 11

   D.   Kalshi Cannot Obtain Dismissal by Relying on the Commodity Exchange Act. ............. 13

II.   The Nation Alleges Sufficient Facts to State a Claim for Relief Pursuant to the Gaming Ordinance. ........................................................................................ 14

III.   The Nation Alleges Sufficient Facts to State a Claim for Declaratory Relief for Infringement of Tribal Sovereignty ........................................................... 17

IV.   The Nation States a Lanham Act Claim by Alleging that Kalshi Falsely Advertised that it Conducts Legal Sports Betting in All Fifty States. ........................... 19

   A.   There is No Heightened Pleading Standard for False Advertising. ............... 20

   B.   The Nation Alleged that Kalshi Injured the Nation Through Kalshi's False Advertising. Therefore, the Nation Alleged the Third Element of its § 43(a) Claim and the Requisite Standing to Bring the Claim. .................................... 22

   C.   The Nation Alleged Kalshi Made a False Statement of Fact about Kalshi's Service. ...... 25

   D.   The Nation Alleged Kalshi's Statements Deceived and Have the Tendency to Deceive a Substantial Segment of its Audience ..................................... 29

V.   The Nation States a Claim for Civil Rico Against all Defendants ........................... 30

   A.   The Nation Alleges That Defendants Conducted the Affairs of an Association-in-Fact Enterprise. ........................................................................... 31

   B.   The Nation Alleges Predicate Acts of Racketeering. .................................. 33

      1.   The Nation Alleges Wire Fraud. ...................................................... 33

      2.   The Nation Alleges Violations of the Wire Act or 18 U.S.C. § 1955. .......... 36

      3.   The Nation Alleges Proximate Causation and Cognizable Injury. .............. 38

VI.   The Nation Alleges Facts Sufficient to State a Claim Against Robinhood Markets, Inc. and Kalshi, Inc. ............................................................................ 40

Conclusion ........................................................................................................... 42

i

# TABLE OF AUTHORITIES

**Cases**

*Anza v. Ideal Steel Supply Corp.*,
   547 U.S. 451 (2006) ........................................................................................... 38, 39

*Artichoke Joe's Cal. Grand Casino v. Norton*,
   353 F.3d 712 (9th Cir. 2003) ...................................................................................... 5

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................ 2, 19, 24, 41

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................................ 2, 10

*Blue Lake Rancheria v. Kalshi, Inc.*,
   Case No. 25-CV-06162-JSC, 2025 WL 3141202 (N.D. Cal. Nov. 10, 2025) ..................... 9, 13

*Bob Jones Univ. v. United States*,
   461 U.S. 574 (1983) .................................................................................................. 37

*Borsellino v. Goldman Sachs Grp., Inc.*,
   477 F.3d 502 (7th Cir. 2007) .................................................................................... 20

*Boyle v. United States*,
   556 U.S. 938 (2009) .................................................................................................. 31

*Brockett v. Effingham Cnty., Illinois*,
   116 F.4th 680 (7th Cir. 2024) ................................................................................... 10

*C & L Enters., Inc. v. Citizen Band Potawatomi Indian Tribe of Oklahoma*,
   532 U.S. 411 (2001) .................................................................................................... 5

*California v. Cabazon Band of Mission Indians*,
   480 U.S. 202 (1987) .................................................................................................... 2

*Chicken Ranch Rancheria of Me-Wuk Indians v. California*,
   42 F.4th 1024 (9th Cir. 2022) .................................................................................... 3

*Child's Health Def. v. Meta Platforms, Inc.*,
   112 F.4th 742 (9th Cir. 2024) ................................................................................... 39

*Cleveland Bakers & Teamsters Health & Welfare Fund v. AMAG Pharms., Inc.*,
   2025 WL 1024103 (D. Mass. Mar. 12, 2025) ........................................................... 33

ii

*Coastal Abstract Service, Inc. v. First American Title Insurance Co.,*
  173 F.3d 725 (9th Cir. 1999) ............................................................................. 26

*Corner Post, Inc. v. Bd. of Governors of Fed.Rsrv. Sys.,*
  603 U.S. 799 (2024) ........................................................................................... 37

*Data Rsch. & Handling, Inc. v. Vongphachanh,*
  278 F. Supp. 3d 1066 (N.D. Ind. 2017) .............................................................. 26

*Dental Recycling N. Am., Inc. v. Stoma Ventures, LLC,*
  No. 4:23 CV 670 CDP, 2023 WL 6389071 (E.D. Mo. Oct. 2, 2023) ..................... 27

*Diamond Ctr., Inc. v. Leslie's Jewelry Mfg. Corp.,*
  562 F. Supp. 2d 1009 (W.D. Wis. 2008) .............................................................. 29

*EEOC v. Cherokee Nation,*
  871 F.2d 937 (10th Cir. 1989) ........................................................................... 16

*Eli Lilly & Co. v. Arla Foods, Inc.,*
  893 F.3d 375 (7th Cir. 2018) ........................................................... 19, 22, 23, 25

*Epic Sys. Corp. v. Lewis,*
  584 U.S. 497 (2018) ........................................................................................... 36

*Flagler Assocs. v. Haaland,*
  573 F. Supp. 3d 260 (D.D.C. 2021), *reversed on other grounds*, 71 F.4th 1059 (Fed. Cir. 2023)
  .......................................................................................................................... 25

*Gallego v. Wal-Mart Stores, Inc.,*
  2005 WI App 244, 288 Wis. 2d 229, 707 N.W.2d 539 .......................................... 12

*Holmes v. Sec. Inv. Prot. Corp.,*
  503 U.S. 258 (1992) ........................................................................................... 39

*Hopfensperger v. Shawano Cnty.,*
  No. 10-C-0960, 2012 WL 1108561 (E.D. Wis. Mar. 30, 2012) .............................. 23

*Hot Wax, Inc. v. Turtle Wax, Inc.,*
  191 F.3d 813 (7th Cir. 1999) ......................................................................... 23, 29

*KalshiEX LLC v. Flaherty,*
  No. 25-CV-02152-ESK-MJS, 2025 WL1218313 (D. N.J., Apr. 28, 2025) .............. 28

*KalshiEX LLC v. Martin,*
  793 F. Supp. 3d 667 (D. Md. 2025) ................................................................ 28, 35

iii

*KalshiEX, LLC v. Hendrick*,
  No. 2:25-CV-00575-APG-BNW, 2025 WL 3286282 (D. Nev. Nov. 24, 2025) .......... 14, 28, 35

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014) .................................................................................... 22

*Lynn Scott, LLC v. Grubhub Inc.*,
  No. 20 C 6334, 2024 WL 3673718 (N.D. Ill. Aug. 6, 2024) .................................... 21

*Menominee Tribal Enterprises v. Solis*,
  601 F.3d 669 (7th Cir. 2010) ........................................................................ 5, 16

*Merrion v. Jicarilla Apache Tribe*,
  455 U.S. 130 (1982) ...................................................................................... 5

*Michigan v. Bay Mills Indian Cmty.*,
  572 U.S. 782 (2014) ............................................................................... passim

*Midwest Grinding Co. v. Spitz*,
  976 F.2d 1016 (7th Cir. 1992) ........................................................................ 39

*Montana v. Blackfeet Tribe*,
  471 U.S. 759 (1985) ...................................................................................... 5

*Montana v. United States*,
  450 U.S. 544 (1981) .................................................................................. 4, 15

*Moreland v. Club 390 Corp.*,
  No. 18 C 7441, 2019 WL 13076638 (N.D. Ill. Aug. 26, 2019) ................................. 25

*Murphy v. NCAA*,
  584 U.S. 453 (2018) ..................................................................................... 37

*My Health, Inc. v. Gen. Elec. Co.*,
  No. 15-CV-80-JDP, 2015 WL 9474293 (W.D. Wis. Dec. 28, 2015) ............................. 2

*N. Am. Derivatives Exch., Inc. v. Nevada Gaming Control Bd.*,
  No. 2:25-CV-00978-APG-BNW, 2025 WL 2916151 (D. Nev. Oct. 14, 2025) ................. 35

*Nat'l Org. for Women, Inc. v. Scheidler*,
  510 U.S. 249 (1994) ..................................................................................... 31

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015) ..................................................................................... 27

iv

*Paul Davis Restoration, Inc. v. Everett*,
   No. 14-C-1534, 2014 WL 7140038 (E.D. Wis. Dec. 12, 2014) ............................................ 26

*Peters v. West*,
   692 F.3d 629 (7th Cir. 2012) ............................................................................... 19, 24

*Priority Int'l Animal Concepts, Inc. v. Bryk*,
   No. 12-C-0150, 2012 WL 6020044 (E.D. Wis. Dec. 3, 2012) ...................................... 20, 21, 29

*Pugh v. Tribune Co.*,
   521 F.3d 686 (7th Cir. 2008) ................................................................................... 2

*Ratfield v. U.S. Drug Testing Lab'ys, Inc.*,
   140 F.4th 849 (7th Cir. 2025) ................................................................................. 38

*Reves v. Ernst & Young*,
   507 U.S. 170 (1993) ............................................................................................ 32

*Slaney v. Int'l Amateur Ath. Fed'n*,
   244 F.3d 580 (7th Cir. 2001) ................................................................................. 33

*Spierer v. Rossman*,
   798 F.3d 502 (7th Cir. 2015) ............................................................................... 2, 5

*State of California v. Iipay Nation of Santa Ysabel*,
   898 F.3d 960 (9th Cir. 2018) .............................................................................. 12, 13

*Steven v. Roscoe Turner Aeronautical Corp.*,
   324 F.2d 157 (7th Cir. 1963) ................................................................................. 40

*Stevenson v. United Animal Health, Inc.*,
   No. 1:23-CV-00509-TWP-CSW, 2023 WL 9040111 (S.D. Ind. Dec. 29, 2023) ..................... 23

*Thermal Design, Inc. v. Guardian Bldg. Prods., Inc.*,
   No. 08-C-828, 2009 WL 1181327 (E.D. Wis. Apr. 29, 2009) ........................................ 20, 21

*TNT Amusements, Inc. v. Torch Elecs., LLC*,
   No. 4:23-CV-330-JAR, 2025 WL 947506 (E.D. Mo. Mar. 28, 2025), *affirmed in relevant part
   on reconsideration*, No. 4:23-CV-330-JAR, 2025 WL 2336858 (E.D. Mo. Aug. 13, 2025) .... 27

*Towada Audio Co. v. Aiwa Corp.*,
   No. 18-CV-4397, 2019 WL 1200748 (N.D. Ill. Mar. 14, 2019) ....................................... 25

*United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Walgreen Co.*,
   719 F.3d 849 (7th Cir. 2013) .............................................................................. 31, 32

v

*United States v. Britton*,
   289 F.3d 976 (7th Cir. 2002) ........................................................................ 34

*United States v. Turner*,
   551 F.3d 657 (7th Cir. 2008) ........................................................................ 33

*United States v. Wheeler*,
   435 U.S. 313 (1978) ........................................................................................ 2

*Uriah Prods., LLC v. Curt Mfg. LLC*,
   No. 3:24CV873 DRL-SJF, 2025 WL 2912337 (N.D. Ind. Oct. 10, 2025) ............. 26

*Viehweg v. Ins. Programs Mgmt. Grp., LLC*,
   2024 WL 4165078 (7th Cir. Sept. 12, 2024) ................................................... 39

*Washington v. Confederated Tribes of Colville Indian Reservation*,
   447 U.S. 134 (1980) ........................................................................................ 2

*White Mountain Apache Tribe v. Bracker*,
   448 U.S. 136 (1980) ........................................................................................ 5

*Wisconsin v. Ho-Chunk Nation,* 512 F.3d 921(7th Cir. 2008) ........................... 7

**Statutes**

18 U.S.C. § 1084 ..................................................................................... 33, 36

18 U.S.C. § 1084(a) ...................................................................................... 36

18 U.S.C. § 1955 ........................................................................ 30, 33, 36, 37

18 U.S.C. § 1964(c) ...................................................................................... 39

25 U.S.C. § 2701 .................................................................................... passim

25 U.S.C. § 2702 .................................................................................... passim

25 U.S.C. § 2703(5) ...................................................................................... 18

25 U.S.C. § 2710 .................................................................................... passim

31 U.S.C. § 5361(b) ......................................................................... 11, 12, 37

31 U.S.C. § 5362(1)(E)(ii) ...................................................................... 12, 13

Wis. Stat. § 945.01(1)(a)1 ............................................................................ 12

Wis. Stat. § 945.03 ................................................................................................................ 37

**Other Authorities**

1 Cohen's Handbook of Federal Indian Law § 6.04 (2025) ................................................. 3

SS. REP. 100-446, 1988 U.S.C.C.A.N. 3071................................................. 3, 4, 7, 17

**Rules**

Fed. R. Civ. P. 12(b)(6) .................................................................................................... 2

Fed. R. Civ. P. 9(b)........................................................................................................... 33

Fed. R. Civ. P. 8(e)(2) ...................................................................................................... 29

**Regulations**

17 C.F.R. § 40.11 .......................................................................................................... 14, 32

QB\168080.00083\100063686.1

## Introduction

The Ho-Chunk Nation (the "Nation") brings suit to stop Kalshi, Inc. and KalshiEX LLC from conducting class III gaming on its Indian lands in violation of the Indian Gaming Regulatory Act ("IGRA"), the Nation's Gaming Ordinance, the Nation's Class III Tribal-State Compact and the Nation's inherent sovereignty. In addition, the Nation seeks civil damages available to it under RICO because Kalshi, Inc. and KalshiEX LLC (collectively "Kalshi") joined forces with Robinhood Markets, Inc. and Robinhood Derivatives (collectively "Robinhood") to illegally conduct class III gaming on the Nation's Indian lands through the internet. Finally, the Nation brings a False Advertising Claim against Kalshi because it falsely advertised its illegal conduct as sports betting, legal in all 50 states.

The Defendants ask this Court to ignore the factual allegations in the Complaint and, in Kalshi's case its own advertisements, and instead find that they are a "derivatives exchange" or a "derivatives trading business." Defendants cannot both make money off what Kalshi advertises as sports betting but disclaim their conduct as "derivative trading" to avoid liability. And they certainly cannot obtain dismissal of the Nation's claims by disclaiming the facts the Nation alleges in its complaint. Because the Nation alleges that Kalshi conducts class III gaming, in the form of sports betting, by selling event contracts that cannot meet the legal definition of a swap, Kalshi cannot obtain dismissal by arguing that its sports events contracts are swaps. Furthermore, Robinhood cannot succeed on its motion to dismiss[1] for the same reasons.

Below the Nation lays out the legal standard applicable to a motion to dismiss as well as the legal standard for interpreting tribal statutory rights. Then, the Nation explains why each of its

---

[1] The Nation only brings one claim, for civil RICO, against Robinhood. This Court need not consider Robinhood's arguments seeking dismissal of any other claims because the Nation has not brought any other claims against it.

QB\168080.00083\100063686.1

claims survives dismissal. While Kalshi and Robinhood made separate motions to dismiss and filed separate briefs in support of those motions, most of their arguments are the same. For this Court's convenience the Nation is filing a single opposition brief in response.

## Legal Standards

### 1.    Legal Standard for Motions to Dismiss.

In deciding a motion to dismiss under Rule 12(b)(6), this Court tests the complaint's legal sufficiency. *See* Fed. R. Civ. P. 12(b)(6). This Court should grant dismissal only if no recourse could be granted under any set of facts consistent with the allegations. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563 (2007). "To survive a motion to dismiss under Rule 12(b)(6)," a plaintiff must allege sufficient facts to "'state a claim for relief that is plausible on its face.'" *Spierer v. Rossman*, 798 F.3d 502, 510 (7th Cir. 2015) (citing *Twombly*, 550 U.S. at 570). As this court has previously emphasized, the motion to dismiss phrase of the proceedings "is not an opportunity for the court to find facts or weigh evidence." *My Health, Inc. v. Gen. Elec. Co.*, No. 15-CV-80-JDP, 2015 WL 9474293, at *2 (W.D. Wis. Dec. 28, 2015). The court must "tak[e] all factual allegations as true and draw[] all reasonable inferences in favor of the plaintiffs." *Pugh v. Tribune Co.*, 521 F.3d 686, 692 (7th Cir. 2008).

### 2.    Legal Standard for Interpreting Tribal Statutory Rights.

The Nation is a sovereign government with its lands based in Wisconsin. As a sovereign, the Nation retains powers that "are in general, 'inherent powers of a limited sovereignty which has never been extinguished.'" *United States v. Wheeler*, 435 U.S. 313, 323 (1978). The Nation has these powers because they are "a fundamental attribute of sovereignty." *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 152 (1980).

Regardless of whether the right to control gaming on its lands is a fundamental attribute of sovereignty, *see California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 207 (1987), the Nation has a right to control gambling on its Indian lands because Congress delegated that authority to the Nation under IGRA and the Nation has a Gaming Compact (the "Gaming Compact") with the State of Wisconsin. Congress enacted IGRA in response to *Cabazon. Chicken Ranch Rancheria of Me-Wuk Indians v. California*, 42 F.4th 1024, 1031 (9th Cir. 2022). Congress "attempted to balance the need for sound enforcement of gaming laws and regulations, with the strong Federal interest in preserving the sovereign rights of tribal governments to regulate activities and enforce laws on Indian land." S. REP. 100-446, 5, 1988 U.S.C.C.A.N. 3071, 3075 ("S. REP. 100-466"). IGRA "recognizes and affirms the principle that by virtue of their original tribal sovereignty, tribes reserved certain rights . . . and that today, tribal governments retain all rights that were not expressly relinquished." *Id.* As the Ninth Circuit has explained, IGRA is "'an example of cooperative federalism' in that it seeks to balance the competing sovereign interests of the federal government, state governments, and Indian tribes, by giving each a role in the regulatory scheme." *Chicken Ranch*, 42 F.4th at 1032 (citations omitted). Congress enacted IGRA to alleviate burdens on federal resources and promote tribal sovereignty, tribal self-government, and tribal self-determination through tribal economic self-sufficiency, namely, through tribal gaming. *See generally* 1 Cohen's Handbook of Federal Indian Law § 6.04[3] (2025) (discussing the history and context of the trust relationship between tribes and the federal government); 25 U.S.C. §§ 2701–2702.

By entering into a State-Tribal Compact, authorized by IGRA, Wisconsin and the Nation, each a sovereign in its own right, allocated their sovereign powers to regulate class III gaming on

the Nation's lands.[2] The Nation and Wisconsin did not break new ground in doing so. As the Supreme Court explained in *Bay Mills*, a Tribal-State compact, "typically prescribes the rules for operating gaming, allocates law enforcement authority between the tribe and State, and provides remedies for breach of the agreement's terms." 572 U.S. at 785 (citing 25 U.S.C. §§ 2710(d)(3)(C)(ii), (v)). Under IGRA, states and tribes are allowed to allocate law enforcement authority for gaming on Indian lands.

In passing IGRA, Congress gave tribes, "**the exclusive right to regulate gaming activity on Indian lands** if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming." 25 U.S.C. § 2701(5) (emphasis added). Congress explained the objectives of this regulation, which focused on the integrity of the gaming enterprise, "to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and the players." 25 U.S.C. § 2702(2). Congress also empowered tribes to enjoin class III gaming activity occurring on Indian lands in violation of a Gaming Compact—which, of course, by definition would violate IGRA. 25 U.S.C. §§ 2710(d)(1), 2710(d)(7)(A)(ii).

In doing so, Congress granted tribes the power to enjoin the acts of others on their lands. *See* S. REP. 100-446, 18. Whereas previously the United States Supreme Court ruled that tribes have limited inherent sovereign authority with respect to nonmembers engaged in activities on non-Indian owned fee land located within a reservation, *Montana v. United States*, 450 U.S. 544,

---

[2] There are now two copies of the Gaming Compact and all of its amendments in the record, one compiled copy attached as Ex. H to Attorney Choe's Declaration in Support of the Kalshi Defendant's Motion to Dismiss, Doc. 30, and one copy of separate versions of the original compact and all amendments attached as Exhibits A-E of the Declaration of Mr. Mudd, Doc. 41. For ease of citing to the original compact and its amendments, the Nation cites to the exhibits to Mr. Mudd's declaration in this brief.

565-66 (1981), Congress gave tribes the authority to stop class III gaming activity occurring on Indian lands in violation of a Tribal-State Compact. In doing so, Congress delegated to Tribes the authority to stop class III gaming by nonmembers conducted in violation of a Tribal-State Compact. Congress clarified that the purpose of Section 2710(d)(7)(A)(ii) was to grant "United States District courts jurisdiction over actions by . . . a tribe or state to enjoin **illegal** gaming on Indian lands . . . ." S. REP. 100-446, 18 (emphasis added).

Where Congress gives, Congress can take away but it must do so expressly and unequivocally. *See Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 790 (2014) ("*Bay Mills*") (requiring "unequivocal[]" expression to abrogate sovereign rights (quoting *C & L Enters., Inc. v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 532 U.S. 411, 418 (2001)). "Although Congress has plenary authority over tribes, courts will not lightly assume that Congress in fact intends to undermine Indian self-government." *Bay Mills*, 572 U.S. at 790. As the Supreme Court has held, "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Montana v. Blackfeet Tribe,* 471 U.S. 759, 766 (1985). Courts construe ambiguities in federal law "generously" in favor of tribes in order to comport with "traditional notions of sovereignty and with the federal policy of encouraging tribal independence." *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 143-44 (1980). Federal courts adopt the Tribes' interpretation of Indian statutes not because it is the best interpretation but because it is the Indian Tribe's interpretation. *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 730 (9th Cir. 2003).

Thus, for example, when Congress does not provide clear indication of its intent to abrogate Indian sovereignty rights, courts apply the special canons of construction to the benefit of Indian interests. *Cf. Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 149 (1982). As the Seventh Circuit

has held, "a statute of general applicability will be held inapplicable to Indians if it would interfere with tribal governance . . . [o]r if it would clash with rights granted Indians by other statutes. *Menominee Tribal Enterprises v. Solis,* 601 F.3d 669 (7th Cir. 2010). As a result, for example, any other statute of general applicability is inapplicable to tribes if it clashes with the rights granted to tribes in IGRA.

## I.    THE NATION ALLEGES SUFFICIENT FACTS TO STATE A PLAUSIBLE CLAIM FOR RELIEF UNDER IGRA.

This Court should deny Kalshi's Motion to Dismiss the Nation's IGRA claims for four reasons: (1) the Nation is entitled to sue third parties who conduct class III gaming on its Indian lands in violation of its Gaming Compact; (2) the Nation alleged that Kalshi conducts class III gaming in its Indian lands in violation of its Gaming Compact; (3) UIGEA cannot apply because Kalshi seeks to use it to alter or limit State law and the Gaming Compact; and (4) Kalshi cannot obtain dismissal by creating disputes of fact with respect to the applicability of the Commodity Exchange Act.

### A.    The Nation Is Entitled to Sue Third Parties Who Conduct Class III Gaming on Its Indian Lands in Violation of its Gaming Compact.

First, Kalshi is wrong as a matter of law to argue that the Nation has not alleged a violation of its Gaming Compact. (Doc. 29 at 11.) In making this argument, Kalshi confuses the word "violation" with breach. Congress had no such confusion when it passed IGRA, using breach to refer to a dispute between the parties to the Compact and violation in referring to the ability of states and tribes to regulate class III gaming conducted on Indian lands in violation of a gaming compact. *Compare* 25 U.S.C. § 2710(d)(3)(C)(v), *with* 25 U.S.C. § 2710(d)(7)(A)(ii).

Kalshi is wrong to conflate Tribal-State compacts with ordinary contracts. Even a cursory glance shows this argument fails. (*See* Doc. 29 at 13.) In passing IGRA, Congress distinguished

6

between "compact" and "contract." *Compare* 25 U.S.C. § 2710(d)(7)(A)(ii), *with id*. § 2710(d)(3)(C)(v). And Congress allowed the parties to the compact to define their own remedies for breach. 25 U.S.C. § 2710(d)(3)(C)(v). At the same time, Congress limited tribes to enjoining violations of the compact if they chose to bring suit in federal court for "any cause of action . . . to enjoin a class III gaming activity located on Indian lands and conducted in **violation of any Tribal-State compact** . . . ." 25 U.S.C. § 2710(d)(7)(A)(ii) (emphasis added).

Congress did so because a compact is both a contract between two sovereigns, binding upon both in a manner akin to a private contract and a regulatory device, establishing the *only* conditions under which class III gaming may occur on a particular tribe's Indian lands. 25 U.S.C. §§ 2710(d)(1)(C), 2710(d)(3)(C); S. REP. 100-446, at 13 ("After lengthy hearings, negotiations and discussions, [Congress] concluded that the use of compacts between tribes and states is the best mechanism to assure that the interests of both sovereign entities are met with respect to the regulation of complex gaming enterprises . . . ."). Congress chose to use the word violate in referring to the compact as a regulatory device and used the word breach in referring to a dispute between the parties to the compact.

In seeking to dismiss the Nation's IGRA claim, Kalshi asks this Court to find that the Nation does not have the authority to regulate class III gaming on its Indian lands if third parties are conducting the class III gaming. In so arguing, Kalshi ignores Congress's stated purpose in passing IGRA. Congress identified the purpose of IGRA in Section 2702, stating among other things that the purpose of IGRA was to "provide a statutory basis for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences." 25 U.S.C. § 2702(2). Tribes could not regulate their gaming vis-à-vis third parties if they had no way to enjoin those parties' gaming on their Indian lands.

7

Moreover, even if this Court accepts that the Seventh Circuit limited jurisdiction under 25 U.S.C. § 2710(d)(7)(A)(ii) in its decision in *Wisconsin v. Ho-Chunk Nation*, any such limit includes the Nation's claims here. 512 F.3d 921, 933-34 (7th Cir. 2008). In *Ho-Chunk Nation*, the Seventh Circuit explained that federal jurisdiction under this section of IGRA, "exists only when the alleged violation relates to a compact provision agreed upon pursuant to the IGRA negotiation process" laid out in 25 U.S.C. § 2710(d)(3). *Id.* The court went onto explain that there are seven matters which a compact negotiated pursuant to IGRA may address, including, the application of tribal laws and regulations directly relating to the regulating of class III gaming and the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations. *Id.* Here, the Nation alleges that Kalshi violated the Compact by conducting class III gaming on its Indian lands when, under the Compact as negotiated under 25 U.S.C. § 2710(d)(3), only the Nation may conduct such gaming and when, under the Compact as negotiated under 25 U.S.C. § 2710(d)(3), the Nation has the power to prohibit third parties from conducting such gaming.

Nor can Kalshi support its argument by suggesting no tribe has ever before attempted to enjoin a third party's conduct. After all, Kalshi brags about being the first. Here, the Nation has alleged that Kalshi advertises itself as being the first platform to conduct class III gaming nationwide. (Doc., ¶ 4.) Kalshi cannot both brag that it is the first and then seek to avoid liability with the argument that no one has ever been held liable for the conduct it claims to be the first to pursue.

Kalshi also cannot obtain dismissal by arguing that the Nation failed to identify any violation of the Gaming Compact. Over and over again, the Nation alleged that it was the only entity allowed to conduct class III gaming on its Indian lands. In paragraphs 22-36, the Nation

alleged the factual, historical, and legal bases supporting the claim that compacts function as congressionally delegated tribal-state regulatory law governing the only conditions under which class III gaming activity is lawful on particular Indian lands. (Doc., ¶¶ 22–36.) The Nation alleges facts and law to establish that the Nation is the only entity federally authorized through IGRA and the Compact to conduct class III gaming on the Nation's Indian lands. (Doc., ¶¶ 37–41.) Specifically, the Nation alleges that it entered into a class III gaming Compact with Wisconsin in 1992, that is in effect. (Doc., ¶ 37.) And, the Nation alleges that the Gaming Compact complies with IGRA—meaning that the Nation is the only entity allowed to conduct class III gaming on its Indian lands. (Doc., ¶ 39.)

As if these allegations were not enough, as Defendants acknowledge, the Complaint incorporates the Compact by reference. (Doc., ¶¶ 9, 37-41, 64-66; *see also* Doc. 30, ¶ 9.) Under the Gaming Compact, the Nation has, "the sole proprietary interest in all Class III gaming activities operated under this Compact and shall not authorize, permit, or license the operation of any Class III gaming activity under this Compact by any other person." (Doc. 41, Ex. A, at VI.) In addition, the Nation and Wisconsin incorporated the Nation's Gaming Ordinance, by reference, into the Gaming Compact. (*Id.* at XXII.) The Nation is clear in its Gaming Ordinance stating: "No person or entity, other than Ho-Chunk Nation, shall conduct gaming without providing proper notice and obtaining a license, if required, from the Ho-Chunk Nation Commission." (Doc. 41, Ex. F, Section 6.C.) As if that statement was not crystal clear, the Nation also states, in its Gaming Ordinance: "Privately owned gaming operations are prohibited within the jurisdiction of the Nation." (*Id.*, Section 6.D.)

For these reasons Kalshi also cannot succeed by citing a case that held that different compact language, which prescribed what the tribe could do, as opposed prohibiting conduct by

<div align="center">9</div>

others, did not control Kalshi's conduct. *Blue Lake Rancheria v. Kalshi, Inc.,* Case No. 25-CV-06162-JSC, 2025 WL 3141202, at *5 (N.D. Cal. Nov. 10, 2025) (relying on compact language that, "outlines what '[t]he Tribe' is 'authorized and permitted to operate.'") Here, the Nation alleges a violation of its Gaming Compact which makes it clear, "No person or entity, other than the Ho-Chunk Nation, shall conduct gaming without providing proper notice and obtaining a license, if required, from the Ho-Chunk Nation Commission." (Doc. 41, Ex. F, Section 6.C.)

With these facts, the Nation has provided Kalshi more than fair notice of its IGRA claim and the grounds upon which it rests, *Twombly*, 550 U.S. at 555, and has pleaded facts sufficient to allow the Court to draw the reasonable inference that Kalshi is liable for the misconduct alleged by the Nation. *E.g.*, *Brockett v. Effingham Cnty., Illinois*, 116 F.4th 680, 684 (7th Cir. 2024).

**B.    Kalshi Cannot Succeed on a Motion to Dismiss by Disputing the Nation's Factual Allegations that it Conducts Class III Gaming on the Nation's Indian Lands.**

Because the Nation alleges that Kalshi conducts class III gaming on the Nation's Indian lands, in violation of the Gaming Compact, Kalshi cannot succeed on a motion to dismiss by denying these factual allegations. Kalshi would have this Court adopt a different set of facts to dismiss the Nation's IGRA claim. But, on a motion to dismiss, this Court must accept the Nation's allegations as true. *E.g.*, *Brockett*, 116 F.4th at 682.

The Nation alleges that Kalshi conducts class III gaming, in the form of sports betting, on its Indian lands. (Doc. 1, ¶¶ 46-68.) The Nation alleges that Kalshi tells consumers that this class III gaming is, "sports betting." (Doc. 1, ¶¶ 93-94.) The Nation also alleges that in conducting sports betting on its Indian lands, Kalshi is not selling swaps on a commodity exchange because these contracts, "lack[] economic purpose; rather such a 'contract' is simply a gambling scheme that involves prize, chance and consideration." (Doc. 1, ¶ 61.) Because it alleges that Kalshi allows

consumers to participate in this glorified gambling scheme on the Nation's Indian lands, the Nation has alleged that Kalshi is conducting class III gaming on its Indian lands. (Doc. 1, ¶¶ 29–31, 46–68.)

And, contrary to Kalshi's arguments, the Supreme Court has already explained that gaming occurs in the location where the consumers place the bet, even if ancillary activities relating to running the gaming occur elsewhere. *Michigan v. Bay Mills Indian Cmty.,* 572 U.S. 782, 790 (2014). *In Bay Mills* the Tribe set up a casino outside of their lands and the State of Michigan brought suit claiming the Community was violating IGRA. *Id.* The Supreme Court disagreed, because IGRA governs gaming on Indian lands, and even though the Community used administrative services from its Indian lands to run this satellite casino, the actual gaming at issue was not on the Community's Indian lands. *Id.* The Supreme Court held that "'class III gaming activity' is what goes on in a casino—each roll of the dice and spin of the wheel." *Id*. at 792.

Kalshi cannot avoid this analysis here. The Nation alleged that people who are "rolling the dice" and "spinning the wheel" and, for that matter, paying Kalshi, are located on the Nation's Indian lands. Whether Kalshi is headquartered in New York matters no more than the fact that the Bay Mills Indian Community used administrative services from their Indian lands at their off Indian lands casino. Because it allows consumers to make sports bets on the Nation's Indian lands, Kalshi conducts class III gaming on the Nation's Indian lands.

## C.     UIGEA Does Not Apply to IGRA Because it Does Not Alter, Limit, or Extend Any Federal or State Law or Tribal-State Compact.

Kalshi cannot succeed on a motion to dismiss by arguing that UIGEA, not IGRA, governs the Nation's IGRA claims, because such an argument is belied by the plain language of UIGEA. Kalshi neglects to tell this Court that UIGEA states, "No provision of this subchapter shall be

construed as altering, limiting, or extending any Federal [IGRA] or State law or **Tribal-State compact** prohibiting, permitting, or regulating gambling within the United States." 31 U.S.C. § 5361(b). (Emphasis Added). Because it fails to even mention this subsection, Kalshi makes no argument as to why the Court's consideration of Kalshi's UIGEA argument should go any further than the language of UIGEA itself.

Kalshi argues that UIGEA trumps the Nation's IGRA claim, but it cannot. As the Ninth Circuit confirmed in *State of California v. Iipay Nation of Santa Ysabel,* "there is no direct conflict between IGRA and the UIGEA and, thus, we give effect to the provisions of both statutes." 898 F.3d 960, 968 (9th Cir. 2018). In *Iipay Nation*, the tribe was allowing consumers to play online games, including off its Indian lands. *Iipay Nation*, 898 F.3d at 962. The court rejected the argument that the gaming occurred on the tribe's Indian lands concluding, like the *Bay Mills'* court, that the gaming occurs where the consumer participating in the game is located. *Iipay Nation*, 898 F.3d at 967. This is because UIGEA creates "a system in which a 'bet or wager' must be legal both where it is 'initiated' and where it is 'received.'" *Id*. at 965.

Kalshi would have this Court interpret UIGEA to alter and/or limit Wis. Stat. § 945.01, IGRA, and the Gaming Compact, in violation of 31 U.S.C. § 5361(b). In Wisconsin, the legislature created a carve out in the definition of bet for "Contracts for the purchase or sale at a future date of securities or other commodities,"[3] but not for all transactions on designated contract markets as in UIGEA's definition. *Compare* Wis. Stat. § 945.01(1)(a)1, *with* 31 U.S.C. § 5362(1)(E)(ii); *see also* 25 U.S.C. § 2710(d)(1)(B). The Nation alleges that the Kalshi conduct at issue is class III

---

[3] While the Wisconsin legislature did not define "securities or other commodities" in Wis. Stat. § 945.01(1)(a)(1), Wisconsin courts look to the plain meaning of undefined terms by using a dictionary. *Gallego v. Wal-Mart Stores, Inc.,* 2005 WI App 244, ¶ 13, 288 Wis. 2d 229, 707 N.W.2d 539. The term "commodities" means "an economic good such as: [a:] a product of agriculture or mining [b:] an article of commerce especially when delivered for shipment [c:] a mass-produced unspecialized product." Commodity, Merriam-Webster Online, *available at* https://www.merriam-webster.com/dictionary/commodity (last visited, Dec. 17, 2025).

betting, not the sale of securities or commodities. (Doc. 1, ¶ 3.) IGRA, of course, states that class III gaming activities are only lawful on Indian lands if, among other things, conducted in conformance with a Tribal-State compact. 25 U.S.C. § 2710(d)(1)(C). In the Gaming Compact, the Nation and the State defined class III gaming to include, "accepting wagers on the outcomes of, and occurrences within sports and non-sports games, competitions and matches . . ." which, of course, includes sports betting. (Doc. 41, Ex. E, ¶ 4.) And, in the Gaming Compact, the Nation and the State agreed that only the Nation can conduct class III gaming on its Indian lands. (Doc. 41, Ex. A, at VI; Ex. F, Sections 6.C., 6.D.) Because Kalshi ignores the fact that UIGEA does not alter or limit Wisconsin law, IGRA, or the Gaming Compact, it fails to explain how this Court can apply the UIGEA definition of "bet or wager" without altering or limiting Wisconsin law, IGRA, or the Gaming Compact. Kalshi also ignores the fact that the plain language of UIGEA supports *Bay Mills*, namely, the gaming activity occurs where the "bet or wager is initiated, . . . or otherwise made." 31 U.S.C. § 5362(10)(A); *Iipay Nation*, 898 F.3d at 965.

Nor can Kalshi rely on the *Blue Lake Rancheria* court's UIGEA analysis. There, in denying a motion for preliminary injunction, the court concluded that the plaintiffs had "not identified any Tribal-State compact provision regulating gambling which the UIGEA, as applied here, alters, limits, or extends." *Blue Lake Rancheria*, 2025 WL 3141202, at *6. Here, of course, the Nation has identified both provisions in the Gaming Compact as well as in Wisconsin law and IGRA, 25 U.S.C. § 2710(d)(1), that UIGEA, as applied here, would alter, limit or extend.

### D.     Kalshi Cannot Obtain Dismissal by Relying on the Commodity Exchange Act.

Kalshi is wrong to suggest that anything in the Special Rule to the Commodity Exchange Act impliedly repealed the Nation's rights under IGRA or the Gaming Compact. Congress does

not repeal laws by implication and cannot abrogate tribal sovereign authority without expressly and unequivocally saying it is doing so. *See Bay Mills Indian Cmty.*, 572 U.S. at 790.

Nor is Kalshi correct to argue that only a gutted regulatory agency, the CFTC, (Doc. 1, ¶¶ 78, 88, 90), that is not required to, but has the discretion to review these contracts, 17 C.F.R. § 40.11(c), can stop it from conducting class III betting on the Nation's Indian lands. *See KalshiEX, LLC v. Hendrick*, No. 2:25-CV-00575-APG-BNW, 2025 WL 3286282, at *13 n.13 (D. Nev. Nov. 24, 2025). The Nation alleged that under 17 C.F.R. § 40.11(a) a designated contract market is prohibited from listing contracts that involve, reference, or relate to gaming. Kalshi never explains why this prohibition does not apply to it. Instead, Kalshi attempts to distract by explaining how it is allowed to self-certify and could have (but did not) sought pre-approval and how the CFTC had the discretion to review its contracts (but did not). None of that explanation matters. Kalshi cannot shield itself in the Special Rule because in 17 C.F.R. § 40.11(a), the CFTC prohibited it from listing these very contracts.

Regardless, however, Congress did not repeal rights delegated to tribes when it passed the Special Rule. To do so, Congress would have had to expressly state that it was abrogating those rights. *See Bay Mills Indian Cmty.*, 572 U.S. at 790. It did not.

## II.    THE NATION ALLEGES SUFFICIENT FACTS TO STATE A CLAIM FOR RELIEF PURSUANT TO THE GAMING ORDINANCE.

The Nation has a claim against Kalshi for violating the Gaming Ordinance because the Nation alleges that Kalshi conducts class III gaming on its lands, (Doc. 1, ¶ 3); Congress delegated to tribes and states the authority to regulate such gaming, 25 U.S.C. § 2710(d)(1); and here, Wisconsin and the Nation agreed that the Nation had the authority to regulate such conduct, (Doc. 41, Ex. A, Gaming Compact, II.C.) In the Gaming Compact, the State and the Nation incorporated

14

the Gaming Ordinance, which prohibits anyone other than the Nation from conducting class III gaming on the Nation's Indian lands. (*See generally, id.; see generally* Doc. 41, Ex. F.) Nor can Kalshi dismiss the Gaming Ordinance claim by arguing that Congress repealed some or all of IGRA by enacting the 2010 amendments to the Commodity Exchange Act when Congress did not explicitly state it was doing so.

In passing IGRA, Congress stated that class III gaming "shall be lawful on Indian lands only if . . . authorized by an ordinance . . . adopted by the governing body of the Indian tribe having jurisdiction over such lands . . . ." 25 U.S.C. § 2710(d)(1)(A). "If any Indian tribe proposes to engage in, **or to authorize any person or entity to engage in**, **a class III gaming activity on Indian lands of the Indian tribe**, the governing body of the Indian tribe shall adopt and submit to the Chairman an ordinance or resolution that meets the requirements of subsection (b)," for approval by the Chairman of the NIGC. *Id*. § 2710(d)(2)(A) (emphasis added); *Id*. § 2710(e). The Nation passed and the NIGC approved its Gaming Ordinance, which is an extension of, and is federally-mandated by, IGRA, and it is the mechanism through which the Nation exercises its "exclusive right to regulate gaming activity on [its] Indian lands . . . ." 25 U.S.C. § 2701(5).

Indeed, because Congress explicitly delegated the "exclusive right to regulate gaming activity on Indian lands" through the Gaming Ordinance, the *Montana* framework, cited by Kalshi for evaluating tribal regulatory jurisdiction, is inapplicable. (Doc. 29 at 21–24.) In *Montana v. United States,* the Supreme Court ruled that tribes have limited inherent sovereign authority with respect to nonmembers engaged in activities on non-Indian owned fee land located within a reservation. 450 U.S. 544, 565-66 (1981). In passing IGRA, however, Congress established tribal authority to stop class III gaming activity occurring on Indian lands in violation of a Tribal-State Compact. 25 U.S.C. § 2710(d)(7)(A)(ii). Kalshi is wrong to rely on *Montana* as the Nation is not

15

relying on its retained inherent sovereign power, but rather congressionally delegated authority under IGRA.

To be clear, in delegating this authority to the tribes, Congress also required that tribal gaming ordinances follow a procedure similar to regulations in order to be approved. *Compare* 25 U.S.C. § 2710(d)(3)(B) *and* 25 U.S.C. § 2710(d)(8)(D), *with* 25 U.S.C. § 2710(e). Congress, in IGRA, established that compacts govern regulation of class III gaming at the tribal-state level and tribal gaming ordinances govern regulation of class III gaming on Indian lands akin to federal regulatory law.

Kalshi is wrong to suggest that the Commodity Exchange Act repealed any part of IGRA. For Congress to abrogate rights given to tribes, it must do so explicitly and Kalshi cannot even suggest Congress explicitly abrogated any part of IGRA in passing the amendment to the Commodity Exchange Act. Kalshi admits that federal statutes of general applicability are "inapplicable to Indians" if "it would interfere with tribal governance," if "it would clash with rights granted Indians by other statutes," or if "there is pervasive evidence that Congress did not intend by silence that the statute would apply to Indians," all of which are evident from a plain reading of IGRA and the Nation's Gaming Ordinance. (Doc. 29 at 25 (quoting *Menominee Tribal Enters. v. Solis*, 601 F.3d 669, 670–71 (7th Cir. 2010).) Lest there be any confusion about the CEA's silence as to Indian tribes, as discussed above, the Indian canons of construction apply to federal statutes, even where they do not mention Indians at all, where application implicates matters of tribal sovereignty. *See EEOC v. Cherokee Nation*, *supra*, 871 F.2d at 939

**III.     THE NATION ALLEGES SUFFICIENT FACTS TO STATE A CLAIM FOR DECLARATORY RELIEF FOR INFRINGEMENT OF TRIBAL SOVEREIGNTY.**

The Nation alleges that Kalshi infringes on its tribal sovereignty when it allows gambler on the Nation's Indian lands, to compete with the Nation's casinos by using the Kalshi platform. Kalshi cannot dispute that it conducts class III gaming on the Nation's Indian lands so instead, it claims the Nation lacks Article III standing, as the Nation lacks the authority to regulate Kalshi's sports betting conduct on the Nation's Indian lands. This, too, is incorrect.

"The general federal-question statute, 28 U.S.C. § 1331, gives a district court subject matter jurisdiction to decide any claim alleging a violation of IGRA. Nothing in § 2710(d)(7)(A)(ii) or any other provision of IGRA limits that grant of jurisdiction . . . ." *Bay Mills Indian Cmty.*, 572 U.S. at 788 n.2; *see* Doc. 1, ¶ 7. The Nation's Gaming Ordinance is a federal regulatory instrument mandated by IGRA for the governance and regulation of class III gaming on the Nation's Indian lands. It is, therefore, not subject to federal preemption and implements regulatory authority congressionally delegated through IGRA. In enacting IGRA, Congress was clear-eyed regarding the role of tribal sovereignty:

> the Committee has attempted to balance the need for sound enforcement of gaming laws and regulations, with the strong Federal interest in preserving the sovereign rights of tribal governments to regulate activities and enforce laws on Indian land. The Committee recognizes and affirms the principle that by virtue of their original tribal sovereignty, tribes reserved certain rights when entering into treaties with the United States, and that today, tribal governments retain all rights that were not expressly relinquished.

S. REP. 100-446, at 5. IGRA, and the Nation's Compact, and Gaming Ordinance require that the Nation be the primary beneficiary of any class III gaming conducted on the Nation's Indian lands, for the express purpose of generating tribal governmental revenue, and that the Nation have the

17

exclusive right to regulate gaming activity on Indian lands. 25 U.S.C. §§ 2701, 2702, 2710(d); (Doc. 41, Exs. A and F; Doc. 1, ¶¶ 171–72).

The Nation alleges: "An actual controversy exists between the Nation and Kalshi, in that the Nation contends that it has the authority to enforce its Ordinance against Kalshi and prohibit it from engaging in sports gambling on its Indian Lands, while Kalshi asserts that the Nation has no such authority." (Doc. 1, ¶ 173.) Kalshi asks this Court to assume that its sports betting on the Nation's Indian lands are not enough to confer standing because the Nation does not (currently) offer sports betting at its casinos. (Doc. 29 at 28.) In doing so, Kalshi asks this Court to ignore the fact that sports betting is class III gaming and IGRA requires the Nation be the primary beneficiary of class III gaming conducted on its Indian lands. Moreover, Kalshi also asks this Court to assume that while it conducts a subset of class III gaming on the Nation's Indian lands, in violation of the Nation's Gaming Ordinance and IGRA, doing so could not harm the Nation. But, the Nation alleges, "by illegally offering its sports wagering contracts to persons located both on and off of the Indian Lands in Wisconsin, Kalshi draws business away from the Nation's casinos by allowing patrons to participate in class III gaming from their homes." (Doc. 1, ¶ 67.)

Kalshi cannot succeed on this issue by making far-flung analogies about, "any conduct that draws business away from Plaintiff's casinos," (Doc. 29 at 28), because here, the only conduct at issue is Kalshi conducting class III gaming on the Nation's Indian lands. Congress explicitly delegated regulatory authority over such conduct to the Nation, and the Nation has a sovereign right to regulate class III gaming through its Gaming Ordinance and tribal gaming regulations as part of its authority to govern itself. *See* 25 U.S.C. § 2703(5); 25 U.S.C. § 2701(4); 25 U.S.C. § 2702(1).

By disrupting the Nation's regulatory authority over class III gaming on the Nation's land, arising from IGRA, codified in the Nation's gaming ordinance, Kalshi impermissibly interferes with tribal self-government far beyond a reduction in tribal revenue. Congress would not have delegated to Tribes the authority to enact gaming ordinance prohibiting all, except the Tribes from engaging in class III gaming, and required the Secretary to approve those ordinances, only to turn around and with later amendments to the CEA authorized entities like Kalshi to conduct class III in violation of those very ordinances. The Nation has sufficiently alleged that an actual case and controversy exists and this Court has jurisdiction to declare that the Nation has the authority to enforce its Gaming Ordinance and prohibit Kalshi from conducting class III gaming activity through sports betting contracts on the Nation's Indian lands in contravention of the Nation's Gaming Ordinance and, by extension, IGRA.

## IV. THE NATION STATES A LANHAM ACT CLAIM BY ALLEGING THAT KALSHI FALSELY ADVERTISED THAT IT CONDUCTS LEGAL SPORTS BETTING IN ALL FIFTY STATES.

Kalshi asks this Court to dismiss the Nation's false advertising claim by setting up a straw man and knocking it down. But this Court does not consider strawmen on a motion to dismiss. Rather, this Court accepts the allegations in the complaint as true to determine whether the Nation has stated a claim. *See Peters v. West*, 692 F.3d 629, 632 (7th Cir. 2012); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). Here, the Court should deny Kalshi's motion to dismiss the Nation's false advertising claim because even applying the inapplicable heightened pleading standard, the Nation alleged Kalshi's advertisements are false or misleading and that the advertisements are material to consumers, and that the Nation is harmed by Kalshi's advertising.

To state a claim for false advertising under the Lanham Act, a plaintiff need only allege facts showing that: (1) the defendant made a false statement of fact in its advertisement, (2) the

QB\168080.00083\100063686.1

defendant's false statement deceived or had the tendency to deceive a substantial segment of the defendant's audience, and (3) "the plaintiff has been or is likely to be injured as a result of the defendant's false advertisement"—i.e. injury and causation. *See Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 381–82 (7th Cir. 2018). Kalshi incorrectly contends the Nation fails on each element. The Nation mirrors Kalshi's presentation of the above elements.

### A.    There is No Heightened Pleading Standard for False Advertising.

As a threshold matter, contrary to Kalshi's assertion, the Nation need not plead its § 43(a) false advertising claim under the heightened standard of Rule 9(b). (*See* Doc 29 at 28.) The Nation is not alleging a claim "premised on a course of fraudulent conduct." *See Priority Int'l Animal Concepts, Inc. v. Bryk*, No. 12-C-0150, 2012 WL 6020044, at *5 (E.D. Wis. Dec. 3, 2012); *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007). Federal courts in Wisconsin have held, "it is not entirely clear that Rule 9(b) applies to false advertising claims under the Lanham Act" as district courts are divided and the court of appeals has merely referenced its application in dicta. *Thermal Design, Inc. v. Guardian Bldg. Prods., Inc.*, No. 08-C-828, 2009 WL 1181327, at *3 (E.D. Wis. Apr. 29, 2009). The court in *Priority Int'l Animal Concepts, Inc. v. Bryk* held that Rule 8(a) is the proper pleading standard. 2012 WL 6020044, at *3–5. In doing so, the court reasoned that Rule 9(b) is improper here because: (1) neither fraud nor intent is an element of the plaintiff's § 43(a) claim; (2) "a false statement under the Lanham Act is significantly different than a claim of fraud", and (3) the standard is practically unreasonable because "advertising is often conducted by large corporations . . . [meaning the] specific personnel involved in producing and authorizing the allegedly false advertising within the corporate structure will typically be unknown, absent discovery." *Id.*

Despite making a passing reference to the heightened standard, Kalshi does not explain how the Nation's § 43(a) claim sounds in fraud. It cannot. As the Seventh Circuit has explained,

whether Rule 9(b) applies "depend[s] on the [plaintiff's] factual allegations" and claim asserted. *Borsellino*, 477 F.3d at 507. Rather than explain how the Nation's § 43(a) claim "sounds in fraud," Kalshi sets forth unsupported conclusions. (*See* Doc. 29 at 28, 32 n.8.) The Nation does not allege that Kalshi is engaging in a "course of fraudulent conduct" as the basis of its § 43(a) claim. The Nation used the term "fraud" just three times in the Complaint, none of which related to the Nation's § 43(a) claim. (*See* Doc. 1, ¶¶ 82, 153, 168); *see also Borsellino*, 477 F.3d at 507 (holding that Rule 9(b) applied because the first sentence of the plaintiff's complaint stated the case was based on a "pattern of fraud" and that the plaintiff's briefing was "riddled with references to fraud").

Even if this Court finds that the heightened standard applies, the Nation's pleading meets the requirements of Rule 9(b). To satisfy Rule 9(b), the Nation must allege "the who, what, when, where, and how" of its claim. *Borsellino*, 477 F.3d at 507. The Nation has done so.

The Nation's complaint identified Kalshi numerous times as "the party responsible" for the various false advertisements—the "who." (*See, e.g.,* Doc. 1, ¶¶ 93–95, 97.) The Nation alleged that Kalshi's false advertisements are at issue—the "what." (*See, e.g.,* Doc. 1, ¶¶ 110, 177, 180.) The Nation alleged the specific date's that Kalshi published the advertisements and when Kalshi entered the sports betting space marking the impetus of the advertisements at issue—the "when." (*See, e.g.,* Doc. 1, ¶¶ 83–87, 95–98.) The Nation described Kalshi's advertisements and included multiple photos depicting Kalshi's advertisements appearing in various forums and online platforms, which included "billboard signs, out-of-home advertising bus stops, on trucks, and the sides of buildings" and on "Tik Tok, Instagram, X.com, and YouTube"—the "where." (*See, e.g.,* Doc. 1, ¶¶ 4, 93, 99, 100.) Finally, the Nation alleged that Kalshi's advertisements are false because

Kalshi stated that it offers: "Sports Betting Legal in all 50 States on Kalshi" and that Kalshi allows users to bet on sports—the "how." (*See* Doc. 1, ¶¶ 94–95, 98, 110.)

Courts have found virtually identical allegations regarding § 43(a) false advertising claims to be sufficient to meet the Rule 9(b) heightened pleading standard in multiple cases. *See, e.g., Priority Int'l Animal Concepts, Inc.*, 2012 WL 6020044, at *5; *see also Thermal Design, Inc.*, 2009 WL 1181327, at *3; *Lynn Scott, LLC v. Grubhub Inc.*, No. 20 C 6334, 2024 WL 3673718, at *9 (N.D. Ill. Aug. 6, 2024).

> **B.    The Nation Alleged that Kalshi Injured the Nation Through Kalshi's False Advertising. Therefore, the Nation Alleged the Third Element of its § 43(a) Claim and the Requisite Standing to Bring the Claim.**

The Nation alleged that Kalshi injured the Nation's sales and reputation through Kalshi's false advertisements; thus, the Nation alleged both the third element of its § 43(a) claim and the requisite standing to bring the claim.

The third element of a § 43(a) claim requires the plaintiff to allege that "the plaintiff has been or is likely to be injured as a result of the defendant's false advertisement." *Eli Lilly & Co.*, 893 F.3d at 381–82. The third element overlaps with the § 43(a) standing requirement. To have standing under § 43(a) the plaintiff must allege: (1) "an injury to a commercial interest in reputation or sales," and (2) that the plaintiff's "economic or reputational injur[ies] flow directly from the deception wrought by the defendant's advertising." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132–33 (2014). The Nation's allegations are sufficient to both state its claim under the third element and to establish standing.

The Nation alleged that Kalshi's advertisements injure both the Nation's reputation and its revenue. Said injuries are viable and logical when a defendant's deception or false claims cause consumers to withhold or redirect trade away from the plaintiff. *Lexmark*, 572 U.S. at 133; *Eli Lilly & Co.*, 893 F.3d at 383. Here, the Nation alleged that:

> [B]y illegally offering its sports wagering contracts to persons located both on and off of the Indian Lands in Wisconsin, *Kalshi draws business away from the Nation's casinos* by allowing patrons to participate in class III gaming from their homes. Loss of revenue has a direct impact on tribal governmental functions and *has a tangible effect on the services and programs the tribal governments provide* to their members and all persons who live, work, and visit the Nation's Indian Lands.

(Doc. 1, ¶ 67 (emphasis added).) Accepting the Nation's allegations as true, the Nation alleged sufficient details regarding the reputational and financial harm caused by Kalshi's false or misleading advertisements.

Regarding reputation, the Nation alleged facts supporting the "impact" of the lost revenue from Kalshi's conduct—including its false or misleading advertising. (*Id.*) In particular, the Nation alleged the lost revenue associated with consumers who will use Kalshi over the Nation's gaming services will lead to the Nation being unable to provide services and support to its members. (*Id.*) This weakening of the Nation as a whole not only harms the Nation's members, it harms the reputation and goodwill the Nation created by historically offering its services and support to the Nation's members. (*See* Doc. 1, ¶¶ 9, 24, 37–38, 41.) While Kalshi's advertisements may not specifically refer to the Nation, the Nation adequately alleged its reputation was harmed and there is no requirement for Kalshi's advertisements to refer to the Nation for the Nation to allege reputational injury. (Doc. 29 at 28); *see Eli Lilly & Co.*, 893 F.3d at 383; *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir. 1999).

Regarding sales, the Nation's allegation that Kalshi's advertisements "draw[] business away" from the Nation and inhibits "tribal functions" are hardly "implausible" based on the totality of the Nation's allegations. (Doc. at 29); *see Hopfensperger v. Shawano Cnty.*, No. 10-C-0960, 2012 WL 1108561, at *6 (E.D. Wis. Mar. 30, 2012) (holding that the court can consider the "totality" of the complaint on a motion to dismiss); *Stevenson v. United Animal Health, Inc.*, No.

23

1:23-CV-00509-TWP-CSW, 2023 WL 9040111, at *7 (S.D. Ind. Dec. 29, 2023) (same). The Nation alleged IGRA gives the Nation "the exclusive right to regulate class III gaming on Indian Lands" and that under the Nation's Compact, only the Nation is "authorized to conduct class III gaming, including sports wagering, on its Indian Lands." (Doc. 1, ¶¶ 24, 37.) Further, the Nation alleged that "[c]lass III gaming can be the most lucrative form of gaming." (Doc. 1, ¶ 28.) In total, the Nation thoroughly alleged Kalshi conducts class III gaming through its sale of sports event contracts. (Doc. 1, ¶¶ 46, 68.) The Nation therefore alleged Kalshi is in direct competition with the Nation for the same pool of consumers' spending allocated to both gaming and to sports books.

Kalshi is wrong to argue at the motion to dismiss stage that the Nation falls outside of the zone of interests protected by the Lanham Act. Kalshi makes this argument in an attempt to narrowly define the market in which it competes with the Nation for gaming revenue in Kalshi's favor. At this stage, however, the Court must take the Nation's allegations regarding the market as true, not Kalshi's. *See Peters*, 692 F.3d at 632; *see also Ashcroft*, 556 U.S at 678–79. And the Nation alleged that the market in which Kalshi competes is class III gaming, not just sports betting. (Doc. 1, ¶¶ 9, 24, 29–31, 46, 67 ("by illegally offering its sports wagering contracts to persons located both on and off the Indian Lands in Wisconsin, Kalshi draws business away from the Nation's casinos by allowing patrons to participate in class III gaming from their homes."), 68.)

The Nation sufficiently alleged that its "economic or reputational injury flow[s] directly from the deception wrought by the defendant's advertising." *Lexmark*, 572 U.S. at 133. The Nation alleged Kalshi used, and continues to use, advertising across numerous mediums (including social media) that materially deceives the consuming public into using Kalshi's services—namely that Kalshi's platform allows 50 state legal sports betting or sports gaming. (Doc. 1, ¶¶ 4, 98–99, 109.) The Nation further alleged that gaming consumers diverted to Kalshi will not use the Nation's

24

class III gaming services, either in full or in part. (*Id.*, ¶ 67.) In other words, consumers' gaming budget is not infinite and they will opt to use Kalshi's mobile platform over the Nation's in-person gaming offerings. (*Id.*) The Nation further alleged that Kalshi's advertisements have been successful and drawn consumers to Kalshi over-in-person gaming. (Doc. 1, ¶¶ 93–98); *see W. Flagler Assocs. v. Haaland*, 573 F. Supp. 3d 260, 268 (D.D.C. 2021), *reversed on other grounds*, 71 F.4th 1059 (Fed. Cir. 2023) (noting that plaintiff's prediction that online sports wagering would "divert business that would have been spent at [their facilities] and cause it to be spent on online sports gaming" was "reasonable and hardly speculative.").

The above statements must be accepted as true, and courts have held similar statements are sufficient to establish standing to assert a claim for false advertising under § 43(a). *See Eli Lilly & Co.*, 893 F.3d at 384 (holding that because the plaintiff was the only producer of the supplement, any false advertising that decreased demand for the supplement necessarily caused the plaintiff harm); *Moreland v. Club 390 Corp.*, No. 18 C 7441, 2019 WL 13076638, at *3 (N.D. Ill. Aug. 26, 2019) (holding that the allegation that the plaintiff and the defendant "vie for the same dollars from the same demographic group" was sufficient to survive a motion to dismiss); *see also Towada Audio Co. v. Aiwa Corp.*, No. 18-CV-4397, 2019 WL 1200748, at *7 (N.D. Ill. Mar. 14, 2019) (characterizing *Lexmark's* pleading standard as "liberal").

The Nation alleged injury to both its reputation and its sales. The Nation alleged that these injuries were caused by Kalshi's false advertisements. Thus, the Nation has standing and alleged requisite facts to establish the third element of the Nations § 43(a) claim.

### C.    The Nation alleged Kalshi made a false statement of fact about Kalshi's service.

Kalshi ignores the plain language of the Complaint in its attempt to dismiss the Nation's § 43(a) claim. The Nation alleges that Kalshi is making two false statements of fact about its

business: (1) that it conducts "legal" sports betting and (2) that it conducts sports betting. (*See* Compl. ¶¶ 94–95, 98, 110.) The Nation alleged Kalshi's statement that it offers "Sports Betting Legal in all 50 States" is false. (Doc. 1, ¶¶ 110, 177.) The validity of Kalshi's statements are not up for debate at this stage. Rather, to survive a motion to dismiss, the Nation must merely "plausibly allege that [Kalshi] made a false representation in a commercial advertisement." *See Uriah Prods., LLC v. Curt Mfg. LLC*, No. 3:24CV873 DRL-SJF, 2025 WL 2912337, at *3 (N.D. Ind. Oct. 10, 2025). As shown below, the Nation has gone far beyond the minimum requirements in doing so.

Kalshi is wrong to argue that the alleged statements are inactionable opinions. (Doc. 29 at 30.) District courts throughout the Seventh Circuit have held that a misleading statement regarding legality is actionable under § 43(a)(1)(B). *See, e.g.*, *Data Rsch. & Handling, Inc. v. Vongphachanh*, 278 F. Supp. 3d 1066, 1069, 1077 (N.D. Ind. 2017); *Paul Davis Restoration, Inc. v. Everett*, No. 14-C-1534, 2014 WL 7140038, at *3–5 (E.D. Wis. Dec. 12, 2014).

For example, the court in *Data Research*, held the defendants' statement that the plaintiff, "was operating an illegal down payment assistance program, and that Plaintiff was an illegal company" was sufficient to state a claim under the Lanham Act. *Data Rsch. & Handling, Inc.*, 278 F. Supp. 3d at 1069. Similarly, the court in *Paul Davis Restoration* held a false advertisement that stated the plaintiff was breaking the law sufficient for a preliminary injunction. *Paul Davis Restoration, Inc.*, 2014 WL 7140038, at *3–5.

Rather than apply the law used by courts within the Seventh Circuit, Kalshi would have this Court apply a standard used in the Ninth Circuit to conclude that any statement regarding the law or legality of a party's conduct is an inactionable opinion. *Coastal Abstract Service, Inc. v. First American Title Insurance Co.*, 173 F.3d 725, 731-32 (9th Cir. 1999) (finding that the

statement, "Not Licensed in California" to imply that a rival business was required to be licensed under California law was an inactionable opinion."). However, the Seventh Circuit has not adopted this test and nor would it apply here because Kalshi's false statements fall within two exceptions to the *Coastal* rule.

Courts have recognized certain exceptions to the *Coastal* rule, two apply here. First, if the speaker "clearly intended" for the statement to be "reasonably interpreted as a statement of fact," the statement is actionable. *TNT Amusements, Inc. v. Torch Elecs., LLC*, No. 4:23-CV-330-JAR, 2025 WL 947506, at *14 (E.D. Mo. Mar. 28, 2025), *affirmed in relevant part on reconsideration,* No. 4:23-CV-330-JAR, 2025 WL 2336858 (E.D. Mo. Aug. 13, 2025). Second, if the speaker "lacks a good faith belief in the truth of the statement," the statement is actionable. *Dental Recycling N. Am., Inc. v. Stoma Ventures, LLC*, No. 4:23 CV 670 CDP, 2023 WL 6389071, at *4 (E.D. Mo. Oct. 2, 2023).

First, Kalshi's conduct is actionable under § 43(a)(1)(B) because Kalshi is making untrue "statement[s] of objective fact" that are "clearly intended" to be interpreted as statements of fact, not opinions. *TNT Amusements, Inc.*, 2025 WL 947506, at *13. Kalshi never starts any of its advertisements with any statement suggesting it is **opining** that its conduct is legal. *See generally* O*mnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 184 (2015). Instead, as the Nation repeatedly alleged, Kalshi uses its reference to "legal" as a statement of fact. Sometime, Kalshi even presents this statement as one of historical fact, for example, the Nation alleged that Kalshi's advertised itself as: "The First Nationwide Legal Sports Betting Platform." (Doc. 1, ¶ 4.) Kalshi tells consumers that betting on Kalshi is legal and that it is legal in all 50 states. (*See e.g.,* Doc. 1, ¶¶ 97–99, 109.) Therefore, the Nation sufficiently alleged that Kalshi "clearly intended" its statements to be interpreted as objective fact.

Second, the Nation alleged that Kalshi "lack[ed] a good faith belief in the truth of [its] statement." *Dental Recycling N. Am., Inc.*, 2023 WL 6389071, at *5. Specifically, the Nation alleged:

> On information and belief, Kalshi has been prolific in offering sports event contracts *with the knowledge that the legality of their sports event contracts is highly questionable* and widely criticized as an impermissible form of sports gaming or gambling, at a time when power in the CFTC is being consolidated in one commissioner, Quintenz, a Kalshi board member, with the knowledge that the CFTC is understaffed and lacks the resources to adequately review and regulate Kalshi's self-certified contracts to ensure compliance with the CEA.

(Doc. 1, ¶ 91 (emphasis added).) The Nation also alleged that Kalshi told the D.C. Federal Courts that contracts that involve gaming could not be sold on derivative markets. (Doc. 1, ¶¶ 77, 79, 91.) The Nation's allegations are sufficient at the motion to dismiss stage to establish that the lack of good faith exception applies.

Ultimately, the Nation can sustain its § 43(a) claim against Kalshi because the Nation alleged that Kalshi falsely advertises that its regulated commodity exchange platform is actually "sports betting" or "sports gaming." (Doc. 1, ¶¶ 93–94, 96, 99–100.) Kalshi repeatedly tells courts, including this Court, that it is legally selling ***event contracts*** under the Commodity Exchange Act and is fully compliant with the CFTC. (Doc. 29 at 30); *see also KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025); *KalshiEX, LLC v. Hendrick*, No. 2:25-CV-00575-APG-BNW, 2025 WL 3286282 (D. Nev. Nov. 24, 2025); *KalshiEX LLC v. Flaherty,* No. 25-CV-02152-ESK-MJS, 2025 WL1218313 (D. N.J., Apr. 28, 2025) (appeal pending). Kalshi itself stated the Commodity Exchange Act does not permit Kalshi to conduct betting or gaming with its platform. (*See* Doc. 1, ¶¶ 73–74, 77.) In particular, to prevent the CFTC from prohibiting Kalshi from selling event contracts based on elections, Kalshi argued, "that contracts on 'sporting events such as the Super

28

Bowl, the Kentucky Derby, and Masters Golf Tournament' were *precisely* what Congress had in mind as 'gaming' contracts." (*Id.*); Plaintiff's Memorandum in Support of Motion for Summary Judgment, at Section I.B.2., *KalshiEX LLC v. Commodity Futures Trading Comm'n,* No. 23-CV-03257-JMC, 2024 WL 4164694 (D.D.C., Jan. 25, 2024).

As Kalshi admits, sports betting is neither regulated by the CFTC nor allowed under the Commodity Exchange Act. And yet, Kalshi's advertisements repeatedly advertise that they are offering "sports betting" or "sports gaming." (Doc. 1, ¶¶ 94, 96, 99, 109.) Whether or not these statements are legally false or misleading is up to the ultimate trier of fact and their validity is not rightfully at issue during the motion to dismiss stage. Rather, the Nation was required to allege that Kalshi made false statements in its advertisements—which it did. *See generally Priority Int'l Animal Concepts, Inc.*, 2012 WL 6020044, at *5 (finding similar allegations survived a motion to dismiss even under the higher Rule 9(b) standard); (Doc. 1, ¶¶ 110, 177.)

Instead of addressing the numerous issues noted above, Kalshi chooses to take issue with the Nation pleading in the alternative but provides no authority that the Nation cannot do so. (MTD, at 31.) Rather, at the motion to dismiss stage the Nation is required to put Kalshi on notice of its allegations, including any theories posed in the alternative. *See* FRCP 8(e)(2) (allowing pleading in the alternative); *Diamond Ctr., Inc. v. Leslie's Jewelry Mfg. Corp.*, 562 F. Supp. 2d 1009, 1017 (W.D. Wis. 2008) (holding that a plaintiff may plead in the alternative).

### D.    The Nation Alleged Kalshi's Statements Deceived and Have the Tendency to Deceive a Substantial Segment of its Audience.

The Nation alleged that Kalshi's false statements "actually deceived or [have] the tendency to deceive a substantial segment of its audience." (Doc. 1, ¶ 181); *Hot Wax, Inc.*, 191 F.3d at 819. The Nation alleged Kalshi is deceiving consumers because Kalshi's false advertisements are

"likely to cause consumers, including tribal members, to use Kalshi's platform, website(s), software, and/or application(s) to place sports bets or purchase sports event "contracts," believing such use to be universally compliant and that Kalshi offers a legally compliant sports betting platform." (Doc. 1, ¶ 182.) The Nation further alleged that Kalshi is deceiving consumers because, as set forth above, Kalshi's sports betting platform is not legally compliant. (*Id.*) Indeed, Kalshi's advertisements entice and deceive or, at bare minimum, confuse consumers as to the legality or propriety of Kalshi's platform:

- "I'm all in on OKC"
- "Sports betting just dropped on Kalshi"
- "This is pretty sweet"
- "'I traded that I'd be…' dawg that's called betting. You gambled."
- "Serious question – how is this legal?"
- "I just wanted to confirm before using Kalshi. Washington state has strict 'gambling' laws in place and I know Kalshi is a trading app for contracts. Is there a guarantee I will not get into any legal trouble for using there [sic] app in the state?"

(Doc. 1, ¶ 97, 101, 103; Ex. E.) Therefore, the Nation adequately alleged that Kalshi's statements deceived and continue to deceive consumers. The Nation further alleged that consumers rely on Kalshi's statements to engage or interact with Kashi's platform. (Doc. 1, ¶¶ 101-110, 181-182.)

Finally, for the reasons stated above, the Nation thoroughly alleged Kalshi's advertisements have caused, and will cause, injury to the Nation. (*See supra* Section IV, B.)

## V.     THE NATION STATES A CLAIM FOR CIVIL RICO AGAINST ALL DEFENDANTS.

Defendants seek dismissal of the Nation's civil RICO claim by arguing that, in their version of the facts, their conduct is not illegal class III gaming on the Nation's Indian lands, but they cannot succeed on a motion to dismiss by offering a different version of the facts, disputing the legality of their conduct as alleged, or invoking regulatory inaction as a shield where the Complaint

30

plausibly alleges an unlawful racketeering scheme. This Court should deny the motion to dismiss the Nation's civil RICO claim for three reasons: 1) the Nation alleges that Kalshi and Robinhood formed an association-in-fact enterprise to offer class III gaming which is not legal on the Nation's Indian lands; (2) the Nation alleges that, in doing so, Defendants committed wire fraud in violation of the Wire Act and 18 U.S.C. § 1955; and (3) the Nation alleges an injury is a direct, concrete loss resulting from the Defendants' unlawful encroachment on the Nation's exclusive market.

In its complaint, the Nation is clear about its desire to uphold IGRA which Congress passed to, among other things, provide tribes, "adequate basis to shield [them] from organized crime and other corrupting influences." (Doc. 1, ¶ 15-68); 25 U.S.C. § 2702(2). Kalshi, ironically, remind this Court that "RICO was enacted to eliminate 'the infiltration of organized crime and racketeering into legitimate organizations operating in interstate commerce" (Doc. 29 at 33.) Here, by offering unregulated class III gaming on the Nation's Indian lands, in violation of IGRA and shortly after telling a federal court they could not do so under the Commodity Exchange Act, Defendants are the corrupting influence Congress was warning about.

### A.    The Nation Alleges That Defendants Conducted the Affairs of an Association-in-Fact Enterprise.

As Defendants note, to plead conduct of an association-in-fact enterprise, courts require something that "indicate[s] how the cooperation" between businesses "exceed[s] that inherent in every commercial transaction." *United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 856 (7th Cir. 2013). While the 7th Circuit in *Walgreen* cautioned that the definition of an association-in-fact enterprise "is not limitless," the Supreme Court has held on multiple occasions that this definition is to be interpreted broadly. *Id.* at 853 (*citing Boyle v. United States*, 556 U.S. 938, 944 (2009); *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 257 (1994)).

31

Here, the Nation was specific in how the conduct of Defendants working together exceeded those that are inherent in every commercial transaction. Defendants worked together to offer online class III gaming on the Nation's Indian lands, in violation of IGRA and Wisconsin law. Defendants are wrong to pretend that such conduct was a regular business transaction. Nor can they hang their hats on Kalshi's status as a DCM because the CFTC has prohibited DCM's from listing contracts that involve gaming and Kalshi cannot deny that these contracts involve gaming. (Doc. 1, ¶ 114.)

Nothing about Defendants' conduct is routine here. Defendants rely on *Reves v. Ernst & Young*, 507 U.S. 170 (1993), and related authorities for the proposition that routine activity by each defendant is insufficient to constitute "conduct[ing] or participat[ing] in the conduct of the '*enterprise's* affairs,'" as opposed to "their *own* affairs." *Reves*, 507 U.S. at 185. In *Walgreen,* for example, the defendants had a longstanding and ordinary business practice of cooperation "in order for drugs to reach consumers." *Walgreen*, 719 F.3d at 856. Over and over again, however, the Nation explained how Defendants' activities at issue were anything but routine or ordinary.

Defendants here, for the first time, began conducting class III gaming in early 2025 when they offered and widely disseminated these specific and controversial gaming event contracts. (Doc. 1, ¶ 117.) Defendants acknowledge that they were doing something new and different in their advertisements, that Defendants operate "The **First** Nationwide Legal Sports Betting Platform" and that "Robinhood [will] Offer Super Bowl Betting via Kalshi." (Doc. 1, ¶¶ 94, 96.) The Nation highlights that the "Gaming Racket" launched sports betting products "strategically timed with the March Madness NCAA men's and women's basketball tournaments," leading to a reported trading volume of over $320 million across all 50 states through Robinhood. (Doc. 1, ¶ 117.) And the Nation alleges that "the Gaming Racket uses a different arrangement than Robinhood typically uses with its third-party partnerships." (Doc. 1, ¶ 118.) The Nation alleges

32

that instead of receiving "payment for order flow," the Gaming Racket used "a direct revenue-sharing model." (Doc. 1, ¶ 118.)

Nor can Defendants succeed on a motion to dismiss by disputing the Nation's factual allegations that they are conducting class III gaming in violation of IGRA and 17 C.F.R. § 40.11(a). Defendants argue that they are "complying with federal regulations" which they say "is not the conduct of a RICO enterprise." The Nation alleges that Defendants used self-certification as a vehicle to disguise prohibited betting products. (Doc. 1, ¶ 154.) And the Nation alleges that Defendants knew their conduct was unlawful because Kalshi previously represented to the federal courts in the District of Columbia that it could not lawfully engage in this conduct. (Doc. 1, ¶¶ 77, 114.) Similarly, Robinhood recommended to the CFTC that it "focus on prohibiting single sporting events or contests." (Doc. 1, ¶ 115.) The Nation did not allege that Defendants did what the CFTC required, the Nation alleges that Defendants knew they were unlawfully conducting class III gaming and were prohibited by the CFTC from listing such contracts. *Compare Cleveland Bakers & Teamsters Health & Welfare Fund v. AMAG Pharms., Inc.*, 2025 WL 1024103 (D. Mass. Mar. 12, 2025) (dismissing a civil RICO claim against a drug manufacturer based on the drug label used when the FDA required the drug manufacturer to use the label).

## B.    The Nation Alleges Predicate Acts of Racketeering.

The Nation alleges predicate acts of racketeering activity, encompassing wire fraud (18 U.S.C. § 1343), the transmission of wagering information (18 U.S.C. § 1084), and the operation of an illegal gambling business (18 U.S.C. § 1955).

### 1.    The Nation Alleges Wire Fraud.

The Nation alleges that Defendants used the internet to conduct its illegal class III gaming enterprise and did so knowing that their conduct was illegal.

QB\168080.00083\100063686.1

To plead wire fraud, a plaintiff must allege that "(1) the defendant participated in a scheme to defraud; (2) the defendant intended to defraud; and (3) a use of an interstate wire in furtherance of the fraudulent scheme." *United States v. Turner*, 551 F.3d 657, 664 (7th Cir. 2008). As Defendants note, civil RICO claims relying on alleged wire fraud are "subject to the heightened pleading standard of Fed. R. Civ. P. 9(b), which requires a plaintiff to plead all averments of fraud with particularity." *Slaney v. Int'l Amateur Ath. Fed'n*, 244 F.3d 580, 597 (7th Cir. 2001). A plaintiff must allege its wire fraud predicate acts "with some specificity and state the time, place, and content of the alleged false representations, the method by which the misrepresentations were communicated, and the identities of the parties to those misrepresentations." *Id.*

The Nation meets this standard. As the Nation explains, Defendants fraudulently collect money, over the wires, for class III gaming and—at least in their briefing, although not in their advertisements—claim that, rather than conducting class III gaming, they are selling federally regulated derivatives contracts. The Nation alleges that the fraudulent instruments consist of binary event contracts that pose some variation of the questions, "Will <team> win <title>", (Doc. 1, ¶ 80), and "Will <team> win <event>?" (Doc. 1, ¶ 83.) Defendants offer these "contracts" as legal exchange-traded products, though they are actually conducting class III gaming, conduct Kalshi have told the courts involve prohibited gaming. (Doc. 1, ¶ 72, 77, 121.) The Nation alleges Defendants began this scheme when, during the March Madness NCAA men's and women's basketball tournaments, the Gaming Racket conducted class III gaming, on the internet, nationwide, making money off of consumers betting on sports. (Doc. 1, ¶ 117.)

The Nation alleges Defendant intended to defraud because they knew they could not list event contracts that involve gaming—Kalshi repeatedly told the federal courts in the District of Columbia that it could not do so and Robinhood argued for the CFTC to take a narrow approach

34

to defining gaming. (Doc. 1, ¶ 114-115.) Defendants now argue the opposite and claim—despite their prior arguments that such conduct would not be legal—they have a "good-faith belief" in legality, which negates the specific intent required under *United States v. Britton*, 289 F.3d 976, 981 (7th Cir. 2002). Defendants provide no legal support for such an alleged good faith belief in the legality of their actions, or for why this Court should accept their facts over the Nation's allegations.

Nor can Defendants fall back legal exceptions that cannot apply here to claim the Nation has not alleged violations of the Wire Act. As a preliminary matter, the Nation is alleging that it is illegal for the Gaming Racket to conduct class III gaming on its Indian lands. The Gaming Racket seeks dismissal based on its factual allegation—belied by Kalshi's own words to consumers—that it is actually selling "[c]ontracts for the purchase or sale at a future date of securities or other commodities." (Doc. 29 at 39.) The Gaming Racket provides no factual support from the allegations in the Complaint, which are taken as true in deciding a motion to dismiss, that it is selling contracts related to "securities or other commodities." Nor can it, as the Nation does not allege that these contracts involve commodities. Just the opposite, the Nation alleged facts showing these contracts could not be swaps. (Doc. 1, ¶ 61.) And, every court who has considered whether a sports events contract could be a "swap" under the Commodity Exchange Act—which includes matters above and beyond "securities and other commodities—has found that these contracts cannot be swaps. *See KalshiEX, LLC v. Hendrick*, No. 2:25-CV-00575-APG-BNW, 2025 WL 3286282 at *11 (D. Nev. Nov. 24, 2025); *N. Am. Derivatives Exch., Inc. v. Nevada Gaming Control Bd.*, No. 2:25-CV-00978-APG-BNW, 2025 WL 2916151, at *4-5 (D. Nev. Oct. 14, 2025) ("*Crypto*").

35

Similarly, Defendants cannot avoid liability here by falling back on federal pre-emption. First of all, courts across the country have rejected this argument. *See Hendrick*, 2025 WL 3286282 at *17; *Crypto*, 2025 WL 2916151 at *14-15*; Martin, 793 F. Supp. 3d at 678.* As a party to two of these suits, Kalshi should have, at the very least, identified those cases and explained why it disagrees with the analysis that there is no pre-emption. Instead, Defendants rely on the one decision adopting its pre-emption argument, failing to inform this Court that decision is on appeal. Here, where the Nation alleges a violation of a federal law, IGRA, Defendants cannot fall back on a federal pre-emption argument. Nor can they suggest that Congress silently repealed IGRA in passing the 2010 amendments to the Commodity Exchange Act as Congress does not repeal by implication. *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018).

### 2.    The Nation Alleges Violations of the Wire Act or 18 U.S.C. § 1955.

The Wire Act prohibits knowingly using interstate wires to transmit bets or wagers on sporting events. 18 U.S.C. § 1084(a). The Nation alleges the Gaming Racket offers contracts whose sole purpose is to allow participants to wager on sporting outcomes, and that Robinhood promotes and facilitates access to those wagers as a futures commission merchant. (Doc. 1, ¶¶ 111-125.) The Nation alleges that the contracts are tied directly to sporting outcomes, involve consideration, chance, and the opportunity for payout based solely on those outcomes, and are marketed as a way to bet on sports. (Doc. 1, ¶¶ 94, 95, 111-125.) With these allegations, the Nation plausibly describes "bets or wagers" under the Wire Act.

Defendants cannot obtain dismissal by arguing that a different law controls here because, to do so, they have to ask this Court to ignore the Nation's factual allegations. Rather than accept the Nation's factual allegations as true, Defendants ask this Court to assume a different set of facts to conclude the Nation has not alleged a violation of the Wire Act or 18 U.S.C. § 1955. Defendants

36

would have this Court conclude that, despite the Nation's allegations and Kalshi's own advertisements, they are not conducting sports betting on the Nation's lands. They ask this Court to adopt that assumption so that they can then argue that IGRA does not apply and that, instead, UIGEA applies. But even if this Court were willing to ignore the allegations of the complaint, Defendants could not succeed. After all, in passing UIGEA, Congress stated, that "[n]o provision . . . [of UIGEA] shall be construed as altering, limiting, or extending any Federal or State law or Tribal-State compact prohibiting, permitting, or regulating gambling within the United States." 31 U.S.C. § 5361(b). By its own words, UIGEA cannot alter Wisconsin law. The Nation alleges that the Gaming Racket is conducting Class III gaming on the Nation's lands in violation of IGRA, tribal law, state law and federal gaming restrictions. (Doc. 1, ¶¶ 156, 158, 161-168.) The Gaming Racket cannot have these claims dismissed by arguing that, contrary to the allegations in the complaint, they do not conduct class III gaming on the Nation's Indian lands.

Defendants cannot hang their hats on hoping to apply UIGEA's definitions to the Wire Act or rely upon *Bob Jones Univ. v. United States*, 461 U.S. 574, 588 n.10 (1983), and *Corner Post, Inc. v. Bd. of Governors of Fed.Rsrv. Sys.*, 603 U.S. 799, 818 (2024), for support of use of UIGEA's definitions within the context of the Wire Act. Congress did not amend the Wire Act when it passed UIGEA and expressly disclaimed any intent to modify existing gambling prohibitions. 31 U.S.C. § 5361(b). *Bob Jones* and *Corner Post* are inapposite because these cases did not involve the importation of definitions from a later-enacted statute that Congress expressly stated would not alter existing gambling laws. Any confusion here can be resolved by considering the Supreme Court's decision in *Murphy v. NCAA,* decided after the Wire Act, IGRA, UIGEA, and the 2010 amendments to the Commodity Exchange Act were passed. 584 U.S. 453, 479 (2018). There, the Supreme Court noted that "Congress can regulate sports gambling directly, but if it elects not to

do so, each State is free to act on its own." *Id.* In so noting, the Supreme Court cut off any hope the Gaming Racket has of arguing that amendment to the Commodity Exchange Act passed eight years earlier created a whole new system for regulating sports betting.

For the same reasons, the Nation has alleged 18 U.S.C. § 1955 liability. Section 1955 requires operation of an illegal gambling business under state or federal law. The Nation alleges that Kalshi's contracts constitute unlawful wagers under § 945.03, that the business involves multiple participants in managerial and operational roles, and that it operates continuously at substantial volume. (Doc. 1, ¶¶ 111-125.) Defendants cannot avoid these allegations by relying on on § 945.01(1)(a)(1) or CEA preemption, as the Nation alleged that these contracts are not swaps and could not be listed by a registered entity and there is no basis for the suggestion that these transactions are commodities. (Doc. 1, ¶¶ 46-48, 61, 120.)

### 3. The Nation Alleges Proximate Causation and Cognizable Injury.

The Nation has alleged a direct and legally cognizable injury under its civil RICO claim. A RICO plaintiff must allege "some direct relation between the injury asserted and the injurious conduct alleged." *Ratfield v. U.S. Drug Testing Lab'ys, Inc.*, 140 F.4th 849, 852 (7th Cir. 2025). "[A] claim is cognizable under [RICO] only if the defendant's alleged violation proximately caused the plaintiff's injury." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 462 (2006).

Under IGRA and with the Gaming Compact, the Nation has the exclusive right to conduct class III gaming, including sports betting, on its Indian lands. (Doc. 1, ¶ 168); 25 U.S.C. § 2710(d)(1). The Nation alleges that the Gaming Racket intentionally circumvented federal and state law to offer nationwide online sports betting, including self-certified sports event contracts explicitly prohibited by the CFTC and state regulators. (Doc. 1, ¶¶ 111–125.) In doing so, the Gaming Racket directly encroached upon and usurped the Nation's exclusive market, diverting

revenue that belongs to the Nation. (Doc. 1, ¶ 168.) No one is allowed to compete with the Nation and by doing so, the Gaming Racket directly violated the Nation's legally protected exclusive rights on its Indian lands, making the injury concrete and foreseeable as a matter of law.

Because the Nation has a legal monopoly on this revenue-generating activity, none of the cases Defendants cite to argue that the Nation's alleged injury is too attenuated apply. Defendants rely on cases finding that individual consumers' choices between competitors cannot be the basis for the direct harm necessary to prove an injury from a competitor's conduct. *See, e.g., Child's Health Def. v. Meta Platforms, Inc.*, 112 F.4th 742 (9th Cir. 2024) and *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258 (1992) (rejecting RICO claims because the alleged injury depended on independent third-party decisions, creating a highly attenuated causal chain); *see also Viehweg v. Ins. Programs Mgmt. Grp., LLC*, 2024 WL 4165078 (7th Cir. Sept. 12, 2024) (dismissing a RICO claim where the alleged harm was an uncertain expectancy). Defendants have failed to cite even one case in which an entity with a legal monopoly alleged harm because of the illegal encroachment on that monopoly.

The Nation does not allege an injury that could be contingent on consumer choice. Under § 2710(d)(1), consumers do not have lawful alternatives to gamble on the Nation's Indian lands outside the Nation's compacted rights. By unlawfully offering contracts in competition with a market only the Nation may lawfully serve, the Gaming Racket has caused the Nation injury that is the immediate and intended consequence of the Gaming Racket's unlawful conduct. No third-party decisions break the causal chain because the defendants' scheme itself produces the direct injury.

Additionally, Robinhood's argument that consumers are the correct plaintiffs mischaracterizes the nature of the alleged injury. While consumers may participate in the unlawful

gaming contracts, they are incidental, not intended victims. The harm RICO seeks to redress is not ordinary market losses and does not arise from a garden-variety business dispute; RICO instead seeks to redress a direct injury to the *business or property* like that suffered by the Nation. 18 U.S.C. § 1964(c); *see Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1025 (7th Cir. 1992); *see also Anza*, 547 U.S. at 458-60. Here, the Nation specifically alleges that the Gaming Racket offered illegal sports-related event contracts in direct competition with the Nation's Class III gaming operations, in violation of the Nation's exclusive rights under its Tribal-State Compact. (Doc. 1, ¶¶ 46–48, 64–66.) Under 25 U.S.C. § 2702, the Indian tribe is the primary beneficiary of its gaming operations, and the Nation's allegations show that revenue that otherwise would flow to the Nation was directly diverted, harming the Nation's statutory monopoly and affecting tribal governmental functions and services. (Doc. 1, ¶¶ 67–68.) With these allegations, the Nation demonstrates that it, and not the individual consumer, is the proper and direct victim under RICO.

## VI.    THE NATION ALLEGES FACTS SUFFICIENT TO STATE A CLAIM AGAINST ROBINHOOD MARKETS, INC. AND KALSHI, INC.

Contrary to the arguments of Kalshi and Robinhood, the Nation alleges facts sufficient to state a claim against both Robinhood Markets, Inc. and Kalshi, Inc. The Nation alleges claims against both. (Doc. 1, ¶ 3.) For example, the Nation alleges that consumers are placing "illegal bets using defendants Kalshi Inc. and KalshiEX LLC, ("Kalshi"), and Robinhood Markets, Inc. and Robinhood Derivatives LLC ("Robinhood")." (*Id.*) The Nation also alleges: "The above-named defendants are collectively referred to as "Defendants," making it clear that the allegations and claims, where they are not explicitly stated against a specific defendant, apply to all of the defendants. (Doc. 1, ¶ 14.)

The Nation agrees that parent corporations are not liable for the acts of their subsidiaries simply by virtue of their ownership, but the Nation does not rely on ownership as a basis for

liability for these parent entities. (Doc. 29 at 41; Doc. 32 at 28–29 (*citing Steven v. Roscoe Turner Aeronautical Corp.*, 324 F.2d 157 (7th Cir. 1963).) Because the Nation alleges, in the case of Kalshi, that the parents and subsidiaries are both conducting class III gaming on its Indian lands, among other things, and, in the case of Robinhood and Kalshi that both parents and defendants are violating RICO, Defendants cannot obtain dismissal on allegations not made.

In fact, the case on which Defendants rely to support their argument, *Steven*, was decided on summary judgments, not the motion to dismiss stage. *Steven*, 324 F.2d at 159. The court there relied on the undisputed evidence and applied an eleven-factor test, dependent on that evidence, to reach its conclusion. *Id.* (reviewing "corporate minutes and records of stockholders' meetings, federal income tax returns, [state] gross income tax returns, employment security returns to the [state], social security forms, annual corporate reports to the Secretary of the [state] and payroll records and [employee] timecards . . . .").

Regardless, the Nation does not allege that these parent entities are liable by virtue of being parents of liable subsidiaries. Defendants provide no authority for what they ask this Court to do— ignore the factual allegations in the Complaint and adopt their own. Instead, defendants again demand a pleading standard akin to a hypertechnical, code-pleading standard. *Cf. Iqbal*, 556 U.S. at 678 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era . . . ."). The Nation has done more than provide general allegations, it included Kalshi's advertisements where Kalshi—not KalshiEX LLC—tells consumers it offers "[t]he first Nationwide Legal Sports Betting Platform." (Doc. 1, ¶ 4.) The Nation alleged that Robinhood Markets, Inc. operates an investment platform on which consumers can trade stocks, ETFs, and other commodities, and Robinhood Derivatives LLC is a futures commission market, and that both partnered with Kalshi to allow consumers to participate in class III gaming on the Nation's Indian

41

lands. (Doc. 1, ¶¶ 12–13.) At this stage, the Court must accept these allegations as true, *Iqbal*, 556 U.S. at 663. With those allegations, the Nation has alleged more than is required to state a claim against all these entities.

## Conclusion

For the foregoing reasons, the Nations respectfully requests that this Court deny Defendants' Motions to Dismiss.

QB\168080.00083\100063686.1

Dated:  December 19, 2025                    */s/ Emily M. Feinstein*
_____

QUARLES & BRADY LLP
Emily M. Feinstein
Bryce A. Loken
33 East Main Street, Suite 900
Madison, WI 53703
Telephone: 608.251.5000
Facsimile: 608.251.9166
Emily.Feinstein@quarles.com
Bryce.Loken@quarles.com

THE LAW OFFICES OF RAPPORT AND
MARSTON
Lester J. Marston
Cooper M. DeMarse
405 West Perkins Street
Ukiah, CA 95482
Telephone: 707.462.6846
Facsimile: 707.462.4235
ljmarston@rmlawoffice.net

THE HO-CHUNK NATION
Michael P. Murphy, Legislative Counsel for
Ho-Chunk Nation
P.O. Box 667
Black River Falls, WI 54615
Telephone: 715.284.9343
Michael.Murphy@ho-chunk.com

Attorneys for Plaintiff HO-CHUNK
NATION