UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| HO-CHUNK NATION,<br><br>*Plaintiff,*<br><br>v.<br><br>KALSHI INC., KALSHIEX LLC, ROBINHOOD MARKETS, INC., ROBINHOOD DERIVATIVES LLC, AND DOES 1-20,<br><br>*Defendants.* | Case No. 3:25-cv-00698 |

**BRIEF OF INDIAN GAMING ASSOCIATION, NATIONAL CONGRESS OF AMERICAN INDIANS, WASHINGTON INDIAN GAMING ASSOCIATION, CALIFORNIA NATIONS INDIAN GAMING ASSOCIATION, ARIZONA INDIAN GAMING ASSOCIATION, OKLAHOMA INDIAN GAMING ASSOCIATION, NATIVE AMERICAN FINANCE OFFICERS ASSOCIATION, AND 16 FEDERALLY RECOGNIZED INDIAN TRIBES AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

The Indian Gaming Association ("IGA"), National Congress of American Indians ("NCAI"), Washington Indian Gaming Association ("WIGA"), California Nations Indian Gaming Association ("CNIGA"), Arizona Indian Gaming Association ("AIGA"), Oklahoma Indian Gaming Association ("OIGA"), Native American Finance Officers Association ("NAFOA"), and 16 federally recognized Indian Tribes ("Amici Tribes")[1] (collectively, "Tribal

---

[1] The Amici Tribes include: Agua Caliente Band of Cahuilla Indians; Elk Valley Rancheria; Jamul Indian Village of California; Karuk Tribe; Kickapoo Traditional Tribe of Texas; Lytton Rancheria; Mashantucket Pequot Tribal Nation; Mescalero Apache Tribe; Morongo Band of Mission Indians; Pechanga Band of Indians; Picayune Rancheria of Chukchansi Indians of California; Pokagon Band of Potawatomi Indians; Pueblo of Sandia; Seminole Tribe of Florida; Sycuan Band of Kumeyaay Nation; and Tunica-Biloxi Indian Tribe.

Amici") respectfully submit this brief in support of the Ho-Chunk Nation's ("Ho-Chunk" or "Nation") motion for preliminary injunction.

## STATEMENT OF INTEREST

As described more fully in their Motion for Leave to File Amicus Brief, IGA, NCAI, WIGA, CNIGA, AIGA, OIGA, NAFOA, and the Amici Tribes all have a shared, strong interest in this case because of its potential to have a significant impact on tribal sovereign rights regarding gaming on Indian lands. Tribal gaming revenue provides vital funding for essential government services, tribal programs, and economic development.

## ARGUMENT

Tribes, including Ho-Chunk, have primary and in some cases exclusive jurisdiction over their lands and all activities occurring thereon. Tribes are "separate sovereigns pre-existing the Constitution," or, in other words, "distinct, independent political communities, retaining their original natural rights," except where limited by treaties or Congressional action. *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978); *Worcester v. Georgia*, 31 U.S. 515, 559 (1832). Both Congress and the Supreme Court have long recognized this inherent sovereign right extends to conducting and regulating gaming on their Indian lands. *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 218–22 (1987); 25 U.S.C. § 2701(5). Thus tribes, like states, have a strong sovereign interest in determining what gaming activities may take place on their lands. *See* 25 U.S.C. § 2701(5).

In 1988, Congress enacted the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701 *et seq.*, to provide a comprehensive regulatory framework for tribal gaming, and "a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments," and to protect Indian

2

lands from organized crime. 25 U.S.C. §§ 2701(5), 2702(1)-(2). Through IGRA, many tribes have lifted entire generations out of poverty, and tribal gaming revenue provides critical funding to tribal, state, and local governments through revenue-sharing agreements, taxes, and economic stimulus. *See Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 810 (2014) (Sotomayor, J., concurring) ("[T]ribal gaming operations cannot be understood as mere profit-making ventures that are wholly separate from the Tribes' core governmental functions."). For tribes, gaming is not merely a "commercial" endeavor, but an existential one. *See Chicken Ranch Rancheria of Me-Wuk Indians v. California*, 42 F.4th 1024, 1032 (9th Cir. 2022) ("Class III gaming is not only a source of substantial revenue for tribes, but *the lifeblood on which many tribes ha[ve] come to rely*." (internal quotations and citations omitted, and emphasis added)).

      Among other things, IGRA prohibits class III gaming, including sports betting, on Indian lands unless three conditions are met: (1) it is authorized by the tribal government; (2) it is permitted in the state where the Indian lands are located; and (3) it is "conducted in conformance with a Tribal-State compact." 25 U.S.C. § 2710(d)(1); 25 C.F.R. § 502.4(c). Despite this, Defendants use their online platform to conduct sports betting nationwide, including on Ho-Chunk's tribal lands. Notably, they do not even bother to argue that their "sports event contracts" are not sports betting within the meaning of IGRA or the Nation's gaming ordinances. *See generally* ECF Nos. 29 & 32. This is probably for good reason. As the Nevada District Court recently found, Defendants' sports-betting contracts "are sports wagers and everyone who sees them knows it." *KalshiEX, LLC v. Hendrick*, No. 2:25-CV-00575-APG-BNW, 2025 WL 3286282, at *8 (D. Nev. Nov. 24, 2025).

      At bottom, Defendants argue that tribal sovereignty and Congress's "carefully crafted and intricate scheme [under IGRA]" cannot stop their brazenly illegal sports betting activities that

3

occur on the Nation's tribal lands. *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 73–74 (1996). Defendants' position is absurd. Tribes have inherent authority to conduct, regulate, and (importantly here) enjoin any class III gaming activity occurring on their lands, which was expressly recognized and codified within IGRA. Class III gaming—including sports betting and therefore Defendants' sports-betting activity—is only permitted on tribal lands when it is offered pursuant to a tribal-state compact and in accordance with any applicable tribal gaming ordinances. Neither the Nation's compact with Wisconsin ("Compact") nor its tribal gaming ordinance authorize Defendants' sports-betting activities. Accordingly, all class III gaming that occurs on the Nation's tribal lands that is *not* so authorized, including Defendants' sports-betting activity, is expressly prohibited and the Nation has the authority to enjoin it.[2]

Accordingly, the Nation's motion for preliminary injunction should be granted.

I. **Tribes Have the Inherent and Exclusive Authority to Conduct, Regulate, and Enjoin Class III Gaming that Occurs on Their Lands.**

Tribes have the inherent and exclusive sovereign authority to regulate gaming occurring on their tribal lands. Defendants attempt to avoid this fact by arguing that they are nonmembers and that tribes, including the Nation, generally lack authority over nonmembers. ECF No. 29 at *21–24; ECF No. 32 at *15–18. However, this sovereign authority was expressly recognized by both the Supreme Court in *Cabazon* and Congress in enacting IGRA. Specifically, Congress recognized that "Indian tribes have *the exclusive right to regulate gaming activity on Indian lands* if the gaming activity is not specifically prohibited by Federal law and is conducted within

---

[2] To the extent that Defendants argue their conduct is subject to the Commodity Futures Trading Commission's exclusive jurisdiction under the Commodity Exchange Act ("CEA"), or is otherwise exclusively governed by the Unlawful Internet Gambling Enforcement Act, Tribal Amici concur with and incorporate herein the arguments raised by the Nation in their motion. *See* ECF No. 38, at *22–29, 30–32.

a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity." 25 U.S.C. § 2701(5) (emphasis added). If tribes have "the exclusive right to regulate gaming" on their lands, they must then also have the power to regulate nonmembers' gaming activities occurring on their lands. To hold otherwise would create a jurisdictional void.

IGRA's legislative history confirms this understanding. In the floor debate on the bill that would become IGRA, Senator Evans explained that it was his "understanding that the bill leaves undisturbed the tribe's right to totally prohibit certain forms of gambling within an Indian reservation or upon trust lands outside the reservation should the tribe so choose." 134 Cong. Rec. 24025 (Sep. 15, 1988). Senator Inouye, the sponsor of the bill, stated that Senator Evans's understanding was correct and that "the bill is intended to leave intact the tribe's regulatory authority over all lands within the reservation boundaries and upon trust or restricted lands outside the boundaries [and to] … authorize a tribe to completely prohibit all or certain forms of gaming if they so desire." *Id.* These broad statements that tribes are able to "totally" and "completely" prohibit gaming, without reference to membership status, show congressional understanding and intent to maintain that tribes have the exclusive power to prohibit *any* gaming operations conducted on their tribal lands.

In accordance with this principle and under the terms of IGRA, the Nation has the right to sue in federal district court to enjoin class III gaming activity, including sports betting, that occurs on their lands when such activity violates a compact. *See* 25 U.S.C. § 2710(d)(7)(A)(ii) ("The United States district courts shall have jurisdiction over … any cause of action initiated by a State or Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted

5

in violation of any Tribal-State compact entered into under paragraph (3) that is in effect.").[3] Thus, IGRA expressly "permits a suit by either the tribe or a state to enjoin illegal class III gaming." *Stockbridge-Munsee Cmty. v. Wisconsin*, 922 F.3d 818, 822 (7th Cir. 2019); *see also* S. Rep. 100-446, 18 (Aug. 3, 1988) (explaining Congress's understanding that IGRA "[g]rants United States district courts jurisdiction over actions by … a tribe or state to enjoin illegal gaming on Indian lands."); *cf. Cayuga Nation v. New York State Gaming Comm'n*, 2025 WL 2161290, at *2–8 (N.D.N.Y. July 30, 2025) (finding that court may have equitable jurisdiction to hear tribe's claim that state illegally operated and regulated lottery games on tribal lands in violation of IGRA when tribe did not have a gaming compact, despite determining IGRA did not provide the tribe with a private right of action to pursue such violations). A gaming activity that occurs outside the scope of or exceeds what is authorized by a tribe's compact necessarily violates that compact.

Tribes have successfully sued to prevent illegal class III gaming on their lands precisely because of the lack of any compact provision allowing the gaming. *See Coeur d'Alene Tribe v. Idaho*, 842 F. Supp. 1268, 1282 (D. Idaho 1994) (finding in favor of tribe on claim that Idaho's state lottery operated illegally on tribal lands when not authorized by compact), *aff'd,* 51 F.3d 876 (9th Cir. 1995).[4] The National Indian Gaming Commission ("NIGC") has likewise

---

[3] If there is any ambiguity as to tribes' authority to enjoin class III gaming conducted on their tribal lands in violation of IGRA (there is not), the well-established canons of Indian construction require that this Court interpret any ambiguity to the benefit of the Nation. *See, e.g.*, *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985) ("[S]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit ….").

[4] At least one federal court declined to follow the *Coeur d'Alene* decision's holding that a tribe could bring suit to bar a state from offering lotteries on its Indian lands in violation of IGRA. *See Confederated Tribes and Bands of Yakama Indian Nation v. Lowry*, 968 F. Supp. 531, 533–35 (E.D. Wash. 1996), *vacated on other grounds, Confederated Tribes and Bands of Yakama*

recognized this authority. *See* NIGC Office of General Counsel, Legal Opinion re: Sales of Washington State Lottery tickets & games on Tribal Trust lands at 7 (Oct. 16, 2017), available at https://www.nigc.gov/wp-content/uploads/2025/02/WashStateLottery.pdf ("Indian gaming remains an expression of tribal sovereignty, and Indian tribes may remain the primary regulators of gaming activities on Indian lands. As such, within IGRA's regulatory structure, tribes may license and regulate gaming operations on Indian lands owned by non-tribal entities and individuals."); *see also* NIGC Office of General Counsel, Legal Opinion re: Tribal jurisdiction over gaming on fee land at White Earth Reservation at 7 (Mar. 14, 2005), available at https://www.nigc.gov/wp-content/uploads/2024/12/56_whiteearthbandofchippewaindns.pdf ("Lacking compacts, neither the tribes nor, more to the point, the State could conduct a lottery on the reservations, the court concluded." (citing *Coeur d'Alene*, 842 F. Supp. at 1282)).

Moreover, the congressional purpose and structure of IGRA support the Nation's authority to bring actions against illegal third-party gaming operations. First, IGRA is intended to "promot[e] tribal economic development, self-sufficiency, and strong tribal governments; … to shield [Indian lands gaming] from organized crime … [, and] to ensure that the Indian tribe is the primary beneficiary of the gaming operation …." 25 U.S.C. § 2702(1)–(2). These purposes (particularly Congress's intent to ensure that tribes are the primary beneficiaries of gaming on

---

*Indian Nation v. Locke*, 176 F.3d 467 (9th Cir. 1999). However, that court primarily disagreed with the *Coeur d'Alene* decision on the basis that IGRA did not support the tribe's attempt to regulate a state-operated gaming activity, not the lack of a compact, and even observed that IGRA's policy and provisions seem to provide greater support for tribes asserting jurisdiction over "gaming activity conducted by non-tribal entities, other than states." *Id.* at 536; *see also id.* (IGRA's "policy concerns are not implicated by State-operated gaming activity to the same extent as by gaming activity conducted by other non-tribal entities …. Presumably, the state lottery, unlike gaming activity conducted by other non-tribal entities, is much less susceptible to the corrupting influence of organized crime which Congress especially feared in regard to Indian gaming activity.").

7

their tribal lands) would be completely undermined if IGRA, despite flatly prohibiting unauthorized class III gaming, had no mechanism to allow a tribe to prevent illegal non-tribal class III gaming operations from siphoning revenue or bringing in organized crime. *Id.* § 2710(d)(1). Thus, this Court should avoid any interpretation that precludes tribes from enjoining illegal class III gaming. *New York State Dep't of Soc. Svcs. V. Dublino*, 413 U.S. 405, 419–20 (1973) ("We cannot interpret federal statutes to negate their own stated purposes.").

## II. Defendants' Class III Gaming Activity is Prohibited on Ho-Chunk's Tribal Lands.

IGRA provides that class III gaming activities, including sports betting, that occur on Indian lands "shall be lawful" only if they are conducted in conformance with a tribal-state compact and tribal gaming ordinances. 25 U.S.C. § 2710(d)(1); *see* 25 C.F.R. § 502.4(c). Here, Defendants' sports-betting contracts are unlawful because they comply with neither requirement: they are conducted on the Nation's tribal lands without authorization by either the Compact or the Nation's tribal gaming ordinances. The Nation, therefore, has the right to enjoin Defendants' activity.

### A. Defendants' Sports-Betting Activities Takes Place on the Nation's Indian Lands.

Defendants attempt to argue that IGRA is irrelevant to their sports betting activities because their online activities do not take place on the Nation's Indian lands as defined by IGRA.[5] *See* ECF No. 29, at *14–16; ECF No. 32, at *11–12. This is flatly wrong. As an initial matter, operating over the internet does not allow Defendants to supersede or evade ordinary

---

[5] IGRA defines "Indian Lands" as: "all lands within the limits of any Indian reservation" and "any lands title to which is either held in trust by the United States for the benefit of any Indian tribe …." 25 U.S.C. § 2703(4). All the Nation's lands upon which it conducts gaming activities is owned by the United States in trust for the Nation.

jurisdictional principles. *See, e.g.*, *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1123-27 (W.D. Pa. 1997). Nor does the fact that Defendants' servers are physically located outside of Indian lands mean that their conduct does not occur on Indian lands. Interjurisdictional gaming using telecommunications has been regulated for over a hundred years and a firm principle has emerged: the gaming occurs at least at the location where the bettor is at the time the bet is placed, unless the relevant laws provide otherwise. *See Ames v. Kirby*, 59 A. 558, 559 (N.J. Sup. Ct. 1904); *State v. Maloney*, 39 So. 539, 545 (La. 1905); *State v. Rose*, 105 P. 82, 85-86 (Mont. 1909).

This principle is also present in federal law, where federal gaming statutes specify that interjurisdictional gaming is only legal where it is legal in both the origin and destination jurisdictions. *See, e.g.*, 18 U.S.C. § 184(a)–(b); 15 U.S.C. § 3002(3). For example, the Unlawful Internet Gaming Enforcement Act ("UIGEA") clarifies that transactions involving bets that are illegal "in the State or Tribal lands in which the bet or wager is *initiated, received, or otherwise made*" are prohibited when made via the internet. 31 U.S.C. § 5362(10)(A) (emphasis added).[6]

---

[6] Defendants correctly acknowledge that UIGEA provides an exception to its definition of "bet or wager" for transactions occurring on designated contract market ("DCM") exchanges, such as Kalshi. 31 U.S.C. § 5362(1)(E)(ii). However, contrary to what Defendants argue, UIGEA does not supersede IGRA as it pertains to their sports-betting activity, nor does this same exception apply to IGRA. It is therefore inapposite to the determination of *where* a bet or wager occurs for purposes of IGRA.

Moreover, UIGEA does not displace IGRA's requirements for class III gaming conducted on Indian lands. UIGEA is a non-substantive, payment-processing law that Congress narrowly tailored to prohibit using certain kinds of financial transactions to fund gaming that is already unlawful—it neither creates any substantive prohibitions for gaming itself nor supersedes other gaming laws. *See* 31 U.S.C. § 5361(b) (directing that UIGEA should not "be construed as altering, limiting, or extending any Federal or … Tribal-State compact prohibiting, permitting, or regulating gambling within the United States."); *California v. Iipay Nation of Santa Ysabel*, 898 F.3d 960, 965 (9th Cir. 2018) ("In effect, the UIGEA prevents using the internet to circumvent existing state and federal gambling laws, but it does not create any additional substantive prohibitions.").

Further, this principle is expressed in IGRA. Where class III gaming is considered to occur depends on "the stuff involved in playing class III games." *Bay Mills*, 572 U.S. at 792. Here, the activity is sports betting, which necessarily requires at least two parties. As the bettor's activity is essential to the gaming, the gaming occurs at least where the bettor is physically located.[7] *See, e.g.*, *Iipay Nation*, 898 F.3d at 967 (holding that, where tribe offers internet gaming allowing bets to be placed from outside of Indian lands "at least some of the 'gaming activity' … does not occur on Indian lands"); *S. Ute Indian Tribe v. Polis*, no. 1:24-cv-01886, slip op. at 7-8 (D. Colo. Oct. 23, 2025) (same). Consistent with the right of tribes to regulate gaming occurring on their lands, *see* 25 U.S.C. § 2701(5), IGRA's implementing regulations also require the consent of any tribe on whose lands the bettor is located regarding allocations of jurisdiction over internet gaming transactions, *see* 25 C.F.R. § 293.26(c).

Some cases have held that tribal jurisdiction does not apply where tribes conduct online business with nonmembers. However, those cases are distinguishable because they analyze whether tribal jurisdiction is justified, not the location of gaming under IGRA. *See Jackson v. Payday Fin., LLC*, 764 F.3d 765, 782 (7th Cir. 2014); *Stifel v. Lac Du Flambeau Band of Lake Superior Chippewa Indians*, 807 F.3d 184, 207–08 (7th Cir. 2015); *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 769 F.3d 105, 115 (2d Cir. 2014). Moreover, even accepting them as applicable, those cases still support a finding that Defendants' gaming activity here occurs on Indian lands because they indicate that online commercial activity occurs where

---

[7] It is, of course, possible for online wagers to be treated as occurring somewhere other than the player's physical location, but such treatment requires statutory authorization. *See, e.g.*, 25 C.F.R. § 293.26; *West Flagler Assocs., Ltd. v. Haaland*, 71 F.4th 1059, 1061–62, 1066 (D.C. Cir. 2023), *cert. denied*, 144 S. Ct. 2671 (2024) (holding that IGRA allows states and tribes to "allocate jurisdiction" over the regulation of internet gaming conducted by a tribe throughout the state, including on its Indian lands). Nothing here provides such deeming authority for Defendants' sports bets.

the consumer (i.e., the bettor) is located. *See, e.g.*, *Jackson*, 764 F.3d at 782; *Otoe-Missouria*, 769 F.3d at 108.

Thus, Defendants' activities occur on Indian lands, regardless of their physical location, because they offer their sports bets to and engage with bettors physically located on Indian lands.

> **B.     Defendants' Sports-Betting Activity is not Authorized in Accordance with IGRA.**

Further, Defendants' sports-betting activity is not authorized by either the Compact or the Nation's tribal gaming ordinance. First, the Compact necessarily prohibits Defendants' sports betting activities because it authorizes only the Nation to conduct class III gaming on the Nation's lands, thereby prohibiting all others from doing so. Compact §§ IV.A, VI. The Northern District of California's differing interpretation of similar, though not identical, compact language in *Blue Lake Rancheria v. Kalshi Inc.* is not persuasive because the court failed to apply the general rule of contract interpretation that contracts are presumed to be entered with relevant, applicable laws in mind. *See Fla. E. Coast Ry. Co. v. CSX Transp., Inc.*, 42 F.3d 1125, 1129 (7th Cir. 1994) ("Contracts are presumed to be written in contemplation of the existing applicable law. Specifically, parties are assumed to have contracted with reference to those statutory provisions that relate to the subject matter of their contract." (citations omitted)).

Crucially, as discussed, IGRA provides that class III gaming on Indian lands is illegal unless actively authorized by a compact. 25 U.S.C. § 2710(d)(1)(C). Against this backdrop principle, the Compact's specific authorization of only the Nation to conduct class III gaming is paramount. Compact § IV.A. Moreover, that Defendants' conduct is prohibited is only further emphasized by the "application of the rule of *expressio unius est exclusio alterius* … [which] 'instructs that when certain matters are mentioned in a contract, other similar matters are not mentioned were intended to be excluded.'" *Delta Min. Corp. v. Big Rivers Elec. Corp.*, 18 F.3d

11

1398, 1405 (7th Cir. 1994) (quoting *Plumbers and Steamfitters Local 150 v. Vertex Constr. Co.*, 932 F.2d 1443, 1449 (11th Cir. 1991)). Accordingly, because the Compact authorizes only the Nation to conduct class III gaming, it necessarily means that it prohibits all other entities from doing so. Thus, while the Compact does not list Defendants by name, it still expressly prohibits their sports-betting operations.[8]

Not only does the Compact *not* authorize Defendants' sports-betting activity, it *cannot* authorize Defendants' sports-betting activity because IGRA requires that the Nation have the sole proprietary interest and be the primary beneficiary of all gaming conducted pursuant to the Compact. 25 U.S.C. §§ 2710(b)(2)(A)–(B), 2701(2); 25 C.F.R. § 522.7(c). Defendants are private, for-profit companies; the Nation, therefore, does not have the sole proprietary interest in Defendants' gaming activity conducted on its lands, let alone *any* interest in Defendants' gaming activity conducted on its lands.

---

[8] Defendants argue they can do on Indian lands what so many tribes either prohibit or cannot do themselves. For example, both the Oneida Nation and Forest County Potawatomi Community prohibit people under the age of 21 from engaging in class III gaming at their gaming facilities. *See* Sportsbook Rules of Play, Oneida Casino Hotel, available at https://oneidacasinohotel.com/sportsbook-rules-of-play/ (last visited Jan. 6, 2026); Code of Conduct, Potawatomi Casino Hotel House Rules, available at https://www.potawatomi.com/casino/house-rules (last visited Jan. 6, 2026). In California, where wagering on the outcome of sporting events is prohibited, no tribe may operate or allow sports wagering on its Indian lands under a class III gaming compact. *See, e.g.*, Tribal State Compact Between the State of California and the Santa Ynez Band of Chumash Indians at § 3 (Dec. 17, 2015), available at https://www.bia.gov/sites/default/files/dup/assets/as-ia/oig/pdf/508_compliant_2015.12.23_santa_ynez_band_of_chumash_indians_tribal_state_gaming_compact.pdf. Despite these prohibitions, an 18-year-old who is physically located on the Indian lands of the Oneida Nation, the Forest County Potawatomi Community, or any tribe in California can use Kalshi's app to wager on sporting events. Congress has not granted Defendants greater power to conduct and regulate gaming on Indian lands than tribes inherently possess.

Second, the Nation's tribal gaming ordinance also prohibits Defendants' gaming activity. Specifically, the Nation's tribal gaming ordinance expressly prohibits class III gaming that is not authorized by the Compact. *See* 5 HCC § 5(A), ECF No. 41-6 at 12. It further prohibits any gaming for which the Nation does not have the sole proprietary interest or responsibility. *Id.* § 6(A). Here, as discussed, Defendants' sports-betting activity is neither authorized by the Nation's Gaming Ordinance nor its Compact, which incorporates the provisions of the Gaming Ordinance. Defendants' sports-betting activity is therefore prohibited by the Nation's tribal gaming ordinance.

Accordingly, because the Compact does not (and, indeed, cannot) authorize Defendants' sports-betting activity that occurs on the Nation's tribal lands and the Nation's tribal gaming ordinance expressly prohibit it, Defendants' sports-betting activity is unlawful. As such, the Nation has the authority to enjoin Defendants' conduct from occurring on their tribal lands.

## CONCLUSION

For the foregoing reasons, the Tribal Amici respectfully request that the Court grant the Nation's motion for preliminary injunction.

DATED: January 6, 2026

Respectfully submitted,

/s/ Joseph H. Webster
Joseph H. Webster (*pro hac vice* pending)
Elizabeth A. Bower
Jens W. Camp (*pro hac vice* pending)
Hobbs, Straus, Dean & Walker LLP
1899 L Street NW, Suite 1200
Washington, DC 20036
(202) 822-8282
jwebster@hobbsstraus.com
ebower@hobbsstraus.com
jcamp@hobbsstraus.com

*Counsel for Tribal Amici*