# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

HO-CHUNK NATION,

       *Plaintiff*,

    v.

KALSHI INC., KALSHIEX LLC,
ROBINHOOD MARKETS, INC.,
ROBINHOOD DERIVATIVES LLC, AND
DOES 1-20,

       *Defendants*.

Case No. 3:25-cv-00698

## BRIEF IN SUPPORT OF KALSHI DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## <u>TABLE OF CONTENTS</u>

I.    Preliminary Statement ............................................................................................. 1

II.   Background ............................................................................................................. 3

III.  Argument ............................................................................................................... 6

    A.    Legal Standard ............................................................................................ 6

    B.    Plaintiff Fails to Establish a Likelihood of Success Under IGRA (Count I) ................. 7

        1.    Plaintiff Lacks a Statutory Right of Action Under IGRA ........................................ 7

            a.    Kalshi Has Not Violated Plaintiff's Compact With the State of Wisconsin ............................................................................... 8

            b.    Plaintiff Cannot Establish That Kalshi Is Conducting Class III Gaming Activity Located on Indian Lands ............................ 13

        2.    UIGEA Confirms That Congress Did Not Intend for Tribes to Use IGRA to Regulate Transactions Conducted on DCMs ...................... 15

        3.    Plaintiff's Allegations of Noncompliance with the CEA Are Irrelevant and Incorrect ............................................. 18

            a.    Congress Gave the CFTC Exclusive Jurisdiction Over Trading on DCMs ............................................................... 19

            b.    Kalshi's Event Contracts Are Subject to UIGEA's Carveout for "Transactions" Conducted on DCMs ............................. 20

            c.    Kalshi's Event Contracts Are Not Prohibited by the CEA ............ 20

            d.    Plaintiff's Challenge to Kalshi's Event Contracts Amounts to an Improper Collateral Attack on the CFTC ......................... 22

    C.    Plaintiff Fails to Establish a Likelihood of Success Under the Lanham Act (Count V) ............................................................ 23

        1.    Plaintiff Lacks Standing Under the Lanham Act ............................... 24

        2.    Plaintiff Cannot Establish Falsity ........................................... 28

        3.    Plaintiff Cannot Establish Materiality, Deception, or Injury .................. 32

    D.    Plaintiff Will Not Suffer Irreparable Harm Absent a Preliminary Injunction .............. 33

    E.    The Balance of Equities Does Not Favor a Preliminary Injunction ...................... 37

    F.    A Preliminary Injunction Would Not Be in the Public Interest ......................... 42

IV.   Conclusion ............................................................................................................. 43

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                       **Page(s)**

*AbbVie v. Inc. v. Payer Matrix, LLC*,
   2025 WL 1101610 (N.D. Ill. Apr. 14, 2025) ........................................................36

*Akerman v. Nw. Mut. Life Ins. Co.*,
   2025 WL 1431927 (7th Cir. May 19, 2025) ..........................................................7

*Alabama v. PCI Gaming Auth.*,
   801 F.3d 1278 (11th Cir. 2015) ...........................................................................22

*Amoco Prod. Co. v. Gambell*,
   480 U.S. 531 (1987)..............................................................................................37

*Bd. of Forensic Document Exam'rs v. Am. Bar Ass'n*,
   922 F.3d 827 (7th Cir. 2019) ...............................................................................29

*Bidi Vapor, LLC v. Vaperz LLC*,
   543 F. Supp. 3d 619 (N.D. Ill. 2021) ..................................................................32

*Big Lagoon Rancheria v. California*,
   789 F.3d 947 (9th Cir. 2015) ..........................................................................22, 23

*Blue Lake Rancheria v. Kalshi, Inc.*,
   2025 WL 3141202 (N.D. Cal. Nov. 10, 2025) ............................................. *passim*

*California v. Cabazon Band of Mission Indians*,
   480 U.S. 202 (1987)................................................................................................9

*California v. Iipay Nation of Santa Ysabel*,
   898 F.3d 960 (9th Cir. 2018) ..........................................................1, 14, 16, 17

*Cayuga Nation v. New York State Gaming Comm'n*,
   775 F. Supp. 3d 651 (N.D.N.Y. 2025)..................................................................9

*Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*,
   162 F.4th 631 (6th Cir. 2025) ..............................................................................39

*City of Duluth v. Fond du Lac Band of Lake Superior Chippewa*,
   702 F.3d 1147 (8th Cir. 2013) .............................................................................22

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*,
   173 F.3d 725 (9th Cir. 1999) ...............................................................................32

*Comanche Nation v. United States*,
   393 F. Supp. 2d 1196 (W.D. Okla. 2005) ............................................................35

*Commonwealth v. Biden*,
    57 F.4th 545 (6th Cir. 2023) ................................................................. 11

*Conn. Nat'l Bank v. Germain*,
    503 U.S. 249 (1992) ........................................................................... 12

*Cousins v. Sec'y of U.S. Dep't of Transp.*,
    880 F.2d 603 (1st Cir. 1989) ........................................................... 22, 23

*Craig v. Pepperidge Farm, Inc.*,
    2008 WL 4280154 (S.D. Ind. Sep. 15, 2008) ........................................ 34

*CSX Transp., Inc. v. Easterwood*,
    507 U.S. 658 (1993) ........................................................................... 19

*Data Rsch. & Handling, Inc. v. Vongphachanh*,
    278 F. Supp. 3d 1066 (N.D. Ind. 2017) ............................................... 29

*Democratic Nat'l Comm. v. Bostelmann*,
    447 F. Supp. 3d 757 (W.D. Wis. 2020) (Conley, J.) ............................... 42

*DM Trans, LLC v. Scott*,
    38 F.4th 608 (7th Cir. 2022) ............................................................... 34

*Doe v. Univ. of S. Ind.*,
    43 F.4th 784 (7th Cir. 2022) ........................................................... 7, 28

*Douglas v. Indep. Living Ctr. of S. Cal., Inc.*,
    565 U.S. 606 (2012) ........................................................................... 23

*Duct-O-Wire Co. v. U.S. Crane, Inc.*,
    31 F.3d 506 (7th Cir. 1994) ............................................................... 39

*EEOC v. Karuk Tribe Hous. Auth.*,
    260 F.3d 1071 (9th Cir. 2001) ........................................................... 35

*Effex Cap., LLC v. Nat'l Futures Ass'n*,
    933 F.3d 882 (7th Cir. 2019) ............................................................. 15

*Endo USA, Inc. v. Baxter Healthcare Corp.*,
    2025 WL 2829864 (N.D. Ill. May 15, 2025) ......................................... 36

*Fiskars Finland Oy Ab v. Woodland Tools Inc.*,
    2024 WL 3936444 (W.D. Wis. Aug. 26, 2024) ............................ 24, 26, 33

*Florida v. Seminole Tribe of Fla.*,
    181 F.3d 1237 (11th Cir. 1999) ......................................................... 11

*Food Mktg. Inst. v. Argus Leader Media,*
    588 U.S. 427 (2019).................................................................................12

*FTC v. Qualcomm, Inc.,*
    935 F.3d 752 (9th Cir. 2019) ..................................................................39

*Girl Scouts of Manitou Council v. Girl Scouts of United States of Am., Inc.,*
    549 F.3d 1079 (7th Cir. 2008) ................................................................42

*Graham v. Med. Mut. of Ohio,*
    130 F.3d 293 (7th Cir. 1997) ..................................................................33

*Ho-Chunk, Inc. v. Sessions,*
    894 F.3d 365 (D.C. Cir. 2018) ................................................................16

*Hornell Brewing Co. v. Rosebud Sioux Tribal Ct.,*
    133 F.3d 1087 (8th Cir. 1998) ...........................................................14, 15

*Hot Wax, Inc. v. Turtle Wax, Inc.,*
    191 F.3d 813 (7th Cir. 1999) .............................................24, 31, 32, 33

*Jackson v. PayDay Fin., LLC,*
    764 F.3d 765 (7th Cir. 2014) ......................................................14, 15, 35

*Jenkins v. Heintz,*
    124 F.3d 824 (7th Cir. 1997) ..................................................................18

*Jordan v. Wolke,*
    593 F.2d 772 (7th Cir. 1978) ..............................................................7, 33

*K.C. v. Individual Members of Med. Licensing Bd. of Ind.,*
    121 F.4th 604 (7th Cir. 2024) ..................................................1, 6, 24, 25

*KalshiEX LLC v. CFTC,*
    2024 WL 4164694 (D.D.C. Sep. 12, 2024) .......................................22, 41

*KalshiEX LLC v. Flaherty,*
    2025 WL 1218313 (D.N.J. Apr. 28, 2025) .........................................19, 37

*KalshiEX LLC v. Hendrick,*
    2025 WL 3286282 (D. Nev. Nov. 24, 2025) .............................................20

*Knox v. Am. Fam. Ins. Co.,*
    2025 WL 1137222 (W.D. Wis. Apr. 10, 2025) (Conley, J.)................8, 10, 12

*Lexington Ins. Co. v. Smith,*
    117 F.4th 1106 (9th Cir. 2024) ...............................................................15

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014) ...........................................................................24, 27, 28, 29

*Life Spine, Inc. v. Aegis Spine, Inc.*,
  8 F.4th 531 (7th Cir. 2021) ...................................................................................43

*Mays v. Dart*,
  974 F.3d 810 (7th Cir. 2020) ...........................................................................6, 24

*Menominee Tribal Enters. v. Solis*,
  601 F.3d 669 (7th Cir. 2010) .........................................................................16, 35

*Merrion v. Jicarilla Apache Tribe*,
  455 U.S. 130 (1982) ..............................................................................................16

*Michigan v. Bay Mills Indian Cmty.*,
  572 U.S. 782 (2014) ....................................................................................... *passim*

*Michigan v. U.S. Army Corps of Eng'rs*,
  667 F.3d 765 (7th Cir. 2011) ...........................................................................7, 34

*MillerCoors, LLC v. Anheuser-Busch Cos., LLC*,
  385 F. Supp. 3d 730 (W.D. Wis. 2019) (Conley, J.).............................................33

*Montana v. United States*,
  450 U.S. 544 (1981) ..............................................................................................13

*Nat'l Inst. of Fam. & Life Advocates v. Raoul*,
  685 F. Supp. 3d 688 (N.D. Ill. 2023) ...................................................................31

*NLRB v. Little River Band of Ottawa Indians Tribal Gov't*,
  788 F.3d 537 (6th Cir. 2015) .....................................................................16, 35, 36

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015)...............................................................................................29

*Oneida Nation v. Vill. of Hobart*,
  371 F. Supp. 3d 500 (E.D. Wis. 2019), *rev'd and remanded on other grounds*,
  968 F.3d 664 (7th Cir. 2020) ...............................................................................37

*Paul Davis Restoration, Inc. v. Everett*,
  2014 WL 7140038 (E.D. Wis. Dec. 12, 2014) .....................................................29

*Prairie Band of Potawatomi Indians v. Pierce*,
  253 F.3d 1234 (10th Cir. 2001) ...........................................................................35

*Promatek Indus., Ltd. v. Equitrac Corp.*,
  300 F.3d 808 (7th Cir. 2002) ...............................................................................39

*QVC Inc. v. Your Vitamins, Inc.*,
   439 F. App'x 165 (3d Cir. 2011) ..............................................................26, 31, 32

*Rice v. Bd. of Trade of Chi.*,
   331 U.S. 247 (1947) ................................................................................................19

*Roland Mach. Co. v. Dresser Indus., Inc.*,
   749 F.2d 380 (7th Cir. 1984) ...............................................................................42

*Sampson v. Murray*,
   415 U.S. 61 (1974) ..................................................................................................34

*San Manuel Indian Bingo & Casino v. NLRB*,
   475 F.3d 1306 (D.C. Cir. 2007) ............................................................................36

*South Carolina v. Catawba Indian Tribe, Inc.*,
   476 U.S. 498 (1986) ................................................................................................16

*Spicer v. Chicago Bd. of Options Exch., Inc.*,
   977 F.2d 255 (7th Cir. 1992) .................................................................................22

*Stifel, Nicolaus & Co. v. Lac Courte Oreilles Band of Lake Superior Chippewa
   Indians*,
   807 F.3d 184 (7th Cir. 2015) .........................................................................13, 35

*Stockbridge-Munsee Cmty. v. Wisconsin*,
   922 F.3d 818 (7th Cir. 2019) ............................................................................9, 12

*In re Sw. Airlines Voucher Litig.*,
   799 F.3d 701 (7th Cir. 2015) .................................................................................12

*TNT Amusements, Inc. v. Torch Elec., LLC*,
   2025 WL 947506 (E.D. Mo. Mar. 28, 2025) .......................................................31

*Tohono O'Odham Nation v. Schwartz*,
   837 F. Supp. 1024 (D. Ariz. 1993) ......................................................................35

*U-Haul Intern, Inc. v. Jartran, Inc.*,
   522 F. Supp. 1238 (D. Ariz. 1981) ......................................................................28

*United States v. Nordic Vill., Inc.*,
   503 U.S. 30 (1992) ..................................................................................................18

*Ute Indian Tribe of Uintah & Ouray Rsrv. v. Utah*,
   790 F.3d 1000 (10th Cir. 2015) ............................................................................35

*West Flagler Assocs. v. Haaland*,
   573 F. Supp. 3d 260 (D.D.C. 2021) .....................................................................26

*Winter v. Nat. Res. Def. Council,*
   555 U.S. 7 (2008) ....................................................................................1, 6, 37

*Wisconsin v. Ho-Chunk Nation,*
   478 F. Supp. 2d 1093 (W.D. Wis. 2007) ...............................................8, 10

*Wojciechowicz v. Garland,*
   77 F.4th 511 (7th Cir. 2023) ...........................................................................10

*Yazoo & Miss. Valley R.R. Co. v. Thomas,*
   132 U.S. 174 (1889) .........................................................................................11

**Statutes**

5 U.S.C. § 551 ............................................................................................................23

5 U.S.C. § 702 ............................................................................................................23

5 U.S.C. § 706 ............................................................................................................23

7 U.S.C. § 1a ......................................................................................................20, 41

7 U.S.C. § 2 ..............................................................................................2, 10, 19, 41

7 U.S.C. § 5 ................................................................................................................42

7 U.S.C. § 6 ................................................................................................................41

7 U.S.C. § 7 ................................................................................................................41

7 U.S.C. § 7a-2 ..........................................................................................5, 20, 21, 22

7 U.S.C. § 8 ................................................................................................................40

15 U.S.C. § 1116 ........................................................................................................36

25 U.S.C. § 2701 ........................................................................................................11

25 U.S.C. § 2702 ..........................................................................................................9

25 U.S.C. § 2703 ..................................................................................................11, 14

25 U.S.C. § 2706 ........................................................................................................14

25 U.S.C. § 2710 ..................................................................................................*passim*

31 U.S.C. § 5361 ........................................................................................................16

31 U.S.C. § 5362 ......................................................................................2, 15, 17, 20

9 HCC § 945.01 ...........................................................................................4, 14, 30, 41

Wis. Stat. § 409.102 (2018) .................................................................................. *passim*

Wis. Stat. § 945.01 (2017) ..........................................................................4, 14, 30, 40

**Other Authorities**

17 C.F.R. § 38.3 ...........................................................................................................41

17 C.F.R. § 38.5 .............................................................................................................5

17 C.F.R. § 38.150 (2012) ...........................................................................................39

17 C.F.R. § 38.151 (2012) ...........................................................................................39

17 C.F.R. § 38.255 (2012) ...........................................................................................40

17 C.F.R. § 40.11 ................................................................................................ *passim*

120 Cong. Rec. 30464 (1974) ......................................................................................19

Antonin Scalia & Brian Garner, *Reading Law: The Interpretation of Legal Texts*
(2012) .......................................................................................................................11

*Cayuga Nation v. New York State Gaming Comm'n*,
No. 5:24-cv-00537 (N.D.N.Y.), ECF No. 82 ................................................... 9-10

CFTC Staff Ltr. No. 25-36 at 2 (Sep. 30, 2025), *available at*
https://www.cftc.gov/csl/25-36/download ................................................................40

Compl., *SocialSphere, Inc. v. Chavez*,
No. 25-cv-2557 (Mass. Super. Ct.), Dkt. No. 1 (Oct. 15, 2025).............................25

*Concept Release*, 73 Fed. Reg. 25,669, 25,672 (May 7, 2008) ..................................20

Grant Harvey, *Meta's $72B Superintelligence Bet is Building a Future that Could
Kill Its Own Apps*, The Neuron (July 30, 2025),
https://www.theneuron.ai/explainer-articles/metas-72b-superintelligence-bet-
is-building-a-future-that-could-kill-its-own-apps ....................................................32

*Hearings Before the H. Comm. on Agric.*, 93d Cong. (1973).........................................1

*Hearings Before the S. Comm. on Agric. & Forestry*, 93d Cong., 2d Sess. (1974) .................1, 15

James Royal, *Options vs. stocks: Which one is better for you?*, Yahoo! Finance
(Aug. 25, 2025), https://finance.yahoo.com/news/options-vs-stocks-one-
better-210539982.html................................................................................................32

Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent
   L. Rev. 657 (1982) ......................................................................................................15

NYSE, "Designated Market Makers," *available at*
   www.nyse.com/publicdocs/nyse/markets/nyse/designated_market_makers.pdf ...................22

## I.    Preliminary Statement

By this motion, Plaintiff asks the Court to enjoin Kalshi, a nationwide, federally regulated derivatives exchange located in New York City, from making sports event contracts available to persons located on Plaintiff's tribal lands in Wisconsin.  This is an "extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008); *see also K.C. v. Individual Members of Med. Licensing Bd. of Ind.*, 121 F.4th 604, 613 (7th Cir. 2024).  And the only court to consider the claims at issue here—that Kalshi has violated the Indian Gaming Regulatory Act ("IGRA") and the Lanham Act—declined to enter an equivalent preliminary injunction in a decision that goes unmentioned in Plaintiff's brief.  *Blue Lake Rancheria v. Kalshi, Inc.*, 2025 WL 3141202 (N.D. Cal. Nov. 10, 2025).  The *Blue Lake Rancheria* court was right to do so:  if Plaintiff were correct that it is entitled to such relief, then so too would be the approximately 280 other Indian tribes around the country who operate casinos, making a mockery of Congress's decision in 1974 to "[b]ring[] all futures trading under federal regulation" and "prevent any possible conflicts over jurisdiction."[1]

But Plaintiff is not correct.  IGRA does not afford Plaintiff a right of action to enforce IGRA in the manner it attempts; that law only empowers states or tribes to enjoin "violations" of a tribal-state compact, which is not possible here because—as Plaintiff concedes—Kalshi is not a party to such a compact.  Even if it were possible, Plaintiff's claim collides with Congress's decision to exclude from tribal gaming oversight any transactions on contract markets designated by the Commodity Futures Trading Commission ("CFTC"), or "DCMs."  In enacting IGRA in 1988, Congress did not contemplate nationally available online wagering activity; the statute on which Plaintiff relies is "silent" on the issue.  *California v. Iipay Nation of Santa Ysabel*, 898 F.3d

---

[1] *Hearings Before the S. Comm. on Agric. & Forestry,* 93d Cong., 2d Sess. 848 (1974); *Hearings Before the H. Comm. on Agric.*, 93d Cong. 121 (1973).

960, 968 (9th Cir. 2018).  But years later, the Unlawful Internet Gambling Enforcement Act ("UIGEA") addressed the issue head on.  It determined that, although state or tribal law would generally govern "bets or wagers" where they are "initiated," that would not be the case with respect to "any transaction conducted on a [DCM]."  31 U.S.C. § 5362(1)(E)(ii).  In UIGEA, Congress expressly carved out such transactions in furtherance of the preemptive effect of the Commodity Exchange Act ("CEA"), which gives the CFTC "exclusive jurisdiction" over trading on DCMs like Kalshi.  7 U.S.C. § 2(a)(1)(A).  As the *Blue Lake Rancheria* court held, when IGRA is read together with the CEA and UIGEA, it is inconceivable that Congress intended to afford tribes parallel regulatory jurisdiction over the nation's derivatives markets.  2025 WL 3141202, at *7.  IGRA thus provides no basis for an injunction.

Nor is Plaintiff likely to succeed on its Lanham Act claim.  Plaintiff accuses Kalshi of misleading consumers in social media posts that refer to sports event contracts as "sports betting."  Yet Plaintiff's **whole theory** is that Kalshi is, in fact, engaged in sports betting.  *E.g.*, Mov. Br. 5 (header reading "Kalshi Conducts Sports Betting").  Plaintiff cannot succeed on a false advertising claim by pointing to ads that say Kalshi offers the same thing that Plaintiff says it offers.  Nor is Plaintiff likely to succeed on its claim that it is a "false statement of fact" for Kalshi to advertise that it offers "any activity that is 50 state legal [sic]."  Mov. Br. 32.  As the *Blue Lake Rancheria* court explained, "it is not 'literally or facially false' to advertise 'Sports Betting is Legal in all 50 States on Kalshi' or variations of that representation."  2025 WL 3141202, at *2.

Having waited four months after filing its Complaint to seek injunctive relief, Plaintiff makes no showing of the kind of imminent, irreparable harm that would justify the extraordinary remedy it asks the Court to enter, including a sweeping injunction that would prohibit Kalshi from advertising **any** of its products (not just sports event contracts) as legal.  Indeed, at times,

Plaintiff—which does not offer any sports gaming products at all—suggests that Kalshi should be prohibited from offering sports event contracts not just "on," but also "near" its Indian lands. Compl., Prayer for Relief ¶ 5. But the alleged harm Plaintiff claims to its "monopoly" is speculative, unsupported, and in any event monetary in nature, precluding equitable relief. The motion highlights a supposed affront to Plaintiff's sovereignty, but its cited cases involve clashes between ***actual sovereigns***—states and tribes—not the operations of a private business.

The other factors before the Court also weigh heavily against a preliminary injunction. It is Kalshi that will suffer irreparable harm if the Court enters the requested injunction, which would impose significant, unrecoverable costs upon Kalshi; cause severe disruption to its business and damage to its goodwill and reputation; expose Kalshi to serious regulatory risks; and undermine the uniform scheme of federal regulation Congress painstakingly established in the CEA. The motion should be denied.

## II.     Background

Kalshi incorporates by reference its moving and reply briefs in support of Kalshi's motion to dismiss (ECF Nos. 29, 60), including the legal background and argument regarding the claims at issue in this motion. *See* ECF No. 29 at 4-10, 11-21, 28-32; ECF No. 60 at 3-13, 19-25.

Plaintiff is a federally recognized Indian tribe with land spread across fourteen counties in Wisconsin. Kalshi Defendants' Response to Plaintiff Ho-Chunk Nation's Findings of Fact ("FOF") ¶¶ 1, 5; Greendeer Decl. ¶¶ 7, 8. Plaintiff operates multiple brick-and-mortar casinos offering class III gaming on its lands. FOF ¶¶ 9, 27; Mudd Decl. ¶ 3. Plaintiff claims to have maintained a "monopoly" on class III gaming on its lands since 1992. Mov. Br. 4, 55. Class III gaming includes event wagering, which is defined in Plaintiff's gaming compact with the State of Wisconsin (the "Compact") as "accepting wagers on the outcomes of, and occurrences within, sports and non-sports games, competitions, and matches." Mudd Decl. ¶ 4; Mudd Ex. E at 3. That

Compact is an agreement between Plaintiff and Wisconsin. FOF ¶ 12. Plaintiff's statutes, which are "modeled" upon Wisconsin's statutes, expressly carve out contracts traded on DCMs like Kalshi from the definition of "bet." 9 HCC § 945.01(1)(a)(1) (excluding commodities contracts from definition of "bet"); Ex. A (Ho-Chunk Nation Supreme Court Order) (noting Ho-Chunk Nation criminal code, including HCC § 945, is "modeled from the Wisconsin Criminal Code");[2] Wis. Stat. § 945.01(1)(a)(1) (2017) (same exclusion for commodities contracts from definition of "bet"); Wis. Stat. § 409.102(1)(dm) (2018) (defining commodities contracts as contracts traded on DCMs pursuant to federal commodities law).

Kalshi operates a federally regulated exchange—known colloquially as a "prediction market"—where users can trade event contracts based on the outcome of real-world events. FOF ¶ 34; Sottile Decl. ¶¶ 2, 6-7. In 2020, the CFTC unanimously designated Kalshi as a DCM. Compl. ¶ 69; Ex. B. In doing so, it affirmed that Kalshi's platform complied with the CEA and the CFTC regulations promulgated thereunder, and subjected Kalshi to ongoing regulation by the CFTC. Ex. B. Since then, Kalshi has offered a variety of event contracts relating to climate, technology, health, popular culture, economics, politics, and, more recently, sports. FOF ¶¶ 36-41; Exs. C-F. Kalshi self-certified the sports event contracts at issue here pursuant to Section 7a-2(c)(1) of the CEA. FOF ¶¶ 36-41; Ex. G. These certifications contain extensive information for the CFTC's review, including in confidential appendices not available to the public. Sottile Decl. ¶¶ 15-17; *see* Exs. C-F.

On January 22, 2025, Kalshi self-certified the first of many sports event contracts now available on its exchange. Sottile Decl. ¶ 14; FOF ¶ 36. Shortly after, the CFTC requested that

---

[2] "Ex. __" refers to exhibits to the Declaration of Karen Wong, dated January 20, 2026, filed herewith.

Kalshi submit a "demonstration of compliance" with the CEA pursuant to 17 C.F.R. § 38.5(b). Sottile Decl. ¶ 18. Kalshi responded with memoranda detailing the listing's compliance with applicable rules and regulations and the CFTC's jurisdiction over sports event contracts traded on DCMs. *Id.* The CEA authorizes the CFTC to "determine" that particular event contracts "involve" certain enumerated activities (including "gaming") and are "contrary to the public interest." 7 U.S.C. § 7a-2(5)(C). A CFTC regulation promulgated thereunder provides a process for this public interest review. 17 C.F.R. § 40.11. To date, the CFTC has not conducted such a review of any of Kalshi's sports event contracts. Sottile Decl. ¶¶ 19-20.

On August 20, 2025, Plaintiff commenced this action. Compl. On November 21, 2025, Defendants moved to dismiss Plaintiff's Complaint. ECF Nos. 28, 31.

The Complaint mirrors an action filed in July 2025 in the Northern District of California—brought by the same counsel and raising virtually identical claims against the same defendants—on behalf of three tribes. *See* Compl., *Blue Lake Rancheria v. Kalshi, Inc.*, No. 3:25-cv-06162 (N.D. Cal. July 22, 2025). In September 2025, plaintiffs moved for a preliminary injunction in that case. In November 2025, the *Blue Lake Rancheria* court denied plaintiffs' request, finding no likelihood of success on the merits because (1) UIGEA confirms Congress's intent to exempt transactions conducted on DCMs from otherwise applicable gaming laws; and (2) Kalshi's advertisements were nonactionable statements of opinion. 2025 WL 3141202, at *2-3, *6. Plaintiffs have appealed. *Blue Lake Rancheria v. Kalshi, Inc.*, No. 25-07504 (9th Cir. filed Nov. 25, 2025).

On December 17, 2025, four months after filing suit, Plaintiff moved for a preliminary injunction on two of the five claims advanced in the Complaint—the IGRA claim (Count I) and Lanham Act claim (Count V). ECF No. 37. Plaintiff's brief fails to mention the *Blue Lake*

*Rancheria* ruling. Plaintiff submitted fifty-six proposed findings of fact and five declarations, including one from a purported expert. ECF Nos. 39-44. On December 31, the Court denied Kalshi's request for expedited discovery relating to the preliminary injunction motion, noting that it "may be decided on purely legal grounds." ECF No. 48. While Kalshi agrees that this motion can be decided on legal grounds, it respectfully requests oral argument in connection with the motion in light of the complexity of the issues. If the Court determines that the motion requires resolution of disputed facts, Kalshi respectfully reiterates its request for expedited discovery and an evidentiary hearing. *See* ECF No. 46.

## III. Argument

### A. Legal Standard

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. It is "never awarded as of right." *Id.* at 24. A party "seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20; *K.C.*, 121 F.4th at 613. The analysis for granting a preliminary injunction is "even more searching" where the movant seeks a mandatory preliminary injunction—one requiring that the defendant act rather than maintenance of the status quo. *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020). Mandatory injunctions are "ordinarily cautiously viewed and sparingly used." *Id.* (citation omitted).

A movant must make a "strong showing that it is likely to succeed on the merits," making this factor a "significant burden." *K.C.*, 121 F.4th at 614 (citation omitted). The party must "demonstrate how [it] proposes to prove the key elements of its case." *Id.* Courts must "find in the record the necessary definitive support to justify the granting of . . . preliminary mandatory

relief." *Jordan v. Wolke*, 593 F.2d 772, 774 (7th Cir. 1978).  In assessing the movant's showing, courts "do not accept [its] allegations as true, nor do [courts] give [the movant] the benefit of all reasonable inferences." *Doe v. Univ. of S. Ind.*, 43 F.4th 784, 791 (7th Cir. 2022).  Similarly, courts "do not give [the movant] the benefit of conflicting evidence," but rather "approach the record from a neutral and objective viewpoint, assessing the merits as [they] think they are likely to be decided after more complete discovery and litigation." *Id.* at 791-92.

The likelihood of success on the merits and demonstration of irreparable harm are "threshold factors, which, if not satisfied, doom a plaintiff's request for injunctive relief." *Akerman v. Nw. Mut. Life Ins. Co.*, 2025 WL 1431927, at *1 (7th Cir. May 19, 2025).  Whether a movant shows it faces irreparable harm "takes into account how urgent the need for equitable relief really is." *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 788 (7th Cir. 2011).

### B.  Plaintiff Fails to Establish a Likelihood of Success Under IGRA (Count I)

### 1.  Plaintiff Lacks a Statutory Right of Action Under IGRA

Plaintiff cannot succeed on the merits of its IGRA claim because it lacks a statutory right of action to pursue such a claim.  As relevant here, IGRA authorizes a narrow cause of action permitting states or tribes to enjoin (1) class III gaming located on Indian lands that is (2) conducted in violation of a tribal-state compact.  25 U.S.C. § 2710(d)(7)(A)(ii); *see also Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 795 & n.6 (2014).  Neither prong is met here. The preliminary injunction motion should be denied on this basis alone.  *Blue Lake Rancheria*, 2025 WL 3141202, at *5-7 (denying preliminary injunction motion on grounds that plaintiffs had not shown that Kalshi violated a tribal-state compact).

**a.** *Kalshi Has Not Violated Plaintiff's Compact With the State of Wisconsin.*

As set forth more fully in Kalshi's motion to dismiss (ECF No. 29 at 11-16), Plaintiff lacks a statutory right of action because IGRA permits suits only for violations of a tribal-state compact. 25 U.S.C. § 2710(d)(7)(A)(ii); *Blue Lake Rancheria*, 2025 WL 3141202, at *5. Kalshi cannot violate a tribal-state compact because it is not a party to one; compacts bind the states and tribes who enter into them, as IGRA spells out. Indeed, Plaintiff's own proposed findings of fact acknowledge as much. FOF ¶ 12 ("The Gaming Compact is an agreement between two sovereigns, the State of Wisconsin and the Nation . . . ."). Plaintiff's arguments to the contrary are unavailing.

*First*, Kalshi is not a party to Plaintiff's Compact, which is a contract between the tribe and the state. *Wisconsin v. Ho-Chunk Nation*, 478 F. Supp. 2d 1093, 1098 (W.D. Wis. 2007), *aff'd in part*, *vacated in part*, 512 F.3d 921 (7th Cir. 2008). Kalshi cannot "violate" a contract to which it never agreed to be bound. *Knox v. Am. Fam. Ins. Co.*, 2025 WL 1137222, at *5 (W.D. Wis. Apr. 10, 2025) (Conley, J.) ("[A] contract cannot bind a nonparty."). And in any event, Plaintiff has not identified a provision of that contract that Kalshi has purportedly violated. Instead, Plaintiff invokes provisions that only govern tribal conduct "operated under this Compact[.]" Mov. Br. 16 (citing Mudd Ex. A at § VI). As in *Blue Lake Rancheria*, the compact language cited by Plaintiff speaks only to the tribe's conduct and is "silent" as to third parties. 2025 WL 3141202, at *5.

Plaintiff does not cite a single decision that expands Section 2710(d)(7)(A)(ii) to reach nonparty conduct, and Kalshi has found none. And Seventh Circuit precedent does just the opposite, **narrowing** cognizable claims under Section 2710(d)(7)(A)(ii) to include only those alleging compact violations that relate to the specific matters that may be negotiated in a compact between a tribe and a state. *Ho-Chunk Nation*, 512 F.3d at 933-34. Plaintiff concedes as much by citing *Bay Mills*, which describes compacts as "provid[ing] remedies for breach of the agreement's

terms[.]"   572 U.S. at 785.    And the Seventh Circuit's narrow construction of Section 2710(d)(7)(A)(ii) is consistent with Congress's aims in enacting IGRA, which was a response to Supreme Court precedent holding that states could not regulate gaming on Indian lands. *Bay Mills*, 572 U.S. at 794 (citing *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 221-22 (1987)).  In IGRA, Congress sought to recalibrate and to "provide a statutory basis for the operation of gaming by Indian tribes[,]" 25 U.S.C. § 2702(1), by setting out a unique blend of federal, state, and tribal oversight.  Congress did not provide an open-ended invitation for states or tribes to wield IGRA against persons who are neither parties to a compact nor delegated any responsibilities pursuant to a compact.

In attempting to justify application of Section 2710(d)(7)(A)(ii) to a third party such as Kalshi, Plaintiff mischaracterizes the Seventh Circuit's opinion in *Stockbridge-Munsee Cmty. v. Wisconsin*, 922 F.3d 818 (7th Cir. 2019).  Mov. Br. 19.  That case involved a tribe's alleged breach of *its own* compact, not a breach of a compact by a non-tribal third party.  Indeed, the court was particularly skeptical of tribal-state compacts being used by one tribe to protect against competition from another, let alone against a non-tribal nonparty to the compact.  *Stockbridge-Munsee*, 922 F.3d at 821 ("The Act's provisions concern rights that tribes may assert against states and circumstances under which states may block gaming that tribes want to offer.  But none of the Act's substantive rules seems to protect one tribe from competition by another.").  Plaintiff's reliance on *Cayuga Nation v. New York State Gaming Comm'n*, 775 F. Supp. 3d 651 (N.D.N.Y. 2025), fares no better.  Mov. Br. 18.  There was no tribal-state compact in effect in that case.  And while it is the only case Kalshi has located in which a tribal plaintiff sued a third party under Section 2710(d)(7)(A)(ii), that third party was voluntarily dismissed from the suit.  *See Cayuga*

*Nation v. New York State Gaming Comm'n*, No. 5:24-cv-00537 (N.D.N.Y.), ECF No. 82 (stipulating to dismissal of defendant Jackpocket Inc. with prejudice).

Plaintiff claims that a compact has a dual character as both "a private contract" and a "regulatory device," such that the parties "breach" the contract, while nonparties "violate" the "regulatory device."  Mov. Br. 18.  The Court should reject these abstractions.  Section 2710(d)(3)(C)(v), which Plaintiff cites in support of its purported "breach/violation" dichotomy, merely provides that a compact may include provisions relating to "remedies for breach [of contract]."  That language helps Kalshi, not Plaintiff.  It reflects Congress's understanding that "a compact is a contract, subject to the ordinary rules of contract construction."  *Ho-Chunk Nation*, 478 F. Supp. 2d at 1098.  Plaintiff, again, has no answer for the well-settled principle that "a contract cannot bind a nonparty."  *Knox*, 2025 WL 1137222, at *5.

***Second***, Plaintiff contends that its Compact should be treated similarly to federal regulations.  Mov. Br. 17-18.  This is tantamount to saying that Plaintiff has the authority to regulate Kalshi, which is neither a tribal member nor a tribal licensee.  Even if the Court were to entertain some notion of the Compact giving Plaintiff regulatory authority over nonmember third parties, the CEA preempts other "regulatory law" when it comes to trading on DCMs like Kalshi.  *Wojciechowicz v. Garland*, 77 F.4th 511, 518 (7th Cir. 2023) ("[W]here agency regulations conflict with statutory text, statutory text wins out every time.").  In fact, that is ***exactly*** what the CEA does to an actual "federal regulatory law"—the federal securities laws referenced in its exclusive jurisdiction provision.  7 U.S.C. § 2(a)(1)(A) ("***Except as hereinabove provided*** [regarding contracts traded on DCMs], nothing contained in this section shall . . . supersede or limit ***the jurisdiction at any time conferred on the Securities and Exchange Commission*** . . . .") (emphasis added).  Although Congress provided a structure for states and tribes to agree on

regulating class III gaming, the compact is the mechanism for them to agree on regulation—it is not the regulation itself. Congress expressly laid out a limited right of action in Section 2710 and limited it to violations of compacts, which Plaintiff has not shown here. *Florida v. Seminole Tribe of Fla.*, 181 F.3d 1237, 1245-46 & n.13 (11th Cir. 1999) (Section 2710(d)(7)(A)(ii) provides limited right of action); *Cayuga Nation*, 2025 WL 2161290, at *3-4 (same); *cf. Bay Mills*, 572 U.S. at 787 n.2 (noting that Section 2710(d)(7)(A)(ii), while not limiting federal jurisdiction, "may indicate that a party has no statutory right of action").

Plaintiff repeatedly claims, citing Congress's introductory findings, that IGRA gave tribes the "exclusive right to regulate gaming activity on Indian lands." *E.g.*, Mov. Br. 11-12 (citing 25 U.S.C. § 2701(5)), 17-18. But here, too, Plaintiff is wrong—Congress's "findings" merely reflect the circumstances that led it to enact the law, and do not confer any powers of their own. *See Yazoo & Miss. Valley R.R. Co. v. Thomas*, 132 U.S. 174, 188 (1889) ("[A]s the preamble is no part of the act, and cannot enlarge or confer powers, nor control the words of the act, unless they are doubtful or ambiguous, the necessity of resorting to it to assist in ascertaining the true intent and meaning of the legislature is in itself fatal to the claim set up."); *Commonwealth v. Biden*, 57 F.4th 545, 551 (6th Cir. 2023) ("[A] congressional expression of purpose has as much real-world effect as a congressional expression of apology." (quoting Antonin Scalia & Brian Garner, *Reading Law: The Interpretation of Legal Texts*, 217 (2012))). And in fact, IGRA only confers "exclusive" jurisdiction on tribes over class I gaming (defined as "traditional forms of Indian gaming," 25 U.S.C. § 2703(6)). *Compare* 25 U.S.C. § 2710(a)(1) (giving tribes "exclusive jurisdiction" over class I gaming), *with id.* § 2710(d) (providing for regulation of class III gaming involving tribal, state, and federal roles).

**Third**, Plaintiff seeks to justify its request for an injunction under Section 2710(d)(7)(A)(ii) by pointing to instances where Congress has created both criminal enforcement and civil enforcement actions.  Mov. Br. 19.  But the issue is not what Congress **can** do, but what it **actually has** done.  The relevant question is whether Section 2710(d)(7)(A)(ii) provides a broad-ranging "civil cause of action," as Plaintiff contends (Mov. Br. 19), or whether it hinges on unlawful class III gaming activity that violates a compact.  The statute unambiguously requires the latter.

**Fourth**, Plaintiff's attempt to collapse "unauthorized" into "in violation of" fails for the same reasons the *Blue Lake Rancheria* court rejected it, 2025 WL 3141202, at *5, and because the Supreme Court has recognized that unauthorized gaming is distinct from gaming that violates the terms of a compact.[3]  *Bay Mills*, 572 U.S. at 795 n.6.  That is why the Seventh Circuit treats compacts as contracts governed by ordinary contract principles, and it is why this Court has reiterated that contracts do not bind nonparties.  *See Stockbridge-Munsee*, 922 F.3d at 822-24; *Knox*, 2025 WL 1137222, at *5.  Plaintiff's reliance on language stating that "[n]o person or entity" may conduct gaming without a license underscores the point, because that language appears in Plaintiff's **gaming ordinance** (the "Ordinance"), not the Compact.[4]  *See* ECF No. 41-6 § 4.B.  The Compact refers to a "Gaming Code," and the Ordinance itself distinguishes the "Gaming Code"

---

[3] Reading "violation" to mean "unauthorized," as Plaintiff proposes, would render the latter superfluous.  *Bay Mills*, 572 U.S. at 795 n.6; *see also In re Sw. Airlines Voucher Litig.*, 799 F.3d 701, 710 (7th Cir. 2015).  Plaintiff attempts to "muddy" that clear statutory language by referring to legislative history, but courts have rejected such attempts to supplant the statute (as Plaintiff does (Mov. Br. 17) with preambulatory findings.  *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019); *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992).

[4] Plaintiff asserts that the Compact incorporates the Ordinance by reference.  Mov. Br. 3.  This is yet another error.  The cited provision states that the Compact incorporates the "Gaming Code" by reference.  ECF No. 41-1, § XXII.  The Compact does not define the term "Gaming Code," but Plaintiff's Ordinance makes clear that the Gaming Code is something different from the Ordinance.  *See* ECF No. 41-6, § 5.B (Ordinance requiring that "[t]he Nation shall adopt within its Gaming Code provisions prohibiting gaming by persons employed by the Nation at any site of employment").

from the Ordinance, refuting any suggestion that a violation of the Ordinance is a violation of the Compact. *See* ECF No. 41-1 § XXII; ECF No. 41-6 § 5.B.

*Fifth*, Plaintiff recognizes that its sovereign authority over nonmembers is severely restricted except in the narrowest of circumstances not present here, as set forth in *Montana v. United States*, 450 U.S. 544 (1981), and its progeny. But Plaintiff argues that it can nevertheless assert a claim against Kalshi because IGRA "expressly delegated" authority to tribes that supersedes such "previous[]" restrictions. Mov. Br. 12. For at least two reasons, this argument fails: (1) the limited right of action that IGRA provides does not confer roving jurisdiction on tribes to assert claims against nonmembers, and (2) as the Seventh Circuit has held, tribal attempts to exert regulatory authority over nonmembers under IGRA are still very much subject to *Montana*'s limitations. *Stifel, Nicolaus & Co. v. Lac Courte Oreilles Band of Lake Superior Chippewa Indians*, 807 F.3d 184, 207-09 (7th Cir. 2015) (applying *Montana* framework and concluding tribe had no authority to enforce IGRA against a nonmember).

### b. Plaintiff Cannot Establish That Kalshi Is Conducting Class III Gaming Activity Located on Indian Lands.

In addition to requiring violations of a compact, the cause of action supplied by Section 2710(d)(7)(A)(ii) also requires that a defendant be engaged in a "class III gaming activity" that is "located on Indian lands." Plaintiff has shown neither.

Kalshi is a DCM that offers trading of event contracts on its exchange pursuant to the CFTC's exclusive jurisdiction. *See Blue Lake Rancheria*, 2025 WL 3141202, at *7. It operates from its headquarters in New York City and has no operations or personnel located on Plaintiff's lands. Sottile Decl. ¶ 2. Nevertheless, Plaintiff attempts to recast this trading on an exchange as "class III gaming," claiming that certain of these event contracts amount to "sports betting" under Plaintiff's Compact and Wisconsin law. Mov. Br. 20-21. Of course, "sports betting" is understood

to be within the category of class III gaming.  25 U.S.C. § 2703(8) (class III gaming is "all forms of gaming that are not class I gaming or class II gaming"); *see id.* §§ (6), (7)(A).  But that does not help Plaintiff here, because both Wisconsin law **and Plaintiff's own laws** exclude derivatives trading on DCMs—and thus the very transactions at issue here—from the definition of gaming. Wisconsin law expressly exempts trading on a designated contract market from state gambling prohibitions.  *See* Wis. Stat. § 945.01(1)(a)1 (2017) ("bet" does not include "contracts for the purchase or sale at a future date of securities or other commodities"); Wis. Stat. § 409.102(dm)(1) (2018).  Plaintiff's criminal code does the same.  9 HCC § 945.01(1)(a)(1) (Ho-Chunk criminal code defining "bet" to exclude "[c]ontracts for the purchase or sale at a future date of securities or other commodities").

Nor can Plaintiff satisfy IGRA's geographic predicate because trading on Kalshi's exchange is not "located on Indian lands."  IGRA's text and structure show that "on Indian lands" refers to the operation of brick-and-mortar gaming facilities on tribal territory.  The statute repeatedly uses the term "conduct" in connection with "place, facility, or location," confirming its focus on physical operations (and not nationwide internet platforms like Kalshi).  *See* 25 U.S.C. §§ 2706(b)(1)-(2), 2710(b)(1)(B), 2710(d)(1)(B).  The Supreme Court has emphasized that "everything" in IGRA regulates gaming on Indian lands "and nowhere else."  *Bay Mills*, 572 U.S. at 795.  As for conduct over the internet, courts have recognized IGRA's silence on the matter and looked to UIGEA to fill the gap.  *Iipay Nation*, 898 F.3d at 964 n.6, 968; *Blue Lake Rancheria*, 2025 WL 3141202, at *6.[5]

---

[5] In related contexts, courts have held that internet touchpoints alone are insufficient to constitute conduct on Indian lands.  *See Hornell Brewing Co. v. Rosebud Sioux Tribal Ct.*, 133 F.3d 1087, 1093 (8th Cir. 1998) (online advertisements viewed by tribal members did not constitute conduct on Indian lands for tribal jurisdiction purposes); *Jackson v. PayDay Fin., LLC*, 764 F.3d 765, 768-

### 2. UIGEA Confirms That Congress Did Not Intend for Tribes to Use IGRA to Regulate Transactions Conducted on DCMs.

This dispute arises at the intersection of three federal statutes—IGRA, UIGEA, and the CEA. Each of IGRA and UIGEA address gaming activity: IGRA regulates the conduct of gaming activity "*on* Indian lands"—that is, gaming operations physically conducted on tribal lands, like poker tables or slots; UIGEA regulates "bets or wagers" that can be placed via the internet in a state or reservation where it is unlawful. And the CEA is a comprehensive federal commodities regulation, which arose as Congress's direct response to a growing body of state law that treated commodities and futures trading as unlawful gaming activity. *See Hearings Before the S. Comm. on Agric. & Forestry*, 93d Cong., 2d Sess. 848 (1974); Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 700 (1982); *Effex Cap., LLC v. Nat'l Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019) ("[A] catalyst for the significant amendments to the Commodity Exchange Act was a fear that, without increased federal regulation, the states would regulate the futures markets to a chaotic effect."). For that reason, when Congress passed UIGEA, it explicitly carved out the distinct category of transactions that occur *on a DCM* pursuant to the CEA from its definition of "bets or wagers." 31 U.S.C. § 5362(1)(E)(ii). UIGEA highlighted Congress's continued judgment that trading on DCMs should be regulated under the CEA, with a single federal regulator—the CFTC—overseeing trading on derivatives markets and not through

---

69 (7th Cir. 2014) (tribal members' use of the internet to offer loans to nonmembers did not constitute conduct on Indian lands for tribal jurisdiction purposes); *Lexington Ins. Co. v. Smith*, 117 F.4th 1106, 1110-11 (9th Cir. 2024) (denying petition for rehearing *en banc*) (noting that neither *Hornell* nor *Jackson*, involving activity conducted purely over the internet, "involved tribal land").

federal or state gaming laws.[6]  *See, e.g.,* ECF No. 29 at 16-18.  *Blue Lake Rancheria* neatly

summarizes that point:

> Since it is undisputed Kalshi is a registered entity under the
> Commodity Exchange Act, and that its transactions are conducted
> on the Kalshi internet site, its internet contracts are not bets or
> wagers under the UIGEA and therefore do not constitute "unlawful
> internet gambling" even if the contracts are received, placed or
> transmitted from persons on Indian lands where internet gambling
> is illegal.

2025 WL 3141202, at *6.  In response, Plaintiff notes a "rule of construction" in UIGEA providing

that the statute "shall not be construed as altering, limiting, or extending" any federal or state law

or state-tribal compact concerning gambling, and argues that Kalshi's construction would result in

a prohibited alteration.  Mov. Br. 31-32 (citing 31 U.S.C. § 5361(b)).  The court in *Blue Lake*

*Rancheria* rejected the identical argument.  2025 WL 3141202, at *6.  This Court should, too,

because UIGEA's carveout for transactions conducted on DCMs does none of those things.

UIGEA does not alter IGRA at all.  Kalshi's position is not that UIGEA "implied[ly]

repeal[ed]" a decision that had been made through IGRA to regulate gaming conducted nationally

over the internet.  Mov. Br. 31.  Rather, the point is that, when Congress passed IGRA, it did not

***consider*** that issue at all because, as the Ninth Circuit recognized in *Iipay Nation*, the internet had

not been introduced to the public yet.  898 F.3d at 964 n.6 ("We note that Congress passed IGRA

---

[6] Plaintiff suggests that the CEA should not apply because it is immune from statutes of general applicability.  Mov. Br. 13 (citing *Menominee Tribal Enters. v. Solis*, 601 F.3d 669, 671 (7th Cir. 2010)).  But the rule is that, when silent, statutes of general applicability ***do*** apply to Indian tribes. *NLRB v. Little River Band of Ottawa Indians Tribal Gov't*, 788 F.3d 537, 551 (6th Cir. 2015) (citing *Menominee*, 601 F.3d at 674).  And none of the exceptions set forth in *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 141 (1982), apply here.  *See infra* Section III.D.  Plaintiff further contends that the Indian canon of construction means that the CEA does not apply to it.  Mov. Br. 12-13.  But "this canon applies only to statutes that are both ambiguous and passed for the benefit of Indian tribes," *Ho-Chunk, Inc. v. Sessions*, 894 F.3d 365, 369 n.4 (D.C. Cir. 2018), and does not "permit disregard of the clearly expressed intent of Congress" to confer exclusive jurisdiction over DCMs on the CFTC.  *See South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498, 506 (1986).

in 1988—a few years before the internet became publicly available. . . . [T]he statute nowhere referenced the internet, or other networking capabilities that reach beyond Indian lands."); *see also Blue Lake Rancheria*, 2025 WL 3141202, at *6 ("The UIGEA, unlike IGRA, expressly addresses internet gaming that can be accessed in locations where such gaming is unlawful, *including Indian lands.*") (emphasis in original) (citing 31 U.S.C. § 5362(10)).  UIGEA's carveout does not alter or limit anything in IGRA because it addresses a matter—transactions conducted online—not covered in IGRA at all.  When Congress **did** address the issue through UIGEA, it chose to exempt DCM-based transactions altogether.  Plaintiff simply pretends that this carveout does not exist and entirely ignores the *Blue Lake Rancheria* decision rejecting the very same argument Plaintiff tries to advance here.[7]

UIGEA does not alter Wisconsin law or the Compact either.  As Plaintiff has already conceded, Wisconsin law exempts derivatives trading from its gaming statute.  While Plaintiff tries to argue that the exemption does not extend to event contracts (ECF No. 45 at 12-13), that too is wrong.  Wisconsin law defines "commodity contract[s]" to include contracts that are "[t]raded on . . . a board of trade that has been designated as a contract market for such a contract pursuant to federal commodities laws."  Wis. Stat. § 409.102(dm)(1) (2018).  That definition applies squarely to Kalshi's sports event contracts.  Sottile Decl. ¶ 2; FOF ¶ 34; Compl. ¶ 69.  Kalshi is not arguing that UIGEA alters state law.  On the contrary, UIGEA's carveout fits the existing statutory scheme perfectly.

---

[7] Plaintiff's effort (Mov. Br. 30) to spin *Iipay Nation* in its favor falls flat.  That case involved an inverse fact pattern—a tribe ran an internet gambling business from servers on its own lands for players located off reservation.  898 F.3d at 962.  The Ninth Circuit acknowledged what UIGEA said on the matter—that bets or wagers are deemed to occur where they are "initiated."  *Id.* at 968.  In so holding, the court found that UIGEA did not alter IGRA precisely because IGRA was "silent" on internet gambling.  *Id.*

As for the Compact, the only provision that Plaintiff identifies as being "altered" by Kalshi's reading of UIGEA is one that governs ***the tribe's*** conduct, not Kalshi's. Mov. Br. 16 (citing Section VI of the Compact, which prohibits the tribe from authorizing, permitting, or licensing class III gaming by other persons). Kalshi's reading of UIGEA has no effect on that provision of the Compact, because compacts govern the rights and obligations of the parties, not third parties. *Blue Lake Rancheria*, 2025 WL 3141202, at *6 (rejecting the argument that Kalshi's reading of UIGEA would impermissibly "alter[]" or "limit[]" the governing compact because the identified provisions by their terms applied only to the tribe's conduct).

Plaintiff's argument also proves too much. Every state with legalized gaming subjects it to state licensing regimes. If Congress's exclusion of on-DCM transactions from the definition of "bet or wager" would "alter" state or tribal law, then there would be no circumstance in which the carveout would have effect—Plaintiff's preferred reading of UIGEA's "rule of construction" would always override it. That is not a tenable interpretation. *Jenkins v. Heintz*, 124 F.3d 824, 833 (7th Cir. 1997) ("It is an elementary canon of construction that a statute should be interpreted so as not to render one part inoperative.") (citation modified); *United States v. Nordic Vill., Inc.*, 503 U.S. 30, 36 (1992) (declining to adopt construction that would violate the "settled rule that a statute must, if possible, be construed in such fashion that every word has some operative effect").

### 3. Plaintiff's Allegations of Noncompliance with the CEA Are Irrelevant and Incorrect.

Plaintiff contends that it can proceed under IGRA because Kalshi has not complied with the CEA and CFTC regulations. Mov. Br. 21. Plaintiff fails to explain why noncompliance with the CEA would somehow void the CFTC's regulatory authority, eviscerate UIGEA, and place a national exchange under the regulation of a single tribe. Instead, Plaintiff regurgitates arguments

made by various state attorneys general in other federal litigation in an effort to mask the weakness of its IGRA claim. Those arguments, which are unavailing in any respect, have no relevance here.

### a. Congress Gave the CFTC Exclusive Jurisdiction Over Trading on DCMs.

In rehashing arguments that stemmed from issues of preemption of state gaming laws, Plaintiff overlooks the central component of those cases: Congress's deliberate decision to reserve exclusive jurisdiction over DCMs such as Kalshi to the CFTC. 7 U.S.C. § 2(a)(1)(A). To "assure that Federal preemption is complete," the Senate deleted the provision the Supreme Court had previously interpreted to preserve the states' authority over futures trading. 120 Cong. Rec. 30464 (1974) (statement of Sen. Curtis); *see Rice v. Bd. of Trade of Chi.*, 331 U.S. 247, 255 (1947). And after House drafters introduced a state-law savings clause, the Senate added language making clear that the clause applied "except as hereinabove provided" in the grant of exclusive jurisdiction to the CFTC. S. Rep. No. 93-1131, at 31 (1974). The language ensured that "the Commission's jurisdiction, where applicable supersedes State as well as Federal agencies." *Id.* at 23.

This grant of exclusive jurisdiction leaves no room for state or tribal regulation of trading on DCMs. "Evidence of pre-emptive purpose is sought in the text and structure of the statute at issue." *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 664 (1993). Here, every indicator of congressional intent confirms that the CEA preempts the field of regulating trading on DCMs—both through its express text and by setting out a comprehensive scheme that displaces state regulation. *KalshiEX LLC v. Flaherty*, 2025 WL 1218313, at *5 (D.N.J. Apr. 28, 2025), (concluding that "the exclusive-jurisdiction language reflects an intent to occupy the field"), *appeal docketed*, No. 25-1922 (3d Cir. May 15, 2025).

### b. *Kalshi's Event Contracts Are Subject to UIGEA's Carveout for "Transactions" Conducted on DCMs.*

Plaintiff contends (Mov. Br. 26-29) that Kalshi's sports event contracts are not swaps, citing a single district court decision from Nevada currently on appeal. *KalshiEX, LLC v. Hendrick*, 2025 WL 3286282 (D. Nev. Nov. 24, 2025), *appeal docketed*, No. 25-7516 (9th Cir. Nov. 25, 2025). That ruling—in which the court reversed its own prior ruling and from which Kalshi has appealed—is irrelevant to the issue before the Court here. UIGEA's carveout applies to "***any transaction*** conducted on . . . a registered entity . . . under the Commodity Exchange Act" (*i.e.*, a DCM), not just "swaps." 31 U.S.C. § 5362(1)(E)(ii) (emphasis added). And there is no dispute that Kalshi is such a registered entity under the CEA. 7 U.S.C. § 1a(40)(A). In any event, Plaintiff's theory as to why Kalshi's event contracts are not swaps or futures—that they lack "commercial or hedging interest"—is wrong. It assumes an extratextual statutory requirement that there be some "inherent" economic purpose for the contract. There is no such test under the CEA, and Congress, in fact, ***removed*** a preexisting "economic purpose" requirement in the 2000 amendments to the CEA. *See Concept Release*, 73 Fed. Reg. 25,669, 25,672 (May 7, 2008).

### c. *Kalshi's Event Contracts Are Not Prohibited by the CEA.*

Plaintiff argues that Kalshi's event contracts are prohibited by the CEA. Mov. Br. 21-25. In doing so, Plaintiff refers to 17 C.F.R. § 40.11, which is a regulation and not the statute, and argues that it constitutes a blanket prohibition on all sports event contracts. Plaintiff misconstrues both the statutory scheme and its implementing regulations.

Congress in the Dodd-Frank Act of 2010 created a "Special Rule" regarding certain "agreements, contracts, transactions, or swaps in excluded commodities that are based upon occurrence[s]" *i.e.*, "[e]vent contracts." 7 U.S.C. § 7a-2(c)(5)(C)(i). Recognizing that certain categories of event contracts warranted closer CFTC scrutiny, Congress authorized the CFTC to

review and prohibit six categories of contracts if it concludes they are "contrary to the public interest." *Id.* § 7a-2(c)(5)(C)(ii). The Special Rule provides that the CFTC "may"—but need not—"determine" whether particular event contracts "involve" certain enumerated activities (including, among others, "gaming") and, if so, whether they are "contrary to the public interest." *Id.*; *see also* 17 C.F.R. § 40.11. Plaintiff concedes that the CFTC has not conducted such a public interest review of Kalshi's sports event contracts. Mov. Br. 24. Yet, citing 17 C.F.R. § 40.11(a) in isolation, Plaintiff takes the bizarre position that the CFTC has prohibited them outright. Mov. Br. 22-23. Plaintiff is wrong.

*First*, the text of the rule is clear that, even if a contract falls into a category enumerated in the Special Rule and Regulation 40.11(a), it may still be "approv[ed] or disapprov[ed]" following the CFTC's review under Regulation 40.11(c)—the very opposite of the blanket prohibition Plaintiff asserts. *See* Ex. H at 44786 ("registered entities ***may always*** certify products pursuant to the procedures in § 40.2," subject to public interest review under § 40.11(c) (emphasis added)); Ex. I, at 48970-71 ("The Commission interprets [the Special Rule] to contemplate that the Commission engage in a ***two-step inquiry***." (emphasis added)).

*Second*, to bolster its claim that Congress put in place a complete prohibition on certain event contracts (Mov. Br. 22-23), Plaintiff points to certain statements made by counsel in prior litigation between Kalshi and the CFTC over its political event contracts. Mov. Br. 25. But Kalshi never said that sports event contracts are *per se* prohibited; at most, it acknowledged that it was a closer call whether sports event contracts—as opposed to political event contracts—constituted

"gaming" under 17 C.F.R. § 40.11(a).  Indeed, in that case, the CFTC itself followed precisely that

two-step process.  *KalshiEX LLC v. CFTC*, 2024 WL 4164694 (D.D.C. Sep. 12, 2024).[8]

> ### d.  Plaintiff's Challenge to Kalshi's Event Contracts Amounts to an Improper Collateral Attack on the CFTC.

Plaintiff also cannot succeed on its IGRA claim because this action is not the appropriate

vehicle to challenge the CFTC's decisionmaking.  Plaintiff attempts to turn this proceeding into a

collateral attack on Kalshi's compliance with the CEA and CFTC regulations.  But the

Administrative Procedure Act ("APA") provides the exclusive vehicle for review of an agency's

decision to act (or not act).  *See Big Lagoon Rancheria v. California*, 789 F.3d 947, 953 (9th Cir.

2015) (en banc); *Cousins v. Sec'y of U.S. Dep't of Transp.*, 880 F.2d 603, 605-06 (1st Cir. 1989).[9]

As discussed above, under the CEA's self-certification regime, products that are properly self-

certified "shall" be approved unless and until the CFTC initiates a review and concludes they are

contrary to law or the public interest.  *See* 7 U.S.C. § 7a-2(c)(5)(B)-(C); 17 C.F.R. § 40.11.  The

Special Rule and Regulation 40.11 establish a two-step inquiry—not a *per se* ban—and the

Commission created a defined public interest review process precisely because contracts in

enumerated categories are not automatically prohibited.  *Blue Lake Rancheria*, 2025 WL 3141202,

---

[8] Plaintiff's attempt to frame Kalshi's use of market makers as evidence that it is conducting unlawful sports betting is nonsensical.  Mov. Br. 7, 22.  Market makers are a standard feature of CFTC-regulated DCMs.  S*ee, e.g., Spicer v. Chicago Bd. of Options Exch., Inc.*, 977 F.2d 255, 256 (7th Cir. 1992) ("Market-makers are individual traders appointed by the [DCM] to maintain a fair, orderly and liquid market in one or more classes of option contracts.").  By Plaintiff's logic, the New York Stock Exchange must also fail to qualify as a genuine "market" because it, too, uses market makers to promote liquidity.  *See* NYSE, "Designated Market Makers," *available at* www.nyse.com/publicdocs/nyse/markets/nyse/designated_market_makers.pdf.

[9] *See also Alabama v. PCI Gaming Auth.*, 801 F.3d 1278, 1291 (11th Cir. 2015) ("collateral challenge" to agency decision was inappropriate; the "proper vehicle . . . is an APA claim"); *City of Duluth v. Fond du Lac Band of Lake Superior Chippewa*, 702 F.3d 1147, 1153 (8th Cir. 2013) ("challenge[ ]" to agency "determination" was "properly made under the Administrative Procedure Act," and "the review process established by Congress in the APA" could not "be circumvented").

at *7.  If Plaintiff had concerns about the CFTC's actions as to these contracts, Plaintiff could have raised that in an action against the CFTC under the APA; such arguments are improper here and, more importantly, irrelevant to IGRA (including the right of action under Section 2710(d)(7)(A)(ii)).

Implicitly acknowledging the CFTC's role as Kalshi's sole regulator, Plaintiff argues that an APA action is not available because the "CFTC has the discretion to act on self-certification but is not required to do so."  Mov. Br. 24.  Plaintiff readily admits, however, that the CFTC has elected not to undertake a public interest review of Kalshi's contracts.  *Id.*  Under the statutory regime, when the CFTC does not initiate a public interest review or block a contract for listing on a DCM, that is itself an agency action.  *See* 5 U.S.C. § 551(13) (APA defines "agency action" to include "failure to act").  Plaintiff may disagree with the CFTC's decision to permit listing of these contracts, but its only recourse is against the CFTC.  *See* 5 U.S.C. §§ 702, 706(2) (permitting suit against agency where its action was contrary to law).  What Plaintiff cannot do is flout the CEA by attempting to use IGRA or its Ordinance to regulate products the CFTC has permitted Kalshi to offer.  *See Cousins*, 880 F.2d at 605-06 (noting that "[t]he APA was intended to provide . . . a single uniform method for review of agency action"); *Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606, 615 (2012) (requiring APA claims to avoid "conflicting interpretations of federal law by several different courts (and the agency), thereby threatening to defeat the uniformity that Congress intended"); *see also Big Lagoon Rancheria*, 789 F.3d at 954.

### C. Plaintiff Fails to Establish a Likelihood of Success Under the Lanham Act (Count V)

Plaintiff seeks a broad preliminary injunction barring Kalshi from advertising that it, or its platform, offers any activity that is "50 state legal" [sic] or offers "sports betting" or "sports

gaming." Mov. Br. 1, 32. Plaintiff points to several social media posts, which make no reference to Plaintiff, its casinos, or any future products it may offer. Kretz Exs. A-I; DeMarse Exs. H-L.

To succeed, Plaintiff must show (1) it has standing to bring this claim, *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014); (2) Kalshi made a false statement of fact in a commercial advertisement; (3) "the statement actually deceived or has the tendency to deceive a substantial segment of its audience"; (4) the deception is material; and (5) that Plaintiff "has been or is likely to be injured as a result of the false statement." *Fiskars Finland Oy Ab v. Woodland Tools Inc.*, 2024 WL 3936444, at *7 (W.D. Wis. Aug. 26, 2024) (citing *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir. 1999)). As to each and every element, Plaintiff cannot show it is likely to succeed; it certainly has not made the "strong showing" required to impose extraordinary relief of the kind requested here. *K.C.*, 121 F.4th at 614.

### 1. Plaintiff Lacks Standing Under the Lanham Act

To establish prudential or statutory standing to bring a false advertising claim under the Lanham Act, Plaintiff must show that (1) it suffered "an injury to a commercial interest in reputation or sales," and (2) its "economic or reputational injury flow[s] directly from the deception wrought by the defendant's advertising." *Lexmark,* 572 U.S. at 132-33. Plaintiff claims that Kalshi is causing it "harm" in three different ways (Mov. Br. 47), but the evidence it offers is flawed, and its arguments cannot withstand the "searching" analysis the Court must undertake. *Mays*, 974 F.3d at 818.

***First***, Plaintiff claims that Kalshi's statements "lure consumers away from the Nation's ***existing*** non-sportsbook, gaming offerings," citing the opinions of its purported expert, Brian Wyman, who contends that "[t]he Nation and defendants compete directly for the same pool of consumer dollars allocated to gaming and to sportsbook [sic] specifically." Mov. Br. 47-48 (citing

FOF ¶¶ 28, 30-31) (emphasis added).[10]  Plaintiff provides no other support for this claimed "harm."

It cites no change in customer visitation or attendance numbers, declines in consumer spending, changes in revenue or profitability at any of its casinos, or even anecdotal evidence from a single consumer stating that he or she has recently spent less money at Plaintiff's facilities.  This is wholly insufficient to satisfy Plaintiff's "significant" evidentiary burden.  *K.C.*, 121 F.4th at 614.

As for Wyman, he says that he has "conducted numerous casino market studies," including "in Wisconsin," and "for the Ho-Chunk Nation," Wyman Decl. ¶ 4, but includes no information, analysis, or support from any of those "studies" to support his opinions.  Humphreys Decl. ¶ 16.

He simply asks the Court to accept his *ipse dixit* conclusion that Kalshi's offerings will result in consumers having "less disposable income" and "reduced incentive" to patronize Plaintiff's casinos.  Wyman Decl. ¶ 11.  The one study he actually cites (*id.* ¶ 12) was conducted by a different purported expert, Jonathan Chavez, in a different case involving different casinos serving different markets, and is itself fundamentally flawed and unreliable.  Befurt Decl. ¶¶ 31-34.[11]  It also undermines Wyman on the very point for which he cites it:  that consumers have a fixed or finite gambling budget, such that online offerings will necessarily cannibalize consumers' in-casino spending.  Humphreys Decl. ¶¶ 41-42.  In fact, the peer-reviewed literature is consistent with the opposite conclusion:  mobile offerings are complementary to, and may even increase, consumer spending on wagering.  *Id.* ¶¶ 24-26.  As for Plaintiff's assertion that it competes "directly" with

---

[10] Proposed findings 28 and 30 cite to paragraphs of the Wyman Declaration that do not exist.  As set forth in Kalshi's responses to Plaintiff's Proposed Findings of Fact, none of the rest of the Wyman Declaration provides support for Plaintiff's assertions, as his proffered opinions are unsupported and unreliable.  Humphreys Decl. ¶ 11; Befurt Decl. ¶ 12.  Proposed finding 31 concerns Plaintiff's contemplated Events Wagering business, which does not yet exist; it is thus irrelevant to the alleged harm to Plaintiff's "current" offerings.

[11] Mr. Chavez has been sued for, among other things, fabricating data during the time period in which he propounded the report that Wyman cites as evidence.  *See* Compl., *SocialSphere, Inc. v. Chavez*, No. 25-cv-2557 (Mass. Super. Ct.), Dkt. No. 1 (Oct. 15, 2025).

Kalshi for the "same pool of consumer dollars," that too is contradicted by market research. *Id.* ¶ 32 (overlap between online and in-person consumers is minimal).

Nor does Plaintiff draw anything close to a causal link between this imaginary harm to its "current" offerings and Kalshi's advertisements. Plaintiff vaguely asserts that Kalshi's ads are "designed to attract sports gamblers and divert business" from Plaintiff's facilities and "have succeeded in reaching a broad consumer base, which necessarily *impacts brick-and-mortar sports betting facilities like the Nation's Casinos*." Mov. Br. 48 (emphasis added). But—by its own admission—Plaintiff *does not offer sports betting* at its casinos. FOF ¶ 24; Mudd Decl. ¶ 11. Nor does Plaintiff offer any evidence that Kalshi's ads have reached the universe of consumers (patrons of Plaintiff's casinos) relevant here, let alone that they "cause[d]" any impact to consumer spending decisions or Plaintiff's revenues. *Fiskars*, 2024 WL 3936444, at *8; *see also QVC Inc. v. Your Vitamins, Inc.*, 439 F. App'x 165, 168-69 (3d Cir. 2011) (no reason for the court to conclude that anonymous social media users fell within "the universe of consumers whose opinions are relevant"); Humphreys Decl. ¶ 15. Plaintiff quotes the district court's decision in *West Flagler Assocs. v. Haaland*, 573 F. Supp. 3d 260 (D.D.C. 2021), but the cited language in that decision, reversed on other grounds, relied upon the Chavez Report, which this Court should decline to consider. Befurt Decl. ¶¶ 12, 16, 34, 36.

*Second*, Plaintiff claims that Kalshi "negatively impacted" its "leverage" in contracting with a vendor; because it "could not offer its vendor the monopoly on its Indian lands," it was unable to "negotiate a lower provider fee." Mov. Br. 48. In support, Plaintiff points to the Declaration of Robert Mudd, Plaintiff's Executive Director of Business, stating that Kalshi and other unspecified "[t]hird parties" made it "difficult" to "negotiate the payment of a lower provider's fee" because Kalshi is "currently capturing the Nation's future Event Wagering

market." Mudd Decl. ¶¶ 14-15. Mudd never actually says what fee he negotiated, nor does he say how it was any different from—let alone worse than—the fee he supposedly could have negotiated absent Kalshi's offerings. He accuses Kalshi, along with other "third parties," of making things "difficult" for him in negotiations, but never actually specifies what concrete harm Plaintiff suffered. This is hardly sufficient proof for a preliminary injunction.

More fundamentally, the kind of harm that Plaintiff alleges here—having a "difficult" negotiation or even coming to unfavorable terms—does not fall within the Lanham Act's "zone of interests." *Lexmark*, 572 U.S. at 129-32. The Lanham Act's false advertising prohibition does not protect against competition or commercial experiences that Plaintiff finds unpleasant. And it certainly provides no redress where Plaintiff utterly fails to identify a cognizable "harm" traceable to Kalshi's advertisements.

***Third***, Plaintiff claims that Kalshi's advertisements will reduce revenues from a ***future*** events wagering platform to be offered at its casinos. It is hard to take such a speculative claim seriously, particularly given the complete absence of any concrete information regarding this supposed future venture. Mov. Br. 4, 47-48. Plaintiff provides no specific information on when it intends to launch this business, at which of its locations, or what revenues it believes it will generate from this business, let alone how those revenues will be impacted by Kalshi's materially different product offerings. Humphreys Decl. ¶¶ 15-19. Such speculative and nebulous harm cannot support standing under the Lanham Act. *Lexmark*, 572 U.S. at 132-33. Plaintiff cites the Wyman Declaration in support of its claim that fewer people will "com[e] to its casinos" because of Kalshi. Mov. Br. 48. But Wyman's opinions are speculative, unsupported, unreliable, undermined by the scant "evidence" Wyman himself cites, and inconsistent with findings reported

in peer-reviewed academic literature. Humphreys Decl. ¶¶ 23-26 (summarizing research concluding that in-person and online sports betting are complementary); Befurt Decl. ¶ 12.

Nor does Plaintiff offer any evidence that Kalshi's ads are the "proximate cause" of any supposed harm it may suffer in the future, even assuming that there can be any causality for things that have not happened yet. *Lexmark*, 572 U.S. at 140. Plaintiff points to Kalshi's "rapid growth," which it says is the result of its "sweeping and deceptive advertisement campaign," but does not explain how Kalshi's rapid growth has caused it harm. Mov. Br. 46, 52. That is hardly surprising, since Plaintiff and Kalshi offer materially different products that appeal to different consumer pools. Humphreys Decl. ¶¶ 17, 31-32. The case Plaintiff cites is easily distinguishable for precisely that reason, as it involved direct competitors and ads directly comparing their products. *U-Haul Int'l, Inc. v. Jartran, Inc.*, 522 F. Supp. 1238, 1243-44 (D. Ariz. 1981). Plaintiff asks the Court to draw a "'reasonable inference' that Kalshi's surge as a competitor on the back of its numerous deceptive advertisements harms the Nation's economy." Mov. Br. 53. But Plaintiff offers no evidence that Kalshi is in fact a "competitor," Humphreys Decl. ¶ 31, or that its advertisements have harmed Plaintiff's "economy," and as the movant seeking extraordinary relief, Plaintiff is not entitled to "the benefit of all reasonable inferences." *Univ. of S. Ind.*, 43 F.4th at 791. Without evidence that Kalshi's ads will "proximately cause" a cognizable injury under the Lanham Act, the Court should decline to engage in the "speculative proceedings or intricate, uncertain inquiries" against which the Supreme Court has cautioned. *Lexmark*, 572 U.S. at 132, 140.

### 2. Plaintiff Cannot Establish Falsity

Plaintiff contends that Kalshi has made two categories of "false" statements: (1) that sports betting is legal in all 50 states, and (2) that Kalshi offers sports betting. Both theories fail.

***First***, social media posts advertising sports betting on Kalshi as legal in all fifty states are not statements of fact. As the court held in *Blue Lake Rancheria* when analyzing precisely this question, they are statements of opinion and thus inactionable under the Lanham Act. 2025 WL 3141202, at *2 ("Kalshi's advertisement is merely stating an opinion its product is legal," and therefore "is not 'literally or facially false.'"); *Bd. of Forensic Document Exam'rs v. Am. Bar Ass'n*, 922 F.3d 827, 833 (7th Cir. 2019); *see also Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 184 (2015).

Plaintiff claims that the Seventh Circuit has repeatedly held such statements are actionable—twice referring to the court's supposedly "lengthy history" of doing so. Mov. Br. 39, 40. But Plaintiff does not cite a single Seventh Circuit case. And the cases Plaintiff does cite all involve advertisements claiming a ***competitor's*** product is illegal. *Data Rsch. & Handling, Inc. v. Vongphachanh*, 278 F. Supp. 3d 1066, 1069 (N.D. Ind. 2017) (defendant told others that plaintiff was "operating an illegal . . . program" and was "an illegal company"); *Paul Davis Restoration, Inc. v. Everett*, 2014 WL 7140038, at *3 (E.D. Wis. Dec. 12, 2014) (plaintiff sued over ads accusing it of "breaking the law"); *Lexmark*, 572 U.S. at 123 (defendant advised plaintiff's customers that it was "illegal" to use plaintiff's product). Here, Kalshi's advertisements describe the legality of its ***own*** product, with no reference to Plaintiff.

Plaintiff argues that Kalshi's ads are actionable even if they are legal opinions because "the law is 'clear' that Kalshi cannot offer legal sports betting in all 50 states" and Kalshi "lacked a good faith belief in the truth of its statement." Mov. Br. 40-41. Plaintiff conspicuously fails to cite the *Blue Lake Rancheria* court's decision reaching the opposite conclusion. 2025 WL 3141202, at *2. Nor does Plaintiff address what is unavoidably true: Kalshi is a DCM, registered with the CFTC to offer trading in all fifty states. Sottile Decl. ¶¶ 2, 6. Each of Kalshi's event

29

contracts has been duly self-certified, and thus, under the CFTC's rules and the CEA, each is available to trade in all fifty states. *Id.* ¶¶ 6, 15-16. And Plaintiff's version of the law is far from "clear": courts have reached differing conclusions in disputes between Kalshi and state regulators, and Kalshi's continued defense of the legality of its offerings is evidence of its good faith belief in the truth of its statements, not the opposite.

Plaintiff observes that "sports betting is not legal in Wisconsin," and therefore "is not legal in all 50 states." Mov. Br. 36. But none of Kalshi's ads state that, as a general proposition, all sports betting is legal in all fifty states. As Plaintiff recognizes, the Court must consider Kalshi's statements "in context." *Id.* at 33. Each of the social media posts to which Plaintiff points makes clear that Kalshi is referring to transactions "on Kalshi." *E.g.*, Kretz Ex. F; DeMarse Ex. H; Ex. I; Ex. K. Plaintiff's citation to Wisconsin law (Mov. Br. 38) only underscores Kalshi's good faith belief in the legality of its conduct, since Wisconsin (like Plaintiff itself) has excluded activity on DCMs like Kalshi's from its gambling laws. Wis. Stat. § 945.01(1)(a)(1) (2017); *id.* § 409.102(dm)(1) (2018); 9 HCC § 945.01.

As it has done elsewhere, Plaintiff incorrectly contends that Kalshi "already told [] federal courts . . . that it could not legally sell sports event contracts" (Mov. Br. 36). As described at length in Kalshi's prior briefing (ECF No. 29 at 19-20) and above, Kalshi has never said that, and what it has told the courts remains consistent: Congress empowered the CFTC to conduct a public interest review of contracts that "may" involve the enumerated categories in Regulation 40.11, and in the absence of a negative determination following such a review, Kalshi is authorized to permit trading in properly self-certified contracts.

Plaintiff also argues that Kalshi's opinions are actionable because Kalshi "clearly intended" its statements to be interpreted as objective fact. Mov. Br. 41-42. But it points only to a social

media post saying that "trading is legal in all 50 states on Kalshi," which is—in fact—"literally" the case.  The case Plaintiff cites (Mov. Br. 39-42) is readily distinguishable, as the defendant had "actual knowledge that its legal assurances were false, or at least patently misleading," including because a "clear and unambiguous ruling" preceded the offending statements.  *TNT Amusements, Inc. v. Torch Elec., LLC*, 2025 WL 947506, at *15 (E.D. Mo. Mar. 28, 2025), *reconsideration granted in part on other grounds*, 2025 WL 2336858 (E.D. Mo. Aug. 13, 2025).

Recognizing that it cannot establish that anything that Kalshi has said is literally false, Plaintiff resorts to vague claims that Kalshi has "stoked consumer confusion."  Mov. Br. 42-46; *Hot Wax*, 191 F.3d at 820 (unless statement is literally false, plaintiff must show that it is "misleading in context" or "likely to deceive consumers").  In support, Plaintiff points only to a selection of comments left by anonymous social media users on a smattering of Kalshi's social media posts.  Plaintiff asserts—without evidence—that these comments are "real world consumer responses" and that the Court "could not ask for better evidence" than remarks by "actual consumers," Mov. Br. 44, expending significant energy trying to persuade the Court that it can consider hearsay evidence.  *Id.* at 43-46.  But any evidence this Court considers on a preliminary injunction motion, whether or not hearsay, must be credible and reliable.  *Nat'l Inst. of Fam. & Life Advocates v. Raoul*, 685 F. Supp. 3d 688, 699 (N.D. Ill. 2023).  Plaintiff does not establish that any of the comments it cites were left by real people, rather than bots, Kalshi's competitors, trolls, or even members of Plaintiff.  *QVC*, 439 F. App'x at 168-69.  Plaintiff offers no evidence suggesting how any actual consumers interpreted fast-paced posts and comments on social media, snipping comments it believes suggests confusion from among hundreds of reactions.  *See* Kretz Exs. B-D, I; DeMarse Ex. J.  Nor does Plaintiff offer any reason for the Court to conclude that any of these anonymous social media users fall within "the universe of consumers whose views are

relevant"—*i.e.*, those who might plausibly frequent Plaintiff's casinos—rendering the comments of, at most, "limited value."  *QVC*, 439 F. App'x at 168-69; Humphreys Decl. ¶ 32 ("overlap between online and in-person customers is limited").

**Second**, Plaintiff cannot make out a false advertising claim against Kalshi for saying that it offers "sports betting."  In its Complaint and throughout its briefs, Plaintiff reiterates, *ad nauseum*, that Kalshi **is** engaged in sports betting.  *E.g.*, Compl. ¶¶ 1, 5, 46, 61, 141, 147; Mov. Br. 1, 2, 15, 20, 22; ECF No. 45 at 10, 17, 18.  If Plaintiff's position is, in fact, that Kalshi is **not** engaged in sports betting and that it is **false** for Kalshi to advertise that it is, Plaintiff's entire case is doomed.

Regardless, it is not false advertising for Kalshi to state that it offers "sports betting."  "Bet" is a generalized term used in popular media to describe all kinds of trading and investments.[12]  As Kalshi's CEO put it in the same interview that Plaintiff cites (Mov. Br. 7), "the word betting is used very, sort of loosely."  Statements like these are hardly the kind of "specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact," that the Lanham Act targets.  *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999).

### 3.  Plaintiff Cannot Establish Materiality, Deception, or Injury

Plaintiff must show that Kalshi's "deception is material, in that it is likely to influence the purchasing decision."  *Hot Wax*, 191 F.3d at 819; *see also Bidi Vapor, LLC v. Vaperz LLC*, 543 F.

---

[12] *See, e.g.*, James Royal, *Options vs. stocks: Which one is better for you?*, Yahoo! Finance (Aug. 25, 2025), https://finance.yahoo.com/news/options-vs-stocks-one-better-210539982.html (describing a stock option as a "side bet among traders over what the price of a stock will be at a certain time"); Grant Harvey, *Meta's $72B Superintelligence Bet is Building a Future that Could Kill Its Own Apps*, The Neuron (July 30, 2025), https://www.theneuron.ai/explainer-articles/metas-72b-superintelligence-bet-is-building-a-future-that-could-kill-its-own-apps (characterizing Meta's decision to invest in superintelligence infrastructure as "betting on a world" powered by personalized AI).

Supp. 3d 619, 631 (N.D. Ill. 2021) ("Materiality means that the deception was likely to influence a reasonable consumer's purchasing decision.").  Plaintiff claims "Kalshi's advertisements are highly material to consumers," but points only to Kalshi's "rapid growth" in support of its theory. Mov. Br. 46-47.  Plaintiff draws no connection between Kalshi's growth and its supposedly "false" advertisements.  It makes no showing that the advertisements reached the relevant universe of consumers, let alone influenced their purchasing decisions.  Nor does Plaintiff offer any on-point legal authority, instead offering only cases that it concedes are "largely inapplicable."  Mov. Br. 46-47 ("FTC precedent is largely inapplicable to Lanham Act cases." (quoting *MillerCoors, LLC v. Anheuser-Busch Cos., LLC*, 385 F. Supp. 3d 730, 750 (W.D. Wis. 2019) (Conley, J.))).

Nor has Plaintiff provided evidence on the remaining elements of its false advertising claim justifying the imposition of mandatory injunctive relief.  Plaintiff makes no affirmative argument that Kalshi's advertisements "deceived or ha[ve] the tendency to deceive a substantial segment of its audience," *Fiskars*, 2024 WL 3936444, at *7 (citing *Hot Wax*, 191 F.3d at 819), instead arguing that consumer deception should be presumed if the statements at issue are literally or facially false. Mov. Br. 33.  Plaintiff cites no authority suggesting that presumption is applied in the Seventh Circuit, and regardless, Kalshi's statements are not literally or facially false.  *See supra* Section III.C.2.  Nor are Plaintiff's unfounded claims that Kalshi "stokes consumer confusion" (Mov. Br. 37, 42-46) supported by any evidence, let alone "necessary definitive support."  *Jordan*, 593 F.2d at 774; *see supra* Section III.C.2.  And without any commercial harm traceable to Kalshi, *see supra* Section III.C.1, Plaintiff is unlikely to succeed in showing the requisite injury.

**D.  Plaintiff Will Not Suffer Irreparable Harm Absent a Preliminary Injunction**

Plaintiff has not shown that it will suffer the kind of immediate and irreparable harm required for the mandatory preliminary injunction it seeks.  *See Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295-97 (7th Cir. 1997).  Having waited several months to file its motion, Plaintiff still

cannot show an "urgent . . . need for equitable relief" to prevent an imminent harm. *U.S. Army Corps of Eng'rs*, 667 F.3d at 788.[13]

The harm Plaintiff alleges it will suffer is, at bottom, an economic one. Mov. Br. 53 (describing economic harm resulting from loss of revenue); *see also id.* at 52 (seeking to protect its "market positions"); *id.* at 47 (arguing Kalshi impacts its "revenue from gaming"). But "[e]conomic loss does not constitute irreparable harm." *Craig v. Pepperidge Farm, Inc.*, 2008 WL 4280154, at *2 (S.D. Ind. Sep. 15, 2008) (citing *Sampson v. Murray*, 415 U.S. 61, 90 (1974)). Any loss of revenue, even if proven, would be compensable with money damages at the conclusion of these proceedings and thus cannot support the imposition of a preliminary injunction. *DM Trans, LLC v. Scott*, 38 F.4th 608, 624 (7th Cir. 2022) (lost sales and profits do not meet threshold requirement of irreparable harm). Nor do claims of "lost opportunities . . . support a showing of irreparable harm" because that harm "would ultimately translate into lost profits." *Id.* at 619.[14] As for the supposed "first mover advantage" that Plaintiff's purported expert imagines Kalshi has captured, Wyman Decl. ¶ 10, it is unsupported by any evidence, inconsistent with market research, and nonsensical: if Plaintiff prevails in this case, Kalshi will be prohibited from making its contracts available to persons located on Plaintiff's tribal lands and thus unable to "lock in" any

---

[13] In opposing Kalshi's request for expedited discovery relating to the preliminary injunction motion, Plaintiff referred to reports of Kalshi's recent product offerings and a September 30, 2025 CFTC staff advisory as the reasons why it had not previously sought relief. ECF No. 47 at 7-8. But Plaintiff's motion contains zero references to the kinds of products referenced in that filing, let alone argument that they merit emergency relief. Nor does the CFTC staff advisory—issued nearly three months before Plaintiff filed its motion—provide any support for the notion that Plaintiff now faces irreparable harm.

[14] Indeed, it is unclear that the harm Plaintiff claims is redressable ***at all*** through its request for an injunction against Kalshi. Plaintiff complains of lost revenue due to the "actions of Kalshi, ***and others like it***." Mov. Br. 4 (emphasis added). There are numerous other DCMs offering event contracts nationwide, in addition to the many other tribes that already offer sports betting in Wisconsin. *See* Ex. J (Wisconsin Gaming Map).

consumers located there. Humphreys Decl. ¶¶ 30-34. In any event, the evidence Plaintiff offers of harm to its current and future revenues is unsupported, unreliable, and fundamentally flawed. *See supra* Section III.C.1; Humphreys Decl. ¶¶ 11, 15-22; Befurt Decl. ¶ 33.

Presumably aware that a claim of economic injury does not suffice, Plaintiff argues that Kalshi's sports event contracts harm its "tribal sovereignty" and "tribal self-government." Mov. Br. 50-51. But a private business cannot infringe on Plaintiff's tribal sovereignty. *Stifel*, 807 F.3d at 207 ("The actions of nonmembers outside of the reservation do not implicate [a] Tribe's sovereignty."). This is particularly true of internet-based conduct like Kalshi's, which does not happen "inside the reservation." *Jackson*, 764 F.3d at 782. Indeed, Plaintiff cites only cases that involve other sovereigns—federal and state governments—*not* private parties. Mov. Br. 50. *Ute Indian Tribe of Uintah & Ouray Rsrv. v. Utah*, 790 F.3d 1000 (10th Cir. 2015) (state and local governments); *Tohono O'Odham Nation v. Schwartz*, 837 F. Supp. 1024 (D. Ariz. 1993) (state court); *Comanche Nation v. United States*, 393 F. Supp. 2d 1196 (W.D. Okla. 2005) (federal government); *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001) (state government); *EEOC v. Karuk Tribe Hous. Auth.*, 260 F.3d 1071, 1077 (9th Cir. 2001) (federal agency).

Nor does Plaintiff acknowledge that Kalshi's operation is authorized under the CEA and that "inherent tribal sovereignty can be implicitly divested by federal regulatory schemes"—such as the CEA—that are "silent as to Indian tribes." *NLRB v. Little River Band of Ottawa Indians Tribal Gov't*, 788 F.3d 537, 548 (6th Cir. 2015); *Menominee Tribal Enters. v. Solis*, 601 F.3d 669, 670 (7th Cir. 2010) (recognizing that statutes of general applicability that do not mention Indians are "nevertheless usually held to apply to them"). As Kalshi has explained elsewhere (ECF No. 29 at 24-26; ECF No. 60 at 16), none of the limited exceptions to that "usual" rule apply, in

35

particular because:  (1) tribal casinos are not a "traditional attribute of self-government," *San Manuel Indian Bingo & Casino v. NLRB*, 475 F.3d 1306, 1315 (D.C. Cir. 2007); and (2) incidental impacts on casino revenues that may fund tribal governments do not "touch[] exclusive rights of self-governance in purely intramural matters." *Little River Band*, 788 F.3d at 551-53.

Plaintiff also argues it is entitled to a presumption of irreparable harm under the Lanham Act, but that presumption exists only where a movant has shown it is likely to succeed on the merits and is thus inapplicable here.  15 U.S.C. § 1116(a); *AbbVie v. Inc. v. Payer Matrix, LLC*, 2025 WL 1101610, at *14 (N.D. Ill. Apr. 14, 2025).  Plaintiff vaguely claims that Kalshi's advertising causes specific and concrete harm that "cannot be fully compensated."  Mov. Br. 51. But as set forth above, Plaintiff has made no showing that Kalshi's products—let alone its advertising—are causing harm to Plaintiff's current or contemplated future offerings.  *See supra* Section III.C.1, 3.  Plaintiff again asserts that Kalshi "confuses the public," which in turn damages Plaintiff's "market positions and the integrity of their regulated businesses."  *Id.* at 52.  But scattered and anonymous comments on social media are insufficient to show that actual patrons of Plaintiff's casinos are confused, *see supra* Section III.C.3, let alone a likelihood of "'substantial and immediate' injury."  *Endo USA, Inc. v. Baxter Healthcare Corp.*, 2025 WL 2829864, at *11 (N.D. Ill. May 15, 2025).  Nor has Plaintiff shown that it and Kalshi "compete directly in a manner that could establish irreparable harm for a preliminary injunction."  *Id.* (denying preliminary injunction where products did not actually compete and thus claim of competitive harm was "too tenuous and speculative").  Indeed, Plaintiff could not make that showing if it tried, because it does not offer a sportsbook or product offering that would even remotely resemble Kalshi's listing of event contracts on its DCM.

### E.  The Balance of Equities Does Not Favor a Preliminary Injunction

"A plaintiff seeking a preliminary injunction must establish . . . that the balance of equities tips in his favor." *See Winter*, 555 U.S. at 20.  The Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987).  As set forth above, Plaintiff has not shown that it would suffer any injury if the Court declined to enter an injunction.  But the damage to Kalshi were the Court to grant Plaintiff's request would be immediate and devastating.

Kalshi is a nationwide exchange, and its event contracts are available to trade across the country.  It sets no geographic limits in the United States on its products and has no practical mechanism for implementing such restrictions.  Sottile Decl. ¶¶ 6, 28-31.  To stop offering event contracts on Plaintiff's tribal lands, Kalshi would be required to try and geofence numerous small, irregularly shaped parcels of land "across the entire southern half of Wisconsin . . . separated from each other by hundreds of miles" with "vast distances" between them.  Greendeer Decl. ¶ 8; Ex. K (2020 Census Tribal Tract Map for Ho-Chunk Nation Reservation).

Setting aside whether it is even feasible to do so, to comply with the requested injunction, Kalshi would likely need to pause all trading of sports event contracts on its exchange while it determined whether it could develop a geofencing solution and then, were it possible, to obtain and implement it—a process that would take months and cost millions of dollars.  Sottile Decl. ¶¶ 32-33.  That step alone would result in enormous and irreversible financial and reputational damage to Kalshi.  *Id.* ¶¶ 33-34, 57-58; *Flaherty*, 2025 WL 1218313, at *7 (granting Kalshi preliminary injunctive relief from state enforcement because "Kalshi has identified harms to its reputation and goodwill that are both likely without injunctive relief and not able to be remedied following trial").  Even if Kalshi ultimately prevailed in the litigation, these costs would be non-recoverable due to the limits imposed by sovereign immunity.  *Oneida Nation v. Vill. of Hobart*,

371 F. Supp. 3d 500, 523 (E.D. Wis. 2019) ("tribes are protected from suits for monetary damages"), *rev'd and remanded on other grounds*, 968 F.3d 664 (7th Cir. 2020).

Plaintiff cites Kalshi's Privacy Policy, suggesting that Kalshi already has the ability to geofence Plaintiff's lands. Mov. Br. 56. That is incorrect. While Kalshi has reserved the right in its Privacy Policy to collect certain information about its customers, Kalshi currently only collects —and only has the ability to collect—Know Your Customer ("KYC") data on the traders that place positions on its platform. Sottile Decl. ¶¶ 29-30. This KYC data is limited to the permanent residence and IP address of its users, captured at the time that the user transacts on the platform. *Id.* IP addresses do not provide sufficient information for geolocation. *Id*. ¶ 29. Kalshi does not currently have the ability to geolocate its users, meaning Kalshi does not know where a user's device is located in real time. *Id*. ¶¶ 30-32.

If Kalshi used its KYC data to attempt to geofence Plaintiff's tribal lands, it would likely be both under- and over-inclusive. KYC data would capture all users who claim their permanent residence as being on Plaintiff's tribal lands even if they placed positions while located off Plaintiff's tribal lands. Conversely, the KYC data would likely fail to capture users whose permanent residence is elsewhere, but who traveled to Plaintiff's tribal lands and placed a position while there. *Id*. ¶ 31.

In addition, if the Court entered the requested injunction, Kalshi would be required to identify and immediately unwind or pause trading in any live sports event contracts where one of the parties entered tribal lands. Plaintiff claims that it only seeks to "prohibit Kalshi from offering sports gambling contracts on its Indian lands *prospectively*" (Mov. Br. 56), but that argument only underscores Plaintiff's fundamental misunderstanding of Kalshi's event contracts and the drastic nature of the relief it requests.

Traders on Kalshi's markets can hold open positions in event contracts until the event occurs, which may occur days, weeks, months, or even years after the trader enters the position, and a trader may therefore be on Plaintiff's lands when entering, holding, or exiting a position. Sottile Decl. ¶ 38. For example, a trader who has an open position on who will win the Stanley Cup could enter Plaintiff's lands before the Stanley Cup occurs and choose to exit his position in that contract while there. Plaintiff's requested relief—vaguely prohibiting Kalshi from "offering" sports contracts—would subject Kalshi with the impossible task of trying to identify and unwind or lock contracts whenever any party to an open sports event contract crossed onto tribal lands, even if only briefly. *Id.* Kalshi would be forced to take extraordinarily disruptive steps to comply with a preliminary injunction, impairing existing contractual obligations amongst traders, impacting counterparties no matter where located, and potentially exposing Kalshi to additional liability. *Id.* ¶¶ 41-47, 50-56; *Duct-O-Wire Co. v. U.S. Crane, Inc.*, 31 F.3d 506, 509-10 (7th Cir. 1994) ("los[ing] sales and the opportunity to maintain and develop relationships with existing and potential customers" would cause irreparable harm); *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 813 (7th Cir. 2002) (injury to consumer goodwill constituted irreparable harm); *FTC v. Qualcomm, Inc.*, 935 F.3d 752, 756 (9th Cir. 2019) (irreparable harm where defendant was required to "renegotiate existing [contracts] on a large scale"); *Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.,* 162 F.4th 631, 643 (6th Cir. 2025) (plaintiff "los[ing] access to its 18,000 Michigan users" constituted irreparable harm).

An injunction would also subject Kalshi to regulatory risk. If Kalshi stopped offering its products in specific locales, it would risk violation of the CFTC Core Principles, including its obligation to "provide . . . impartial access to its markets and services," 17 C.F.R. §§ 38.150, 38.151(b) (2012), and to "establish and maintain risk control mechanisms to prevent and reduce

the potential risk of price distortions and market disruptions." *Id.* § 38.255 (2012). Kalshi is unaware of any DCM closing its business to individuals geolocated on Indian lands or in a particular state. Sottile Decl. ¶ 28. Should the CFTC conclude that Kalshi had, by complying with Plaintiff's requested injunction, violated federal law, the agency could seek to revoke Kalshi's designation, resulting in further and immense reputational and economic harm. 7 U.S.C. § 8(b).

Plaintiff mischaracterizes the CFTC's September 30, 2025 Staff Advisory Letter (the "Advisory Letter"), claiming that Kalshi faces no regulatory risk. Mov. Br. 56-57. The CFTC staff issued the Advisory Letter on the eve of a government shutdown to advise DCMs and other market participants that regulatory actions and potential litigation "should be accounted for with appropriate contingency planning, disclosures, and risk management policies and procedures." Commodity Futures Trading Commission, CFTC Staff Ltr. No. 25-36 at 2 (Sep. 30, 2025), *available at* https://www.cftc.gov/csl/25-36/download. Reaffirming its exclusive jurisdiction to regulate transactions conducted on DCMs, the CFTC noted that it "has not, to date, made a determination regarding whether any such contracts involve an activity enumerated or prohibited under CEA," and reserved the right to do so. *Id.* Nowhere does the CFTC staff address the Core Principles' impartiality requirement, let alone suggest that exchanges would not run afoul of that requirement by limiting the access of those on tribal or other lands.

Plaintiff asserts that the risks Kalshi faces from imposition of the requested injunction are of Kalshi's "own making" because "gambling has long been illegal in Wisconsin." Mov. Br. 55. But the very state laws to which Plaintiff cites *exclude* from their scope the very transactions at issue. Wis. Stat. § 945.01(1)(a)(1) (2017) (exempting "[c]ontracts for the purchase or sale at a future date of securities or other commodities" from the definition of "bet"). Under Wisconsin law, a "commodity contract" includes a contract "[t]raded on or subject to the rules of a board of

trade that"—like Kalshi[15]—"has been designated as a contract market for such a contract pursuant to federal commodities laws."  Wis. Stat. § 409.102(dm)(1) (2018).[16]  Kalshi's conduct has not "long been illegal in Wisconsin"; on the contrary, Wisconsin law—like Plaintiff's own code—expressly exempts trading on a DCM from its gambling prohibitions.

The sheer breadth of the relief Plaintiff requests is apparent from the shifting language it has used to describe what it seeks.  In its motion, Plaintiff characterizes its request to the Court to be an injunction prohibiting Kalshi from offering event contracts "on its Indian lands."  Mov. Br. 56.  But Plaintiff's Complaint asks the Court to "preliminarily . . . enjoin Kalshi and Robinhood from offering sports event contract *on or near* the National Indian Lands."  Compl., Prayer for Relief ¶ 5 (emphasis added); *see also* ECF No. 45 at 18 (arguing that by offering event contract "to persons located *both on and off* of Indian Lands . . . Kalshi draws business away from the Nation's casinos" (emphasis added)).  Plaintiff similarly asks the Court to prohibit Kalshi from advertising that it offers "*anything* that is legal in all 50 states."  Mov. Br. 1 (emphasis added).  On its face, this request encompasses not only a prohibition on advertising sports event contracts, but also contracts on, for example, weather or financial events not at issue in the instant litigation.  Without any basis in the law and with no evidentiary showing, what Plaintiff really seeks is to stop Kalshi from operating its nationwide federally regulated exchange altogether, not only on

---

[15] As the Complaint recognizes, KalshiEX LLC is a board of trade expressly authorized to list event contracts for public trading.  ¶ 69; *see also* 7 U.S.C. § 1a(6) (board of trade is "any organized exchange or other trading facility").  In 2020, "the CFTC authorized Kalshi . . . to list event contracts for public trading as a DCM."  *KalshiEX LLC*, 2024 WL 4164694, at *4.  Members of the public can only trade derivatives on a board of trade that the CFTC has designated as a contract market, or DCM.  7 U.S.C. §§ 2(e), 6(a)(1), 7(a); 17 C.F.R. § 38.3(a).

[16] Plaintiff's criminal code, like Wisconsin state law, also exempts commodity contracts from its definition of "bet."  9 HCC § 945.01(1)(a)(1) (Ho-Chunk criminal code defining "bet" to *exclude* "[c]ontracts for the purchase or sale at a future date of securities or other commodities").

Plaintiff's lands, but beyond.  The harms that Kalshi would suffer in the face of these sweeping prohibitions tip firmly against the entry of a preliminary injunction.

### F.  A Preliminary Injunction Would Not Be in the Public Interest

Finally, the mandatory injunction that Plaintiff requests would be contrary to the public interest, disrupting the comprehensive regulatory scheme governing the nation's derivatives markets; ignoring UIGEA's effort to harmonize that scheme with regulation of online gaming activity and the existing federal framework for gaming on Indian lands; and carrying "consequences beyond the immediate parties."  *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 388 (7th Cir. 1984).

For years, Kalshi has been subject to comprehensive regulation of "trading facilities, clearing systems, market participants and market professionals" expressly established by the CEA "to serve the public interests."  7 U.S.C. § 5(b).  The event contracts at issue here have been properly self-certified with the CFTC.  A court order selectively prohibiting Kalshi from offering its products while in full compliance with that scheme would destabilize Congress's regulatory framework; undermine the delicate balance that Congress carefully established in IGRA, UIGEA, and the CEA; sow confusion in the derivatives markets; and thereby harm the public interest.

A preliminary injunction would also harm nonparties, including both Kalshi's customers and its third-party business partners, like Robinhood, another entity duly registered with the CFTC.  *Democratic Nat'l Comm. v. Bostelmann*, 447 F. Supp. 3d 757, 770 (W.D. Wis. 2020) (Conley, J.) ("[P]ublic interest . . . includes the ramifications of granting or denying the preliminary injunction on nonparties to the litigation." (quoting *Girl Scouts of Manitou Council v. Girl Scouts of United States of Am., Inc.*, 549 F.3d 1079, 1100 (7th Cir. 2008))).  Requiring Kalshi to pause trading would be unprecedented and damaging to all parties who rely on the CFTC's guarantee of impartial access to Kalshi's DCM to rapidly hedge their risks in response to constantly-evolving market

conditions—no matter their location. *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 546 (7th Cir. 2021) (recognizing "the public's interest in the enforcement of contracts"). Harm to third parties and harm to market integrity would damage the public interest. The Court should avoid taking this path.

## IV.     Conclusion

Kalshi respectfully requests that the Court deny the Motion.

Dated: January 20, 2026

Respectfully submitted,

*/s/ Sarah A. Zylstra*
Sarah A. Zylstra (State Bar No. 1033159)
szylstra@boardmanclark.com
BOARDMAN & CLARK LLP
1 South Pinckney Street, Suite 410
P.O. Box 927
Madison, WI 53701
Telephone: (608) 257-9521
Facsimile: (608) 283-1709

Olivia S. Choe
ochoe@milbank.com
Joshua B. Sterling
jsterling@milbank.com
MILBANK LLP
1101 New York Avenue, NW
Washington, D.C. 20005
Telephone: (202) 835-7500
Facsimile: (202) 263-7586

Grant R. Mainland
gmainland@milbank.com
Karen Wong
kwong3@milbank.com
Victor Hollenberg
vhollenberg@milbank.com
MILBANK LLP
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

*Attorneys for Defendants Kalshi Inc.*
*and KalshiEX LLC*