**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| HO-CHUNK NATION,<br>*Plaintiff*,<br>v.<br>KALSHI INC., KALSHIEX LLC, ROBINHOOD MARKETS, INC., ROBINHOOD DERIVATIVES LLC, AND DOES 1-20,<br>*Defendants*. | Case No. 3:25-cv-00698 |

**DECLARATION OF XAVIER SOTTILE**

1. I am the Head of Markets at KalshiEX LLC, where I have worked since August 2021. In my role as Head of Markets, I am responsible for the generation of new markets. I received an undergraduate degree in Economics from Yale University in 2020. Before joining Kalshi, I worked at the U.S. House of Representatives, Bridgewater Associates, and the Yale Program on Financial Stability.

2. KalshiEX LLC is an exchange and prediction market specializing in event contracts. Founded in 2018, KalshiEX was granted status as a designated contract market (DCM) by the Commodity Futures Trading Commission (CFTC) in 2020. Kalshi Inc., a holding company, owns 100% of KalshiEX LLC (together with Kalshi Inc., "Kalshi"). Kalshi is headquartered in New York, New York. Its servers are in Ohio. Kalshi does not have any operations or personnel on Plaintiff's tribal lands.

3. My duties at Kalshi include devising proposed new contracts and shepherding those proposals from inception to completion. I also facilitate the process by which our markets undergo the regulatory review cycle under the purview of the CFTC. This involves everything from

personally notifying the CFTC of event contracts that Kalshi has self-certified under Section 5c(c) of the Commodity Exchange Act and Section 40.2(a) of the CFTC regulations, to maintaining records pursuant to statutory and regulatory requirements, certifying that Kalshi's contracts comply with the Act, and communicating with CFTC staff as needed regarding the substance of Kalshi's contract filings.

4. The facts set forth herein are within my personal knowledge, and if called as a witness, I could and would competently testify to them.

5. It is my understanding that Plaintiff has asked the Court to enter a preliminary injunction that would prohibit Kalshi from making its sports event contracts available on Plaintiff's tribal lands and restrict how Kalshi advertises its products. I offer this declaration to describe the extraordinary harm that Kalshi and its users will incur if the Court enters the requested preliminary injunction. This declaration reflects my preliminary analysis of Kalshi's harms based on information available to me at this time. Other unanticipated harms, including to other market participants, are possible, or even likely, given the nature of the requested injunction and the disruption to Kalshi's markets it would produce if entered.

## I. Background on Kalshi's Sports Event Contracts

6. Kalshi is a nationwide exchange and currently offers its event contracts on prediction markets accessible to traders across the United States.

7. Event contracts identify a future event with Yes/No outcomes, payment tied to those outcomes, and an expiration date. Traders take a "Yes" or "No" position on whether an identified event will occur. As an exchange, Kalshi matches one trader's "Yes" bid to enter an event contract with another trader's "No" bid. For example, a property owner in a coastal area may buy a contract that pays out if a hurricane strikes the area (a "Yes" position) in which the

property is located. If a hurricane does strike before the contract expires, the "Yes" position held by the property owner pays out according to its terms.

8. The price of Yes and No positions are set by the market—meaning, every trader on Kalshi in the hurricane contract is expressing a view on how likely a hurricane is to occur. Therefore, an event contract's price may fluctuate between the time the contract was created and its expiration, depending on changing perceptions of the likelihood of the event's occurrence.

9. Traders may also purchase and sell event contracts throughout the pendency of the event. A trader is therefore not locked into their position until the determination of whether the event occurs.

10. On February 26, 2024, Kalshi notified the CFTC that it was implementing a Market Maker Program, and on April 21, 2025, Kalshi notified the CFTC that it was making effective on May 3, 2025, a 2025 Market Maker Program, for the purpose of promoting liquidity and orderliness on Kalshi's exchange. These notifications, which are publicly available, include a certification that the market maker programs comply with the Commodity Exchange Act.

11. Through Kalshi's Market Maker Programs, traders agree to provide a consistent two-sided spread, at certain times, in certain markets and an agreement on the liquidity conditions for the market maker. Kalshi's 2025 Market Maker Program is open to any member that applies and executes a Form Market Maker Agreement, and is subsequently granted market maker status by Kalshi after a thorough review process.

12. Market makers ensure liquidity in the markets, which means that they make it easier for investors to buy or sell shares quickly, without having to wait for a matching buy or sell order to appear. This is done by the market maker acting as the counterparty to trades, thereby guaranteeing that there is almost always someone on the other side of a transaction. A market

maker's transactions must be reasonably calculated to contribute to the maintenance of a fair and orderly market.

13. Kalshi does not transact on its own platform. It is not a market maker.

14. Kalshi began offering sports event contracts in January 2025.

15. Pursuant to the Commodity Exchange Act and CFTC regulations, Kalshi self-certifies event contracts, including sports event contracts, that it offers on its exchange.

16. The submissions that Kalshi provides to the CFTC as part of its self-certification contain the information required by Section 40.2 of the CFTC regulations.

17. Some of the information in Kalshi's self-certification submissions is contained in confidential appendices that are not available to the public. The confidential information that Kalshi submits includes competitively sensitive and proprietary business information.

18. Shortly after Kalshi submitted its first sports event contract self-certification, the CFTC requested that Kalshi demonstrate that those contracts comply with the CEA under 17 C.F.R. § 38.5(b). In response, Kalshi provided lengthy confidential memoranda detailing the contracts' compliance with governing rules and regulations. These memoranda also discussed the CFTC's jurisdiction over sports event contracts traded on DCMs like Kalshi.

19. The CFTC has not engaged in further communication with Kalshi on this question. Therefore, pursuant to the relevant rules and regulations, Kalshi has continued to list, trade, and close event contracts.

20. Additionally, to my knowledge, the CFTC has not conducted any public-interest review of any of Kalshi's sports event contracts.

## II. Harms That Would Arise from a Preliminary Injunction

21. If a preliminary injunction is entered ordering Kalshi to stop making its sports event

contracts available on Plaintiff's tribal lands, Kalshi will be required to take a number of steps in order to comply with the injunction that will result in significant and immediate harm to Kalshi. The harm that Kalshi will suffer falls into four categories: (a) harms imposed by technical barriers to compliance, (b) harms to Kalshi's users from abruptly ceasing operations on Plaintiff's tribal lands, (c) risk that complying with the injunction would jeopardize Kalshi's CFTC designation, and (d) economic and reputational harm to Kalshi from ceasing making its sports event contracts available on Plaintiff's tribal lands. I describe each of these categories in more detail below.

***a. Harms to Kalshi Resulting from Technical Barriers to Compliance***

22. A preliminary injunction would require Kalshi to undertake technological changes that would be either difficult or impossible for Kalshi to implement. Attempting to undertake these extraordinary technological changes would impose substantial costs.

23. For Kalshi to comply with the requested injunction, it would be required, first, to undertake efforts to geolocate which of its users are on Plaintiff's tribal lands, and, second, to stop making its sports event contracts available to those users and to users who enter Plaintiff's tribal lands in the future. I have engaged in internal discussions with our leadership and technical team to determine the feasibility of compliance for both steps. Compliance would be difficult to implement even under a relaxed timeline and nearly impossible to implement immediately.

i. <u>Step One – Identifying Users Located on Plaintiff's Tribal Lands</u>

24. Because Kalshi is subject to uniform federal regulation rather than state-by-state laws, its products are accessible to traders in all 50 states without limitation as to geography. Kalshi currently lacks a mechanism to identify which of its users are located in any particular geographic location at any particular time. Implementing such a mechanism would be costly and could not be done immediately.

25. It is my understanding that traditional web-based sports pools identify their users' whereabouts through a process called geolocation (or geo-positioning). Geolocation identifies and tracks an internet-connected device's location to provide real-time data as to the geographic position of the device. This technology is more sophisticated than merely identifying the device's IP address. Instead, geolocation uses a combination of location-identifiers like GPS coordinates, cell phone towers, WiFi access points, network connections, and Bluetooth beacons to triangulate location.

26. It is my understanding that geolocation is a multi-step and technically complex process even for stationary devices, that the process is even more challenging when tracking real-time movement of devices, and that geolocation is not sensitive enough to track the exact moment that a device crosses into tribal lands.

27. The reason traditional sports pools deploy geolocation is to ensure that the bets and wagers that individuals place in their pools conform to state laws governing gaming and gambling. Geolocation allows sports pools to make geographic determinations at the transaction-level rather than the user-level. Through geolocation, a company can allow and disallow certain transactions that take place in restricted areas rather than denying gamblers access to their platforms based on their residence irrespective of where they are located at the time of wager.

28. Kalshi is not a sports pool. As a CFTC-regulated contract market, Kalshi has never developed or implemented geolocation on its platform because it is subject to the CFTC's exclusive jurisdiction and is not subject to individual state or tribal laws governing gambling. Like the Chicago Mercantile Exchange and the Intercontinental Exchange, Kalshi does not distinguish between users or trades on the basis of geographic location. Instead, Kalshi is subject exclusively to federal law, which does not apply different standards to users by virtue of their geographic

location. I am not aware of any other DCM excluding users based on their geolocation on Indian lands or in a particular state.

29. As a regulated exchange, Kalshi collects and preserves Know Your Customer (KYC) data on the traders that place positions on its platform. Kalshi maintains a database of its traders' KYC data, which is available for CFTC inspection upon request. This data is limited to the reported permanent residence and IP address of its users (captured at the time that the user transacts on the platform). IP addresses do not provide sufficient information for geolocation.

30. Kalshi does not collect other geolocation data on and cannot geolocate its users and therefore does not know where a user's device is located at any point in time.

31. If Kalshi sought to use its existing KYC data to identify users who might be located on Plaintiff's tribal lands at the time of their transactions, it would risk being both under- and over-inclusive. KYC data would capture all users who claim their permanent residence as being on Plaintiff's tribal lands even if they place positions when they are not on Plaintiff's tribal lands. Conversely, the KYC data could fail to capture users whose permanent residence is elsewhere, but who travel to Plaintiff's tribal lands and place a position while there.

32. If Kalshi were ordered to implement geolocation services across its platform, this process would be costly and time-consuming. Kalshi lacks the capacity to implement this service in-house and would therefore need to contract with a cloud- or server-based geolocation platform. I estimate that a partnership with a geolocation service provider would cost Kalshi up to tens of millions of dollars annually. If the Court enters the preliminary injunction Plaintiff seeks, Kalshi would be forced to expend significant financial resources to obtain and implement geolocating services, even if Kalshi ultimately prevails in this matter after months of litigation.

33. Based on my prior negotiations with other key Kalshi vendors and service partners,

moreover, I estimate that negotiating a complex contract with a geolocation service provider alone could take months. Implementing and integrating the geolocation services into our existing platform would take additional time. Attempting to comply with a preliminary injunction could not feasibly be done quickly and, even if it could, would subject Kalshi to massive irrevocable costs.

34. Because Kalshi is not able to geolocate its users at this time, if the Court were to require Kalshi to immediately stop making its sports event contracts available on Plaintiff's tribal lands, Kalshi might be forced to pause trading in all sports event contracts while it tried to implement geolocation services. Pausing trading in all sports event contracts nationwide, even if only temporarily, would itself be tremendously costly for Kalshi. And as I describe in further detail below, pausing trading in Kalshi's contracts would cause harm to Kalshi's traders, leading to significant additional reputational and financial damage to Kalshi.

ii. Step Two - Geographical Cessation

35. Only after identifying Kalshi users who are physically present on Plaintiff's tribal lands through geolocation could Kalshi attempt to comply with an order to stop making its sports event contracts available on Plaintiff's tribal lands. It would be required to do so through a technical process called "geofencing." This process would involve creating a virtual geographic boundary, or geofence, around Plaintiff's tribal lands. Again, this process would be technically challenging, time-consuming, and expensive.

36. Geofencing Plaintiff's tribal lands would be particularly difficult and far from perfect because, as I understand it, the geographic areas at issue here are relatively small and have irregular boundaries. It is my understanding that these features could result in the geofencing being both over- and under-inclusive; on some occasions, the geofence would likely exclude users

who are near, but not on tribal lands, while on other occasions allowing users on tribal lands to transact on Kalshi.

37. Further, while geofencing might allow Kalshi to block *newcomers* from trading on the platform from Plaintiff's tribal lands, geographical cessation would present a host of additional difficulties for Kalshi with respect to *existing* users.

38. Traders can hold open positions in Kalshi contracts until the subject event occurs, which can be months or even years in the future. Traders can and do hold their positions in Kalshi contracts for varying lengths of time. I understand that Plaintiff has asked the Court to enjoin Kalshi from "offering" its event contracts on Plaintiff's lands. It is unclear whether such an injunction would seek to prevent Kalshi from permitting traders to open, close, or hold event contracts while on Plaintiff's lands, or some combination of those activities. The requested preliminary injunction could therefore implicate live contracts available for trading on Kalshi, where at least one party opening, closing, or holding an open position is located on, even if temporarily, tribal lands. A preliminary injunction barring Kalshi from offering such contracts on tribal lands could force Kalshi to either pause trading in those contracts or liquidate traders' positions in an effort to comply. Even if technically feasible, liquidating users' positions would either be impossible or highly costly for Kalshi.[1]

39. To explain why, it is helpful to distinguish Kalshi's exchange from a sports pool or casino. A casino or sports pool operates by taking bets from gamblers on games where the house has a statistical advantage. In other words, gamblers bet against the "house," and when the house

[1] Kalshi would face even further difficulty, from a technological standpoint, in implementing a geofencing solution if it were required to stop making sports event contracts available to a trader who, at any time while holding an open position, entered Plaintiff's tribal lands, even if only for a brief period of time. Kalshi does not have the ability to track all users with open positions at all times, and I do not believe it is technically feasible.

loses, it must pay the gambler on demand. Casinos and sports pools therefore maintain a high level of liquidity so that they can pay out those bets.

40. But Kalshi does not operate a casino or sports pool. Instead, it manages a federally regulated contract market. In contrast to a casino, an exchange facilitates trades between different users on the platform. Traders do not bet against the house but rather enter into contracts with other traders on an exchange. To ensure compliance with CFTC regulations, Kalshi operates a CFTC-approved derivatives clearinghouse that holds traders' funds during the pendency of an open contract. But Kalshi, unlike a sports pool or casino, does not have access to immediate liquidity that it could use to refund the cost basis of a trader's investment. Attempting to facilitate those exits using Kalshi's own funds would be exceptionally expensive and require technical capabilities that Kalshi does not currently have.

***b. Irreparable Harms to Kalshi's Users***

41. As I explained above, if Kalshi is required to stop offering or making its sports event contracts available on Plaintiff's tribal lands, Kalshi will be required to take steps that could result in irreparable harm not only to Kalshi, but also to Kalshi's users. For traders located on Plaintiff's tribal lands who currently hold a position in a sports event contract, Kalshi would be required to either pause current trades pending the outcome of the event that is the subject of the contract, or else to liquidate user positions. Either option would impose severe harms on users—both on and off Plaintiff's tribal lands.

i. <u>Pausing Positions</u>

42. Pausing current positions on Kalshi pending the outcome of the event at issue would deny traders access to their property and threaten their economic expectations.

43. Pausing positions pending the outcome of the event would deny users on Plaintiff's tribal lands access to their property. Users' capital would be locked on the Kalshi platform, and any users with significant investments on the platform would be unable to retrieve it. If the event at issue is months or years in the future, users' assets would be locked up for the duration, or at least through the pendency of this litigation. Given current market conditions and uncertainty, this lack of access to funds could result in substantial losses.

44. Pausing positions would also cause significant disruption to users' investment-backed expectations. Financial traders on Kalshi, like investors in other markets, expect to be able to alter their investments as facts on the ground change. Due to the unique market-sensitivity of event contracts and the ease with which exchanges allow traders to place positions, traders capitalize on the opportunity to enter and exit their positions during the pendency of the contract. Traders also deploy well-recognized strategies like stop-loss orders and portfolio-wide loss mitigation strategies. Traders may invest in a contract expecting to sell if the contract price falls below a certain value or expecting to reinvest more if the investment proves especially sound. And while some contracts operate on short timelines, many of the contracts that Kalshi offers are long-term. For example, one of Kalshi's event contracts allows traders to place positions on whether the electric vehicle market share will rise above 30% by 2030. Traders who have placed a position on this contract may be mitigating their risk on other investments by placing a position that effectively balances out the investment portfolio. As the market for electric vehicles changes so does the price of the event contract. A trader may make an investment at 45 cents on the electric-vehicle contract and institute a stop-loss order to sell the contract when the price dips below 30 cents because 30 cents is the breakeven point on the investment.

45. Many traders on Kalshi are constantly engaged in the practice of ascertaining risk. As facts on the ground change, so do their strategies. Indeed, traders often do not place a position on a contract with the intent of seeing that contract through to its expiration date and risking the full amount of the entry price. Instead, like traders on other kinds of financial markets, they monitor market fluctuations during the lifetime of the event contract to determine when to cash out. In other words, traders do not necessarily value event contracts based on the ultimate value of the contract at its expiration date. They also value the flexibility that event contracts provide as a financial tool to mitigate risk in real-time.

46. Hitting pause on all trades originating from Plaintiff's tribal lands (or held by traders who entered tribal lands with an open position in a Kalshi sports event contract) would upend such investment strategies, damaging traders' expectations. Those traders would not be able to take action on their existing contracts in accordance with their investment models. They would no longer have the flexibility on which they relied when entering into these contracts.

47. Pausing all trades in sports event contracts held by Kalshi users on Plaintiff's tribal lands would not solely affect users and transactions on tribal lands. Again, Kalshi does not operate like a casino, where gamblers bet against the house. Instead, Kalshi facilitates contracts nationwide between individual traders on the market. Traders on either side of a contract often trade from different locations. If traders on Plaintiff's tribal lands are locked out of their positions, their trading counterparts, no matter where located, would likewise be limited in their ability to enter and exit that contract. Pausing transactions originating on Plaintiff's tribal lands would thus disrupt users' positions on the exchange nationwide.

ii. Liquidating Positions

48. Liquidating positions held by traders on Plaintiff's tribal lands would similarly subject users to irreparable harm. Unilaterally settling traders' positions—whether at their original cost or based on current value—could lead to significant losses for users. A trader, for example, may have entered a long-term event contract at 80 cents, but market conditions may have caused his position to decline in value to 30 cents. Rather than allowing the trader to ride out the market dip, immediate liquidation at the market rate would force the trader to take a 50-cent loss on the contract through no fault of his own. Likewise, a trader who bought a contract during a market dip and is forced to exit at the original contract price would not be able to realize any gains that he earned over his holding period for the contract. And in either event, as explained above, it could be prohibitively expensive for Kalshi to liquidate traders' positions.

49. Liquidating the positions of users based on Plaintiff's tribal lands could also disrupt the market for other users by causing a false signal in the market. Event contract markets respond to market fluctuations. Forcing traders to exit a position in a particular contract could have a distorting effect on the value of the contract, potentially resulting in financial losses for other traders and impairing their ability to react to market changes and act accordingly. The ripple effects would also be damaging, creating uncertainty for all traders on Kalshi's exchange, wherever located and including those trading in non-sports event contracts.

***c. Harms to Kalshi Resulting from the Risk of CFTC Decertification***

50. Compliance with a preliminary injunction prohibiting Kalshi from making its sports event contracts available in certain geographical areas would jeopardize Kalshi's status as a CFTC-designated contract market. It is difficult to overstate how harmful this would be to Kalshi.

51. As the Head of Markets at Kalshi, I oversee the regulatory review process for Kalshi's contract markets. In that role, I am responsible for ensuring that each of Kalshi's contracts complies with the nearly two dozen CFTC Core Principles that govern event contracts traded on CFTC-regulated exchanges. If Kalshi stopped offering sports event contracts on Plaintiff's tribal lands, I believe it would be at significant risk of being deemed in violation of these Core Principles, imperiling Kalshi's designation as a contract market under the CFTC's purview.

52. CFTC Core Principle 2 requires that designated contract markets provide their "members, persons with trading privileges, and independent software vendors with impartial access to its markets and services." 17 C.F.R. § 38.151(b) (2012). Pursuant to this regulation, "access criteria" must be "impartial, transparent, and applied in a non-discriminatory manner." *Id.* Discrimination based on geographic location would at least arguably conflict with this requirement, but that is exactly what Kalshi would have to do to comply with a preliminary injunction. Traders on Plaintiff's tribal lands would be barred from accessing Kalshi's exchange and placing positions on Kalshi's contracts, while traders everywhere else would continue to have unlimited access to the platform.

53. CFTC Core Principle 4 charges designated contract markets with the "responsibility to prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement processes." 17 C.F.R. § 38.250 (2012). Immediately liquidating or pausing traders' positions could be understood to lead to the very sort of price distortion and market manipulation that the CFTC regulations guard against. Pausing trades could cause "disruption[] of the delivery or cash-settlement process" and immediate liquidation could cause "price distortion." *Id.*

54. The risk of being found to have violated these Core Principles could expose Kalshi to the panoply of enforcement mechanisms that the CFTC has at its disposal. Those tools range from civil monetary penalties to restitution to criminal liability.

55. Being found to have violated these principles could even jeopardize Kalshi's federal-contract-market status with the CFTC. The CFTC is authorized to suspend or revoke Kalshi's designation if Kalshi fails to comply with federal regulations. Kalshi has spent the better part of the last decade working to gain federal registration as a contract market under the CFTC and has scrupulously endeavored to comply with CFTC regulations to maintain that registration. Losing our federal license would be catastrophic for the company, even if Kalshi were to ultimately succeed in this suit.

56. CFTC enforcement is not a mere theoretical risk. Several years ago, a CFTC-regulated exchange was charged with offering contracts on a discriminatory basis because it only allowed sportsbooks to trade on its platform. Discriminating on the basis of presence on tribal lands could likewise subject Kalshi to federal repercussions. It is inconceivable, for example, to imagine a CFTC-designated contract market like the Chicago Mercantile Exchange abruptly closing its exchange to users on a particular Indian reservation without serious federal repercussions. Yet that is exactly what a preliminary injunction would require Kalshi to do.

***d. Economic and Reputational Harms to Kalshi***

57. The market uncertainty created by abruptly pausing trading in all sports event contracts while Kalshi determined how to comply with a preliminary injunction would cause Kalshi severe reputational harm and an irrevocable loss of goodwill. Unwinding open sports event contracts would do the same. Either step would likely lead many users to leave the platform—even users outside of tribal lands. Traders must have confidence in the integrity of the market to

invest in it, but market confidence would be deeply shaken by the prospect that Kalshi might in the future be forced to restrict access to some other group of market participants or to pause trading or unwind positions in other kinds of contracts. Even if Kalshi were—after months or years of litigation—to prevail in this lawsuit, regaining that market confidence would be very difficult. Kalshi has expended enormous resources to advertise its platform, onboard traders, and maintain their business. Losing those traders would mean that many of those efforts were for naught. In short, a preliminary injunction would impose significant and irrevocable economic and reputational harm on the company, as well as business partners like Robinhood.

58. Abruptly closing contracts could also subject Kalshi to additional liability from traders whose contracts were voided, exposing Kalshi to additional economic and reputational harm resulting from defending against any lawsuits brought against Kalshi's attempted compliance with a preliminary injunction.

I declare under penalty of perjury under the laws of the United States of America and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on this 20th day of January, 2026 in New York, New York.

Xavier Sottile