# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WISCONSIN

HO-CHUNK NATION,

      Plaintiff,

      v.

KALSHI INC., KALSHIEX LLC,
ROBINHOOD MARKETS, INC.,
ROBINHOOD DERIVATIVES LLC,
and DOES 1-20,

      Defendants.

Case No.: 25-cv-698

---

## PLAINTIFF HO-CHUNK NATION'S REPLY IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION

# Table of Contents

Introduction ........................................................................................................................... 1

I.     The Nation is likely to succeed on the merits of Its IGRA claim. ........................................ 2

   A.   The Nation can stop Kalshi from conducting class III gaming on its Indian lands under
        IGRA. ....................................................................................................................... 2

      1.   The Nation can stop third parties from conducting class III gaming on its Indian lands
           in violation of the Gaming Compact. ....................................................................... 3

      2.   Tribal-State Compacts are not merely private contracts. .............................................. 5

      3.   Kalshi is violating the Gaming Compact. ................................................................... 7

   B.   Kalshi conducts class III gaming on the Nation's Indian lands. ........................................ 10

   C.   UIGEA does not apply to the motion for injunctive relief or this litigation. ....................... 11

      1.   The Nation has not brought a UIGEA claim. ............................................................ 11

      2.   Kalshi is wrong to suggest that UIGEA alters or limits IGRA with respect to internet
           gaming. .................................................................................................................. 13

   D.   Kalshi cannot rely on the Commodity Exchange Act to allow it to violate the Gaming
        Compact. ................................................................................................................... 15

II.    The Nation is likely to succeed on the merits of its Lanham Act claim for false advertising ..
       ................................................................................................................................... 19

   A.   The Nation's § 43(a) claim has five elements. ............................................................... 19

   B.   The Nation has standing to bring its § 43(a) claim. ........................................................ 20

      1.   Kalshi injured the Nation's existing sales because its false advertisements lured
           customers away from the Nation's class III gaming offerings. ...................................... 21

      2.   Kalshi injures the Nation by negatively impacting the Nation's leverage in contracting
           with a vendor to run its forthcoming Events Wagering Platform. ................................. 23

      3.   Kalshi injured the Nation by reducing the Nation's potential revenue from its
           forthcoming Events Wagering platform. ................................................................... 24

   C.   The Nation has shown that Kalshi made a literally false statement. ................................... 25

      1.   Kalshi's statements regarding 50 state legal sports betting are literally false. ............... 25

      2.   Kalshi's statement that it, or its platform, offers "sports betting" or "sports gaming" is
           literally false. ......................................................................................................... 29

   D.   If this Court finds that Kalshi's statements are not literally false, it should find that
        Kalshi's statements are misleading and actually deceive or have a tendency to deceive a
        substantial segment of its audience. ............................................................................. 30

   E.   The Nation has shown materiality and injury. ............................................................... 33

III.   The Nation will suffer irreparable harm in the absence of the requested injunctive relief ...
       ................................................................................................................................... 34

   A.   The Nation filed its Motion as soon as practicable. ........................................................ 34

QB\168080.00083\100618656.5

B.   The Nation alleges it is facing non-economic harms...........................................................36

C.   The equities and public interest tip strongly in favor of the Nation. ...............................39

D.   A preliminary injunction would be in the public interest. ................................................42

Conclusion ..........................................................................................................................................44

QB\168080.00083\100618656.5

# TABLE OF AUTHORITIES

**Cases**

*AHBP LLC v. Lynd Co.*,
    649 F. Supp. 3d 371 (W.D. Tex. 2023) ........................................................................ 21

*Bd. of Forensic Document Examiners, Inc. v. Am. Bar Ass'n*,
    922 F.3d 827 (7th Cir. 2019) ........................................................................................ 26

*Belmora LLC v. Bayer Consumer Care AG*,
    819 F.3d 697 (4th Cir. 2016) ........................................................................................ 21

*Blue Lake Rancheria v. Kalshi Inc.*,
    No. 25-CV-06162-JSC, 2025 WL 3141202 (N.D. Cal. Nov. 10, 2025) ............................. 6, 25

*Brewer v. Town of Eagle*,
    553 F. Supp. 3d 636 (E.D. Wis. 2021) .............................................................. 19, 21, 23

*Brickstructures, Inc. v. Coaster Dynamix, Inc.*,
    No. 16 CV 10969, 2017 WL 4310671 (N.D. Ill. Sept. 28, 2017) ............................................ 21

*Brown v. Gardner*,
    513 U.S. 115 (1994) ........................................................................................................ 6

*California v. Cabazon Band of Mission Indians*,
    480 U.S. 202 (1987) ........................................................................................................ 5

*Cayuga Nation v. New York State Gaming Comm'n*,
    775 F. Supp. 3d 651, 667 (N.D.N.Y. 2025) ................................................................... 7

*Chicken Ranch Rancheria of Me-Wuk Indians v. California*,
    42 F.4th 1024 (9th Cir. 2022) ........................................................................................ 5

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ...................................................................................................... 42

*Coastal Abstract Service, Inc. v. First American Title Insurance Co.*,
    173 F.3d 725 (9th Cir. 1999) ............................................................................. 25, 26, 27

*Coeur d'Alene Tribe v. State*,
    842 F. Supp. 1268 (D. Idaho 1994), *aff'd sub nom. Coeur D'Alene Tribe v. State of Idaho*,
    51 F.3d 876 (9th Cir. 1995) ........................................................................................... 7

*Commonwealth v. Biden*,
    57 F.4th 545 (6th Cir. 2023) ......................................................................................... 4

QB\168080.00083\100618656.5

*Data Rsch. & Handling, Inc. v. Vongphachanh*,
  278 F. Supp. 3d 1066 (N.D. Ind. 2017) ................................................................. 25

*Dental Recycling N. Am., Inc. v. Stoma Ventures, LLC*,
  No. 4:23 CV 670 CDP, 2023 WL 6389071 (E.D. Mo. Oct. 2, 2023) ................................ 27, 28

*Doe #1 v. Noem*,
  No. 25-CV-317-WMC, 2025 WL 1555382 (W.D. Wis. June 2, 2025) ........................ 19, 21, 23

*Educ. Impact, Inc. v. Danielson*,
  No. CIVA 14-937 FLW LHG, 2015 WL 381332 (D.N.J. Jan. 28, 2015) .............................. 21

*Eli Lilly & Co. v. Arla Foods, Inc.*,
  893 F.3d 375 (7th Cir. 2018) .............................................................................. 20

*Fiskars Finland Oy Ab v. Woodland Tools Inc.*,
  No. 22-CV-540-JDP, 2024 WL 3936444 (W.D. Wis. Aug. 26, 2024) ............................ passim

*Gallego v. Wal-Mart Stores, Inc.*,
  2005 WI App 244, 288 Wis. 2d 229, 707 N.W.2d 539 ................................................... 9

*Graham v. Med. Mut. of Ohio*,
  130 F.3d 293 (7th Cir. 1997). ............................................................................... 37

*Griffin v. Oceanic Contractors, Inc.*,
  458 U.S. 564 (1982) ............................................................................................. 1

*Hot Wax, Inc.v. Turtle Wax, Inc*,
  191 F.3d 813 (7th Cir. 1999) ............................................................................... 33

*Iipay Nation. California v. Iipay Nation of Santa Ysabel*,
  898 F.3d 960 (9th Cir. 2018) .......................................................................... 10, 12

*Ill. Republican Party v. Pritzker*,
  973 F.3d 760 (7th Cir. 2020) ............................................................................... 19

*Johnson & Johnson * Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.*,
  960 F.2d 294 (2d Cir. 1992) ............................................................................... 30

*KalshiEX LLC v. CFTC*,
  No. 24- 5205, 2024 WL 4802698 (D.C. Cir. Nov. 15, 2024) .......................................... 15

*KalshiEX LLC v. Commodity Futures Trading Commission*,
  Case No. 23-CV-03257-JMC, 2024 WL 4164694 (D.D.C., Jan. 25, 2024) ............................ 15

iv

*KalshiEX, LLC v. Hendrick*,
　　No. 2:25-CV-00575-APG-BNW, 2025 WL 3286282, *9 (D. Nev. Nov. 24, 2025) .......... passim

*KalshiEX, LLC v. Martin*,
　　793 F. Supp. 3d 678 (D. Md. 2025) .................................................................... 17, 39

*KHN Sols. LLC v. Shenzhen City Xuewu Feiping Trading Co.*,
　　No. C 20-07414 WHA, 2025 WL 3764197 (N.D. Cal. Dec. 30, 2025) ................................... 33

*Kraft, Inc. v. F.T.C.*,
　　970 F.2d 311 (7th Cir. 1992) .......................................................................... 33

*Lac du Flambeau Band of Lake Superior Chippewa Indians v. Wisconsin*,
　　770 F. Supp. 480 (W.D. Wis. 1991) .................................................................... 14

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
　　572 U.S. 118 (2014) ................................................................................ passim

*LG Elecs. v. Whirlpool Corp.*,
　　No. 08 C 242, 2010 WL 2921633 (N.D. Ill. July 22, 2010) ..................................... 34

*Loper Bright Enters. v. Raimondo*,
　　603 U.S. 369 (2024) .................................................................................. 17

*Marbury v. Madison*,
　　5 U.S. 137 (1803) ..................................................................................... 17

*Martell v. Mauzy*,
　　511 F. Supp. 729 (N.D. Ill. 1981) ..................................................................... 37

*Maryland v. King*,
　　567 U.S. 1301 (2012) .................................................................................. 38

*Massachusetts v. KalshiEX, LLC.*,
　　No. 2584CV02525, 2026 Mass. Super. LEXIS 2 (Jan. 20, 2026) ......................... 27, 35, 39, 42

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
　　456 U.S. 353 (1982) ................................................................................... 18

*Michigan v. Bay Mills Indian Cmty.*,
　　572 U.S. 782 (2014) ................................................................................ passim

*MillerCoors, LLC v. Anheuser-Busch Companies, LLC*,
　　385 F. Supp. 3d 730 (W.D. Wis. 2019) .............................................................. 31, 34

v

*Montana v. Blackfeet Tribe*,
　471 U.S. 759 (1985) ........................................................................................... 15

*Montway LLC v. Navi Transp. Servs. LLC*,
　No. 25-CV-00381-SB, 2025 WL 3151403 (D. Del. Nov. 11, 2025) ....................... 21

*Morningware, Inc. v. Hearthware Home Prods., Inc.*,
　No. 09 C 4348, 2012 WL 3721350 (N.D. Ill. Aug. 27, 2012) ................................. 34

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
　584 U.S. 453 (2018) ............................................................................................. 1

*N. Am. Derivatives Exch., Inc. v. Nevada Gaming Control Bd.*,
　No. 2:25-CV-00978-APG-BNW, 2025 WL 2916151 (D. Nev. Oct. 14, 2025) ........ 17

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
　575 U.S. 175 (2015) ............................................................................................ 26

*Paul Davis Restoration, Inc. v. Everett*,
　No. 14-C-1534, 2014 WL 7140038 (E.D. Wis. Dec. 12, 2014) ............................. 26

*Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*,
　896 F.3d 809 (7th Cir. 2018) ......................................................................... 34, 37

*Riddell, Inc. v. Schutt Sports, Inc.*,
　724 F. Supp. 2d 963 (W.D. Wis. 2010) ............................................................... 30

*Robinhood Derivatives, LLC v. Dreitzer*,
　Case No.: 2:25-cv-01541-APG-DJA, 2025 WL 3283308 (D. Nev. Nov. 25, 2025) ............... 40

*Russello v. United States*,
　464 U.S. 16 (1983) ............................................................................................... 6

*S.E.C. v. McCarthy*,
　322 F.3d 650 (9th Cir. 2003) ................................................................................ 6

*Smith v. United States*,
　508 U.S. 223 (1993) ........................................................................................... 14

*SocialSphere, Inc. v. Chavez*,
　No. 25-cv-2557 (Mass. Super. Ct.) ..................................................................... 22

*Stand Up for California! v. U.S. Dep't of the Interior*,
　959 F.3d 1154 (9th Cir. 2020) .............................................................................. 6

vi

*State v. Fitzgerald,*
   2019 WI 69, 387 Wis. 2d 384 N.W.2d 165 ............................................................... 4

*Stockbridge-Munsee Cmty. v. Wisconsin,*
   922 F.3d 818 (7th Cir. 2019) ................................................................................... 3

*TNT Amusements, Inc. v. Torch Elecs., LLC,*
   No. 4:23-CV-330-JAR, 2025 WL 947506 (E.D. Mo. Mar. 28, 2025),
   *affirmed in relevant part on reconsideration,* No. 4:23-CV-330-JAR, 2025 WL 2336858 (E.D.
   Mo. Aug. 13, 2025) ................................................................................. 26, 28, 29

*Tohono O'Odham Nation v. Schwartz,*
   837 F. Supp. 1024 (D. Ariz. 1993) ......................................................................... 36

*Ty, Inc. v. Jones Grp., Inc.,*
   237 F.3d 891 (7th Cir. 2001) ................................................................................. 34

*U-Haul Int'l, Inc. v. Jartran, Inc.,*
   522 F. Supp. 1238 (D. Ariz. 1981), *aff'd,* 681 F.2d 1159 (9th Cir. 1982) ................................ 37

*Veve v. Corporan,*
   977 F. Supp. 2d 93 (D.P.R. 2013) ........................................................................... 33

*W. Flagler Assocs. v. Haaland,*
   573 F. Supp. 3d 260 (D.D.C. 2021), *reversed on other grounds,* 71 F.4th 1059 (Fed. Cir. 2023)
   ................................................................................................. 22, 23

*Wisconsin Cent. Ltd v. United States,*
   585 U.S. 274 (2018) ........................................................................................ 14

*Yazoo & Miss. Valley R.R. Co. v. Thomas,*
   132 U.S. 174 (1889) ......................................................................................... 4

## Statutes

15 U.S.C. § 1116(a) .......................................................................................... 37

25 U.S.C. § 2701 ......................................................................................... 4, 32

25 U.S.C. § 2702 ....................................................................................... passim

25 U.S.C. § 2703 ........................................................................................... 14

25 U.S.C. § 2710 ....................................................................................... passim

2711(e)(1)(D) .................................................................................................................... 5

31 U.S.C. § 5361(b) .......................................................................................................... 12

31 U.S.C. § 5365(b)(3) ......................................................................................................12|

7 U.S.C. § 1a(47)(A)(ii) ................................................................................................... 16

7 U.S.C. § 2(a)(1)(A) ................................................................................................... 16, 17

7 U.S.C. § 8(b) .................................................................................................................. 42

IGRA, Pub. L. No. 99-383, § 10 (1986) .......................................................................... 14

Public Law 117-103 .......................................................................................................... 36

Wis. Stat. § 409.102(dm) .................................................................................................... 9

Wis. Stat. § 945.01(1)(a)1 ................................................................................................... 9

**Other Authorities**

*75 million people watch 2025 NBA Finals on ABC in U.S., up 16% vs. last year*,
  NBA COMMUNICATIONS, https://pr.nba.com/2025-nba-finals-viewership/ (last visited Jan. 27,
  2026) ............................................................................................................................. 23

Bill Chappell, *An AI video ad is making a splash. Is it the future of advertising?*, NAT'L PUB.
  RADIO (Jan. 27, 2026, 11:00 PM), https://www.npr.org/2025/06/23/nx-s1-5432712/ai-video-
  ad-kalshi .......................................................................................................................... 23

CFTC Letter No. 25-36, https://www.cftc.gov/csl/25-36/download ......................... 16, 35, 39, 41

Commodity, Merriam-Webster Online, *available at* https://www.merriam-
  webster.com/dictionary/commodity (last visited, Dec. 17, 2025) ............................................ 9

Gouker, Dustin, *Kalshi Self-Certifies Betting On NCAA Transfer Portal*, available at
  https://substack.com/home/post/p-181933506 (last visited Jan. 27, 2025) ............................. 35

https://www.justice.gov/tribal/2013-and-2022-reauthorizations-violence-against-women-act-
  vawa .............................................................................................................................. 36

S. REP. 100-446, 1988 U.S.C.C.A.N. 3071 .................................................................... 3, 5

*The Dynamics of Casino Slot Revenue Tax Base Calculations*, 20 J. Tax'n F. Inst. 11 ............... 13

U.S. Constitution, Article I, Section 8, Clause 3 ........................................................... 36

**Regulations**

17 C.F.R. § 40.11(a) ........................................................................................................ 17

17 C.F.R. § 40.11(a)(1) ................................................................................................... 17

17 C.F.R. §§ 38.150, 38.151 .......................................................................................... 41

25 C.F.R. § 140.9 ........................................................................................................... 36

25 C.F.R. § 140.21… ...................................................................................................... 37

25 C.F.R. § 502.4 ........................................................................................................... 30

25 C.F.R. § 502.4(c) ....................................................................................................... 10

Ariz. Admin. Code § R19-4-117 .................................................................................... 40

QB\168080.00083\100618656.5

## Introduction

> [I]nterpretations of a statute which would produce absurd results are
> to be avoided if alternative interpretations consistent with the
> legislative purpose are available.

*Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982).

Kalshi, Inc. and KalshiEX LLC (collectively "Kalshi") spin a tail of Congress implicitly legalizing sports betting nation-wide—while *explicitly* stating the opposite on the Senate floor—back in 2010 with the Dodd-Frank Amendments to the Commodity Exchange Act. According to Kalshi, Congress did so allowing zero state or tribal regulatory oversight of the gambling occurring within their respective territories. And, if that wasn't enough, following Kalshi's logic, the Supreme Court was left in the dark eight years later when it held that Congress had not regulated sports betting directly, allowing states to do so. *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 486 (2018).

Such is the absurd legal fiction that Kalshi would have this Court accept as the law, and it has recently been rejected by courts across the country. *See e.g., KalshiEX, LLC v. Hendrick*, No. 2:25-CV-00575-APG-BNW, 2025 WL 3286282, *9 (D. Nev. Nov. 24, 2025) ("It is absurd to think that Congress intended for DCMs to turn into nationwide gambling venues on every topic under the sun to the exclusion of state regulation and with no comparable federal regulator without ever mentioning that was the goal when Congress added swaps to the CEA in 2010."). All the while, there is an alternative, more straightforward interpretation that is consistent with the legislative purpose of the relevant laws: "These are sports wagers and everyone who sees them knows it." *Id.* at *8.

In this motion, the Ho-Chunk Nation (the "Nation") asks this Court to stop Kalshi from conducting class III gaming on its Indian lands in violation of the Indian Gaming Regulatory Act

1

("IGRA") and stop falsely advertising that its offers nationwide legal sports betting. In response to the IGRA claim, Kalshi confuses and distorts the applicable law, all the while arguing it will be irreparably harmed if it is required to follow the law. In response to the false advertising claim, Kalshi admits it competes with the Nation, but suggests that its ads reading, "[T]he First Nationwide Legal Sports Betting Platform" are merely opinions. Kalshi cannot avoid the consequences of its false advertising by recasting its statements of fact as ones of opinions. Nor can Kalshi avoid an injunction by arguing that it will be harmed if it has to follow the law.

The Nation asks this Court to stop Kalshi from conducting class III gaming on its Indian lands and from falsely advertising that its conduct is sports betting that is legal in all 50 states. Kalshi has not raised any real disputes of fact. Rather, it couches legal disputes, such as the location of where its sports betting occurs, as disputes of fact. With this Reply, the Nation also submits replies to Kalshi's responses to the Nation's findings of fact.

## I.    The Nation is likely to succeed on the merits of Its IGRA claim.

The Nation has shown that it is likely to succeed on the merits of its IGRA claim for four reasons. First, the Nation can stop Kalshi from conducting class III gaming on its Indian lands. Second, Kalshi conducts sports betting "nationwide" and conducts class III gaming on the Nation's Indian lands. Third, the Nation has not brought a UIGEA claim and Kalshi cannot rely on UIGEA to defeat the Nation's IGRA claim. Fourth, Kalshi cannot conduct class III gaming on the Nation's Indian lands, regardless of whether its conduct falls under the Commodity Exchange Act.

### A.    The Nation can stop Kalshi from conducting class III gaming on its Indian lands under IGRA.

Kalshi is wrong to suggest that it can conduct class III gaming—what Kalshi calls sports betting—on the Nation's Indian lands without the Nation being able to do anything about it. In

passing IGRA, Congress gave states and tribes the power to stop third parties from conducting class III gaming on Indian lands in violation of Tribal-State Compacts. 25 U.S.C. § 2710(d)(7)(A)(ii). Moreover, Congress enabled states and tribes to reach an agreement as to who would regulate gaming on Indian lands. Kalshi argues that, because it is not a tribe or a state, it cannot be regulated when conducting class III gaming on Indian lands. But, Congress did not limit states and tribes to regulating only each other in passing IGRA.

### 1. The Nation can stop third parties from conducting class III gaming on its Indian lands in violation of the Gaming Compact.

Kalshi asks this Court to add words Congress did not include in 25 U.S.C. § 2710(d)(7)(A)(ii) to avoid an injunction under IGRA. Kalshi claims that Congress meant to say tribes and states can only bring suit against each other to stop illegal gaming on Indian lands. But Congress did not limit tribes and states in this way.

In enacting IGRA, Congress explained that the cause of action in 25 U.S.C. § 2710(d)(7)(A)(ii) was intended to "[g]rant[] United States district courts jurisdiction over actions by . . . a tribe or state "to enjoin illegal gaming on Indian lands." S. REP. 100-446, 18, 1988 U.S.C.C.A.N. 3071, 3088; *see also Stockbridge-Munsee Cmty. v. Wisconsin*, 922 F.3d 818, 822 (7th Cir. 2019) (holding that IGRA expressly "permits a suit by either the tribe or a state to enjoin illegal class III gaming."). In section 2710(d)(7)(A)(ii), Congress limited: *who may sue* (state or tribe), *what may be enjoined* (class III gaming), and *the condition* (activity conducted in violation of a compact), but not *the class of defendants* (e.g., tribe, state, vendor, etc.). Kalshi asks this Court to read a limit into section 2710(d)(7)(A)(ii) that is not found there. "But this Court does not revise legislation . . . ." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 794 (2014). Courts should not read a statute to include a matter it does not include. *State v. Fitzgerald,* 2019 WI 69, ¶ 30, 387 Wis. 2d 384, 929 N.W.2d 165.

Kalshi creates another problem with this argument, it requires this Court to ignore 25 U.S.C. §§ 2701–2702. In those sections of IGRA, Congress stated that the purpose of passing IGRA was to: "promot[e] tribal economic development, self-sufficiency, and strong tribal governments; . . . to shield [Indian lands gaming] from organized crime . . . [; and] to ensure that the Indian tribe is the primary beneficiary of the gaming operation . . . . " 25 U.S.C. §§ 2702(1)–(2). These purposes (particularly Congress's intent to ensure that tribes are the primary beneficiaries of gaming on their Indian lands) would be completely undermined if IGRA—despite flatly prohibiting unauthorized class III gaming—had no mechanism allowing a tribe to prevent illegal, non-tribal class III gaming operations from siphoning revenue or even bringing in organized crime. Id. § 2710(d)(1).

The Supreme Court has not ignored these sections and neither should this Court. *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782 (2014) at 785, 791 (relying on 25 U.S.C. §§ 2701, 2702 to interpret § 2710). Kalshi points to cases in which a court found a preamble to a law could not control or override clear, operative text in the law. *See Yazoo & Miss. Valley R.R. Co. v. Thomas*, 132 U.S. 174 (1889); *Commonwealth v. Biden*, 57 F.4th 545 (6th Cir. 2023). Kalshi cannot suggest that any part of 25 U.S.C. §§ 2701–2702 creates a conflict with any other part of IGRA so those cases do not apply here.

Just as problematic, Kalshi asks this Court to find that section 2710(d)(7)(A)(ii) is only a compact enforcement mechanism among parties, making other parts of section 2710(d) superfluous. This Court should reject Kalshi's attempt to interpret one part of IGRA in a manner that renders superfluous another part of IGRA. *City of Chicago v. Fulton,* 592 U.S. 154, 159 (2021). Kalshi is wrong to argue that when Congress said "violation" it really meant "breach."

4

Congress used both words to mean different things in IGRA. *Compare* 25 U.S.C. § 2710(d)(3)(C)(v), *with* 25 U.S.C. § 2710(d)(7)(A)(ii).

In fact, in passing IGRA, Congress intended for tribes to be able to regulate third parties. Congress understood "that high stakes, *unregulated* bingo . . . attracts organized crime," *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 211 (1987) (original emphasis), and resolved this problem by regulating non-tribal actors through IGRA. "The major provisions of the bill required tribes to adopt ordinances governing gaming operations and a newly established Federal gaming commission to approve such ordinances before a game could be licensed. **It provided a detailed system for the investigation and regulation of non-Indian investors and managers**." S. REP. 100-446, 4 (emphasis added); 25 U.S.C. §§ 2710(d)(2)(A), 2710(d)(2)(B)(ii) (authorizing gaming ordinance disapproval if "the tribal governing body was significantly and unduly influenced in the adoption of such ordinance . . . by any person identified in section 2711(e)(1)(D) [i.e., criminals]). Kalshi is wrong to suggest otherwise.

## 2.    Tribal-State Compacts are not merely private contracts.

Even though Congress enabled states and tribes to allocate their sovereign powers to regulate class III gaming on Indian lands through the use of Tribal-State Compacts, Kalshi claims these agreements cannot be used to do so. Kalshi is wrong. In passing IGRA, Congress created a regulatory scheme with roles for the federal government, state governments, and Indian tribes. *Chicken Ranch Rancheria of Me-Wuk Indians v. California*, 42 F.4th 1024, 1032 (9th Cir. 2022). Other than pretending the Gaming Compact is simply a private contract between two parties, Kalshi has no support for its claim that it can violate the regulatory scheme established by Congress with impunity.

QB\168080.00083\100618656.5

Kalshi is wrong to suggest that a Tribal-State Compact is merely "a private contract" between two parties. After all, courts treat Tribal-State Compacts the same as they treat secretarial procedures (described in sections 2710(d)(7)(B)(iii)–(vii) as a set of procedures prescribed by the Secretary of the Interior under which class III gaming may be conducted on Indian lands if a state and a tribe are unable to agree to the terms of a compact). *Stand Up for California! v. U.S. Dep't of the Interior*, 959 F.3d 1154, 1159–60 (9th Cir. 2020) (original emphasis); *Blue Lake Rancheria v. Kalshi Inc.*, No. 25-CV-06162-JSC, 2025 WL 3141202, at *5 (N.D. Cal. Nov. 10, 2025). Courts could not treat secretarial procedures the same as compacts if compacts were merely contracts between parties. Unlike a contract, there are no "parties" to secretarial procedures, the Secretary prescribes them.

In fact, in passing IGRA, Congress distinguished between "compact" and "contract." *Compare* 25 U.S.C. § 2710(d)(7)(A)(ii), *with id.* § 2710(d)(3)(C)(v). Congress used compact to refer to the regulatory devise and contract to refer to the agreement between sovereigns. "It is a well-established canon of statutory interpretation that the use of different words or terms within a statute demonstrates that Congress intended to convey a different meaning for those words." *S.E.C. v. McCarthy*, 322 F.3d 650, 656 (9th Cir. 2003); *Russello v. United States*, 464 U.S. 16, 23 (1983). Moreover, "there is a presumption that a given term is used to mean the same thing throughout a statute . . . ." *Brown v. Gardner*, 513 U.S. 115, 118 (1994). Kalshi is wrong to suggest the two different words mean the same thing.

In fact, Congress only used the word "contract" when discussing compacts in 25 U.S.C. § 2710(d)(3)(C)(v), concerning remedies for breach of contract. Congress did not refer to compacts as "contracts," and only used the term "contract" to reference "management contracts" in 25 U.S.C. § 2710(d)(9). In section 2710(b), Congress used the term "contract" to refer to service contracts,

supply contracts, and construction contracts, all of which are outside the scope and limitations of the compacting process. Kalshi cannot support its argument that compacts are private contracts under the plain language of IGRA.

Kalshi would have this Court find that while the Supreme Court explained IGRA "creates a framework for regulating gaming activity on Indian lands" Congress did not give states and tribes the ability to regulate the conduct of third parties on Indian lands. *See Bay Mills*, 572 U.S. 785 (citing 25 U.S.C. § 2702(3)). Not so. In section 2710(d)(1)(C), Congress required that the regulation of class III gaming be carried out via Tribal-State Compacts, approved by the Secretary of the Interior, which become law upon publication in the federal register. 25 U.S.C. §§ 2710(d)(3)(B), (d)(8)(D). Once approved, "Class III gaming activity on the Indian lands of the Indian tribe shall be fully subject to the terms and conditions of the Tribal-State compact . . . ." 25 U.S.C. § 2710(d)(2)(C). Kalshi fails to cite any legal authority concluding that such a compact is only a contract between private parties

### 3. Kalshi is violating the Gaming Compact.

Only federally-recognized Indian tribes have the right to conduct class III gaming on their Indian lands, 25 U.S.C. §§ 2710 (d)(1)(A)(i), 2703(5), and no entity—tribe, state, or any third-party—may conduct class III gaming activity on Indian lands absent authorization by a Tribal-State Compact. 25 U.S.C. § 2710(d)(1); *see Coeur d'Alene Tribe v. State*, 842 F. Supp. 1268, 1282 (D. Idaho 1994), *aff'd sub nom. Coeur D'Alene Tribe v. State of Idaho*, 51 F.3d 876 (9th Cir. 1995) ("in the absence of a tribal gaming ordinance and a compact, neither the Tribe nor any non-tribal entity, including the State of Idaho, may conduct Class III gaming on the reservation."); *Cayuga Nation v. New York State Gaming Comm'n*, 775 F. Supp. 3d 651, 667 (N.D.N.Y. 2025) ("IGRA's

restrictions on class III gaming applies to any class III gaming activity conducted on Indian lands, including gaming activity conducted by the State.").

Congress enabled the Nation to enjoin Kalshi from offering its sports betting contracts to consumers on the Nation's Indian lands, violating the Nation's compact with the State of Wisconsin (the "Gaming Compact") and the Nation's Gaming Ordinance. *See* 25 U.S.C. §§ 2710(d)(1)(C); 2710(d)(7)(A)(ii); 2710(d)(3)(C)(i). Under the Gaming Compact, the Nation has, "the sole proprietary interest in all Class III gaming activities operated under this Compact and shall not authorize, permit, or license the operation of any Class III gaming activity under this Compact by any other person." (Doc. 38 at 16.) The Nation's Gaming Ordinance is incorporated by reference into the Gaming Compact, and provides: "No person or entity, other than the Ho-Chunk Nation, shall conduct gaming without providing proper notice and obtaining a license, if required, from the Ho-Chunk Nation Commission." It further provides that "[p]rivately owned gaming operations are prohibited within the jurisdiction of the Nation." (Doc. 38 at 16.)

Kalshi cannot deny that it is violating the Gaming Compact. Instead, Kalshi argues that this Court should ignore the fact that the Gaming Compact incorporated the Gaming Ordinance by reference. (Doc. 63 at 12). Kalshi goes a step further to suggest that the Nation does not know its own laws because the Nation refers to the Gaming Code colloquially as the Gaming Ordinance and the Gaming Compact only incorporates the Nation's "Gaming Code" by reference. (Doc. 63 at 12 n.4.) Officially, the Nation titled the law, "Ho-Chunk Nation Code (HCC) Title 5 – Business and Finance Code Section 1 Amended & Restated Gaming Ordinance." (Doc. 41, Ex. F.) Kalshi is wrong to suggest that a colloquial reference means there is more than one law or that there could be confusion over that law. As already explained, the Nation had to have its Gaming Ordinance

approved by the Chairperson of the National Indian Gaming Commission. 25 U.S.C. § 2710(d)(1)(A)(iii). The Nation correctly cites its own law.

Nor can Kalshi hang its hat on the Nation or the State of Wisconsin's criminal law. Neither help Kalshi here. To the extent Kalshi hopes to convince the Court that the Nation's criminal code is the Nation's Gaming Ordinance, Kalshi fails because, among other reasons, the criminal code was not approved by the Chairperson of the National Indian Gaming Commission. (Doc. 67, Ex. A.)

Kalshi is also wrong in its suggestion that its sports betting is allowed under the Nation and Wisconsin's criminal law. Kalshi assumes its sports betting falls into the exception to the definition of bet for "[c]ontracts for the purchase or sale at a future date of securities or other commodities." Wis. Stat. § 945.01(1)(a)1. Kalshi has no support for this assumption. While the Wisconsin legislature did not define "securities or other commodities" in Wis. Stat. § 945.01(1)(a)(1), Wisconsin courts look to the plain meaning of undefined terms by using a dictionary. *Gallego v. Wal-Mart Stores, Inc.,* 2005 WI App 244, ¶ 13, 288 Wis. 2d 229, 707 N.W.2d 539. The term "commodities" means "an economic good such as: [a:] a product of agriculture or mining [b:] an article of commerce especially when delivered for shipment [c:] a mass-produced unspecialized product." Commodity, Merriam-Webster Online, *available at* https://www.merriam-webster.com/dictionary/commodity (last visited, Dec. 17, 2025). Kalshi seems to assume this Court should apply a definition of "commodity contract" from Wis. Stat. § 409.102(dm), but never explains why "securities or other commodities" should mean the same thing as a "commodity contract" or why this Court should ignore the Wisconsin Legislature when it limited the definition of "commodity contract" in Wis. Stat. § 409.102(dm) to Chapter 409.

QB\168080.00083\100618656.5

In the end, Kalshi cannot avoid the simple fact that it is violating the Gaming Compact. The Nation and only the Nation is allowed to conduct class III gaming on the Nation's lands. Kalshi should be enjoined from violating the Gaming Compact.

**B.      Kalshi conducts class III gaming on the Nation's Indian lands.**

Kalshi cannot deny that it conducts class III gaming on the Nation's Indian lands. After all, Kalshi advertises that it conducts nationwide sports betting. (Reply Findings of Fact ("RFoF"), ¶ 45.) Both the Nation and the National Indian Gaming Commission define sports betting as one of the activities that fall into class III gaming. 25 C.F.R. § 502.4(c); (RFoF, ¶ 17). In response, Kalshi points out that it is from New York and its servers are in Ohio. (RFoF, ¶ 25.) Kalshi cannot and does not deny that Kalshi platform users on the Nation's Indian lands use its platform to bet on sports. Instead, Kalshi argues that the holdings of *Bay Mills* and *Iipay Nation* should be turned upside down to find that the location of the user is not relevant to the analysis of where the gambling occurs. Kalshi is wrong.

The Supreme Court has already held that, in deciding whether gaming occurs on Indian lands under IGRA, courts must look to where the users who are gaming are located. *Bay Mills,* 572 U.S. at 792. In *Bay Mills*, the Court rejected the very argument Kalshi makes here—that gaming activity could occur where the necessary administrative action for the gaming activity occurred. *Id.* As the Court explained, "numerous provisions of IGRA show that 'class III gaming activity' means just what it sounds like—the stuff involved in playing class III games." *Id.* Rather than where the action occurred to oversee the gaming, the Court concluded "[t]he 'gaming activity' is (once again) the gambling." *Id.* at 792-93. In the case of the Bay Mills Community, the actual gambling occurred off of Indian lands and thus Michigan could not use IGRA to enjoin it. *Id.*

The Ninth Circuit reiterated this holding in *Iipay Nation*. *California v. Iipay Nation of Santa Ysabel,* 898 F.3d 960 (9th Cir. 2018). There, the state brought both an IGRA claim and a claim under the Unlawful Internet Gambling Enforcement Act (UIGEA) against the Iipay Nation because it was offering online bingo to users off of its Indian lands. Because the consumers at issue were playing the online bingo off of the Iipay Nation's lands, the Ninth Circuit concluded that the gaming activity did not fall under IGRA. *Id.* at 966. Just like the Supreme Court had in *Bay Mills*, the Ninth Circuit held that "the act of placing a bet or wager is the 'gambling in the poker hall,' not the 'off-site licensing or operation of the games.'" *Id.* at 967 (citations omitted).

Here, Kalshi cannot deny that consumers use its platform to place bets or wagers on the Nation's Indian lands. As a result, Kalshi conducts "gambling activity" on the Nation's Indian lands. That Kalshi may conduct other activities in New York or Ohio makes no difference. Kalshi conducts gaming on the Nation's Indian lands which is subject to IGRA.

### C.    UIGEA does not apply to the motion for injunctive relief or this litigation.

#### 1.    The Nation has not brought a UIGEA claim.

Kalshi provides no consistent or supported theory for applying UIGEA to the Nation's claims. The Nation has not alleged that Kalshi has violated UIGEA by accepting financial transactions related to unlawful internet gambling prohibited by UIGEA. Kalshi does not and cannot argue that UIGEA is a defense to an IGRA claim. Instead, Kalshi argues, "[t]his dispute is at the intersection of three federal statutes—IGRA, UIGEA, and the CEA." But Kalshi never explains how, in the absence of the Nation bringing a UIGEA claim, UIGEA relates to this dispute.

Instead of explaining why UIGEA applies, Kalshi explains why it wants UIGEA to apply. After all, had the Nation brought a UIGEA claim, Kalshi could rely on the fact that UIGEA does

11

not apply to transactions occurring on a DCM. (Doc. 63 at 15.) But the Nation did not bring a UIGEA claim.

Not to be deterred, Kalshi argues that the Nation cannot stop Kalshi from conducting class III gaming on its Indian lands in violation of the Gaming Compact because, according to Kalshi, such conduct is not prohibited by UIGEA. Kalshi implies—without one iota of legal support—that UIGEA is an exclusive remedy for all internet gaming. Not so. Congress was clear that UIGEA was not an exclusive remedy, stating that no provision of UIGEA, "shall be construed as altering, limiting, or extending any Federal or State law or Tribal-State compact prohibiting, permitting, or regulating gambling." 31 U.S.C. § 5361(b). Another section of the statute, specifically relating to its application on Indian lands, underscores the point: "No provision of this section shall be construed as altering, superseding, or otherwise affecting the application of the Indian Gaming Regulatory Act." *Id*. § 5365(b)(3). And, to be clear, Kalshi wants this Court to construe UIGEA to allow it to continue conducting class III gaming on the Nation's Indian lands, altering and/ or limiting the Gaming Compact and IGRA. These provisions are pellucid, and they are dispositive.

Thus, Kalshi is wrong to suggest that UIGEA should be construed to allow it to conduct class III gaming on the Nation's Indian lands. Doing so would alter the Gaming Compact which prohibits third parties from conducting class III gaming on the Nation's Indian lands and IGRA which only allows class III gaming on Indian lands pursuant to a Tribal-State Compact. Unlike IGRA, which only allows class III gaming on Indian lands pursuant to a Tribal-State Compact, "UIGEA does not make gambling legal or illegal directly." *Iipay*, 898 F.3d at 964–65. Rather, UIGEA regulates financial transactions related to unlawful online gambling. *Id.*

Regardless, because the Nation has not brought a UIGEA claim, Kalshi cannot rely on UIGEA here to defend against the Nation's IGRA claim.

12

## 2. Kalshi is wrong to suggest that UIGEA alters or limits IGRA with respect to internet gaming.

Unwilling to give up a get-out-of-jail-free card, Kalshi next argues that UIGEA alters or limits IGRA with respect to internet gaming. Of course, Congress was clear that UIGEA could not be construed to alter or limit IGRA. But, even ignoring that fact, Kalshi is wrong to argue that IGRA does not cover internet gaming on Indian lands for two reasons. First, Kalshi has its history wrong. Congress was aware of the coming internet age when it passed IGRA. Second, even if Kalshi was right on its history, Kalshi is wrong to suggest that the general terms of IGRA could not apply to new technology.

Even before Congress passed IGRA, the gaming industry was using networked gaming machines. Specifically, the gaming industry began using progressive jackpots by at least the mid 1980's, to compete against the ever-increasing jackpots offered by state lotteries. *The Dynamics of Casino Slot Revenue Tax Base Calculations*, 20 J. Tax'n F. Inst. 11, 14. By linking slot machines together in a casino, the industry offered games where the jackpot grew based on the number of players across the casino. *Id.* By 1986, a company had developed a system allow linked slot machines across a series of casinos all linked to a common progressive jackpot. *Id.*

In passing IGRA, Congress acknowledged that gaming was more than just people sitting face to face over a deck of cards or in front of a slot machine. Specifically, in IGRA, Congress classified gaming in broad terms, including computerized and electronic formats:

> The term 'class II gaming' means— the game of chance commonly known as bingo (**whether or not electronic, computer, or other technologic aids are used in connection therewith**) . . . in which the holder of the card covers such numbers or designations when objects, similarly numbered or designated, are drawn or **electronically determined** . . . .
>
> . . . .

13

The term 'class II gaming' does not include—**electronic or electromechanical facsimiles of any game of chance** or slot machines **of any kind**.

. . . .

The term 'class III gaming' means **all forms of gaming** that are not class I gaming or class II gaming.

25 U.S.C. § 2703(7)(A)(i) & (B) & 2703(8) (emphasis added).

Even in Wisconsin, on-line gaming was occurring when IGRA was passed. In *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Wisconsin*, decided just three years after IGRA was passed, Judge Crabb described an early version of on-line gaming. 770 F. Supp. 480, 483 (W.D. Wis. 1991). Discussing lotteries offered by the state, the court listed "on-line games" in which "the player chooses (or the computer selects) a subset of six numbers from a larger set of numbers" and "[t]ickets are issued by a computer terminal connected electronically to a central computer that records and confirms the play." *Id.* Given that the state of Wisconsin had already established and was conducting on-line gaming by 1991, Kalshi is wrong to suggest that Congress could not have envisioned this reality three years earlier.

Second, regardless of whether Congress, who had passed the Super Computer Network Study Act introduced by Senator Al Gore two years before passing IGRA, Pub. L. No. 99-383, § 10 (1986), anticipated modern online gaming on smartphones and mobile technology, Kalshi is wrong to suggest that UIGEA abrogates tribes' rights to control class III gaming on their lands if that gaming is online. Kalshi suggests that there is a "gap" in IGRA that UIGEA fills because IGRA is general where UIGEA is specific.

But, the Supreme Court has rejected the argument that statutes written in general terms do not apply to new technologies when the conduct fits the statutory category, even if the technology was unknown. *See*, *e.g.*, *Wisconsin Cent. Ltd v. United States*, 585 U.S. 274, 284 (2018) ("While

14

every statute's *meaning* is fixed at the time of enactment, new *applications* may arise in light of changes in the world." (original emphasis)); *Smith v. United States*, 508 U.S. 223, 229 (1993) ("Had Congress intended the narrow construction petitioner urges, it could have so indicated. It did not, and we decline to introduce that additional requirement on our own.").

Moreover, in order to adopt this argument, this Court would also have to reject the special canon of statutory construction that benefit Indian interests. According to the Supreme Court, "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Montana v. Blackfeet Tribe,* 471 U.S. 759, 766 (1985). Here, Kalshi asks this Court to narrowly interpret IGRA and remove from IGRA online gaming where the user is located on Indian lands. To do so, this Court would have to assume that, in passing UIGEA, Congress intended to undermine Indian self-government, something the Supreme Court has said courts "will not lightly assume." *Bay Mills,* 572 U.S. at 790.

### D. Kalshi cannot rely on the Commodity Exchange Act to allow it to violate the Gaming Compact.

Continuing Kalshi's game of *heads, I win, tails, you lose*, Kalshi claims that the linchpin of its entire defense, CEA legitimacy, is both irrelevant and beyond the Court's powers of review. Kalshi is wrong that the CEA allows it to conduct sports betting, wrong to suggest that the CFTC has blessed its conduct, and wrong that courts cannot decide this issue of federal law. Moreover, Kalshi provides no basis for its assumption that if its sports betting contracts are "swaps" that it can violate IGRA by conducting class III gaming on the Nation's lands.

First, Kalshi cannot in good faith suggest that sports events contracts are allowed under the CEA. To be clear, Kalshi has an ever-changing position on this issue. Back in the fall of 2024, Kalshi was clear that sports-events contracts could not be swaps and, even if they were, could be

banned as against public interest. Appellee's Br. at 45, *KalshiEX LLC v. CFTC*, No. 24- 5205, 2024 WL 4802698, at *45 (D.C. Cir. Nov. 15, 2024); Plaintiff's Memorandum in Support of Motion for Summary Judgment, at Section I.B.2., *KalshiEX LLC v. Commodity Futures Trading Commission*, Case No. 23-CV-03257-JMC, 2024 WL 4164694 (D.D.C., Jan. 25, 2024). Now, Kalshi suggests that none of this matters because it is a DCM and can do what it wants unless the CFTC tells it otherwise.

Kalshi has made no effort to show that its sports betting actually amount to swaps allowed under the CEA. 7 U.S.C. § 2(a)(1)(A). To do so, Kalshi must prove that these bets could be considered an agreement, contract or transaction that "provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii).

Here, Kalshi provides no evidence to show that these contracts are swaps. It provides no evidence that these contracts are "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency" or that there is an associated, "financial, economic, or commercial consequence." Given that Kalshi told the federal courts in the District of Columbia that such contracts could not be swaps, Kalshi could hardly argue otherwise here.

Second, Kalshi is wrong to argue that the CFTC has somehow blessed its ability to allow sports betting on its derivative exchange. On September 30, 2025, the CFTC told all DCMs—which includes Kalshi—that it, "has not, to date been requested to take or taken any official action to approve the listing for trading of sports-related event contracts on any DCM." CFTC Advisory Letter, CFTCLTR No. 25-36, 2025 WL 2817302, *1 n.4 (September 30, 2025). Kalshi provides

16

no evidence that at some point after September 30, 2025, the CFTC took official action to approve any such contracts.

In fact, the CFTC has already determined that such contracts may not be listed by passing a federal regulation stating just that. As the District Court in Nevada explained, "Congress set forth in the CEA that if the CFTC determines that a contract is contrary to the public interest," the contract may not be listed, and held: "The CFTC made that public interest determination on a blanket basis when it promulgated 17 C.F.R. § 40.11(a), which prohibits DCMs from listing a swap based on an excluded commodity that 'involves, relates to, or references . . . gaming,' or 'an activity that is similar to' gaming." *N. Am. Derivatives Exch., Inc. v. Nevada Gaming Control Bd.*, No. 2:25-CV-00978-APG-BNW, 2025 WL 2916151, at *10 (D. Nev. Oct. 14, 2025) ("*Crypto*"); *Hendrick*, 2025 WL 3286282, *9 ("Additionally, the CFTC has prohibited DCMs from listing contracts that involve gaming. 17 C.F.R. § 40.11(a)(1)."). Kalshi never explains to this Court why it can list contracts that the CFTC prohibited it from listing.

Third, Kalshi is wrong to suggest that a court cannot review its actions. Kalshi conflates CFTC regulatory authority with the federal court authority to interpret and apply the law. Courts have long held that "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803); *accord Crypto*, 2025 WL 2916151, at *6. As the Supreme Court recently explained, "it does not follow that Congress has taken the power to authoritatively interpret [a] statute from the courts and given it to the agency. Congress expects courts to handle technical statutory questions[.]" *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 374 (2024). In fact, while Kalshi cites 7 U.S.C. § 2(a)(1)(A) to argue that the CFTC has "exclusive jurisdiction," (Doc. 63 at 19), that same section says, "[n]othing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State." *Id.*

The CFTC's exclusive jurisdiction relates to other agencies, such as the Securities Exchange Commission, that may otherwise have overlapping jurisdiction, not to federal courts. *KalshiEX, LLC v. Martin,* 793 F. Supp. 3d 678 (D. Md. 2025). The Supreme Court explained that the exclusive-jurisdiction provision was intended to "consolidate federal regulation of commodity futures trading in the Commission" and to "separate the functions of the [CFTC] from those of the [SEC] and other regulatory agencies." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 386–87 (1982). Kalshi is wrong to suggest that this provision strips federal courts of their powers to interpret the law.

As Kalshi well knows, courts across the country have rejected the argument that they cannot interpret this law. *See, e.g., Martin*, 793 F. Supp. 3d at 678; *Hendrick,* 2025 WL 3286282, *3. As the District Court of Nevada explained, "[a] DCM cannot insulate itself from state [and federal] regulation through self-certification where its conduct does not fall within the CFTC's exclusive jurisdiction provision." *Hendrick,* 2025 WL 3286282, *5.

Finally, even if this Court determines that Kalshi is allowed to offer sports betting under the CEA, Kalshi provides no legal basis for its assumption that the CEA controls what Kalshi can do on the Nation's Indian lands. Kalshi cannot deny that it conducts sports betting or that sports betting falls into the category of class III gaming. In passing IGRA, Congress made class III gaming unlawful on Indian lands unless those activities met the requirements of 25 U.S.C. § 2710(d)(1). Unless Congress unequivocally stated that, by adding swaps to the CEA, it was altering tribes' ability to control class III gaming on their Indian lands, then Congress did not do so. *Bay Mills*, 572 U.S. at 790. Even if Kalshi can offer sports betting under the CEA—and the Nation does not believe it can—Kalshi still cannot conduct sports betting on the Nation's Indian lands.

18

## II.    The Nation is likely to succeed on the merits of its Lanham Act claim for false advertising.

For the reasons stated below, and in the Nation's opening brief, the Nation has shown that it is likely to succeed on the merits of its Lanham Act claim for false advertising (hereinafter, "§ 43(a) claim"). The Court should impose a targeted preliminary injunction that forbids Kalshi from making two false statements: (1) that Kalshi, or its platform, offers any activity that is 50 state legal; and (2) that Kalshi, or its platform, offers "sports betting" or "sports gaming." The Nation has provided "a strong showing" that the Nation is likely to succeed on the merits of its § 43(a) claim without "spill[ing] . . . into the ultimate merits"—a line Kalshi seems keen to cross. *Doe #1 v. Noem*, No. 25-CV-317-WMC, 2025 WL 1555382, at *7 (W.D. Wis. June 2, 2025) (stating a strong showing normally "includes a demonstration of *how* the applicant proposes to prove the key elements of its case) (emphasis added); *Brewer v. Town of Eagle*, 553 F. Supp. 3d 636, 655 (E.D. Wis. 2021) (quoting *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020)). Therefore, this Court should grant the Nation's motion.

### A.    The Nation's § 43(a) claim has five elements.

The Nation has shown that it is likely to succeed on the elements necessary to prove the Nation's § 43(a) claim:

1)    The Nation has standing to bring the claim, *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132–33 (2014);

2)    Kalshi "made a false statement of fact . . . in a commercial advertisement about it's . . . product";

3)    Kalshi's false "statement actually deceived or has the tendency to deceive a substantial segment of [Kalshi's] audience";

4)    "[T]he deception is material, in that it is likely to influence the purchasing decision"; and

5) The Nation "has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products."[1]

*Fiskars Finland Oy Ab v. Woodland Tools Inc.*, No. 22-CV-540-JDP, 2024 WL 3936444, at *7 (W.D. Wis. Aug. 26, 2024). Additionally, and contrary to Kalshi's assertion (Doc. 63 at 33), the Seventh Circuit made clear that if the Nation shows Kalshi made a statement that is "literally false," as opposed to "misleading," then the Nation is not required to prove the third element. *Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 382 (7th Cir. 2018).

### B.    The Nation has standing to bring its § 43(a) claim.

Kalshi erroneously argues the Nation lacks standing to bring its § 43(a) claim. In reality, the Nation has shown that Kalshi injured, and will continue to injure, the Nation through Kalshi's false advertising. To have standing under § 43(a), the Nation must show: (1) "an injury to a commercial interest in reputation or sales," and (2) that the Nation's "economic or reputational injur[ies] flow directly from the deception wrought by [Kalshi's] advertising." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) at 132–33. Each of the three distinct injuries that the Nation identified in its opening brief—lost existing and future sales, lost negotiation leverage, harm to tribal operations and support system—flow directly from Kalshi's false advertisements. (Doc. 38 at 47–49.)

As a threshold matter, Kalshi concedes that it competes with the Nation. Kalshi argues that the "overlap between online consumers"—Kalshi's consumers—and "in-person consumers"—the Nation's consumers—is "minimal." (Doc. 63 at 25–26; Doc. 65, ¶ 32 (stating surveys Mr. Humphreys reviewed "averaged approximately 7%" overlap).) While the Nation disagrees that

---

[1] The fifth element of the claim and the standing element overlap. As shown below, to have standing under § 43(a) the Nation must show: (1) "an injury to a commercial interest in reputation or sales," and (2) that the Nation's "economic or reputational injur[ies] flow directly from the deception wrought by [Kalshi's] advertising." *Lexmark Int'l, Inc.,* 572 U.S. at 132–33.

the overlap is minimal, Kalshi's evidence shows, and its statements admit, that there is overlap between Kalshi's consumers and the Nation's consumers—Kalshi estimates around 7%. (Doc. 65, ¶ 32.) Therefore, assuming for sake of argument that Kalshi's figure is correct, Kalshi is competing for 7% of the Nation's customers. Kalshi's competition admission is relevant because *Lexmark* places no lower bound on the amount of "withh[eld] trade from the plaintiff" required to establish standing under § 43(a). *See generally Lexmark*, 572 U.S.118; *see also Belmora LLC v. Bayer Consumer Care AG*, 819 F.3d 697 (4th Cir. 2016) (holding a diversion of "some" consumers satisfies *Lexmark*). Further, § 43(a) "does not have a de minimis exception." *Montway LLC v. Navi Transp. Servs. LLC*, No. 25-CV-00381-SB, 2025 WL 3151403, at *10 (D. Del. Nov. 11, 2025). Therefore, the Nation established standing the moment Kalshi's false advertisements caused the Nation to lose just one dollar from the shared consumer pool.[2]

1. **Kalshi injured the Nation's existing sales because its false advertisements lured customers away from the Nation's class III gaming offerings.**

Kalshi injured the Nation's existing sales because its false advertisements lured customers away from the Nation's class III gaming offerings (the "first injury"). (RFoF, ¶ 28.) The first injury is supported by the Nation's expert, Brian Wyman, who opined that Kalshi's activities, communicated through its advertising, "reduce [consumer's] incentive to visit the Nation's casinos" thereby decreasing the Nation's revenue. (*Id.*, ¶¶ 28–30; Doc. 42, ¶ 12.) Mr. Wyman bases his opinions on his education in mathematics, industry experience, and the market studies he

---

[2] Even if this Court finds that the Parties are not competitors, such a finding is not dispositive. *Brickstructures, Inc. v. Coaster Dynamix, Inc.*, No. 16 CV 10969, 2017 WL 4310671 (N.D. Ill. Sept. 28, 2017) (holding that after *Lexmark*, a plaintiff is not required to be a competitor to bring a § 43(a) claim); *Educ. Impact, Inc. v. Danielson*, No. CIVA 14-937 FLW LHG, 2015 WL 381332 (D.N.J. Jan. 28, 2015) ("Here, although DGLLC is not in direct competition with EI, the claims made on its website, if shown to be false, likely have the effect of limiting EI's sales."); *AHBP LLC v. Lynd Co.*, 649 F. Supp. 3d 371 (W.D. Tex. 2023) ("Even if Plaintiff and Bio Supplies were not competitors, Plaintiff would have standing under the Lanham Act because it lost sales as a result of the Lynd Defendants' false advertising of the Product.")

conducted for the Nation. (Doc. 42, ¶ 10.) Mr. Wyman provides sufficient opinions to sustain the Nation's burden at the preliminary injunction stage as they show "how" the Nation was injured without "spill[ing] . . . into the ultimate merits." *Doe #1*, 2025 WL 1555382, at \*6; *Brewer*, 553 F. Supp. 3d at 655.

Kalshi's meritless attacks on Mr. Wyman do not change that the injury has happened and is traceable to Kalshi. Kalshi focuses its attack on the Chavez study. (Doc. 63 at 25.) However, regardless of the criticisms Kalshi conjures, Kalshi cannot deny that the Chavez study was already found to be reliable by a court in the face of similar criticism. *See W. Flagler Assocs. v. Haaland*, 573 F. Supp. 3d 260, 268 (D.D.C. 2021), *reversed on other grounds,* 71 F.4th 1059 (Fed. Cir. 2023). While the Chavez study involved different casinos, the issue the study was used to determine was the same—whether online gaming lured customers away from casinos. *Id.* That Kalshi stoops to a level of referencing a lawsuit against Mr. Chavez that is in its infancy shows the weakness in Kalshi's argument. (Doc. 63 at 25 n.11); *see generally SocialSphere, Inc. v. Chavez*, No. 25-cv-2557 (Mass. Super. Ct.). Kalshi's critiques of Wyman and the bases of his opinions are meritless.

The Nation has shown a causal link between the first harm and Kalshi's advertisements. The Parties agree that Kalshi and the Nation compete for an overlapping pool of consumers. (RFoF, ¶¶ 30–31; Doc. 63 at 25–26; Doc. 65, ¶ 32.) Kalshi does not contest that its marketing strategy targets said pool, and Wyman opines that Kalshi's online offerings divert consumers away from the Nation's casinos. (RFoF, ¶¶ 28–30.) Additionally, Kalshi does not contest that its advertisements reach a broad consumer base, nor can it argue that its advertisements have not reached "the universe of consumers" relevant here. (Doc. 63 at 26.)

The Nation provided numerous examples of Kalshi's advertisements that ran on various social media platforms including TikTok, Instagram, Threads, and X.com (formerly Twitter).

(RFoF, ¶¶ 45–50). Across these platforms, Kalshi has at least 718,000 followers. (RFoF, ¶ 44.) Kalshi's advertisements on said platforms are viewed millions of times in a mere week after Kalshi posts them. *See* Bill Chappell, *An AI video ad is making a splash. Is it the future of advertising?*, NAT'L PUB. RADIO (Jan. 27, 2026, 11:00 PM), https://www.npr.org/2025/06/23/nx-s1-5432712/ai-video-ad-kalshi ("One week after its streaming debut, the video also racked up more than 3 million views on Kalshi's X account."). Further, Kalshi's advertisements ran during major sporting events that were broadcast nationwide, including the NBA finals in 2025.[3] *Id.* Kalshi's advertisements broad reach necessarily impacts brick-and-mortar sports betting facilities like the Nation's Casinos. *See W. Flagler Assocs.*, 573 F. Supp. 3d at 268. Kalshi's broad advertising campaign has certainly reached the consumers that the Nation and Kalshi compete for which has caused a reduction in the Nation's sales as consumers are lured away. Thus, the Nation has standing.

### 2.    Kalshi injures the Nation by negatively impacting the Nation's leverage in contracting with a vendor to run its forthcoming Events Wagering Platform.

Kalshi injured the Nation by negatively impacting the Nation's leverage in contracting with a vendor to run its forthcoming Events Wagering platform (the "second injury"). (RFoF, ¶ 25.) Kalshi has no real counter to the second injury except to complain that Executive Director Mudd did not divulge the exact "fee he negotiated" in his dealings with IGT. (Doc. 63 at 26–27; RFoF, ¶ 25; Doc. 41, ¶¶ 13–14.) Executive Director Mudd explained that Kalshi's actions in capturing the Events Wagering market adversely impacted the Nation's ability to negotiate and obtain a lower providers fee from IGT, the exact fee actually agreed to is not relevant. (RFoF, ¶ 25; Doc. 41, ¶

---

[3] The 2025 NBA finals alone had 75 million viewers. *75 million people watch 2025 NBA Finals on ABC in U.S., up 16% vs. last year*, NBA COMMUNICATIONS, https://pr.nba.com/2025-nba-finals-viewership/ (last visited Jan. 27, 2026).

15.) With his statements, the Nation shows "how" it was injured without "spill[ing] . . . into the ultimate merits." *Doe #1*, 2025 WL 1555382, at *6; *Brewer*, 553 F. Supp. 3d at 655.

The second injury was caused by Kalshi's false advertisements. As further detailed below, *infra* Sections II.C.1 and II.E, Kalshi's false advertisements were the driving force behind Kalshi's ability to capture the market share. Therefore, like in *Lexmark*, the Nation's second injury "flows directly" from Kalshi's false advertisements. *Lexmark*, 572 U.S. at 138.

### 3. Kalshi injured the Nation by reducing the Nation's potential revenue from its forthcoming Events Wagering platform.

Kalshi injured the Nation by reducing the Nation's potential revenue from its forthcoming Events Wagering platform (the "third injury"). Contrary to Kalshi's assertion, the Nation provided the details of its forthcoming Events Wagering platform, including that it will be available at "all of [the Nation's] class III casinos." (RFoF, ¶¶ 25–31; Doc. 41, ¶¶ 11–15.) Kalshi ignores its own case law which states that an injury under a § 43(a) claim can be forward looking in that the Nation can show it is "likely to be injured." *See Fiskars*, 2024 WL 3936444, at *7. The Nation will have less sales from its Events Wagering platform because of Kalshi's actions. (Doc. 42, ¶ 10.) Such an injury to sales is a cognizable harm to establish standing. *See Lexmark*, 572 U.S. at 131–32.

The third injury was caused by Kalshi's false advertisements. Again, as further detailed below, *infra* Sections II.C.1 and II.E, Kalshi's false advertisements were the driving force behind Kalshi's ability to capture the market share. (RFoF, ¶ 54.) As a result of Kalshi's hold on the market, the Nation will have less people coming to its casinos to conduct Events Wagering and make ancillary purchases. (Doc., ¶ 28.) Therefore, like in *Lexmark*, the Nation's third injury "flows directly" from Kalshi's false advertisements. *Lexmark*, 572 U.S. at 138.

Under each of the foregoing injuries, the Nation has established standing to bring its § 43(a) claim against its competitor Kalshi.

**C.    The Nation has shown that Kalshi made a literally false statement.**

Despite Kalshi's attempt to seek refuge in questionable case law outside the Seventh Circuit and contort the Nation's argument, Kalshi cannot escape the fact that it made two literally false statements: (1) that Kalshi, or its platform, offers any activity that is 50 state legal; and (2) that Kalshi, or its platform, offers "sports betting" or "sports gaming."

**1.    Kalshi's statements regarding 50 state legal sports betting are literally false.**

Kalshi's statements that it, or its platform, offers anything that is 50 state legal is a literally false statement of fact. The foundation of Kalshi's argument to the contrary rests entirely on *Coastal Abstract Service, Inc. v. First American Title Insurance Co.,* 173 F.3d 725, 731–32 (9th Cir. 1999).[4] Unfortunately for Kalshi, the *Coastal* rule offers no respite for Kalshi's false statements.

***First***, Kalshi failed to respond to the argument that calls into question whether the *Coastal* rule is good law after *Lexmark*. (*See* Doc. 63 at 28–32.) As the Nation's opening brief stated, the Supreme Court made no mention of the *Coastal* rule when it discussed a § 43(a) claim based on statements in a letter discussing the legality of the defendant's products. (Doc. 38 at 40); *Lexmark*, 572 U.S. at 138. Specifically, the statement at issue was an assertion that the defendant's "business was illegal." *Id.* at 138. While the issue before the court was standing, Kalshi cannot refute that the court **never** stated or implied any concern that the statement was about legality. *See generally id.* If the court agreed with Kalshi that there is a hard rule that a statement concerning legality is a statement of opinion, the court would have said so.

---

[4] The court's holding regarding falsity in *Blue Lake Rancheria v. Kalshi Inc.* rested entirely on the *Coastal* rule. *See Blue Lake Rancheria v. Kalshi Inc.*, No. 25-CV-06162-JSC, 2025 WL 3141202, at *2 (N.D. Cal. Nov. 10, 2025).

**Second**, district courts in the Seventh Circuit and the Supreme Court have held that statements of legality are actionable in a § 43(a) claim. *See, e.g.*, *Data Rsch. & Handling, Inc. v. Vongphachanh*, 278 F. Supp. 3d 1066, 1069, 1077 (N.D. Ind. 2017); *Paul Davis Restoration, Inc. v. Everett*, No. 14-C-1534, 2014 WL 7140038, at *3–5 (E.D. Wis. Dec. 12, 2014); *Lexmark*, 572 U.S. at 123. Kalshi is wrong to argue that it matters which party's product the statement described as legal or illegal. (Doc. 63 at 29.) First, Kalshi offers no case law to support that its distinction is relevant, nor does it find any support in *Coastal* itself. (Doc. 63 at 29; *see Coastal Abstract Service, Inc.* 173 F.3d 725. Further, in *TNT Amusements*, the court considered the *Coastal* rule's application to a party who, exactly like Kalshi here, advertised that its **own** "Game Machines are legal." *TNT Amusements, Inc. v. Torch Elecs., LLC*, No. 4:23-CV-330-JAR, 2025 WL 947506 (E.D. Mo. Mar. 28, 2025), *affirmed in relevant part on reconsideration,* No. 4:23-CV-330-JAR, 2025 WL 2336858 (E.D. Mo. Aug. 13, 2025). The court in *TNT Amusements* made no mention of Kalshi's legal or illegal distinction. *See id.* Therefore, Kalshi's distinction regarding whose product is legal or illegal is meritless. This Court should adhere to the guidance of other district courts in the Seventh Circuit and the Supreme Court in not applying the *Coastal* rule.

Kalshi proclaims to offer its own Seventh Circuit and Supreme Court case law in an attempt to plant a flag in a relevant jurisdiction; however, both cases confirm that Kalshi is wrong. (*See* Doc. 63 at 29.) Both *Bd. of Forensic Document Examiners, Inc. v. Am. Bar Ass'n*, 922 F.3d 827 (7th Cir. 2019) and *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015) show what Kalshi failed to do in its advertisements to transform its statements from fact to opinion. In *Bd. of Forensic Document Examiners, Inc.*, the court held that the defendant's statements were opinions because the statements were proceeded by a warning that the statements "represent the *opinion* of the authors alone." 922 F.3d at 833 (emphasis added). Likewise, in

26

*Omnicare, Inc.*, the court held that qualifiers like "I think" or "I believe" transform a statement from fact to opinion. 575 U.S. at 183–84. Kalshi's statements are not proceeded by a warning nor a qualifier such as "Kalshi thinks" or "Kalshi believes." (*See* RFoF, ¶ 44–60.)

It is obvious why Kalshi chose not to include a warning or a qualifier. After all, who would use Kalshi's platform if instead its advertisements read "Kalshi *thinks* Sports Betting [is] Legal in all 50 States on Kalshi"? Kalshi relies on and profits from the factual nature of its statements to drive use of its platform. (*See* RFoF, ¶ 54.) Therefore, Kalshi's statements regarding the legality of its platform cannot be considered anything other than statements of fact.

***Third***, even if this Court finds that the *Coastal* rule applies, the law is "clear" that Kalshi cannot offer legal sports betting in all 50 states. *Dental Recycling N. Am., Inc. v. Stoma Ventures, LLC*, No. 4:23 CV 670 CDP, 2023 WL 6389071, at *4 (E.D. Mo. Oct. 2, 2023). The Nation is not presenting its own "version of the law." (Doc. 63 at 30.) The Nation is holding Kalshi to its numerous statements that it offers legal "Sports Betting . . . in all 50 States" and that it provides a "Nationwide Legal Sports Betting Platform." (RFoF, ¶ 45.) Irrespective of whether "Kalshi is a DCM[] registered with the CFTC to offer trading in all fifty states," or whether it is in fact offering "trading" as opposed to betting, Kalshi states that it offers legal **sports betting** with no jurisdictional bounds. (Doc. 63 at 29–30; RFoF, ¶ 45.) That statement cannot be true. Numerous jurisdictions, including Wisconsin, have laws prohibiting and regulating sports betting. 25 U.S.C. § 2710(d)(1); (RFoF, ¶¶ 20–23, 30). Moreover, Kalshi has been enjoined from operating in Massachusetts, with other similar statewide injunction requests pending. *Massachusetts v. KalshiEX, LLC.,* No. 2584CV02525, 2026 Mass. Super. LEXIS 2, at *21-22 (Jan. 20, 2026). Unless sports betting was legal in every U.S. state and territory at the time Kalshi made these statements—which it most certainly was not—Kalshi's statements are literally false. Further,

27

unfortunately for Kalshi, the use of the qualifier "on Kalshi" does not change the laws in numerous jurisdictions that prohibit and regulate sports betting. (Doc. 63 at 30.)

*Fourth*, even if this Court finds that the *Coastal* rule applies, Kalshi's statements are actionable because Kalshi lacked "a good faith belief in the truth of the statement[s]." *Dental Recycling N. Am., Inc.*, 2023 WL 6389071, at *5. Again, Kalshi attempts to hide from its own statements. Kalshi's statements have been inconsistent as was called out by the court in *KalshiEX, LLC v. Hendrick*, 2025 WL 3286282, at *7 n.3 ("Kalshi *has changed its tune* and now self-certifies to the CFTC that not only a game but things that happen during a game have potential financial consequences.") (emphasis added). Kalshi fails to address *Hendrick* nor its former statements elsewhere. Instead, Kalshi merely states that "what it has told the courts remains consistent"—another false statement of fact. (Doc. 63 at 30.) Kalshi's position further exacerbates its lack of good faith in its advertisements.

*Fifth*, even if this Court finds that the *Coastal* rule applies, Kalshi cannot hide from the fact that it "clearly intended" it statements to be "interpreted as objective fact and not merely opinions." *TNT Amusements*, 2025 WL 947506, at *14. Kalshi's argument on this point is unclear and fruitless. (Doc. 63 at 30–31.) *TNT Amusements* provides an exception to the *Coastal* rule regarding the speaker's intention as it relates to statements of legality—Kalshi's attempt to distinguish *TNT* Amusements is wholly unrelated to the intention exception. *See id.*; (Doc. 63 at 31). Kalshi appears caught in the open as it is faced with its own public response reaffirming the legality of its platform to a confused consumer:



(RFoF, ¶ 46.) Kalshi does not have a meaningful response, because there is none when faced with its own statement. Kalshi cannot contend that its numerous statements affirming the legality of its service were intended as opinion statements when Kalshi itself publicly reaffirms that its statements should be taken "literally." *See TNT Amusements*, 2025 WL 947506, at *13.

For the foregoing reasons, this Court should find that Kalshi made literally false statements of fact regarding its offerings of any activity that is 50 state legal. Nothing in Kalshi's response shows any different.

**2.     Kalshi's statement that it, or its platform, offers "sports betting" or "sports gaming" is literally false.**

Kalshi's statements that it offers "sports betting" or "sports gaming" are literally false. Here, the Nation's argument is made in the alternative to its IGRA argument.

Kalshi goes to great lengths to tell this Court that it specifically offers "sports event contracts" which is not class III gaming. (Doc. 63 at 4–6, 13–14, 20–23.) Now, relying on the statements of its CEO, Kalshi offers a puzzling argument that its use of the terms "sports betting"

and "sports gaming" are ambiguous and can mean the same thing as "sports events contracts." (Doc. 63 at 32.) Kalshi cannot have it both ways. As stated in the Nation's opening brief, class III gaming—which Kalshi admits it cannot conduct—includes "[a]ny *sports betting* and parimutuel wagering." 25 C.F.R. § 502.4 (emphasis added). Therefore, "sports betting" has a specific meaning. Offering "sports betting" means you are offering class III gaming. 25 C.F.R. § 502.4. Kalshi's CEO may treat the term sports betting "very, sort of loosely," but the law does not. (Doc. 63 at 32.) Unless Kalshi would now like to admit that its service is a sports betting platform, Kalshi's statements by necessity are literally false.

**D.      If this Court finds that Kalshi's statements are not literally false, it should find that Kalshi's statements are misleading and actually deceive or have a tendency to deceive a substantial segment of its audience.**

If this Court finds that Kalshi's statements are not literally false, it should find that Kalshi's statements are misleading and "actually deceive or have a tendency to deceive a substantial segment of its audience."[5] *Fiskars*, 2024 WL 3936444, at *7. As shown below, Kalshi is wrong that the Nation made "no affirmative argument on this point." (Doc. 63 at 33.)

In its opening brief, the Nation set forth two routes to prove that Kalshi's statements are misleading and deceptive. *See Johnson & Johnson * Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 297–98 (2d Cir. 1992); *Riddell, Inc. v. Schutt Sports, Inc.*, 724 F. Supp. 2d 963, 971 (W.D. Wis. 2010); (Doc. 38 at 42). Kalshi fails to address either of the Nation's points in its response. (Doc. 63 at 31, 33.)

Instead, Kalshi offers a fruitless attack on the Nation's extrinsic evidence that demonstrates Kalshi's advertisements misled and confused a substantial portion of consumers. (Doc. 63 at 31.)

---

[5] To reiterate, if the Nation shows that Kalshi's statements are literally false, it does not have to prove this element of the claim. *Eli Lilly & Co.*, 893 F.3d at 382 ("A literally false statement will necessarily deceive consumers, so extrinsic evidence of actual consumer confusion is not required.").

As a threshold matter, Kalshi concedes that hearsay is not a barrier for this Court to consider the Nation's evidence. (Doc. 63 at 31.) And yet, Kalshi attempts to diminish the fact that these social media comments offer a firsthand insight into consumer reactions to Kalshi's false advertisements. (*Id.*) This Court has previously considered social media reactions to advertisements like those at issue here and held that the reactions supported a finding of deception. *See MillerCoors, LLC v. Anheuser-Busch Companies, LLC*, 385 F. Supp. 3d 730, 750 (W.D. Wis. 2019). Here, the social media reactions have a much higher persuasive value because, unlike the defendant in *MillerCoors*, Kalshi engages with the confused consumers and stokes further consumer confusion:

 



*See id.* at 742–744; (RFoF, ¶¶ 44, 45–46). Thus, the Nation's extrinsic evidence is sufficient to show that Kalshi's misleading statements "actually deceive or have a tendency to deceive a substantial segment of its audience." *Fiskars*, 2024 WL 3936444, at *7.

Moreover, Kalshi now claims that it does not conduct "sports betting" or anything illegal because it is a DCM regulated by the CFTC. (Doc. 63 at 4, 13, 19, 29–30.) And yet, Kalshi does not refute or dispute the fact that its advertisements proudly proclaimed Kalshi was offering "sports betting." (RFoF, ¶¶ 45, 48, 49.) Kalshi cannot have it both ways. Either it does not offer "sports betting" and thus its advertisements were false, or at best misleading. Or Kalshi offers sports betting in violation of the Nation's sovereign rights. *See* 25 U.S.C § 2701(5).

Similarly, if Kalshi continues to maintain that it does not offer "sports betting," Kalshi's advertisements never make this distinction and instead mislead consumers regarding the nature of Kalshi's application or platform, including the conduct its users would be participating in. *See Hot*

32

*Wax, Inc.v. Turtle Wax, Inc*, 191 F.3d 813 (7th Cir. 1999) at 819. As the consumers' reactions make clear, Kalshi's statements on its advertisements actually induced users to use Kalshi's platform, which in turn harms the Nation.

### E. The Nation has shown materiality and injury.

The Nation has shown that Kalshi's deception is material. *Fiskars*, 2024 WL 3936444, at *7. Kalshi's rapid growth is directly connected to its false statements—in fact, it is driven by them. (RFoF, ¶ 54.) This Court need only consider the impact if Kalshi were honest about its platform. Kalshi's definitive advertisement statement is axiomatic—"Sports Betting [is] Legal in all 50 States on Kalshi." According to Kalshi, what it really meant was instead "***We think*** Sports Betting [is] Legal in all 50 States on Kalshi." Rather than make an accurate and non-misleading advertisement, Kalshi instead encouraged consumers to take Kalshi's word for the legality—even when consumers expressed skepticism. (RFoF, ¶¶ 50, 46.)

Similarly, Kalshi would have lost or not gained consumers had Kalshi's advertisements accurately reflected its now-stated view for what Kalshi is or what it offers—events contracts offered by a DCM that are regulated by the CFTC. In short, Kalshi's actual legal and operational status is not "attractive," marketable, or "palatable." *See KHN Sols. LLC v. Shenzhen City Xuewu Feiping Trading Co*., No. C 20-07414 WHA, 2025 WL 3764197, at *8 (N.D. Cal. Dec. 30, 2025) (holding the false statements were material because some of the false statements were included to make the product "palatable" consumers); *Veve v. Corporan*, 977 F. Supp. 2d 93, 104 (D.P.R. 2013) (holding the false statement was material because the advertisement "depicts attractive elements" the defendant cannot offer). Tempted by higher profits, Kalshi instead opted to adopt false and/or misleading statements.

Further, this Court should consider *Kraft, Inc. v. F.T.C.* when analyzing materiality for two reasons. 970 F.2d 311 (7th Cir. 1992). ***First***, *MillerCoors, LLC* does not foreclose the application

33

of FTC precedent to Lanham Act cases and other district courts have used *Kraft, Inc.* to analyze materiality under the Lanham Act. *MillerCoors, LLC,* 385 F. Supp. 3d at 750; *Morningware, Inc. v. Hearthware Home Prods., Inc.*, No. 09 C 4348, 2012 WL 3721350, at *15 (N.D. Ill. Aug. 27, 2012); *LG Elecs. v. Whirlpool Corp.*, No. 08 C 242, 2010 WL 2921633, at *3 (N.D. Ill. July 22, 2010)). **Second**, like in *Kraft, Inc.*, it is "indisputabl[e]" that Kalshi's advertisement campaign drove its rapid growth—a fact Kalshi does not deny. Applying the holding in *Kraft, Inc.* to Kalshi's rapid growth, this Court should find that Kalshi's false advertisements are material to consumers.

As set forth above, the Nation has shown that it has been and is likely to be further injured by Kalshi's false statements. *See supra* Section II.B.

## III. The Nation will suffer irreparable harm in the absence of the requested injunctive relief.

The Nation has shown that it has "no adequate remedy at law" and that absent injunctive relief, the Nation will suffer irreparable harm. *See Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 896 F.3d 809, 816 (7th Cir. 2018).

### A. The Nation filed its Motion as soon as practicable.

As a threshold matter, the Nation filed its motion as soon as practicable in the face of both Kalshi's rapidly evolving platform and the rapidly changing legal decisions surrounding the enforcement of it. Kalshi provides no legal support for its position that four months is too long. Kalshi has not argued or provided any evidence that it was "lulled into a false sense of security," that it "acted in reliance on [the Nation's] delay," nor that it was "negatively affected" by the Nation's timing. *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 901 (7th Cir. 2001) (holding that the plaintiff's decision to wait *eight months* to file its motion for preliminary injunction did not foreclose the motion) (emphasis added).

In just the last few months, Kalshi rapidly expanded its class III gaming options from relatively simple bets on which team will win or lose an individual game, to bets against a spread, to bets on individual player performance and statistics, to parlays where users can bet on ten games in a single bet or bet on whether a team will win, cover the spread, and score a touchdown in the fourth quarter. (Reply to PFoF, ¶¶ 39-41.) Kalshi has recently gone as far as to allow users to gamble on whether college basketball players will transfer schools. Gouker, Dustin, *Kalshi Self-Certifies Betting On NCAA Transfer Portal*, available at https://substack.com/home/post/p-181933506 (last visited Jan. 27, 2025). The Nation filed its motion for a preliminary injunction as soon as practicable in the face of Kalshi's conduct and Kalshi has not shown it was adversely impacted by the Nation's timing.

Moreover, in that same window of time, Kalshi was repeatedly warned that it was or could be violating various laws with respect to its sports betting business, with each warning increasing the likelihood that Kalshi would stop. On September 30, 2025, the CFTC told all DCMs—which includes Kalshi—that it, "has not, to date been requested to take or taken any official action to approve the listing for trading of sports-related event contracts on any DCM." CFTC Advisory Letter, CFTCLTR No. 25-36, 2025 WL 2817302, *1 n.4 (September 30, 2025). On November 24, 2025, the District of Nevada dissolved a previously granted preliminary injunction, allowing the Nevada Gaming Control Board to enforce Nevada's gaming laws against Kalshi. *Hendrick*, 2025 WL 3286282. And, the warnings have not stopped. On January 20, 2026, the Massachusetts Superior Court allowed the state's motion for a preliminary injunction against Kalshi prohibiting Kalshi from offering sport-related event contracts without a state-issued license. *Massachusetts v. KalshiEX, LLC.,* 2026 Mass. Super. LEXIS 2, at *21-22.

**B.    The Nation alleges it is facing non-economic harms.**

The numerous harms the Nation faces because of Kalshi are not economic. Kalshi fails to meaningfully engage with or respond whatsoever to the irreparable harms the Nation presents in its opening brief.

***First***, the Nation faces a harm to its sovereign, jurisdictional, IGRA-codified rights to regulate all forms of class III gaming that occur on its Indian Lands. Kalshi fails to meaningfully engage with the numerous cases cited by the Nation that hold "harm to [a tribe's] sovereignty cannot be remedied by any other relief other than an injunction . . . ." *Tohono O'Odham Nation v. Schwartz*, 837 F. Supp. 1024, 1034 (D. Ariz. 1993).

Moreover, Kalshi is wrong that a business cannot interfere with the Nation's tribal sovereignty. The United States Constitution states that "Congress shall have the power . . . to regulate Commerce with . . . the Indian Tribes . . . ." U.S. CONST. art. I, § 8, cl. 3. Congress, time and time again, has enacted laws regulating non-Indian commercial activities on Indian lands to empower tribes to exercise their sovereignty over their lands, their people, and non-Indians that conduct business on tribal land. The federal government has long required "Indian traders," persons and companies that sell goods—including commodities—to Indian tribes, to apply for a license to do so. *See* 25 C.F.R. § 140.9(b). More recently, in the Violence Against Women Act Reauthorization Act of 2022, Public Law 117-103, Congress authorized "Tribes . . . to exercise their sovereign power to investigate, prosecute, convict, and sentence . . . non-Indians who commit covered crimes [child violence, sexual violence, etc.] in Indian country . . . ."[6]

Thus, interference with tribal sovereignty, jurisdiction, and right to self-government is not limited to a state's interference with these rights. This principle applies equally to businesses and

---

[6] https://www.justice.gov/tribal/2013-and-2022-reauthorizations-violence-against-women-act-vawa

individuals that conduct activities—in particular, gambling, 25 C.F.R. § 140.21—on Indian lands. That is the reason why Congress created a cause of action in IGRA for a tribe to seek an injunction in federal court to enjoin class III gaming on its Indian lands. And, here, Kalshi is doing just that, in violation of the Nation's IGRA-codified right to regulate all forms of class III gaming that are conducted on its Indian lands.

 **Second**, under both its IGRA and Lanham act claim, the Nation's very existence is at stake. As stated in the Nation's opening brief, this case is about the very livelihood of the Nation. *See Martell v. Mauzy*, 511 F. Supp. 729, 743 (N.D. Ill. 1981) (holding that the plaintiffs demonstrated irreparable harm because the plaintiffs' "present and future livelihood" was at stake). Kalshi fails to respond whatsoever to the threat the Nation faces because of Kalshi's actions. Again, this case represents the epitome of harm that injunctive relief is designed to address as there is no adequate remedy at law that can repair or "atone" for the destruction of the Nation's economy. *See Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 296 (7th Cir. 1997).

 **Third**, under the Lanham Act, the Nation faces irreparable harm due to Kalshi's sweeping and deceptive advertisement campaign. As a threshold matter, the Nation is entitled to a presumption of irreparable harm because the Nation has shown that it is likely to succeed on the merits of it § 43(a) claim. *See* 15 U.S.C. § 1116(a). Par for the course, Kalshi fails to respond to the Nation's argument that its sweeping and deceptive advertisement campaign makes it inherently difficult to quantify monetary damages. *See U-Haul Int'l, Inc. v. Jartran, Inc.*, 522 F. Supp. 1238, 1255 (D. Ariz. 1981), *aff'd*, 681 F.2d 1159 (9th Cir. 1982). Inherently difficult to quantify monetary damages, which continue to expand as Kalshi's advertisements run rampant, give the Nation "no adequate remedy at law." *Planned Parenthood of Ind. & Ky., Inc.*, 896 F.3d at 816. Therefore, Kalshi's advertisements have irreparably harmed the Nation which warrants injunctive relief.

Thus, Kalshi is left trying to re-characterize the harm it causes as purely economic, (Doc. 63 at 34), but even there, Kalshi cannot succeed. After all, Kalshi is conducting business on the Nation's lands in violation of IGRA and the Nation's laws. Kalshi is the unwanted guest who won't leave. While Kalshi is certainly also causing the Nation economic harm, Kalshi cannot deny that, by illegally conducting business on the Nation's Indian lands, Kalshi is irreparably harming the Nation. The Supreme Court has held that when a state is unable to enforce its laws, the state suffers a form of irreparable harm. *Maryland v. King,* 567 U.S. 1301, 1303 (2012). Here the Nation seeks to enforce its laws to stop illegal gaming on its lands. Kalshi is wrong to suggest that the Nation's only harm is economic.

Even if Kalshi is right that the Nation also will suffer economic harm, the impact of that harm on the Nation's ability to fund its government is irreparable. Tribal governmental gaming revenue constitutes the primary source of funding of the Nation's government.[7] Congress intended that such governmental gaming "provide a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C. § 2702 (1). The irreparable harm caused by the loss of revenue as a result of Kalshi's illegal sports gambling is thus not purely economic—it is a harm to tribal economic development, self-sufficiency, and strong tribal governments. Tribal governmental gaming revenue lost as a result of Kalshi's sports gambling activities directly impacts tribal governmental functions, all of which depend on gaming revenue to operate. The Nation cannot fund and operate social services departments to protect and support Indian children, offer hot meal programs for tribal elders, host cultural ceremonies, run programs to preserve native languages, *etc*., without that revenue. So, needless to say, this case is not just about money, as

---

[7] Given that land within tribal reservations is generally owned by the United States in trust for tribes or individual Indians, tribes do not have a basis to assess and fund their governments with property taxes.

Kalshi would like to portray it. It is about the irreparable harm to the tribal government.

For all the foregoing reasons, this Court should find that the Nation has no adequate remedy at law and will suffer irreparable harm absent injunctive relief.

### C.     The equities and public interest tip strongly in favor of the Nation.

Kalshi cannot show that the equities or public interest favor it. Kalshi has known the risks of doing what it told the federal courts in the District of Columbia it could not do—list events contracts involving gaming—and accepted those risks in exchange for allowing conducting a multi-billion dollar sports betting business. Kalshi cannot seriously contend that the equities favor allowing it to continue offering sports gambling on the Nation's Indian lands in violation of applicable law.

First, Kalshi fails to explain how its wildly speculative parade of horribles that would befall it if it had to cease offering class III sports gambling on the Nation's Indian Lands, are specific to this case, as opposed to the other cases in which courts have agreed that Kalshi's conduct is against the law. *See, e.g., Martin,* 793 F. Supp. 3d 667; *Hendrick*, 2025 WL 3286282; *Massachusetts v. KalshiEX, LLC,* 2026 Mass. Super. LEXIS 2, at *21-22. And, Kalshi has had months to prepare to avoid these problems. Indeed, on September 20, 2025, the CFTC instructed DCMs, like Kalshi, that they needed to prepare to protect their consumers should these kinds of cases "result in termination of sports-related event contract positions." CFTC Advisory Letter, CFTCLTR No. 25-36, 2025 WL 2817302, *1 (September 30, 2025). Given the fact that other states have been allowed to enforce their laws against Kalshi, and that Kalshi was warned to prepare its consumers for such enforcement, Kalshi cannot show that the equities favor it here.

Nor is Kalshi credible to suggest that requiring it to geofence could tip the equities in its favor. Geofencing in the sports gambling industry is a norm—not an outlier. State-licensed, non-

Indian sports gambling companies in the United States routinely geofence state-by-state. In some states, such as Arizona, these companies are required to specifically geofence off all Indian reservations within the state. *See* Ariz. Admin. Code § R19-4-117. Geofencing is thus not only possible, but it is feasible and commonplace.

The Robinhood defendants have an even weaker argument here as they have already shown they can stop and start allowing their customers to trade in sports wagers by location. *Robinhood Derivatives, LLC v. Dreitzer,* Case No.: 2:25-cv-01541-APG-DJA, 2025 WL 3283308, *1 (D. Nev. Nov. 25, 2025). In *Dreitzer*, Robinhood Derivatives stopped all Nevada residents from being able to trade in sports wagers for several months. *Id.* Given that the Nation only seeks to stop illegal class III gaming on its Indian lands, the Robinhood defendants' claim of "substantial harm" rings hollow.

Secondly, Kalshi's attempt to minimize the Nation's reliance on Kalshi's Privacy Policy does not alter the balance of equities. Kalshi argues that it lacks the ability to geolocate users in real time and instead collects only limited KYC information—such as permanent residence and IP address—which it claims would be under- and over-inclusive if used for geofencing. But the Nation does not contend that Kalshi must track users continuously or determine their precise location at all times. The relevant inquiry is whether Kalshi can take reasonable steps to determine a user's location at the moment a wager is placed, in order to avoid offering sports-gambling contracts on the Nation's Indian lands. Kalshi's insistence on real-time geolocation sets up a false standard. An injunction need not require omnipresent tracking to be effective or equitable.

Nor can Kalshi avoid an injunction by mischaracterizing the scope of the injunction the Nation seeks. Kalshi argues that if so enjoined, it would face "the impossible task of trying to identify and unwind or lock contracts whenever any party to an open sports event contract crossed

onto tribal lands, even if only briefly" and that it "would be forced to take extraordinarily disruptive steps to comply with a preliminary injunction, impairing existing contractual obligations amongst traders, impacting counterparties no matter where located, and potentially exposing Kalshi to additional liability." (Doc. 63 at 39.) No so. The Nation seeks an injunction prohibiting Kalshi from offering sports gambling contracts on its Indian lands *prospectively* so as to prevent further harm to individuals that have been deceived by and purchased sports gambling contracts on Kalshi. The Nation has not asked that Kalshi to monitor users continuously, unwind existing contracts, or freeze trading whenever a trader later enters tribal territory.

Nor can Kalshi complain about potential regulatory risk from an injunction. Kalshi argues that "[a]n injunction would also subject Kalshi to regulatory risk" because, "[i]f Kalshi stopped offering its products in specific locales, it would risk violation of the CFTC Core Principles, including its obligation to 'provide . . . impartial access to its markets and services.'" (Doc. 63 at 39-40, *citing* 17 C.F.R. §§ 38.150, 38.151(b) (2012). But the CFTC instructed DCMs like Kalshi to account for litigation and regulatory contingencies—not to disregard judicial outcomes, on September 30, 2025. *See* CFTC Letter No. 25-36 (available at https://www.cftc.gov/csl/25-36/download). Any risk Kalshi faces from ignoring this instruction is self-inflicted.

The Massachusetts Superior Court has already addressed Kalshi's self-inflicted harm:

> There can be little question that Kalshi well understood that its business model—especially once it began offering bets on sporting events—came into direct conflict [with] state enforcement regimes; Kalshi chose to take that risk head-on. Second, compliance with state regulations is a typical challenge many federally regulated, nationwide companies face as part of their normal business operations because of our federal system. I am therefore unconvinced that compliance with a preliminary injunction in this case poses an unusual degree of hardship for Kalshi to overcome, or will be fatal to its business or CFTC designation.

41

2026 Mass. Super. LEXIS 2, at *21-22; *see also Hendrick*, 2025 WL 3286282, at *12-*13 (noting, in the context of a public interest analysis, that "there is no evidence before [the court] that the CFTC would take adverse action against Kalshi for complying with court orders and state law while the various lawsuits play out," citing a lack of CFTC enforcement action against another CFTC designated entity that limited its offerings based on location following state enforcement action).

Finally, similarly, this Court should not be swayed by Kalshi speculating that following the law might result in it losing its DCM designation under 7 U.S.C. § 8(b). If the CFTC wants to revoke this designation, it is required to provide notice, a hearing on the record, and judicial review. *Id.* Kalshi cites no precedent for its argument that its designation can be revoked if it complies with a judicial order. Kalshi cannot avoid an injunction by raising alleged harms that depend on future, uncertain, or hypothetical agency action. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411-12 (2013). Nor does any overbroad language in Plaintiff's motion transform a location-specific injunction into a nationwide shutdown: such issues can be addressed through tailoring and do not constitute cognizable regulatory harm.

### D.    A preliminary injunction would be in the public interest.

Kalshi is wrong to argue that it should be allowed to continue violate the Gaming Compact because requiring it to stop would harm the public interest. Kalshi took the risk that this harm would happen when it decided to ignore its prior arguments, IGRA, and various states' laws to conduct sports betting nationwide. Any potential disruption to the derivatives market or inconvenience to third parties stems from Kalshi's own decision to offer these event contracts in the manner it has chosen, not from the Court's intervention.

In fact, the CFTC told Kalshi and other DCMs on September 30, 2025 to take steps to mitigate the risks to the public interest that Kalshi now raises. Kalshi fails to identify even one step it has taken to do so. At this point, Kalshi cannot seriously claim that an injunction—rather than its own choice not to act—harms the public interest.

Kalshi cannot manufacture a public interest argument by creating its own risk of market disruption. Granting a preliminary injunction would advance—not undermine—the public interest by ensuring compliance with federal law, maintaining market integrity, protecting the rights of participants, and most importantly to the Nation, preserving tribal sovereignty. In the face of the numerous cease and desist letters and threats of civil and criminal sanctions from state gambling regulators across the United States, Kalshi chose to continue conducting sports betting, rather than pause, assess the situation, and wait for the litigation to play out. Kalshi put its foot on the gas pedal—expanding quickly to offering over/under bets, point spreads, player prop bets, and parlays. Kalshi cannot now use its own illegal conduct—and the complications that might ensue if it is ordered to stop violating the law—as a cudgel to force the conclusion that the balance of the equities and the public interest are in its favor. It is Kalshi, not the Nation, that has "disrupt[ed] the comprehensive regulatory scheme governing the nation's derivatives markets," (Doc. 63 at 42), by illegally offering sports gambling on a derivatives exchange. The public interest weighs heavily in favor of complying with the tribal and state gambling laws and regulations that are designed and intended, specifically, to protect the public interest with respect to the risks associated with sports gambling. For these reasons, the balance of the equities and the public interest weigh heavily in favor of the Nation.

QB\168080.00083\100618656.5

## Conclusion

For the foregoing reasons, the Nations respectfully requests that this Court deny Defendants' Motions to Dismiss.

Dated:  January 30, 2026                /s/ Emily M. Feinstein
                                        _____

                                        QUARLES & BRADY LLP
                                        Emily M. Feinstein
                                        Bryce A. Loken
                                        33 East Main Street, Suite 900
                                        Madison, WI 53703
                                        Telephone: 608.251.5000
                                        Facsimile: 608.251.9166
                                        Emily.Feinstein@quarles.com
                                        Bryce.Loken@quarles.com

                                        THE LAW OFFICES OF RAPPORT AND
                                        MARSTON
                                        Lester J. Marston
                                        Cooper M. DeMarse
                                        405 West Perkins Street
                                        Ukiah, CA 95482
                                        Telephone: 707.462.6846
                                        Facsimile: 707.462.4235
                                        ljmarston@rmlawoffice.net

                                        THE HO-CHUNK NATION
                                        Michael P. Murphy, Legislative Counsel for
                                        Ho-Chunk Nation
                                        P.O. Box 667
                                        Black River Falls, WI 54615
                                        Telephone: 715.284.9343
                                        Michael.Murphy@ho-chunk.com

                                        Attorneys for Plaintiff HO-CHUNK
                                        NATION

QB\168080.00083\100618656.5