IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

HO-CHUNK NATION,

                Plaintiff,

    v.

KALSHI INC., KALSHIEX LLC,
ROBINHOOD MARKETS, INC. and
ROBINHOOD DERIVATIVES LLC,

                Defendants.

OPINION and ORDER

25-cv-698-wmc

---

This case principally concerns the ability of plaintiff Ho-Chunk Nation, a federally-recognized Indian tribe, to prohibit online sports betting from occurring on its tribal land. Defendants Kalshi Inc. and KalshiEX LLC (collectively, "Kalshi") have partnered with defendants Robinhood Derivatives LLC, and Robinhood Markets, Inc. (collectively, "Robinhood") to advertise and operate a "nationwide, internet-based, prediction market," which purports to offer users so-called "event contracts" based on the occurrence of real-world events, including sports matches, that are solely governed by the U.S. Commodities Trading Futures Commission ("CFTC"). The Ho-Chunk Nation ("Nation") claims that Kalshi's sports event contracts amount to unlawful gaming being offered and advertised on the Nation's tribal lands in violation of the Indian Gaming Regulatory Act, 25 U.S.C. § 2701-2721 ("IGRA"). The Nation also claims that Kalshi's advertisements for "legal" sports betting are false or misleading in violation of the Lanham Act, 15 U.S.C. § 1125, and that all defendants have engaged in criminal racketeering in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c).

Pending before the court are defendants' motions to dismiss plaintiff's complaint in full for failure to state any viable claim, as well as lacking standing to assert a Lanham Act claim. (Dkt. #28 and Dkt. #31.)  In addition to opposing those motions, plaintiff has filed its own motion for the entry of a preliminary injunction under IGRA and the Lanham Act.  (Dkt. #37.) As to IGRA, plaintiff seeks to enjoin Kalshi from offering class III gaming on the Nation's lands; and as to the Lanham Act, plaintiff seeks to enjoin Kalshi from advertising that its sports events contracts are "legal" in every state. (*Id.* at 2.)

The Indian Gaming Association, National Congress of American Indians, Washington Indian Gaming Association, California Nations Indian Gaming Association, Arizona Indian Gaming Association, Oklahoma Indian Gaming Association, Native American Finance Officers Association, and sixteen federally-recognized Indian Tribes filed an Amicus Brief in support of the Nation's motion for a preliminary injunction.  (Dkt. #56.)  The parties have also made the court aware of relevant authority issued since their motions were filed.  (Dkt. ##83, 85, 87, 88, 89.)  Having reviewed the parties' filings and the growing body of relevant case law, the court concludes that the pending motions present only questions of law, not fact, alleviating the need for an evidentiary hearing.  Further, for reasons discussed below, plaintiff's complaint states a claim under IGRA, so defendants' motions to dismiss will be denied as to that claim, while plaintiff's complaint fails to state a viable claim under either the Lanham Act or RICO, so those claims will be dismissed.  Finally, although plaintiff has shown a likelihood of success on the merits of their IGRA claim, its motion for a preliminary injunctive will be denied because plaintiff has not shown *irreparable* harm absent such relief.

BACKGROUND[1]

**A. Ho-Chunk Nation's Gaming Compact and Ordinance**

Formerly known as the Wisconsin Winnebago, the Ho-Chunk Nation is a federally recognized Indian tribe with jurisdiction over tribal land held in trust by the United States, covering some 17 square miles across 14-counties in Wisconsin. The Nation faces unusual challenges, complications and obstacles in providing essential government services to its tribal members because its people and land are so spread out. Accordingly, the Nation has pursued various avenues of economic development to fund government programs and services and to meet the needs of its members. In particular, gaming is now the Nation's primary source of revenue, as conducted at casinos located on the Nation's trust land under a Tribal-State Gaming Compact with the State of Wisconsin.

The Nation first entered a Tribal-State Gaming Compact with the State of Wisconsin in 1992 ("Compact"). (Dkt. #41-1.) The Compact has since been amended four times and affords the Nation primary responsibility for the regulation of its gaming facilities and activities to ensure: the fairness of class III games;[2] the games are shielded from criminal activity; the

---

[1] For purposes of deciding defendants' motions to dismiss, the background facts recounted here are based on the allegations of plaintiff's complaint viewed in the light most favorable to the Nation, as modified by the parties' proposed facts and responses submitted with the preliminary injunction filings. *See* Fed. R. Civ. P. 12(b)(1); *Evers v. Astrue*, 536 F.3d 651, 656–57 (7th Cir. 2008) (In considering subject matter jurisdiction, the court must accept all well-pleaded facts within the complaint as true, but may also consider evidence outside of the pleadings to ensure jurisdiction is proper.) As explained below, however, the *material* facts are essentially undisputed, including for purposes of deciding plaintiff's motion for a preliminary injunction.

[2] "Class III gaming activities" include "the types of high-stakes games usually associated with Nevada-style gambling," including slot machines, card games and betting on sporting and non-sporting events. *In re Indian Gaming Related Cases*, 331 F.3d 1094, 1097 (9th Cir. 2003).

Nation is the primary beneficiary of gaming activities; and promotion of tribal economic development and self-sufficiency. (*Id.* § II, at 2.) Under the Compact, the Nation is authorized: (1) to operate slot machines, lottery games, banked and percentage card games; and (2) to accept wagers on the outcomes of and occurrences within, sports and non-sports games, competitions, and matches, with the exception of pari-mutuel wagering on horse, harness, and dog racing events. (*Id.* § IV, at 3–5.) The Compact only authorizes the Nation (or an entity authorized by the Nation under a management contract) to conduct gaming activities on the Nation's tribal lands, and *explicitly* prohibits "operation of any Class III gaming activities under this Compact" by any other person or entity. (*Id.* § VI.) In exchange, as approved by the United States Department of the Interior, the Nation also makes annual payments to the State of Wisconsin under the terms of the Contract. (*Id.* at 46.)

Further, the Nation enacted a Gaming Ordinance (also called the "Gaming Code") as approved by the Chairman of the National Indian Gaming Commission, a federal agency within the Department of the Interior. (Dkt. #41-6.) This ordinance purports to comprehensively regulate gaming activities on the Nation's territorial lands and is incorporated by reference into the Compact itself. (Dkt. #41-1, at 38 ("The Gaming Code of the Tribe, as it may be from time-to-time amended, is incorporated by reference into this Compact.").) The Gaming Ordinance also establishes the Nation's "Tribal Gaming Commission," which is granted the authority to adopt and enforce regulations that establish standards for conducting all gaming on the Nation's Indian lands. Finally, the Gaming Ordinance specifies what games can be conducted on the Nation's Indian lands *and* prohibits the operation of *any* gaming not authorized by the Nation's Compact or Gaming Ordinance, including unlicensed or privately owned gaming operations within the jurisdiction of the Nation. (Dkt. #41-6, § 6.C ("No

person or entity, other than the Ho-Chunk Nation, shall conduct gaming without providing proper notice and obtaining a license, if required, from the Ho-Chunk Nation Commission.").) Thus, the Gaming Ordinance expressly states, "Privately owned gaming operations are prohibited within the jurisdiction of the Nation." (*Id.* § 6.D.)

### B. Kalshi's Involvement with Sporting "Event Contracts" and Regulation by the Commodities Futures Trading Commission

Kalshi purports to operate as a "derivatives exchange" on which traders buy and sell "event contracts," which are instruments that provide for payment based on the occurrence of an event or contingency. For example, Kalshi offers contracts on the outcomes of elections, weather events, inflation and sporting events. More specifically, Robinhood Markets, Inc. operates as an investment platform that permits trading on stocks, ETFs, and other commodities, while Robinhood Derivatives LLC is its wholly owned subsidiary operating as a futures commission merchant and providing options on futures trading. Of particular relevance here, Robinhood has partnered with Kalshi to open -- on the "Robinhood investment platform" -- a "prediction market hub," allowing people to place unregulated wagers in the form of event contracts.

Kalshi was first approved as a designated contract market ("DCM") by the CFTC in 2020. As a DCM, Kalshi must comply with the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 *et seq.*, which regulates futures trading, and any CFTC rules and regulations. 7 U.S.C. § 7(d)(1)(A). A DCM can list new contracts for trading on its exchange in two ways: it can either (1) request approval from the CFTC, 7 U.S.C. § 7a- 2(c)(4), and then list the contract as

"preapproved," *or* (2) "self-certify" that the contract complies with all applicable law, then list the contract, subject to an opportunity for CFTC review, 7 U.S.C. § 7a-2(c)(1).

Event contracts are subject to an additional "Special Rule" for CFTC review and approval.  7 U.S.C. §§ 7a-2(c)(5)(C)(i), (ii). Under the Special Rule, the CFTC has explicit authority to conduct a "public-interest review" of newly listed event contracts that "involve" unlawful activity, terrorism, assassination, war, gaming, or other similar activity. *Id*. The CFTC further retains the authority to prohibit a DCM from listing an event contract that has been determined to be against the public interest.  *Id*.  By rulemaking, the CFTC has also concluded that event contracts involving enumerated activities are contrary to the public interest and, therefore, DCMs may not list them.  17 C.F.R. § 40.11.

For five years now, Kalshi has partnered with Robinhood to offer a platform for trading event contracts on a variety of substantive areas.  Beginning in January 2025, Kalshi specifically filed self-certifications with the CFTC to trade "sports event contracts," which allow buyers to predict the winner of a sport event title and other outcomes related to American sports leagues. These event contracts take the form of a binary "yes/no" in response to questions such as: "Will <team> win <title>?"; "Will <team> win <event>?"; "Will <player/team> score <first/last/any/count> touchdown(s) in  of <game>?"; "Will <team> win <game> by <above/below/between/exactly/at least> <count> points?"; "Will <game> have <over/under> <count> points in <time period> of <game>?"; and "Will <outcomes> occur in <events>?"  While the CFTC has the discretion to review each of these contracts, it has not done so as to *any* of Kalshi's "sports events contracts."

Kalshi promotes its products across major social media platforms such as TikTok, Instagram, X.com, and YouTube, including opportunities to bet on the outcome of sports

events.    For example, on its Instagram account, @kalshi_official, Kalshi has published advertisements stating that Kalshi offers "The First Nationwide Legal Sports Betting Platform," making "Sports Betting Legal in all 50 States on Kalshi."  (Dkt. #44-8.)  Similarly, on TikTok, Kalshi advertised, "To the guy that told me that sports trading is legal in all 50 states on Kalshi, I love you." (Dkt. #44-10.)  So, too, one user commented on this advertisement stating, "It not [sic] legal" to which Kalshi replied, "It literally is."  (*Id.*)  And on February 3, 2025, Kalshi itself re-posted an article with the headline, "Robinhood to Offer Super Bowl Betting via Kalshi," on its Instagram account.  (Dkt. #43-5.)

### C.  This Lawsuit

Because people on its tribal land can access Kalshi's online platform to bet on sports event contracts, the Nation claims that Kalshi is offering illegal class III gaming on tribal land in violation of IGRA, the Nation's Tribal-State Gaming Compact, and its Gaming Ordinance. The Nation further claims that Kalshi is in direct competition with the Nation's own gaming businesses, and as a result is depriving the Nation of revenue that it could be collecting through its own sports betting and other gaming opportunities.  Specifically, in its complaint, the Nation asserts the following claims against Kalshi: (1) violation of the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701–2721; (2) violation of the Nation's Gaming Ordinance, which was enacted under IGRA; (3) racketeering activity, including wire fraud under 18 U.S.C. § 1343, the illegal transmission of wagering information in violation of 18 U.S.C. § 1084, and the operation of an illegal gambling business in violation of 18 U.S.C. § 1955; (4) infringement of the Nation's sovereignty and interference with its tribal self-governance; and (5) false

advertising under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).  Plaintiff names Robinhood as a defendant only on the RICO claim (claim 3).

OPINION

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege facts that plausibly lead to a claim upon which relief could be granted.  *Gogos v. AMS Mech. Sys.*, 737 F.3d 1170, 1172 (7th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  In resolving a motion to dismiss under Fed. R. Civ. P. 12(b)(1) or 12(b)(6), the court accepts as true all facts in the complaint, drawing all reasonable inferences in the plaintiff's favor. *Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016); *Sykes v. Cook Cnty. Circuit Court Probate Div.*, 837 F.3d 736, 739 (7th Cir. 2016).

In contending that plaintiff's complaint should be dismissed in full, defendants argue that plaintiff: (1) fails to state a claim under IGRA or its Gaming Ordinance (counts 1 and 2); (2) lacks standing to sue for infringement of its tribal sovereignty (count 4); (3) lacks standing and fails to state a claim under the Lanham Act (count 5); and (4) fails to state a civil RICO claim (count 3).  Because the court sees little distinction between plaintiff's claims based on IGRA, its Gaming Ordinance and tribal sovereignty (claims 1, 2, and 4), as all three claims ultimately are grounded in IGRA, it will consider those claims together.  After concluding that plaintiff's allegations are sufficient to state a claim under IGRA, and defendants have identified no other persuasive basis to dismiss that claim, the court will next consider whether plaintiff is entitled to preliminary injunctive relief.  Finally, the court will proceed to address plaintiff's Lanham Act and RICO claims.

## I. Indian Gaming Regulatory Act

In 1988, Congress passed IGRA to enable regulation of gaming on Indian lands following the Supreme Court's ruling in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), which held that states lacked that authority.  Generally, to "provide a statutory basis for the operation of gaming by Indian tribes," 25 U.S.C. § 2702(1), Congress adopted a system of federal, state and tribal oversight.  Specifically, IGRA permits "class III gaming activities" on Indian lands provided three conditions are met: (1) it is authorized by the tribal government; (2) it is permitted in the state where the Indian lands are located; *and* (3) it is "conducted in conformance with a Tribal-State compact," which is an agreement between the tribe and the state in which the activities occur.  25 U.S.C. § 2710(d)(1); 25 C.F.R. § 502.4(c).  The National Indian Gaming Commission regulations include sports betting as one of the activities that falls into class III gaming.  25 C.F.R. § 502.4(c) ("Class III gaming means … [a]ny sports betting and parimutuel wagering [.]")

On its face, plaintiff's complaint states a straightforward claim that defendant Kalshi violated IGRA by offering class III gaming on Indian lands that are neither authorized by plaintiff nor conducted in conformance with a Tribal-State Compact.  *See* ." *KalshiEX, LLC v. Hendrick*, No. 2:25-CV-00575-APG-BNW, 2025 WL 3286282, at *8 (D. Nev. Nov. 24, 2025) (finding Kalshi's "sports event contracts" to be "sports wagers and everyone who sees them knows it," including Kalshi, who advertises itself as a "sports betting platform").  Moreover, Kalshi does not appear to dispute that:  (1) its sports events contracts qualify as "class III gaming" under IGRA, (2) a person could access Kalshi's platform on plaintiff's territorial lands; or (3) Kalshi is operating without plaintiff's approval and outside a Tribal-State Compact.  Instead, Kalshi argues that plaintiff's complaint fails to state a claim under IGRA on a variety

of grounds, as well as that preliminary injunctive relief should be denied even if such a claim

exists.  The court addresses each of these arguments below.

### A.  Right of Action under IGRA

As an initial matter, Kalshi argues that plaintiff lacks *any* statutory right of action to sue

it for violations of IGRA.  In relevant part, IGRA states that:

> The United States district courts shall have jurisdiction over…any cause of action
> initiated by a State or Indian tribe to enjoin a class III gaming activity located on Indian
> lands and conducted in violation of any Tribal-State compact…that is in effect.

25 U.S.C. § 2710(d)(7)(A)(ii). The United States Supreme Court has clarified that this

provision does *not* limit the *subject matter jurisdiction* of federal district courts under the "general

federal-question statute, 28 U.S.C. § 1331, which gives district courts jurisdiction to decide

any claim alleging a violation of IGRA," and "nothing in [IGRA] limits that grant of jurisdiction

(although those provisions may indicate that a party has no statutory right of action)."

*Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2014).

Despite this seeming broad grant of jurisdiction, Kalshi would latch onto the Supreme

Court's parenthetical mention in *Bay Mills* of a "statutory right of action" to argue that plaintiff

cannot bring an IGRA-based claim against it.   In other words, Kalshi would read

§ 2710(d)(7)(A)(ii) to only create a right of action to enjoin gaming conducted "in violation of

any Tribal-State compact," meaning the statutory right of action created by IGRA can only be

brought against a *State* or *Indian tribe* that is both a party to and in breach of the particular

Tribal-State compact at issue.  Thus, Kalshi argues in essence that Congress only empowered

tribes or states to sue each other for breach of contract under IGRA, not to sue third parties

10

like Kalshi, who by implication would now be free to engage in gaming activities on tribal lands without regulation.

While neither the United States Supreme Court nor Seventh Circuit has addressed the question whether an Indian tribe can sue an entity under § 2710(d)(7)(ii) that is not a party to the underlying Tribal-State compact, this reading appears without basis in the text, legislative history or common sense. To begin, nothing in § 2710(d)(7)(ii), IGRA itself or Congress's findings, purposes, or legislative history in passing IGRA supports an intent to restrict the reach of § 2710(d)(7)(A)(ii) to breach of contract claims between the parties to a gaming compact. Instead, by the terms themselves, "Tribal-State compacts" are not merely an agreement between two private parties. Rather, they represent agreement as to gambling regulation and enforcement between two governmental bodies -- a tribe and a state -- under the imprimatur of the federal government.

Indeed, the Tribal-State compact here incorporates the Nation's Gaming Ordinance, which plaintiff was required by IGRA to adopt. In particular, tribes engaging in or authorizing class II and class III gaming on their lands must pass a gaming ordinance that includes several provisions governing gaming operations, including that the "Indian tribe will have the sole proprietary interest and responsibility for the conduct of any gaming activity" *and* net gaming revenue must be used for designated purposes. 25 U.S.C. § 2710(b)(2)(A)–(F); §2710(d)(1). The gaming ordinance is then reviewed and approved by the National Indian Gaming Commission ("NIGC"), a federal agency within the Department of the Interior, and is published in the Federal Register. *Id.* § 2710(d)(2)(B). Once the ordinance is published, "class III gaming activity on the Indian lands of the Indian tribe *shall be fully subject* to the terms and conditions of the Tribal-State compact." *Id.* § 2710(d)(2)(C) (emphasis added). Thus, once

11

the Gaming Ordinance was approved by the NGIC and incorporated into the Tribal-State compact, the compact becomes not just a private contract between a tribe and state, but also a regulatory devise that creates a framework for the regulation of gaming on Indian lands, which expressly applies to *all* class III gaming activity. *See Coeurd'Alene Tribe v. Idaho*, 842 F. Supp. 1268, 1282 (D. Idaho 1994), *aff'd* 51 F.3d 876 (9th Cir. 1995) ("in absence of a tribal gaming ordinance and a compact, neither the Tribe nor any non-tribal entity, including the State of Idaho, may conduct Class III gaming on the reservation"); *Cayuga Nation v. New York State Gaming Comm'n*, 775 F. Supp. 3d 651, 666 (N.D.N.Y. 2025) ("IGRA's restrictions on class III gaming applies to any class III gaming activity conducted on Indian lands."). Even Kalshi concedes in its brief that "Tribal gaming ordinances, if adopted pursuant to IGRA and approved by the Commissioner, permit tribes to regulate gaming activity, as defined in the statute, where that gaming activity is 'conducted' on tribal lands." (Kalsh Br. (dkt. #29) 35.)

While Kalshi cites *Wisconsin v. Ho Chunk Nation*, 512 F.3d 921 (7th Cir. 2008), for the proposition that only certain types of IGRA claims may be brought under 2710(d)(7)(A)(ii), the Seventh Circuit actually ruled that federal jurisdiction under this section of IGRA, "exists only when the alleged violation relates to a compact provision agreed upon pursuant to the IGRA negotiation process" as laid out in 25 U.S.C. § 2710(d)(3). *Id.* at 933–34. In fairness to Kalshi, the Seventh Circuit does explain in its *Ho Chunk* opinion that there are seven matters that a compact negotiated under IGRA may *address*, but this included: (1) the application of tribal laws and regulations relating directly to class III gaming; and (2) the allocation of criminal and civil jurisdiction between the state and the Indian tribe necessary for the enforcement of such laws and regulations. *Id.* Here, plaintiff contends just that: Kalshi violated the Tribal-State compact by conducting class III gaming on its Indian lands, when the Compact as

12

negotiated under 25 U.S.C. § 2710(d)(3) makes plain that: (1) *only* plaintiff may conduct Class II gaming; *and* (2) plaintiff has the power to prohibit third parties from conducting Class III gaming under its Compact and Gaming Ordinance.

Kalshi also points to *Blue Lake Rancheria v. Kalshi Inc.*, No. 25-CV-06162-JSC, 2025 WL 3141202 (N.D. Cal. Nov. 10, 2025), *appeal filed*, No. 25-7504 (9th Cir. Nov. 28, 2025), in support of its argument that only the parties to a Tribal-State compact may violate it, but again that is not what the court held.  Rather, the court reviewed the language of the specific tribal-state compact at issue, finding it outlined *only* what the tribe was authorized to operate, while remaining "silent about what companies like [Kalshi]" could do.  *Id.* at *6.  In contrast, plaintiff's Tribal-State compact with Wisconsin and the incorporated Ordinance expressly prohibits "operation of any Class III gaming activities under this Compact" by any other person or entity except the Tribe itself.  (Dkt. #41-1, § VI; Dkt. #41-6, § 6.C.)[3]

Treating the Tribal-State compact and incorporated Gaming Ordinance as a regulatory device is also supported by IGRA's legislative history, as well as its text.  In particular, as the Senate Report on IGRA explains, "The major provisions of the bill required tribes to adopt ordinances governing gaming operations and a newly established Federal gaming commission to approve such ordinances before a game could be licensed.  It provided a detailed system for the investigation and regulation of non-Indian investors and managers."  S. REP. 100-446, 4, 1988 U.S.C.C.A.N. 3071, 3074.  Thus, IGRA requires that regulation of class III gaming be

---

[3] Even less relevant is Kalshi's citation to the Seventh Circuit's decision in *Stifel, Nicolaus & Co. v. Lac du Flambeau Band of Lake Superior Chippewa Indians*, 807 F.3d 184 (7th Cir. 2015), which is wholly inapposite, addressing a question about tribal court jurisdiction over a commercial dispute *unrelated to any gaming compact or ordinance*.

carried out via Tribal-State compacts, approved by the Secretary of the Interior, and published in the federal register, just like agency regulations. 25 U.S.C. §§ 2710(d)(3)(B) & (d)(8)(D). And to ensure that tribes could enforce the Tribal-State compact and ordinances, Congress adopted broad language in IGRA's enforcement provision, § 2710(d)(7)(A)(ii), stating that a tribe could bring "*any* cause of action" to "enjoin a class III gaming activity" conducted "in *violation* of any Tribal-State compact."[4]

Of course, Congress could have limited enforcement actions to "breach of contract" claims, as Kalshi suggests, but *chose* not to limit the type of legal action or the class of defendants that could be sued, consistent with its stated, unambiguous intent in passing IGRA: to ensure that "Indian tribes have the **exclusive right to regulate** gaming activity on Indian lands . . ." 25 U.S.C. §2701(5) (emphasis added). IGRA was also intended "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments," 25 U.S.C. §2701(1); and "to provide a statutory basis for the regulation of gaming by an Indian tribe . . . to ensure that the Indian tribe is the primary beneficiary of the gaming operation." 25 U.S.C. §2701(2). Thus,

---

[4] As the Supreme Court has explained, a primary purpose of this provision was to delineate the extent to which Congress abrogated tribal sovereign immunity in passing IGRA. (*Id.* at 791 ("IGRA partially abrogates tribal sovereign immunity in § 2710(d)(7)(A)(ii) [by] authoriz[ing] a State to sue a tribe to 'enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal–State compact.'")); *see also Kiowa Tribe of Oklahoma v. Mfg. Techs., Inc.*, 523 U.S. 751, 758 (1998) (citing the provision as an example of legislation "restrict[ing] tribal immunity from suit in limited circumstances"); *Fla. v. Seminole Tribe of Fla.*, 181 F.3d 1237, 1242 (11th Cir. 1999) (With respect to § 2710(d)(7)(A)(ii), it is "clear that Congress abrogated tribal immunity only in the narrow circumstance in which a tribe conducts class III gaming in violation of an existing Tribal–State compact.")

IGRA's legislative history further explains that Congress intended to grant "United States district courts jurisdiction over actions by . . . a tribe or state to enjoin illegal gaming on Indian lands." S. REP. 100-446, 18, 1988 U.S.C.C.A.N. 3071, 3088.  All of these purposes would be undermined if IGRA afforded no mechanism for tribes to prevent illegal, non-tribal class III gaming operations on their lands.

Finally, if there were any ambiguity as to a tribe's authority to enjoin class III gaming conducted on its tribal lands under IGRA, the well-established canons of statutory construction require that this court interpret that ambiguity to benefit the Nation tribe.  *See, e.g.*, *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985) ("[S]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit ….").  Accordingly, the court concludes that plaintiff can sue Kalshi under IGRA for violating its Tribal-State compact and Gaming Ordinance by offering class III gaming on Indian lands absent authorization from plaintiff.

### B.  "On Indian Lands"

Defendants next argues that IGRA is irrelevant to their sports betting activities because their online activities do not take place "on Indian lands," since that is as defined by IGRA in relevant part as "all lands within the limits of any Indian reservation" and "any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual."  25 U.S.C. § 2703(4).  While conceding that individuals on the Nation's Indian lands can use its platform to bet on sports, Kalshi specifically argues that running a derivatives exchange from New York, where it is headquartered, does not amount to conduct "located on Indian lands."  Said differently, Kalshi asserts *ipse dixit* that IGRA applies only to "brick-and-

mortar gaming facilities physically located on Indian reservations," and thus, because it is from New York and its servers are in Ohio, IGRA does not apply. (Dkt. #29, at 25–26.)

The fundamental problem with defendant's argument is that the Supreme Court has already held in deciding whether gaming occurs on Indian lands under IGRA, that courts must look to where the *users* who are gaming are located. *Bay Mills*, 572 U.S. at 792. Indeed, in *Bay Mills*, the Court rejected the assertion that gaming activity occurs where the necessary administrative action for the gaming activity occurs. *Id.* As the Court explained, "numerous provisions of IGRA show that 'class III gaming activity' means just what is sounds like—the stuff involved in playing class III games," and thus, the "gaming activity" is not where the action occurred to oversee the gaming, but the "'gaming activity' is (once again) the gambling." *Id.* at 792–93. Since the activity at issue here is sports betting, the gaming activity similarly occurs where the bettor is physically located. *See Iipay Nation California v. Iipay Nation of Santa Ysabel*, 898 F.3d 960, 967 (9th Cir. 2018) (holding that online bingo offered by tribe off Indian lands did not fall under IGRA because "the act of placing a bet or wager is the 'gambling in the poker hall,' not the 'off-site licensing or operation of the games.'"). *S. Ute Indian Tribe v. Polis*, no. 1:24-cv-01886, slip op. at 7-8 (D. Colo. Oct. 23, 2025) (same).

This holding is also consistent with IGRA's implementing regulations for internet gambling occurring on tribal land -- for example, a tribe offering internet gambling that is accessible on another tribe's Indian lands. Specifically, under IGRA regulations, tribes have jurisdiction over internet gaming transactions where the bettor is located on another tribe's lands, but only if the other tribe has "lawfully consented." 25 C.F.R. § 293.26(c). Similarly, in other areas of the law, interjurisdictional gaming is only legal where it is legal *both* where the bet originated and where it landed. *E.g.,* 18 U.S.C. § 1084(a)–(b) (gambling using wire

16

transmission is criminal offense unless gambling is legal in both state or foreign country where bet originated and was sent); 15 U.S.C. § 3002(3) (defining ""interstate off-track wager" as "legal wager" placed on outcome of a horserace "where lawful in each State involved").  And under the Unlawful Internet Gaming Enforcement Act ("UIGEA"), transactions involving bets that are illegal "in the State or Tribal lands in which the bet or wager is initiated, received, or otherwise made" are prohibited when made via the internet.  31 U.S.C. § 5362(10)(A).  Thus, IGRA's enforcement provision and other regulations, as well as other federal laws, recognize that internet gambling occurs *at least* in the place where the bettor places a bet, and plaintiff has adequately alleged that Kalshi is offering unauthorized gaming on its lands.

### C.  The Unlawful Internet Gambling Enforcement Act ("UIGEA")

As mentioned above, defendants also argue is that the UIGEA affirmatively authorizes its online sports betting, even if it occurs on Indian lands without permission from and regulated by a tribe.  Enacted by Congress in 2006, UIGEA regulates online gambling.  31 U.S.C. § 5361(a)(4).  However, unlike IGRA or other gambling regulations, UIGEA does not make gambling legal or illegal.  Indeed, Congress expressly *disavowed* any intent to "alter[], limit[], or extend[]" existing federal, state and tribal gaming regulations, including IGRA.  31 U.S.C. § 5361(b).  Instead, UIGEA makes it illegal for a "person engaged in the business of betting or wagering" to accept knowingly certain financial payments from an individual who is engaged in "unlawful Internet gambling."  31 U.S.C. § 5363.

Unlawful internet gambling occurs when an individual places or receives a "bet or wager by any means which involves the use, at least in part, of the Internet where such bet or wager is unlawful under any applicable Federal or State law in the State or Tribal lands *in which the*

*bet or wager is initiated, received, or otherwise made*."  31 U.S.C. § 5362(10)(A) (emphasis added).

A "bet or wager" includes "staking or risking" something of value, purchasing a lottery ticket,

or transmitting "any instructions or information pertaining to the establishment or movement

of funds by the bettor or customer in, to, or from an account with the business of betting or

wagering."  31 U.S.C. § 5362(1).  Thus, at most, UIGEA allows for internet gambling that is

otherwise legal; it neither creates nor even addresses a system in which a "bet or wager" is illegal

where it is "initiated" or "received," including gaming on Indian lands.  *See Iipay Nation of Santa*

*Ysabel*, 898 F.3d at 965 (discussing application of UIGEA to Indian lands).  In short, the

UIGEA prevents using the internet to circumvent existing state, tribal and federal gambling

laws, but does not create any additional substantive prohibitions.

  If this was all UIGEA did, Kalshi's argument would be meritless on its face.  In fairness,

however, Kalshi's argument relies on an exception in the reach of the UIGEA, which carves out

CFTC-regulated transactions from its scope.  In particular, the UIGEA definition of "bet or

wager" excludes "any transaction conducted on or subject to the rules of a registered entity or

exempt board of trade under the [CEA]."  31 U.S.C. § 5362(1)(E)(ii).  As a result of this

exclusion, Kalshi argues that sports event contracts on Kalshi's platform are by implication

lawful gaming activity, regardless of the lawfulness of gambling in the states or tribal lands in

which the "event contracts" are initiated or received.  However, this argument goes too far.  To

begin, just because Kalshi's conduct is not *prohibited* by the UIGEA, does not make its offering

of sports betting contracts legal anywhere, much less on Indian lands where it is expressly

prohibited.

  More importantly, plaintiff has not sued Kalshi under the UIGEA, and whether Kalshi's

conduct violates that law is largely irrelevant to plaintiff's claim under IGRA, except perhaps

18

to the extent that it is notable Congress chose not to include or add a similar carve out in IGRA. Indeed, Kalshi cites no controlling legal authority to support its premise that UIGEA supplants all law applicable to internet gaming, nor that UIGEA somehow displaces IGRA's more elaborate system at the federal, state and tribal levels for regulating class III gaming conducted on Indian lands.

At most, Kalshi notes that as part of its decision to deny a motion for preliminary injunction, the Northern California district court in *Blue Lake Rancheria*, 2025 WL 3141202, found significant the plaintiffs' failure to "identif[y] any Tribal-State compact provision regulating gambling which the UIGEA, as applied here, alters, limits, or extends." *Id*. at *6. But that decision is certainly not controlling, and in any event, plaintiff in this case *has* identified provisions in the Tribal-State compact as well as in IGRA, that applying a UIGEA-like carve-out for CFTC-regulated transactions from the definition of "bet or wager" *would* alter, limit or extend. Moreover, as discussed, the UIGEA is a non-substantive, payment-processing law that Congress narrowly tailored *to prohibit* using certain kinds of financial transactions to fund gaming that is already unlawful; and that Act neither creates any substantive prohibitions for gaming itself, nor supersedes other gaming laws. Rather, UIGEA states just the opposite: "No provision of this section shall be construed as altering, superseding, or otherwise affecting the application of the Indian Gaming Regulatory Act[,]" *id.* § 5365(b)(3), or "as altering, limiting, or extending any Federal or … Tribal-State compact prohibiting, permitting, or regulating gambling within the United States." The UIGEA goes even further by directing that it should not even "be construed as" doing either. *Id.* § 5361(b). Thus, nothing about the UIGEA prevents plaintiff from pursuing its claim under IGRA. *See Ipay Nation*, 898 F.3d at

19

968 ("[T]here is no direct conflict between IGRA and the UIGEA and, thus, we give effect to the provisions of both statutes.")

### D. Commodity Exchange Act

Defendants' final argument for dismissal of plaintiff's IGRA claim relates to Kalshi's separate regulation by the CFTC under the CEA. In defendants' view, the CEA grants exclusive jurisdiction to the CFTC over "designated contract markets" ("DCMs") and the event contracts Kalshi lists, and, therefore, the CEA preempts the application of plaintiff's Gaming Ordinance, as well as IGRA as a whole when it comes to those contracts. In support, defendants refer this court to CEA's provision stating that the CFTC:

> shall have exclusive jurisdiction ... with respect to accounts, agreements ..., and transactions involving swaps or contracts of sale of a commodity for future delivery ..., traded or executed on a contract market designated pursuant to section 7 of this title or a swap execution facility pursuant to section 7b-3 of this title or any other board of trade, exchange, or market, and transactions subject to regulation by the Commission pursuant to section 23 of this title.

7 U.S.C. § 2(a)(1)(A).

In response, plaintiff argues that Kalshi's sports-event contracts fall outside the CFTC's exclusive jurisdiction because they do not qualify as "swaps" or "contracts of sale of a commodity for future delivery." Notably, several *district* courts have reached a similar conclusion. *E.g.*, *Ohio Gambling Recovery, LLC, v. Kalshi Inc., et al.*, No. 4:25-CV-1573, 2026 WL 865788, at *6 (N.D. Ohio Mar. 30, 2026); *KalshiEX LLC v. Schuler*, No. 2:25-cv-1165, 2026 WL 657004, at *4 (S.D. Ohio Mar. 9, 2026); *KalshiEX, LLC v. Hendrick*, No. 2:25-CV-00575-APG-BNW, 2025 WL 3286282 at *11 (D. Nev. Nov. 24, 2025); *N. Am. Derivatives Exch., Inc. v. Nevada Gaming Control Bd.*, No. 2:25-CV-00978-APG-BNW, 2025 WL 2916151, at *4-5 (D. Nev. Oct. 14, 2025) ("*Crypto*"). Finally, in a case concerning betting on election

20

results, Kalshi itself appears to have taken a different position than it does now regarding whether sports event contracts are "swaps." *See* Brief of Appellee KalshiEX LLC at 41, KalshiEX LLC v. CFTC, No. 24-5205 (D.C. Cir. Nov. 15, 2024) ("[A]s the legislative history directly confirms Congress did not want sports betting to be conducted on derivatives markets."); *see also* Kalshi's Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment at the district court level, ECF No. 17-1 (noting that a provision of the Commodity Exchange Act, which the court will discuss, "functions as a check on attempts to launder . . . sports gambling through the derivatives markets" (citing 7 U.S.C. 7a-2(c)(5)(C)(i)(V))).

However, the Third Circuit -- to date, the only circuit to have considered the issue -- recently issued a decision holding that because Kalshi's sports-related event contracts *are* swaps under the CEA, state law purporting to regulate Kalshi's event contracts is preempted. *KalshiEX, LLC v. Flaherty*, No. 25-1922, 2026 WL 924004, at *4 (3d Cir. Apr. 6, 2026). Kalshi also submitted three complaints recently filed in federal district courts by the CFTC itself, in which the agency argues that federal law preempts state law.[5]

Although these recent decisions and the CFTC complaints provide some regulatory guidance, none are dispositive of the issues before this court. Plaintiff has not asserted any state law claims, and all the discussions and arguments relating to federal preemption over state

---

[5] Notably, neither the Third Circuit decision nor CFTC complaints address the potentially absurd results that could flow from defining a "swap" to include sports-event contracts. Under this interpretation of the CEA, even if sports wagering and sports event contracts constitute "gambling" under state (or tribal) law, a sports event contract becomes a "swap" once it is listed on a DCM. (*See* Cpt. ¶¶ 82–83.) But under the CEA, it is "unlawful for any person ... to enter into a swap" outside of a DCM. 7 U.S.C. § 2. In other words, Kalshi's position would seem to require forcing *all* sports betting onto DCMs. As one court explains it, Kalshi's argument boils down to this: "if contracts are not traded on an exchange, then they are not swaps that must be traded on an exchange." *Hendrick*, 2025 WL 3286282 at *9. The same court rejected this logic as "self-fulfilling, circular, and inconsistent with the statutory text." *Id.*

law do not address the question whether the CEA preempts or repeals tribal authority under IGRA, plaintiff's Tribal-State compact and its Gaming Ordinance. In other words, even if this court were to agree with the Third Circuit or the CFTC, holding that Kalshi's sports-event contracts are swaps subject to the CFTC's jurisdiction, defendants have not shown that the CEA would necessarily preempt or repeal IGRA, nor limit plaintiff's tribal authority. On the contrary, "[a]lthough Congress has plenary authority over tribes," the U.S. Supreme Court cautions against "lightly assum[ing] that Congress in fact intends to undermine Indian self-government." *Bay Mills Indian Cmty.*, 572 U.S. at 790. Neither are courts to find Congress repealed its own laws "by implication," nor abrogate tribal sovereign authority without expressly and unequivocally saying it is doing so. *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 59 (1978); *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 18 (1987); *see also Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress ... does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions -- it does not, one might say, hide elephants in mouseholes.") All of these conditions appear particularly apt here, given that accepting Kalshi's position "would have a seismic impact on Indian tribes' authority to regulate gaming on tribal land[.]" *KalshiEX, LLC v. Schuler*, No. 2:25-CV-1165, 2026 WL 657004, at *6 (S.D. Ohio Mar. 9, 2026). Because Kalshi has developed no persuasive argument that the CEA and CFTC jurisdiction would abrogate, repeal or otherwise deny *tribal* authority (as opposed to state law) delegated by Congress under IGRA, the CEA is not a basis for dismissal of plaintiff's IGRA claim.

22

### E.  Preliminary Injunctive Relief

The final question relating to plaintiff's IGRA claim is whether the court should grant a preliminary injunction precluding Kalshi from offering sports event contracts on plaintiff's Indian land absent permission from the Nation.  Although the court has concluded already that plaintiff's complaint states a claim under IGRA, there is a fundamental difference between stating a viable claim and obtaining preliminary injunctive relief.  Stating a claim requires only plausible allegations, which plaintiff's complaint has done, while a "preliminary injunction is an extraordinary remedy intended to preserve the status quo until the merits of a case may be resolved." *Indiana Civil Liberties Union v. O'Bannon*, 259 F.3d 766, 770 (7th Cir. 2001).  To begin, a plaintiff seeking an injunction must make two, threshold showings: a likelihood of success on the merits *and* irreparable harm.  *Planned Parenthood of Indiana, Inc. v. Commissioner of Indiana State Dept. Health*, 699 F.3d 962, 972 (7th Cir. 2012).  As noted, these are independent requirements, so if a plaintiff fails to establish irreparable harm, the court may deny an injunction on that ground alone, without considering a likelihood of success on the merits.  *DM Trans, LLC v. Scott*, 38 F.4th 608, 618 (7th Cir. 2022).  The mere possibility of harm is also not enough; the plaintiff must show that irreparable harm is *likely*.  *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008).

In this case, plaintiff alleges two types of harm: economic and non-economic.  With respect to economic harm, plaintiff alleges that Kalshi's sports event contracts will deprive it of gaming revenue needed to fund its government, support economic development, and take care of its members.  However, plaintiff has produced little evidence to support its assertions.  In particular, despite Kalshi having operated sports event contracts for several months, plaintiff provides no evidence showing: a measurable change in customer visitation or attendance

23

numbers at its casinos; declines in consumer spending; changes in revenue or profitability at any of its casinos; or even anecdotal evidence from a single consumer stating that he or she has recently spent less money at plaintiff's facilities because of Kalshi's contracts being offered as an alternative.  Thus, while one might infer *some* loss of revenue, plaintiff's assertions about *current* monetary harm, much less of a magnitude to present a risk to the Nation's economic livelihood, are largely unsupported by any evidence.  Rather, it would seem likely that any interim loss is marginal at best and compensable at worst.[6]

As for non-economic harm, plaintiff claims that Kalshi's actions interfere with the Nation's sovereignty and rights granted under IGRA.  Although the court agrees that such harm may be significant, the court is not persuaded that interfering with the status quo, particularly in light of the substantial legal and regulatory questions involved, is appropriate or even necessary, as plaintiff has to date failed to show that it will suffer the kind of immediate and irreparable harm required for entry of a preliminary injunction.  Accordingly, the court will deny plaintiff's request for preliminary injunctive relief on its IGRA claim.

### A.  Lanham Act Claim

Plaintiff also brings a false advertisement claim against defendant Kalshi, contending its advertisements stating that Kalshi offers legal, nationwide sports betting are false under federal, state and tribal prohibitions on sports gambling.  To state a false advertising claim under the Lanham Act, a plaintiff must allege: (1) the defendant made a material false

---

[6] Kalshi is strongly encouraged to monitor and preserve where online sports betting is occurring by whatever means available, including tracking originating bets, URLs, financial transactions or other means.

statement of fact in a commercial advertisement; (2) the false statement actually deceived or had the tendency to deceive a substantial segment of its audience; and (3) the plaintiff has been or is likely to be injured as a result of the false statement. *Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 382 (7th Cir. 2018); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 122 (2014). Kalshi argues that plaintiff has failed to show both that it made a false statement or that plaintiff has been injured as a result.[7]

A plaintiff can prove that advertising is false by showing that it contains a statement that is "literally false" or a statement that, while literally true, implicitly conveys a false message, is misleading, or is likely to deceive consumers. *Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 382 (7th Cir. 2018). Literal falsity means a statement that is "bald-faced, egregious, undeniable, [and] over the top." *Id.* (quoting *Schering-Plough Healthcare Prods., Inc. v. Schwarz Pharma, Inc.*, 586 F.3d 500, 513 (7th Cir. 2009)). For the other category of statements -- those that are literally true but misleading -- the plaintiff must allege customer confusion. *Id.*

Here, Kalshi argues that its statements about the legality of its sports event contracts are not actionable as false or misleading statements under the Lanham Act, at least under the current state of the law, because there is no clear, legal authority on the issue. Although the Seventh Circuit has not addressed the question, many courts follow guidance from the D.C. and the Ninth Circuit Courts of Appeal regarding whether statements about legality are actionable under the Lanham Act. In *Dial A Car, Inc. v. Transportation, Inc.*, 82 F.3d 484 (D.C. Cir. 1996), the court of appeals addressed a situation in which two taxicab companies

---

[7] Notably, Kalshi does not argue that plaintiff lacks Article III standing to assert a false advertisement claim, but rather that plaintiff lacks "prudential or statutory" standing under the Lanham Act. (Dkt. #29, at 28–29.) Because the court is dismissing this claim for a different reason, it declines to address defendants' non-jurisdictional standing arguments.

advertised their legal authority to provide corporate services in the District of Columbia using cars not licensed there. The parties disputed the interpretation of a Taxicab Commission administrative order on the subject, which had not yet been tested in court. *Id.* at 486. In response to the defendants' motion to dismiss, the plaintiff presented a Declaration of the Commission's General Counsel purporting to opine that the defendants were acting in violation of the order. *Id.* However, the district court refused to consider it and dismissed the complaint, reasoning that the Commission had not yet resolved the question at the time of the defendants' statements, and the D.C. Circuit affirmed, holding that "there must be a clear and unambiguous statement *from the Taxicab Commission*" such that "the law was unambiguous *at the time [the] alleged misstatements were made*." *Id*. at 489 (emphasis in original). Similarly, in *Coastal Abstract Service, Inc. v. First American Title Insurance. Co*., 173 F.3d 725 (9th Cir. 1999), the statement at issue involved whether an escrow agent offered services in California despite not being licensed under that state's statute. *Id*. at 731. At the time the statement was made, however, the Ninth Circuit found no clear authority on the question of the legal requirement of a state license as a condition of offering services. Accordingly, that court also held the statement was not actionable under the Lanham Act. *Id.* at 732. In particular, the court instructed that "[a]bsent a clear and unambiguous ruling from a court or agency of competent jurisdiction, statements by laypersons … purport[ing] to interpret the meaning of a statute or regulation are opinion statements, and not statements of fact." *Id.* at 731.

Although the Seventh Circuit has not directly opined on the issue, many other courts have relied on *Coastal Abstract* and *Dial A Car* for the general rule that, to be actionable, a statement about legality or compliance is an "unactionable opinion" for purposes of the Lanham Act absent a "clear and unambiguous ruling" from a court or agency on the issue. *E.g.,*

26

*Azurity Pharms., Inc. v. Edge Pharma, LLC*, 45 F.4th 479, 493 (1st Cir. 2022); *Dental Recycling N. Am., Inc. v. Stoma Ventures, LLC*, No. 4:23 CV 670 CDP, 2023 WL 6389071, at *4 (E.D. Mo. Oct. 2, 2023); *McDavid Knee Guard, Inc. v. Nike USA, Inc.*, No. 08 CV 6584, 2010 WL 3000178, at *3 (N.D. Ill. July 28, 2010); *Sierra Shelving, Inc. v. Design Assistance Constr. Sys., Inc.*, No. 2:07CV281, 2008 WL 11512375, at *3 (E.D. Va. May 13, 2008).  Applying that same guidance in this case, this court agrees that plaintiff has failed to provide any definitive guidance regarding the legality of Kalshi's sports event contracts.  Instead, both sides have shown that courts, as well as federal, state and tribal agencies, have provided mixed opinions.  Moreover, given that Kalshi has consistently taken the position that it is governed by the CFTC and only the CFTC, *and* no court agency has yet to reject its position in a definitive decision, plaintiff's allegations do not permit an inference that Kalshi's advertisements are false, misleading or lacking a good-faith belief in the opinion's truth.  Accordingly, the court will dismiss plaintiff's Lanham Act claim.

### B.  RICO

Finally, plaintiff also asserts claims against Kalshi and Robinhood under the Racketeer Influenced and Corrupt Organizations Act ("RICO").  Enacted to strengthen criminal and civil remedies against organized crime, RICO has been construed more broadly to afford a private right of action for any person "injured in his business or property by reason of a violation of" that Act's substantive provisions.  18 U.S.C. § 1964(c).  In pertinent part, the Act makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity

27

or collection of unlawful debt." 18 U.S.C. § 1962(c). "Racketeering activity" includes gambling chargeable under state law and punishable by imprisonment for more than one year, as well as wire and mail fraud. 18 U.S.C. § 1961(1)(A)–(B). Thus, to advance a civil RICO claim, a plaintiff must allege that the defendant committed a crime (a so-called "predicate act").

Here, plaintiff's complaint identifies three such predicate acts: wire fraud (18 U.S.C. § 1343); transmitting wagering information in violation of the Wire Act (18 U.S.C. § 1084); and operation of an illegal gambling business (18 U.S.C. § 1955). (Dkt. #1, ¶ 153.) However, the court agrees with defendant that none are adequately alleged. As an initial matter, the elements of mail fraud are: (1) the defendant's participation in a scheme to defraud; (2) defendant's commission of the act with intent to defraud; and (3) use of the mails in furtherance of the fraudulent scheme. 18 U.S.C. §§ 1341, 1343; *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 657 (7th Cir. 2015). The elements of wire fraud as alleged by plaintiff are the same, except that it requires use of interstate wires rather than mail in furtherance of the scheme. *Id.* Thus, both mail and wire fraud require "proof of intent to defraud, proof that the defendant willfully participated in a scheme with knowledge of its fraudulent nature[,] and the intent to achieve illicit objectives." *United States v. Hagen*, 917 F.3d 668, 672 (8th Cir. 2019); *see also United States v. Filer*, 56 F.4th 421, 434 (7th Cir. 2022) (intent to defraud requires a "willful act . . . with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another") (internal citation and quotations omitted).

In contrast, plaintiff has failed to allege that defendants had a plan or scheme to defraud and an intent to defraud. As discussed above, plaintiff's allegations also do not permit an inference that defendants willfully schemed or intended to defraud customers or consumers

28

criminally to achieve illicit objectives.  Rather, plaintiff's allegations suggest that defendants have acted openly, offering a federally-regulated, derivatives market to participants, and under at least a colorable argument that their activities are legal under the CEA as insulated by the CFTC.  Indeed, the "victims" of the fraud -- those gambling on sports outcome -- do not appear to be defrauded at all, except to the extent they may be unwittingly violating tribal law, since they are apparently getting similar renumeration as bettors with Kalshi as they would with the Nation.  Certainly, plaintiff has every right to seek to shut down defendants operating its otherwise legal gambling enterprise on its tribal lands, but claiming they are engaged in a *criminal* enterprise under RICO goes too far.  Accordingly, plaintiff's RICO claim will be dismissed for failure to state a claim upon which relief may be granted.

ORDER

IT IS ORDERED that:

1) Defendants' motions to dismiss (dkt. #28 and dkt. #31) are GRANTED IN PART and DENIED IN PART.  The motions are GRANTED with respect to plaintiff's claims under the Lanham Act and Racketeer Influenced and Corrupt Organizations Act.  The motions are DENIED in all other respects.

2) Robinhood Derivatives, LLC, and Robinhood Markets, Inc. are DISMISSED as defendants.

3) Defendants' request for judicial notice of the Tribal-State Compact (dkt. #34) is GRANTED.

4) Plaintiffs' motion for preliminary injunctive relief (dkt. #37) is DENIED.

5) The motion for leave to file amicus brief (dkt. #56) by various entities is GRANTED.

Entered this 11th day of May, 2026.

                              BY THE COURT:

                              /s/

                              _____
                              WILLIAM M. CONLEY
                              District Judge